1   Joseph J. Tabacco, Jr. (75484)
    jtabacco@bermanesq.com
2   Christopher Heffelfinger (118058)
    cheffelfinger@bermanesq.com
3   James C. Magid (233043)
    jmagid@bermanesq.com
4   **BERMAN DEVALERIO PEASE TABACCO**
    **BURT & PUCILLO**
5   425 California Street, Suite 2100
    San Francisco, CA  94104
6   Telephone: (415) 433-3200
    Facsimile:  (415) 433-6382
7
    **Attorneys for Plaintiff Northstar Financial Advisors, Inc.**
8
    [Additional Counsel Appear on Signature Page]
9

10                  **UNITED STATES DISTRICT COURT**

11                  **NORTHERN DISTRICT OF CALIFORNIA**

12

13   NORTHSTAR FINANCIAL ADVISORS,        )   Case No. C-08-4119 SI
     INC., on Behalf of Itself and all Others  )
14   Similarly Situated,                    )   CLASS ACTION
                                            )
15                          Plaintiff,       )   **PLAINTIFF'S OPPOSITION TO**
                                            )   **DEFENDANTS' MOTION TO DISMISS**
16       v.                                  )   **COMPLAINT**
                                            )
17   SCHWAB INVESTMENTS, CHARLES            )   Time:        9:00 a.m.
     SCHWAB & CO., INC., CHARLES            )   Date:        January 23, 2009
18   SCHWAB INVESTMENT MANAGEMENT,          )   Courtroom:   Courtroom 10, 19th Floor
     INC., and SCHWAB TOTAL BOND            )                The Honorable Susan Illston
19   MARKET FUND,                           )
                                            )
20                          Defendants.      )
                                            )

21

22

23

24

25

26

27

28

[C-08-4119 SI] PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS COMPLAINT

## STATEMENT OF ISSUES

1. Whether Plaintiff Northstar Financial Advisors, Inc. ("Northstar" or "Plaintiff") sufficiently pled a claim that Defendant Schwab Investments violated the Investment Company Act of 1940 by concentrating the Schwab Total Bond Market Fund's portfolio in non-agency collateralized mortgage obligations securities in violation of the Fund's stated fundamental investment policy to "track" the Lehman Brothers U.S. Aggregate Bond Index through use of an "indexing strategy."

2. Whether Plaintiff sufficiently pled a claim that Defendant Schwab Investments violated the Investment Company Act of 1940 by concentrating more than 25% of the Schwab Total Bond Market Fund's total assets in non-agency collateralized mortgage obligations in violation of the Fund's stated fundamental investment policy.

3. Whether Northstar was on inquiry notice of its claims more than one year prior to the filing of its Complaint on August 28, 2008, despite the fact that, among other things, inquiry notice is an inherently factual issue that is infrequently decided on a motion addressed to the pleadings, and where Defendants continued to represent at all relevant times that the Schwab Total Bond Market Fund was continuing to track the Lehman Brothers U.S. Aggregate Bond Index by pursuing an indexing strategy, and the Fund only began to deviate from the Lehman Brothers U.S. Aggregate Bond Index after October 2007.

4. Whether Northstar (a Schwab independent financial consultant) has standing to bring this action on behalf of itself, its investment clients, and other members of the class of holders of the Schwab Total Bond Market Fund, against the Schwab related entities, on grounds, among others, that it directed the investments in the Fund on behalf of its clients, was in direct privity with Schwab-related entities in making those investment decisions, has a direct financial interest in the outcome of the litigation because it derives its fees from the value of assets under its management, and has received an assignment of claim from a beneficial holder of the Fund and a member of the class.

5. Whether this Court should follow Ninth Circuit precedent and find that there is an implied right of action under Section 13(a) of the Investment Company Act of 1940.

6. Whether Plaintiff adequately pled a claim for breach of fiduciary duty under

1   California law.

2         7.      Whether Plaintiff adequately pled a claim for breach of contract and for breach of the

3   covenant of good faith and fair dealing.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

STATEMENT OF ISSUES ..................................................................................................... i

3

PRELIMINARY STATEMENT .............................................................................................1

4

STATEMENT OF FACTS ......................................................................................................3

5

ARGUMENT ..........................................................................................................................5

6

I.       STANDARDS ON A MOTION TO DISMISS UNDER RULE 8(a) .......................5

7

II.      THE FUND DEVIATED FROM FUNDAMENTAL INVESTMENT POLICIES .................5

8       A.       The Fund Deviated From A Fundamental Investment Policy By Concentrating Its
                 Portfolio In Non-Agency CMOs That Were Not Part Of The Index.............................5

9
         B.       The Fund Deviated From A Fundamental Investment Objective By Concentrating
10               More Than 25% Of Its Total Assets In Non-Agency Mortgage-Backed Securities......8

11
III.     NORTHSTAR'S CLAIMS ARE NOT BARRED BY THE STATUTE OF
12       LIMITATIONS ........................................................................................................10

         IV.      NORTHSTAR HAS STANDING TO BRING THIS ACTION .............................13
13
         V.       SECTION 13(a) PROVIDES AN IMPLIED PRIVATE RIGHT OF ACTION ....................16
14
         VI.      PLAINTIFF HAS ADEQUATELY PLED A CLAIM FOR BREACH OF FIDUCIARY
15               DUTY ....................................................................................................................17

16               A.       California Law Should Apply To Plaintiff's Claim For Breach Of Fiduciary Duty ...17

17                        1.       Defendants Have Not Identified Controlling Authority in Massachusetts
                                   That Materially Differs From the Law in California ......................................18
18
                          2.       Defendants Have Failed to Establish the Interest of Massachusetts in
19                                 Having its Own Law Applied ......................................................................18

20                        3.       The Interests of California Would be More Impaired if California Breach
                                   of Fiduciary Duty Law is Not Applied to This Case ......................................18
21
                 B.       Under California Law Plaintiff Has Adequately Pled Breach of Fiduciary Duty .......19
22
                          1.       Defendants Owe Shareholders a Fiduciary Duty............................................19
23
                          2.       Defendants Breached Those Fiduciary Duties................................................20
24
         VII.     PLAINTIFF'S CLAIMS FOR BREACH OF CONTRACT AND BREACH OF THE
25               COVENANT OF GOOD FAITH AND FAIR DEALING ARE MORE THAN
                 ADEQUATELY PLED ...........................................................................................20
26
                 A.       The Prospectuses and Plaintiff's Purchase of Shares of the Fund Constitute a
27                        Contract...............................................................................................................20

28

B. Plaintiff Has Adequately Pled A Breach of Contract Between The Trust and Shareholders of the Fund ..............................................................22

C. Plaintiff Has Adequately Plead A Claim For Breach Of The Covenant Of Good Faith And Fair Dealing ........................................................22

CONCLUSION.........................................................................................................23

1

## TABLE OF AUTHORITIES

2

**Federal Cases**

3

*Alleghany Corp. v. Breswick & Co.,*
    353 U.S. 151 (1957)....................................................................................14

*Betz v. Trainer Worthman & Co.,*
    519 F.3d 863 (9th Cir. 2008) ................................................................11, 12

*Blatt v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    916 F.Supp. 1343 (D.N.J. 1996) ............................................................16

*Conley v. Gibson,*
    355 U.S. 41 (1957)...................................................................................5

*Council of Ins. Agents & Brokers v. Molasky-Arman,*
    522 F.3d 925 (9th Cir. 2008) ..................................................................14

*Employers-Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Anchor Capital Advisors,*
    498 F.3d 920 (9th Cir. 2007) ..................................................................14

*Engel v. CBS, Inc.,*
    981 F.2d 1076 (9th Cir. 1992) ................................................................19

*Fleury v. Harper & Row, Publishers, Inc.,*
    698 F.2d 1022 (9th Cir. 1983) ................................................................19

*Franklin Life Ins. Co. v. Commonwealth Edison Co.,*
    451 F.Supp. 602 (S.D. Ill. 1978)............................................................21

*Gray v. First Winthrop Corp.,*
    82 F.3d 877 (9th Cir. 1996) ....................................................................12

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.,*
    159 F.3d 723 (2d Cir. 1998)....................................................................17

*In re Daisy Sys. Corp.,*
    97 F.3d 1171 (9th Cir. 1996) ..................................................................20

*In re Gulf Oil/Cities Serv. Tender Offer Litig.,*
    725 F.Supp. 712 (S.D.N.Y. 1989)...........................................................21

*In re Nucorp Energy Sec. Litig.,*
    661 F.Supp. 1403 (S.D. Cal. 1987).........................................................18

*In re Tyco Int'l Ltd.,*
    236 F.R.D. 62 (D.N.H. 2006) .................................................................15

*Indemnified Capital Invs., SA. v. R.J. O'Brien & Assocs., Inc.,*
    12 F.3d 1406 (7th Cir. 1993) ..................................................................15

*Klaxon Co. v. Stentor Elec. Mfg. Co.,*
    313 U.S. 487 (1941)................................................................................18

*Lapidus v. Hecht,*
    232 F.3d 679 (9th Cir. 2000) ............................................................................. 16

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,*
    507 U.S. 163 (1993).......................................................................................... 5

*Lilley v. Charren,*
    936 F.Supp. 708 (N.D. Cal. 1996) .................................................................... 11

*Livid Hldgs. Ltd. v. Salomon Smith Barney, Inc.,*
    416 F.3d 940 (9th Cir. 2005) ............................................................................ 11

*McKesson HBOC, Inc. v. N.Y. State Common Retirement Fund, Inc.,*
    339 F.3d 1087 (9th Cir. 2003) .....................................................................21, 22

*Olmsted v. Pruco Life Ins. Co.,*
    283 F.3d 429 (2d Cir. 2002)............................................................................... 17

*Portland Gen. Elec., Co. v. Johnson,*
    754 F.2d 1475 (9th Cir. 1985) ........................................................................... 14

*Potomac Capital Mkts. Corp. v. Prudential-Bache Corporate Dividend Fund, Inc.,*
    726 F. Supp. 87 (S.D.N.Y. 1989).....................................................................8, 16

*Preminger v. Peake,*
    536 F.3d 1000 (9th Cir. 2008) .....................................................................13, 14

*Radol v. Thomas,*
    772 F.2d 244 (6th Cir. 1985) ............................................................................. 18

*Sheppard v. TCW/DW Term Trust 2000,*
    938 F.Supp. 171 (S.D.N.Y. 1996).......................................................................7

*Takeda v. Turbodyne Techs., Inc.,*
    67 F.Supp.2d. 1129 (C.D. Cal. 1999) ................................................................ 15

*Vasquez v. L.A. County,*
    487 F.3d 1246 (9th Cir. 2007) ........................................................................... 14

*Williams v. Gerber Prods. Co.,*
    523 F.3d 934 (9th Cir. 2008) ...........................................................................3, 5

**State Cases**

*Blankenheim v. E. F. Hutton & Co.,*
    217 Cal.App.3d 1463 (1990) ..............................................................................20

*Carma Developers (Cal.), Inc. v. Marathon Dev. Calif., Inc.,*
    2 Cal.4th 342 (1992) ..........................................................................................22

*Casey v. U.S. Bank Nat'l. Assn.,*
    127 Cal.App.4th 1138 (2005) .............................................................................20

*Cohen v. Stratosphere Corp.*
    115 F.3d 695 (9th Cir. 1997) ..............................................................................21

*Diamond Multimedia Sys., Inc. v. Super. Ct.,*
    19 Cal.4th 1036 (1999) ........................................................................................19

*Duffy v. Cavalier,*
    215 Cal.App.3d 1517 (1989) ...............................................................................20

*Garamendi v. Mission Ins. Co.,*
    131 Cal.App.4th 30 (2005) ...........................................................................18, 19

*Hurtado v. Super. Ct.,*
    11 Cal.3d 574 (1974) ...........................................................................................18

*Kransco v. Am. Empire Surplus Lines Ins. Co.,*
    23 Cal.4th 390 (2000) .........................................................................................22

*Kruse v. Bank of Am.,*
    202 Cal.App.3d 38 (1988) ...................................................................................21

*Kudokas v. Balkus,*
    26 Cal.App.3d 744 (1972) ...................................................................................20

*Palmer v. Truck Ins. Exch.,*
    21 Cal.4th 1109 (1999) .......................................................................................23

*Stokes v. Henson,*
    217 Cal.App.3d 187 (1990) .................................................................................20

*Vai v. Bank of America Nat'l Trust & Sav. Assn,*
    56 Cal.2d 329 (1961) ...........................................................................................20

*Washington Mut. Bank v. Super. Ct.,*
    24 Cal.4th 906 (2001) .........................................................................................18

**Federal Statutes**

15 U.S.C. §§80a-8(b)(2)-(3) ...................................................................................1, 4, 5

15 U.S.C. §80a-13(a) .............................................................................................5, 6, 13

15 U.S.C. §80a-8(b)(1)(F) ........................................................................................9, 10

15 U.S.C. ¶80a-13(a)(3) ..................................................................................................6

28 U.S.C. §1658(b) ........................................................................................................16

7 U.S.C.A. §25 ...............................................................................................................15

**State Statutes**

Cal. Civ. Code §1550 .....................................................................................................21

Cal. Civ. Code §1559 .....................................................................................................22

**Other Authorities**

Guidelines, SEC Release Nos. 33-6479...............................................................................9

Restatement (SECOND) CONTRACTS §24 (1981) ...........................................................21

**PRELIMINARY STATEMENT**

This action arises out of Defendants' deviation from the stated fundamental investment objectives of the Schwab Total Bond Market Fund ("Fund").  Instead of tracking the Lehman Brothers U.S. Aggregate Bond Index ("Index") – as Defendants promised Fund shareholders in proxy statements – Defendants invested shareholders' monies in high risk, non-U.S. agency collateralized mortgage obligations ("CMOs") and other non-U.S. agency mortgage-backed securities.

It is beyond dispute that Defendants' speculation into mortgage-backed securities was a clear deviation from the Fund's investment objectives.  Defendants' gamble was dependent on the value of the residential real estate upon which the mortgages were based.  Unfortunately, Defendants' bets were called short and the Fund's shareholders were subjected to tens of millions of dollars in losses, when the U.S. residential real-estate market collapsed, together with the drastic decline in the value of non- agency mortgage-backed securities.

Contrary to what actually occurred, Defendants made clear in the Fund's July 25, 1997 Proxy Statement that their strategy and that of the Index was "designed to maintain high credit-quality standards" because the Index was comprised primarily of "U.S. Treasuries, government agency securities and government agency mortgage-backed securities." Corrected Complaint for Violation of the Investment Company Act of 1940 ("Complaint"), dated September 3, 2008, ¶54.[1]  The Proxy Statement described in detail the "indexing strategy" that would be followed by the Fund "to closely approximate [the] Index's characteristics." ¶37.  Those fundamental investment policies were only changeable by shareholder vote.  *See, e.g.*, ¶¶31-48; 15 U.S.C. §§80a-8(b)(2)-(3), 13(a).

In an obvious effort at misdirection, Defendants' Motion to Dismiss Complaint ("Def. Mem.") ignores the 1997 Proxy Statement, and references a November 15, 2006 Prospectus, as amended July 13, 2007, that sets forth the Fund's investment strategy to "track" the Index by using the Index as a "guide" in purchasing securities.[2]  Unquestionably, Defendants neither tracked the

---

[1] All references to "¶ __" are to the Complaint.

[2] The 2007 Prospectus is annexed as Exhibit A to the Declaration of K.C. Allan Waldron in Support of Motion to Dismiss Complaint ("Waldron Decl.").  By including and referencing limited portions of certain of Defendants' SEC filings not referenced in the Complaint, Defendants seek to convert

1   Index nor used it as a guide.  Rather, in an outrageous and unlawful abuse, Defendants disregarded

2   the Index and sadly gambled with and lost tens of millions of dollars of the shareholders' assets.

3   Indeed, Defendants' wild investment strategy so deviated from the Lehman Index that as of February

4   28, 2008, approximately 27% of the Fund's total assets were comprised of high risk, non-U.S.

5   agency CMOs that were dependent on valuations of residential real estate and shared no

6   characteristics with the secure U.S. government, U.S. agency, and corporate bond investments that

7   comprised the Lehman Index. ¶¶3-5, 49-87.[3]

8           By concentrating the Fund's portfolio in non-agency CMOs, however, Defendants not only

9   violated the fundamental investment objective to track the Index, and lost tens of millions of dollars,

10  but also violated the policy forbidding concentration of greater than 25% of the Fund's assets in one

11  "industry."  As a result of the Fund's speculation in non-agency CMOs, the Fund underperformed

12  the Index by 7% for the year September 4, 2007 through August 31, 2008.   The Fund's

13  underperformance was not "temporary," as Defendants state.  Def. Mem. at 1, 4.  Rather, the Fund

14  has continued to underperform the Index by an additional 3.83% subsequent to August 31, 2008, for

15  an aggregate underperformance of 10.83%.  *See* Exh. A to the Declaration of Robert C. Finkel, dated

16  December 10, 2008, in opposition to Defendants' motion to dismiss ("Finkel Decl.").

17          These allegations – that the Fund deviated from its fundamental investment objectives – are

18  more than sufficient to withstand the high pleading standards of Rule 9(b) of the Federal Rules of

19  Civil Procedure.  Here, however, Defendants acknowledge that their motion should be judged by the

20  lower standard of Rule 8(a) of the Federal Rules of Civil Procedure and that Plaintiff need only

21  allege "enough facts to state a claim to relief that is plausible on its face."  *Williams v. Gerber Prods.*

22  *Co.*, 523 F.3d 934, 938 (9th Cir. 2008) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).

23          Defendants' other arguments, such as that there is no private right of action under Section

24  13(a) of the Investment Company Act of 1940 and that Plaintiff's claims are barred by the statute of

25  their motion to dismiss to a ***trial*** by motion.  In any event, under any (even selective) version of the
    facts, Northstar's complaint should be sustained.

26  [3] Defendants are the Fund, Schwab Investments (an investment trust whose trustees controlled the

27  operations of the Fund), Charles Schwab & Co. (the underwriter and selling agent for the Fund's
    shares), and Charles Schwab Investment Management, Inc. (the Fund's investment advisor).  ¶¶14-

28  17.

1    limitations, are also without merit.  A private right of action under Section 13(a) is well established

2    in the Ninth Circuit.  Moreover, there is nothing in the Fund's November 15, 2006 Prospectus, as

3    amended on July 13, 2007 (Waldron Decl., Exh. A), that invites inquiry notice that the Fund had

4    deviated from the Index.  Although that Prospectus identified the Fund's CMO investments, the

5    Prospectus continued to represent that the Fund's fundamental investment objective was to "track"

6    the Index.  The Fund continued to perform consistently with the Index until late 2007. ¶¶5, 71, 83.

7    The Prospectus pointedly did not disclose that the Fund's CMOs were high risk, were not part of the

8    Index, and were not guaranteed or insured by the federal government.  Instead, Defendants gave

9    every indication that the Fund's investments were consistent with the Index.  Clearly, in light of

10   these well pled allegations, together with the arguments advanced below, Defendants' motion to

11   dismiss should be denied.

12                                **STATEMENT OF FACTS**

13           The Fund was converted in 1997 from an actively managed U.S. government bond fund to a

14   passive index fund by shareholder vote pursuant to a Proxy Statement dated July 25, 1997. ¶¶25-31.

15   The Proxy Statement stated that subject to shareholder approval, the Fund would adopt a

16   fundamental investment objective "to attempt to provide a high level of current income consistent

17   with preservation of capital by seeking to track the investment results of a particular bond index

18   through the use of an indexing strategy."  ¶32.  The Proxy Statement added that the Fund would

19   track the Index.  ¶33.

20           The Index was described in the Proxy Statement (at 18) as "a broad market-weighted index

21   which encompasses the following classes of investment grade fixed-income securities: U.S. Treasury

22   and agency securities, corporate bonds, international (dollar denominated) bonds, agency mortgage-

23   backed securities, and asset-backed securities."  ¶34.  The Index is a proprietary Lehman Brothers

24   index, consisting of over 9,000 separate instruments whose exact composition is not generally

25   available to investors.  The composition of the Index changes from time-to-time.  ¶35.

26           The Proxy Statement further stated (at 22) that the Fund "would be unable to hold all of the

27   individual issues which comprise the [Index] because of the large number of securities in the

28   [Index]," but that the "Fund would hold a portfolio of fixed-income securities that is managed to

closely approximate [the] Index's 'characteristics of coupon rate, duration, sector, quality and optionality (or convexity).'"   ¶37.  The Proxy Statement sought to assure investors that the Fund's portfolio would continue to consist of "U.S. treasury or agency securities" that were part of the Index, which "have the lowest credit risk compared to other types of fixed income securities."   ¶41. The Proxy Statement stated that the Fund would seek a correlation of 0.9 or better between the Fund and the Index.  ¶39.

The Proxy Statement also established a fundamental investment objective that the Fund "may not concentrate investments [in excess of 25% of the Fund's total assets] in a particular industry or group of industries" unless necessary to track the Index.  ¶¶43-45.

The Fund's fundamental investment objectives, including the objectives to "track" the Index, and to not concentrate in any industry, were changeable only by shareholder vote.  *See* ¶67; 15 U.S.C. §§80a-8(b)(2)-(3), 13(a).

Since the Fund's inception, Defendants have made various representations as to what strategy the Fund would employ to "track" the Index.  In the Prospectus dated November 15, 2006, as amended July 13, 2007 ("2007 Prospectus"), Waldron Decl., Exh. A, the Fund represented (at 14) that:

> To pursue its goal, the fund primarily invests in a diversified portfolio of debt instruments that is designed to track the performance of the Lehman Brothers U.S. Aggregate Bond Index.  The fund uses the index as a guide in structuring the fund's portfolio and selecting its investments.  However, the fund is not required to invest any percentage of its assets in the securities represented in the index.

The Fund has also represented that "[b]efore purchasing or selling a security, the Investment Manager would analyze each security's characteristics and determine whether purchasing or selling the security would help the Fund's portfolio approximate the characteristics of the Index."  ¶38.  *See also* 2007 Prospectus, Waldron Decl., Exh. A, at 17 ("Your investment follows the bond market, as measured by the index.  The fund is designed to follow the performance of the index during upturns as well as downturns.").

As of August 31, 2007, the Fund had over $1.5 billion in assets and 150 million shares outstanding.  ¶20.  Until August 28, 2007, the Fund performed in line with the Index.  ¶68.  From September 4, 2007 through August 27, 2008 (the date the Complaint was filed), however, the Fund

had a negative return of 1.09% compared to a positive return of 5.92% for the Index, for a total underperformance of 7.00%.  ¶71.  The Fund has continued its underperformance, returning negative 2.99% since August 29, 2008, compared to a positive .75% return for the Index – a further underperformance of 3.74%.  The total underperformance of the Fund compared to the Index from August 28, 2007 through December 9, 2008 is 10.83%.  *See* Finkel Decl., Exh. A.

The Fund's significant deviation from the Index is attributable to its concentration of in excess of 25% of its total assets in non-agency collateralized mortgage-backed securities that were substantially more risky than the fixed-income U.S. government and agency securities that comprised the Index.  *See* ¶¶72-82.  The Fund's investment in non-agency CMOs was fundamentally inconsistent with its obligations to "track" the Index, its strategy to use the Index as a "guide" to making investments, and its policy against concentration of investments in any "industry."

## ARGUMENT

### I.    STANDARDS ON A MOTION TO DISMISS UNDER RULE 8(a)

Rule 8(a) merely requires that a claim be pled so as to give a defendant "fair notice of what the…claim is and the grounds upon which it rests," something that does not require pleading "specific facts to support [the complaint's] general allegations."  *Conley v. Gibson*, 355 U.S. 41, 47-48 (1957).  Notice pleading, regardless of the context, requires only general notice of a claim.  *See, e.g., Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168-69 (1993).  A plaintiff must plead only broad allegations of the *prima facie* elements of an alleged violation.  Plaintiffs must also plead "enough facts to state a claim to relief that is plausible on its face" and "raise a right to relief above the speculative level."  *E.g.*, *Williams*, 523 F.3d at 938.

### II.    THE FUND DEVIATED FROM FUNDAMENTAL INVESTMENT POLICIES

#### A.    The Fund Deviated From A Fundamental Investment Policy By Concentrating Its Portfolio In Non-Agency CMOs That Were Not Part Of The Index

ICA Sections 8(b)(2)-(3) and 13(a) restrict the Fund from deviating, without a shareholder vote, from its fundamental investment policies to (1) "track" the Index by use of an "indexing strategy" and (2) "not concentrate investments [in excess of 25% of the Fund's total assets] in a particular industry or group of industries" unless issued or guaranteed by the U.S. government or its

1   agencies, or as necessary to track the Index.  15 U.S.C. ¶80a-13(a)(3).[4]

2          Northstar understands that the success of the Fund's investment strategy was not guaranteed

3   and that the Fund's investment objective and investment strategy did not require the Fund to invest

4   **only** in the securities that comprised the Index.  To the extent the Fund purchased securities that

5   were not part of the Index, the 1997 Proxy Statement promised investors that those investments

6   would be "managed" "through statistical sampling and other procedures" "to closely approximate

7   [the] Index's characteristics."  ¶37.

8          The Fund's concentration of investments in non-agency CMOs were inconsistent with the

9   Fund's stated investment objective to "track" the Index "through the use of an indexing strategy."

10  *See*  ¶76.   Contrary to Defendants' contentions, Def. Mem. at 10, the Complaint **does** allege

11  "how...the CMOs contributed to some supposed failure to approximate the index's characteristics."

12  *See* Def. Mem. at 10.

13         As alleged in the Complaint (¶82), the "Fund's investment [of 27.3% of the Fund's total

14  assets] in [non-agency] CMOs...in light of all circumstances, was speculative, irresponsible and a

15  gross deviation from the Fund's fundamental investment policies...."  *See also* ¶¶58, 60 (alleging the

16  strict underwriting standards established by the agencies' government charters and the implicit

17  government guarantees of payment).  The non-agency CMOs purchased for the Fund represented

18  tranches of mortgage-backed securities, such as principal only or interest only payments that were

19  significantly more risky than the agency-issued mortgage-backed securities that were part of the

20  Index.   Included in the Fund's portfolio were CMOs sponsored by such subprime lenders as

21  Citigroup, Merrill Lynch, Countrywide, Bear Stearns, IndyBank, Lehman, and Washington Mutual.

22  *See* ¶74.  *See also* ¶41 (quoting the 1997 Proxy Statement at 4 ("U.S. Treasury and agency securities

23  have the lowest credit risk compared to other types of fixed income securities.")); ¶61 ("The

24  mortgage-backed securities issued by Ginnie Mae, Fannie Mae, and Freddie Mac, and maintained in

25  the Lehman Index, had the highest credit quality among mortgage-backed securities.").  Defendants

26

27  [4] Plaintiff does not dispute that the ICA Section 13(a) claim should have been asserted only against

28  Schwab Investments (*see* Def. Mem. at 6-7) inasmuch as the other Defendants – although properly
    named on state law claims – are not registered investment companies.

1    never say that, or how, the Fund's investments in CMOs were ***consistent*** with their obligations to

2    track the Index.

3           Although the 2007 Prospectus states that the Fund "may invest" in a number of different

4    securities including "collaterized mortgage obligations," Waldron Decl., Exh. A at 14, the

5    Prospectus does not state that those CMOs would not be government- or agency-based, would have

6    fundamental characteristics inconsistent with the Index, and would be weighted in the Fund in

7    amounts that were grossly disproportionate to their weighting in the Index.  Not surprisingly, starting

8    in approximately the fall of 2007, with weaknesses in the residential real estate market, the more

9    credit-worthy agency-issued securities substantially out-performed the less creditworthy privately

10   issued securities, causing injury to class members.  *See* ¶¶5, 71 (referencing the Fund's 7%

11   underperformance against the Index).[5]  By investing in the CMOs, the Fund broke its "promise [] to

12   'attempt' or 'seek' to track the Lehman Index."  *See* Def. Mem. at 2, 9.

13          Defendants' motion in fact concedes that the "poor underperformance" of the Fund was

14   caused by "a flight to quality across all segments of the fixed income market."  Def. Mem. at 4

15   (quoting ¶70 (*i.e.*, from what the Fund did invest in (low quality CMOs) to what the Fund should

16   have invested in (high quality government securities)).  *See also* Def. Mem. at 19

17   (acknowledging that the Fund "deviated *temporarily* from the index it seeks to track") (emphasis

18   added).

19          *Sheppard v. TCW/DW Term Trust 2000*, 938 F.Supp. 171 (S.D.N.Y. 1996), cited Def. Mem.

20   at 9, is distinguishable.  *Term Trust* involved a stated general fundamental investment policy "to

21   provide a high level of current income and return $10 per share, the initial public offering price, to

22   shareholders on the termination date."  Defendants in *Term Trust* had broad discretion on how to

23   achieve that objective.  *Id.* at 173.  Here, the fundamental investment objective contained a specific

24   direction to track an index using an "indexing strategy."  Also, in *Term Trust* the fund followed its

25   stated investment strategy and purchased the exact securities as represented in its SEC filings.  Here,

26   the Fund represented that it would "track" the Index and use the Index as a "guide," but then

27   _____

28   [5] The Index's performance contradicts Defendants' assertion that "[j]ust about every owner of fixed-income assets has been hurt [by] the financial crisis…."  Def. Mem. at 4.

[C-08-4119 SI] PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS COMPLAINT                                          7

1   speculated in CMO securities that were not part of the Index or an "indexing strategy."  *See Potomac*

2   *Capital Mkts. Corp. v. Prudential-Bache Corporate Dividend Fund, Inc.*, 726 F. Supp. 87 (S.D.N.Y.

3   1989) (sustaining complaint alleging deviation from a fund's fundamental investment policies

4   requiring investments in high quality dividend-paying securities).

5
6
   **B.     The Fund Deviated From A Fundamental Investment Objective By
            Concentrating More Than 25% Of Its Total Assets In Non-Agency Mortgage-
            Backed Securities**

7       The Fund's fundamental investment policies restricted the Fund from "[c]oncentrating

8   investments [of greater than 25% of total assets] in a particular industry or group of industries"

9   unless necessary to track the Index.  This fundamental investment policy assured shareholders that

10  the Fund would remain well diversified.  Because this policy was "fundamental," Defendants could

11  not change the policy without first obtaining approval by a majority of the Fund's shareholders.[6]

12      As recently as September 16, 2005, the Fund's Statement of Additional Information ("SAI")

13  specifically advised investors that mortgage-backed securities constituted "a particular industry" and

14  thus were subject to the Fund's no-concentration fundamental policy:

15
16
        Based on the characteristics of mortgage-backed securities, each fund has identified
        mortgage-based securities...as a separate industry for purposes of a fund's
        concentration policy ....

17  Finkel Decl., Exh. B at 8.

18      Yet by 2007, the Fund reversed its stated policy and invested more than 25% of its assets in

19  non-agency CMOs – without ever seeking shareholder approval.  ¶¶72-84.  The new policy stated

20  that mortgage-backed securities "are ***not*** part of any industry for purposes of a fund's concentration

21  policy."   ¶78 (emphasis added).   Citing this new policy – while disregarding its prior one –

22  Defendants declare that as a matter of law there was no violation of the Fund's initial fundamental

23  investment policy.  Def. Mem. at 10-12.

24      Defendants acknowledge that "industry classifications...must be reasonable."  *Id*. at 11

25  (quoting SEC Guide 19 at *74).  Defendants own authority, the "SEC's Guide 19," ***confirms*** that a

26

27  _____
    [6] This claim is independent of Northstar's claim with respect to tracking the Index.  Even if the
    Fund's concentration of CMO investments did not violate the fundamental non-concentration policy
28  (which it did), the Fund violated the fundamental policy to track the Index.

    [C-08-4119 SI] PLAINTIFF'S OPPOSITION TO
    DEFENDANTS' MOTION TO DISMISS COMPLAINT                                              8

1    fund wishing to change its concentration policy must disclose its intention to do so and then obtain

2    shareholder approval.  *Registration Form Used by Open-End Mgmt. Inv. Cos.; Guidelines,* SEC

3    Release Nos. 33-6479, IC-13436, 1983 SEC LEXIS 1030, at *203 (Aug. 12, 1983) (Finkel Decl.,

4    Exh. C).  The SEC made clear that "[f]reedom of action to concentrate pursuant to management's

5    investment discretion, without shareholder approval, has been considered by the staff to be

6    prohibited by sections 8(b)(1) and 13(a)(3) of the 1940 Act ...."  *Id.* at *203.  And while Guide 19

7    permits a fund to "select its own industry classifications," nowhere does it allow the fund to alter

8    those classifications absent prior shareholder approval.  If a fund were permitted to undercut an

9    existing concentration policy simply by redefining an established industry classification to exclude a

10   category of securities, without obtaining shareholder approval, whatever protection provided by the

11   fund's policy would be lost – just as occurred here.  ICA Sections 8 and 13(a) do not permit such

12   manipulations.  *See In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig.,* 95 Civ. 033 (LMM),

13   1996 U.S. Dist. LEXIS 14209, at *16, n.10 (S.D.N.Y. Sept. 27, 1996) ("If the fund desires to change

14   its policy of concentration, Section 13(a)(3) requires shareholder approval of the new policy.").

15   There is no rationality for Defendants to have believed in 2005 that mortgage-backed securities

16   comprised an industry, but to have determined (without shareholder vote) in 2007 that they no longer

17   comprised an industry.

18          Defendants also argue that CMOs are not an industry but rather a form of security.  Yet, the

19   collateral for the CMOs all consist of properties in the same industry – residential homes.  That real

20   estate is a separate asset class is established by ICA Section 8(b)(1)(F), which accords special

21   treatment to investments in real estate (requiring the recital of whether "the registrant intends to

22   engage" in "the purchase and sale of real estate and commodities, or either of them").  *See* 15 U.S.C.

23   §80a-8(b)(1)(F).  Moreover, when the Fund invested in forms of securities in separate industries,

24   such as corporate bonds, it clearly delineated the industries reflecting those investments.  *See*

25   Waldron Dec., Exh. D at 46-49.  That a CMO may be a form of security does not change the ***fact***

26   that the Fund's investments in CMOs were concentrated in one industry.

27          Although Defendants acknowledge that they "typically [rely] on the industry classifications

28   provided in the Global Industry Classification Standard ["GICS"]" and that they know of "no

1    standard industry classification system [that] defines 'mortgage-backed securities' as an industry,"

2    Def. Mem. at 11, in fact the GICS classifies mortgage-backed securities within a sub-industry of

3    mortgage real estate investment trusts.  *See* Finkel Decl., Exh. D at 4-5.

4          Defendants further rely on an SAI filed by the PIMCO Funds (not referenced in the

5    Complaint).  Waldron Decl., Exh. C.  Leaving aside whether PIMCO's policies excuse ***Defendants'***

6    misconduct, the PIMCO SAI only states that "[m]ortgage-backed securities that are issued by or

7    guaranteed by the U.S. Government, its agencies or instrumentalities" were "not subject to the

8    Fund's industry concentration restrictions." *Id.* at 15.  The PIMCO SAI acknowledges that "private

9    issue mortgage-related securities whose underlying assets are neither U.S. Government securities nor

10   U.S. Government-insured mortgages…may be subject to a greater risk of default than other

11   comparable securities in the event of adverse economic, political or business developments."

12   Moreover, the PIMCO SAI provides no exemption for CMOs (as opposed to mortgage-backed

13   securities) from PIMCO's concentration policy, but rather emphasizes the risk that "CMOs may be

14   less liquid and may exhibit greater price volatility than other types of mortgage- or asset-backed

15   securities." *Id.*

16         In fact, the PIMCO Total Return Fund (the largest U.S. bond mutual fund; albeit not an index

17   fund), was heavily weighted in favor of U.S. government agencies (60.4%) (exclusively fixed

18   income securities) and only invested 3% in non-agency mortgage-backed securities.  *See* Finkel

19   Decl., Exh. E.

20         Because the Fund's investment of 27.3% of total assets in CMOs is a concentration in one

21   industry, this claim should be sustained.

22   **III.    NORTHSTAR'S   CLAIMS   ARE   NOT   BARRED   BY   THE   STATUTE   OF**
         **LIMITATIONS**
23
24         The determination of when a statute of limitations begins to run is governed by the two-step

25   "inquiry-plus-reasonable-diligence test."  *Betz v. Trainer Worthman & Co.*, 519 F.3d 863, 870 (9th

26   Cir. 2008).  *See also Lapidus v. Hecht*, C 98-3130 MMC, 2002 U.S. Dist. LEXIS 14566, at *23

27   (N.D. Cal. May 17, 2002) ("*Lapidus I*") (statute of limitations begins to run "from the date the

28   violation should have been discovered in the exercise of ordinary diligence").  First, the court must

1    determine whether the plaintiff had inquiry notice of the facts giving rise to their securities claims.

2    *Betz*, 519 F. 3d at 870-71 (citation omitted).  Plaintiffs are on inquiry notice of a securities claim

3    when "there exists sufficient suspicion of fraud to cause a reasonable investor to investigate the

4    matter further." *Id*.  The facts must be sufficiently egregious to "incite the victim to investigate." *Id*.

5    at 871 (citation omitted).  The Ninth Circuit has repeatedly held that a company's "financial

6    problems alone are generally insufficient to suggest fraud." *Livid Hldgs. Ltd. v. Salomon Smith*

7    *Barney, Inc.*, 416 F.3d 940, 951 (9th Cir. 2005) (quoting *Mosesian v. Peat, Marwick, Mitchell &*

8    *Co.*, 727 F.2d 873, 879 (9th Cir. 1984)).  S*ee also Betz*, 519 F.3d at 878 (even a drastically declining

9    account balance is not sufficient to trigger the duty to inquire).

10        Only if the court determines that the facts were sufficiently egregious to incite investigation,

11    must the court then turn to the second step of the analysis and determine whether the objective

12    investor, in the exercise of reasonable diligence, should have discovered facts constituting a

13    securities law violation.  *Id*. at 871.  *See also In re Exodus Communs., Inc.*, C 01-2661 MMC, 2005

14    U.S. Dist. LEXIS 20222, at *21 (N.D. Cal. Aug. 5, 2005).  While this inquiry is "essentially

15    objective in character," it "necessarily entails an assessment of the plaintiff's particular

16    circumstances, from the perspective of a reasonable investor." *Betz*, 519 F.3d at 871.

17        The question of whether the statute of limitations has run is an intensely factual issue that is

18    nearly exclusively reserved for the jury.  *Id*. at 866, 877.  *See Livid Hldgs.*, 416 F.3d at 951 ("the

19    question of what a reasonably prudent investor should have known is particularly suited to a jury

20    determination") (quoting *Mosesian*, 727 F.2d at 879); *Lilley v. Charren*, 936 F.Supp. 708, 714 (N.D.

21    Cal. 1996) (Illston, J.) (denying motion to dismiss on basis that plaintiffs' claims are time barred

22    noting that "when a plaintiff discovered or should have discovered the alleged fraud is a question of

23    fact"); *Exodus*, 2005 U.S. Dist. LEXIS 20222, at *22 ("the question of when a reasonably diligent

24    investor did discover or should have discovered the alleged wrongdoing is a question of fact").  The

25    Ninth Circuit enforces "a high bar for deciding the inquiry notice issue as a matter of law." *Swartz*

26    *v. Deutsche Bank*, C03-1252MJP, 2008 U.S. Dist. LEXIS 36139, at *22 (W.D. Wash. May 2, 2008)

27    (citing *Gray v. First Winthrop Corp.*, 82 F.3d 877, 881 (9th Cir. 1996) (reversing trial court's grant

28    of summary judgment)).  Indeed, when considering a fully developed record after full discovery, the

1  defendant still "bears a considerable burden in demonstrating, at the summary judgment stage, that

2  the plaintiff's claim is time barred." *Betz*, 519 F.3d at 871 (citing *SEC v. Seaboard Corp.*, 677 F.2d

3  1301, 1309-10 (9th Cir. 1982)).  Northstar does not dispute that a statute of limitations defense may

4  be established through SEC filings, *see* Def. Mem. at 13, but rather that such a defense as a matter of

5  fact or of law cannot be established by ***defendants'*** SEC filings.  To find plaintiffs' claims are time-

6  barred is reversible error for any court unless the "uncontroverted evidence irrefutably demonstrates

7  plaintiff discovered or should have discovered the fraudulent conduct."  *Gray*, 82 F.3d at 881.

8  　　　Here, Northstar was not on inquiry notice of potential claims until late 2007, at the earliest.

9  Among other things:

10  　　　1.　　The Fund did not suffer *any* decline in value relative to the Index until late 2007 –

11  within one year of Northstar filing the Complaint on August 28, 2008.  ¶71.

12  　　　2.　　The Fund's SEC documents and shareholder letters continued to represent that the

13  Fund was pursuing its investment objective to track the Index.  The Ninth Circuit has stated that "our

14  hesitation to approve summary judgment in securities fraud cases is especially pronounced where the

15  plaintiff alleges that the defendants' reassurances convinced the plaintiff to postpone his or her legal

16  action."  *Betz*, 519 F. 3d at 872 (citing *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d

17  1434, 1436 (9th Cir. 1984)).

18  　　　3.　　The Index is not a public index.  Investors had no reason to believe that the

19  composition of the Fund was different from the Index.

20  　　　4.　　Even if investors knew that the Fund's concentration of non-agency CMOs was

21  inconsistent with the Index, the Fund had represented that it would only use the Index as a "guide"

22  and track the Index "through statistical sampling and other procedures."  *See* ¶37.  Investors had no

23  reason to suspect that the Fund was not engaging in other strategies that had positioned the Fund, in

24  the aggregate, to track the Index.

25  　　　5.　　Defendants' financial disclosures are complex and not always available to investors.

26  For example, Defendants rely on a November 30, 2006 Form N-Q (Quarterly Schedule of Portfolio

27  Holdings) Waldron Decl., Exh. E (not referenced in the Complaint), for its assertion that "Northstar

28  thus knew precisely how much of the portfolio was invested in mortgage-backed securities."  Form

1   N-Qs, however, are not mailed to investors and can be located by only the most sophisticated

2   investor experienced with navigating the SEC's PACER system.

3          6.     The November 30, 2006 Form N-Q only disclosed that the Fund held 52.3% of net

4   assets in "mortgage-backed securities."   Those investments included U.S. Government agency

5   mortgages (26.4%), non-agency CMOs (17.4%), and commercial mortgage-backed securities

6   (8.5%).  Contrary to Defendants' motion, there is nothing in that Form N-Q to establish inquiry

7   notice that Defendants at that time had violated either the principle to track the Index or not to

8   concentrate the portfolio.  *See* Def. Mem. at 12 (stating incorrectly that the Fund "invested more than

9   25 percent of its assets in non-agency mortgage-backed securities starting in the fall of 2006.").

10          If an IRS investigation and the noisy withdrawal of the auditor in *Swartz*, 2008 U.S. Dist.

11   LEXIS 36139, and the extensive conversations with the defendants in *Betz*, 519 F.2d at 872, 878,

12   regarding the plaintiff's declining principal balance were insufficient to hold as a matter of law that

13   the plaintiffs were on inquiry notice, the mere disclosure of the Fund's CMO investments, without

14   any fluctuation of share price, cannot rise to a level sufficient to trigger Plaintiff's inquiry notice

15   obligations here.[7]

16   **IV.    NORTHSTAR HAS STANDING TO BRING THIS ACTION**

17          Northstar possesses the requisite standing to bring this lawsuit.   The "'irreducible

18   constitutional minimum of standing' consists of three elements: (1) injury in fact, (2) causation, and

19   (3) likelihood that a favorable decision will redress the injury."  *Preminger v. Peake*, 536 F.3d 1000,

20   1005 (9th Cir. 2008) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)).

21   Northstar had approximately 240,000 shares of the Fund under management as of August 31, 2007

22   and has a significant financial interest in the outcome of this action.  Defendants incorrectly argue

23   that Northstar lacks standing because it does not have a legal right to recover individually on the

---

[7] Plaintiff's claims in this action were brought within one year of it being placed on inquiry notice of Defendants' violation of 15 U.S.C. §80a-13(a), so the Court does not need to determine whether the extended limitations period provided by Sarbanes-Oxley, Section 804, 28 U.S.C. §1658(b), applies. In 28 U.S.C. §1658(b) Congress extended the statute of limitations and the statute of repose for private rights of action involving "a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934" to include the ICA, to a two-year statute of limitations and a five-year statute of repose.  Defendants' citations (at 13) predate Sarbanes-Oxley.

1    claims asserted in the Complaint, arguing that Northstar purchased the subject fund shares on behalf
2    of its investors in its capacity as an investment advisor, and therefore did not suffer an "injury-in-
3    fact." Def. Mem. at 6.

4        The Ninth Circuit has held that the injury required to satisfy the standing analysis "may be
5    minimal." *Preminger,* 536 F.3d at 1005. *See also Council of Ins. Agents & Brokers v. Molasky-*
6    *Arman,* 522 F.3d 925, 932 (9th Cir. 2008) (holding that "an identifiable trifle" is sufficient to
7    establish standing). Courts focus on "whether harm to the plaintiff is sufficient to give him or her
8    the 'requisite personal interest' in a case." *Preminger*, 536 F.3d at 1005. *See also Vasquez v. L.A.*
9    *County,* 487 F.3d 1246, 1250 (9th Cir. 2007) (stating that the purpose of the "injury-in-fact" prong is
10   to ensure that "there is an advocate with a sufficient personal concern to effectively litigate the
11   matter").

12       Here, Northstar has suffered an "injury-in-fact" and has, therefore, satisfied the standing
13   requirement. As set forth in the Complaint, "Northstar operates under a fee-based structure based on
14   the total value of assets under management." ¶12. Thus, Northstar suffered a reduction in fees as
15   the total value of the assets it manages decreased. Therefore, Northstar has suffered a financial
16   injury that is constitutionally sufficient to establish standing.[8] *See Preminger,* 536 F.3d at 1005.

17       The Ninth Circuit has conferred standing upon investment managers in similar
18   circumstances. In *Employers-Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Anchor*
19   *Capital Advisors*, 498 F.3d 920, 922 n.1 (9th Cir. 2007), the court noted that "an investment advisor
20   has an interest in its own right to receive full and fair disclosures regarding the true value of a
21   company's stock" and could therefore be considered a "purchaser" under the Private Securities
22   Litigation Reform Act of 1995 ("PSLRA") with "proper standing to pursue litigation on behalf of its
23   individual clients." *See also Takeda v. Turbodyne Techs., Inc.,* 67 F.Supp.2d. 1129, 1136 n.18 (C.D.
24   Cal. 1999) (noting that an investment advisor was suitable to serve as lead plaintiff in a securities

---

[8] *See Alleghany Corp. v. Breswick & Co.*, 353 U.S. 151, 160 (1957) (holding that minority common
stockholders had standing to challenge an Interstate Commerce Commission order based on a
threatened financial injury to the value of their shares); *see also Portland Gen. Elec., Co. v. Johnson*,
754 F.2d 1475, 1480 (9th Cir. 1985) (holding that a utility company that brought an action
challenging reduced-rate sales of electric power by a federal hydroelectric marketing agency had
alleged a financial injury and, therefore, had constitutional standing).

1   fraud class action and that the advisor would "add sophistication to the group's oversight of counsel,

2   and will further the goals of the [PSLRA]").  *Anchor Capital* is particularly compelling here (unlike

3   the cases cited by Defendants that concern open market frauds), where Northstar was in direct

4   privity with Schwab and Schwab had actual knowledge of Northstar's direct reliance and financial

5   interest in the accuracy of the Fund's stated investment objectives.

6         Defendants inappropriately rely upon *Indemnified Capital Invs., SA. v. R.J. O'Brien &*

7   *Assocs., Inc.*, 12 F.3d 1406 (7th Cir. 1993), and *In re Tyco Int'l Ltd.*, 236 F.R.D. 62 (D.N.H. 2006).

8   Def. Mem. at 6.  In *Indemnified Capital*, the court held that an overseas investment company lacked

9   standing to assert claims on behalf of its customers under the Commodities Exchange Act, 7

10  U.S.C.A. §25.  12 F.3d at 1409.  Unlike Northstar, the investment company at issue there ("ICI")

11  was not a registered investment advisory firm nor did it allege that its fee structure was based on the

12  value of the funds it managed.  *Id.* at 1407-08.  In contrast, "ICI actually benefitted from its

13  customers' misfortune, i.e., ICI received commissions on the trades" that were at issue.  *Id.* at 1410.

14  Under those circumstances, ICI could not possibly have established an injury-in-fact when it

15  ultimately benefited from its customers' losses.  Here, Northstar suffered a loss in fees as a direct

16  result of Defendants' statutory violations, which caused a decrease in the total value of the assets

17  under its management.

18        *Tyco* is also readily distinguishable from the present matter.  There, the court held that an

19  asset management company lacked standing to bring a securities fraud class action because the

20  company did not "even attempt to satisfy the Constitution's injury-in-fact requirement," but only

21  argued that it had standing as a "purchaser" of the securities at issue.  236 F.R.D. at 73.  Here,

22  Northstar satisfies the necessary requirements of Article III as it stands to suffer direct financial

23  injury due to the Fund's performance.

24        Defendants have failed to cite a single Ninth Circuit decision that has not conferred standing

25  to an investment advisor that suffers direct financial injury in the form of a decrease in value of the

26  assets it manages.[9]   The reason is simple: when an entity suffers a direct financial loss due to a

27
28

---

[9] The Second Circuit recently held that an investment advisor lacked constitutional standing to bring
a securities action in a representative capacity on behalf of its clients where the advisor did not have
ownership or title of the claim itself.  *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 06-

1  defendant's conduct, such entity easily passes the test for constitutional standing.[10]

2  **V.    SECTION 13(a) PROVIDES AN IMPLIED PRIVATE RIGHT OF ACTION**

3          Defendants' sole argument that there is no private right of action under Section 13(a) is a

4  purported "trend against implying private rights of action" under the ICA.  Def. Mem. at 7.

5  Defendants' argument completely ignores the well-settled law that a private right of action ***does***

6  exist under Section 13(a), including in the Ninth Circuit.  *See also* Sarbanes-Oxley, §804, 28 U.S.C.

7  §1658(b), recognizing the existence of private rights of action under the ICA.  *Supra* at 13 n.7.

8          In *Lapidus v. Hecht*, 232 F.3d 679 (9th Cir. 2000), the Ninth Circuit held that mutual fund

9  shareholders had standing to bring claims against an investment trust, and other related entities,

10 under Section 13(a)(2)-(3).  The Ninth Circuit emphasized the direct injury to shareholders' "voting

11 rights" from unapproved changes in fundamental investment policies.  *Id.* at 684.  *See also Lapidus*

12 *I*, 2002 U.S. Dist. LEXIS 14566 (addressing on remand the merits of plaintiffs' Section 13(a)

13 implied private right of action).[11]

14         Defendants argue that since the Second Circuit's decision in *Olmsted v. Pruco Life Ins. Co.*,

15

16 1664-CV(L), 2008 US. App. LEXIS 24490, at *18 (2d Cir. Dec. 3, 2008) ("In our view,…the
   minimum requirement for injury-in-fact is that the plaintiff have legal title to, or a property interest
17 in, the claim.") (citation omitted).  The court noted that an assignment of claims confers legal title or
   ownership of those claims and, thus, fulfills the constitutional requirement of injury-in-fact.  *Id.* at
18 *5.

19 *W.R. Huff* is readily distinguishable from the present matter because there, the asset management
   company did not allege a direct financial injury, as Northstar does here.  Thus, Northstar has the
20 "property interest" in this litigation that the Second Circuit emphasized.  Nonetheless, in light of this
   recent ruling, Northstar has obtained an assignment of claims, attached to the Finkel Decl. as Exh. F,
21 from one of its clients that invested in the Fund at issue.  Therefore, if the Court is inclined to follow
   the Second Circuit's recent approach, Northstar satisfies those mandates and can amend its
   Complaint accordingly if deemed necessary.

22 [10] In *Miller v. Dyadic Int'l., Inc.*, 07-80948-CIV, 2008 U.S. Dist. LEXIS 32271, at *31 (S.D. Fla.
23 April 18, 2008), the court found that an investment advisor had standing as it suffered "direct
   financial losses" as a result of its client's losses because the advisor was "compensated for its
24 investment advice based on the performance and ***value of the portfolios under its management***" and
   that as a result, "losses to [the] client's portfolio ***directly translate*** into losses in income to [the
25 advisor]."  (Emphasis added.)

26 [11] Other jurisdictions have found Section 13(a) to provide a private right of action.  *See Potomac*
   *Capital*, 726 F.Supp. at 93 n.5 ("Private rights of action have been recognized under Section
27 13(a)(3)."); *Blatt v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 916 F.Supp. 1343, 1357 (D.N.J.
   1996) (discussing claims brought under ICA §13(a) and holding that "a private right of action
   exists").  *See also Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 731-32 (2d Cir.
28 1998) (discussing the merits of private plaintiffs' claims under ICA §13(a)).

[C-08-4119 SI] PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS COMPLAINT                                              16

283 F.3d 429 (2d Cir. 2002) (finding no implied private right of action under ICA Sections 26(f) and 27(i)), "no court…has implied a private right of action under any provision of the [ICA]." Def. Mem. at 8. In fact, *Olmsted* was decided March 7, 2002 – a full two months prior to the District Court decision in *Lapidus I*, which did imply a private right of action under Section 13(a). Moreover, *Olmsted* was limited to ICA Sections 26(f) and 27(i) and did not address the well-settled law finding a private right of action under Section 13(a). 283 F.3d at 432-36. As such, the alleged "trend" against finding *new* private rights of action, if it exists, is irrelevant to Defendants' motion.

## VI. PLAINTIFF HAS ADEQUATELY PLED A CLAIM FOR BREACH OF FIDUCIARY DUTY

Defendants contend that Plaintiff has not alleged that each Defendant owed a fiduciary duty to Plaintiff and that even if there were such duties, there was no breach because there is no allegation that Defendants violated the Fund's investment policies. Def. Mem. at 14-16. Both arguments are misplaced. Defendants' argument that there is no duty running from them to Plaintiff depends on an incorrect assumption that Massachusetts law, and not California law, applies to this case. Here, California law applies and under California law, it is settled that a fiduciary duty exists between a corporation and its shareholders (even if class members are considered shareholders of the Trust, which they were not). Further, the Complaint adequately alleges that Defendants violated the Fund's investment policies, breaching that fiduciary duty.

### A. California Law Should Apply To Plaintiff's Claim For Breach Of Fiduciary Duty

Defendants suggest that a breach of fiduciary duty claim could only be brought against Schwab Investments, and that because Schwab Investments is a Massachusetts business trust, Massachusetts law applies, and Massachusetts does not recognize a fiduciary duty owed by a corporation to a shareholder. Def. Mem. at 14-15. This contention is incorrect because California law, not Massachusetts law, applies to the breach of fiduciary duty claim, and in any event, class members were shareholders of the Fund, not of Schwab Investments (the Trust charged with responsibility for operating the Fund). *See* Def. Mem. at 15, n.8.

A federal court must apply the forum state's choice-of-law rules to the application of state law. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *In re Nucorp Energy Sec.*

1   *Litig.*, 661 F.Supp. 1403, 1412 (S.D. Cal. 1987) ("A federal court exercising pendent jurisdiction

2   over state law claims must apply the choice of law rules of the state in which it sits").  To resolve

3   conflict-of-law issues California uses the three-pronged "governmental interest analysis" test.

4   *Washington Mut. Bank v. Super. Ct.*, 24 Cal.4th 906, 919 (2001); *Hurtado v. Super. Ct.*, 11 Cal.3d

5   574, 579-80 (1974). [12]

6         Here, Defendants have failed to satisfy any of these three prongs.

7               **1.    Defendants Have Not Identified Controlling Authority in Massachusetts**
                      **That Materially Differs From the Law in California**
8

9         Defendants have not shown that the laws "materially differ" because they have not cited

10  controlling Massachusetts authority expressly refusing to recognize a fiduciary duty between a

11  corporation and its shareholders.[13]  *Garamendi v. Mission Ins. Co.*, 131 Cal.App.4th 30, 41 (2005)

12  (applying California law in the absence of any controlling precedent from foreign jurisdiction).

13              **2.    Defendants Have Failed to Establish the Interest of Massachusetts in**
                      **Having its Own Law Applied**

14        Additionally, Defendants have failed "to establish [Massachusetts'] interest in having its own

15  law applied."  *Washington Mut.*, 24 Cal.4th at 920.  While the Fund "is organized under the laws of

16  Massachusetts," Defendants have failed to identify that Massachusetts has any interest in having its

17  law applied with respect to the operation of the Fund.  *Garamendi*, 131 Cal.App.4th at 41.

18              **3.    The Interests of California Would be More Impaired if California Breach**
                      **of Fiduciary Duty Law is Not Applied to This Case**
19

20        Even ***assuming*** that Defendants have established that there is a material difference between

_____

21  [12] The three-pronged governmental interest analysis requires: (1) the foreign law proponent shows
    that foreign law materially differs from California law; (2) the trial court determines what interest, if
22  any, each state has in applying its own law; and (3) only where the trial court determines that the
    laws are materially different and that each state has an equivalent interest in having its law applied,
23  must the court select the law of the state whose interests would be "more impaired" if its law were
    not applied.  *Washington Mut.*, 24 Cal. 4th at 919-20.

24  [13] *Powers v. Ryan*, 00-10295-00, 2001 U.S. Dist. LEXIS 1389 (D. Mass. Jan. 9, 2001), cited by
    Defendants, is inapposite. In *Powers*, a federal district court sitting in diversity declined to recognize
25  a duty between shareholders and a corporation under Massachusetts law because after observing
    there was no such authority in Massachusetts imposing a fiduciary duty, the court stated that it was
26  limited to applying existing law, not creating it.  Defendants' citation to *Radol v. Thomas*, 772 F.2d
    244 (6th Cir. 1985) is irrelevant.  First, *Radol* is a Sixth Circuit decision that discusses Ohio, not
27  Massachusetts, law.  Second, the reasoning in *Radol*, cited by Defendants (at 15), is inapplicable
    here.  In the instant case, Plaintiff is a shareholder of the Fund, not of the Trust.  Thus, there is no
28  "absurdity" of shareholders satisfying their claims from the Fund.

California and Massachusetts law, and ***assuming*** that Massachusetts has an interest in having its laws applied in this case, Defendants must still satisfy the third and final "comparative impairment" prong of the governmental interest analysis; that is, the Court must select the law of the state whose interests would be "more impaired" if the law were not applied.  In this third prong, the balance is weighted in favor of the application of California law.  *Engel v. CBS, Inc.*, 981 F.2d 1076, 1081 (9th Cir. 1992) (noting preference for California law in "comparative impairment" prong); *Fleury v. Harper & Row, Publishers, Inc.*, 698 F.2d 1022, 1025 (9th Cir. 1983) (applying California law). Here, Defendants have not offered any argument why Massachusetts would be more impaired if its law were not applied.

California, on the other hand, has a direct and tangible interest in having its law apply.  All Defendants are headquartered in San Francisco, California, where all material conduct with respect to the Fund occurred.  As the California Supreme Court has stated, the state has "a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices" within its own territory.  *Diamond Multimedia Sys., Inc. v. Super. Ct.*, 19 Cal.4th 1036, 1064 (1999).

### B.      Under California Law Plaintiff Has Adequately Pled Breach of Fiduciary Duty

Under California Law, Defendants owe Plaintiff and all shareholders a fiduciary duty.  As described in the Complaint, this duty was breached when Defendants deviated from the fundamental investment objectives of the Fund.

### 1.      Defendants Owe Shareholders a Fiduciary Duty

Defendant Schwab Investments undeniably owed the Fund's shareholders a fiduciary duty because it, and its Board of Trustees, are responsible for the oversight of the Fund's investments and the oversight of the investment advisor, as well as all SEC filings.  The Complaint details the factual basis for the duty, as well as its breach.

Moreover, while Defendants attempt to downplay Defendant Charles Schwab & Co., Inc.'s role, it, too, owes its customers a fiduciary duty.  *Blankenheim v. E. F. Hutton & Co.*, 217 Cal.App.3d 1463, 1475 (1990) ("the law is well settled in California that the relationship between a stockbroker and his customer is fiduciary in nature."); *Duffy v. Cavalier*, 215 Cal.App.3d 1517, 1534

1    (1989).  Independently, Charles Schwab & Co., Inc. is in a fiduciary relationship with customers as

2    the parent company of Schwab Investments.

3           Moreover, as the Investment Advisor is responsible for the management of the Fund's

4    investments, it, too, stands in a fiduciary relationship with the Fund and its clients.  *See*

5    *In re Daisy Sys. Corp.*, 97 F.3d 1171, 1178 (9th Cir. 1996); *Stokes v. Henson*, 217 Cal.App.3d 187,

6    195 (1990) (inferring fiduciary duty between investment advisor and client).[14]

7           In any event, the existence of a fiduciary duty is a question of fact and is thus inappropriate

8    for decision upon a motion to dismiss.  *See Strigliabotti,* 2005 U.S. Dist. LEXIS 9625, at **25-26;

9    *Kudokas v. Balkus,* 26 Cal.App.3d 744, 750 (1972) ("Existence of a confidential or fiduciary

10   relationship depends on the circumstances of each case and is a question of fact for the fact trier.").

11   Here, Plaintiffs have alleged the Defendants are the investment advisor, trustee, and principal

12   underwriter for the Fund.  As such, they controlled, managed and participated in the investment

13   decisions for the Fund.

14              **2.        Defendants Breached Those Fiduciary Duties**

15          As detailed in the Complaint, Defendants breached their fiduciary duties.  The Complaint

16   lays out when the Fund first reported material deviations from the Index as well as from its own

17   industry concentration limitations.  *See* ¶¶70-84.  These material misrepresentations and omissions

18   are sufficient to state a claim for constructive fraud in California, even if no intent to deceive is

19   present.  *See, e.g., Vai v. Bank of America Nat'l Trust & Sav. Assn*, 56 Cal.2d 329, 343 (1961).

20   **VII.    PLAINTIFF'S CLAIMS FOR BREACH OF CONTRACT AND BREACH OF THE
21          COVENANT OF GOOD FAITH AND FAIR DEALING ARE MORE THAN
            ADEQUATELY PLED**

22          **A.        The Prospectuses and Plaintiff's Purchase of Shares of the Fund Constitute a
23                  Contract**

24          Defendants' claim that SEC filings and prospectuses can never form the basis of a contract is

25   false.  *See In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F.Supp. 712, 728 (S.D.N.Y. 1989)

---

26   [14] Northstar seeks leave, if necessary, to amend its Complaint to assert claims against Charles
     Schwab & Co., Inc. and the Investment Advisor for 1) aiding and abetting the breach of fiduciary
27   duty as well as 2) acting in concert with the Trust to breach the latter's fiduciary duty. *See
     Strigliabotti v. Franklin Res., Inc.*, C 04-00883 SI, 2005 U.S. Dist. LEXIS 9625, at **26-28 (N.D.
28   Cal. Mar. 7, 2005); *Casey v. U.S. Bank Nat'l. Assn.*, 127 Cal.App.4th 1138, 1144 (2005).

1   (accepting, without discussion that an Offer to Purchase was a contract with shareholders); *Franklin*

2   *Life Ins. Co. v. Commonwealth Edison Co.*, 451 F.Supp. 602, 605 (S.D. Ill. 1978) (It is unquestioned

3   that the redemption terms contained in a prospectus create a contract between the corporation and its

4   stockholders.). As noted by Defendants, normal contract principles apply. *Kruse v. Bank of Am.*,

5   202 Cal.App.3d 38, 59 (1988) ("It is, of course, elemental that the creation of a valid contract

6   requires mutual assent ordinarily evidenced by an offer and acceptance.").

7        An offer is "is the manifestation of willingness to enter into a bargain, so made as to justify

8   another person in understanding that his assent to that bargain is invited and will conclude it."

9   Restatement (SECOND) CONTRACTS §24 (1981). Here, the language of the prospectus itself makes

10  clear that an offer is being made where the funds are registered and qualified for sale. Moreover,

11  each prospectus describes the Fund in detail and instructs the reader on how to purchase shares of

12  the Fund.

13       The Fund's prospectus constituted an offer because it invited the investor's performance (by

14  placing an order) to be the conclusion of the bargain. After the investor accepts the offer by placing

15  an order, as contemplated by the prospectus, for consideration (exchanges of money for shares of the

16  Fund) a contract is created. *See* Cal. Civ. Code §1550.

17       Defendants' reliance on *Cohen v. Stratosphere Corp.* 115 F.3d 695, 697 (9th Cir. 1997), is

18  irrelevant because the plaintiffs there never actually tendered consideration. *Id.* at 697 (plaintiffs

19  "complain that they were improperly denied the opportunity to purchase stock at all"). Similarly,

20  *McKesson HBOC, Inc. v. N.Y. State Common Retirement Fund, Inc.*, 339 F.3d 1087 (9th Cir. 2003),

21  did not hold that prospectuses could not ever, as a matter of law, be the foundation of a contract.

22  Rather, the court found that the prospectus in that case could not serve as the foundation for a

23  contract with the shareholders because there was a separate merger agreement that was the basis of

24  the transaction and, in any event, the shareholders never "accepted" the exchange proposal in the

25  prospectus because they never actually tendered their shares. *Id.* at 1092. The prospectus here, in

26  contrast, invited potential investors to accept the offer by purchasing shares, and the "bargained for

27  exchange" is the offeree/investor's monies in exchange for the equity interest in the Fund. *See*

28

1    RESTATEMENT (SECOND) CONTRACTS §71 (1981).[15]

2        **B.    Plaintiff Has Adequately Pled A Breach of Contract Between The Trust and Shareholders of the Fund**

3            The 1997 Proxy Statement established a contract between the registered investment company
4    (Schwab Investments) and the Fund's shareholders that required Schwab Investments to adhere to
5    the Fund's fundamental investment objectives.    ¶¶25-69.    Schwab Investments breached that
6    contract when it deviated from the Index and concentrated more than 25% of total assets in high-risk
7    CMOs.[16]  ¶¶70-84.

8        **C.    Plaintiff Has Adequately Plead A Claim For Breach Of The Covenant Of Good Faith And Fair Dealing**

9            California has long recognized an "implied covenant of good faith and fair dealing in every
10   contract that neither party will do anything which will injure the right of the other to receive the
11   benefits of the agreement." *Kransco v. Am. Empire Surplus Lines Ins. Co.*, 23 Cal.4th 390, 400
12   (2000) (citing *Comunale v. Traders & General Ins. Co.*, 50 Cal.2d 654 (1958)).   This covenant
13   "finds particular application in situations where one party is invested with a discretionary power
14   affecting the rights of another." *Carma Developers (Cal.), Inc. v. Marathon Dev. Calif., Inc.*, 2
15   Cal.4th 342, 372 (1992).

16

17           While a breach of the contract is not required for a finding of liability under this claim, "the
18   scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and
19   express terms of the contract." *Id.* at 373.   It is a fundamental principle of contract law that to the
20   extent there is any ambiguity in the terms of the prospectus as giving rise to a contract, such
21   ambiguity must be resolved against the drafter of the prospectus. *Palmer v. Truck Ins. Exch.*, 21
22   Cal.4th 1109, 1115 (1999).   Here, Defendants breached the covenant by not following the industry

---

23   [15] Defendants claim that there is no consideration present because they were required to disclose the
24   Fund's investment policies.  Def. Mem. at 17.  However, federal law did not mandate Defendants'
     specific contractual obligations, such as to "track" the Index.  That federal law mandates disclosure
25   of material information has no bearing on whether an offer to sell a security accompanied by specific
     representations on how the Fund would be managed establishes a contract.

26   [16] Plaintiff also has standing, as an intended third party beneficiary, to assert a breach of contract
     claim based on the contract between the Trust and the Investment Advisor Requiring the Investment
27   Advisor to "adher[e] to the Fund's stated investment objective."  ¶16.  *See* Cal. Civ. Code §1559 ("A
     contract, made expressly for the benefit of a third person, may be enforced by him at any time before
28   the parties thereto rescind it.").

[C-08-4119 SI] PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS COMPLAINT                                        22

concentration limits and other rules they themselves wrote into their own prospectuses and other SEC filings.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss the Complaint.

**E-Filing Attestation**

I, Christopher T. Heffelfinger, am the ECF User whose ID and password are being used to file this document.  In compliance with General Order 45 X.B., I hereby attest that ROBERT C. FINKEL, whose e-filing signature appears below, has concurred in the filing of this document.

Dated:  December 11, 2008

**WOLF POPPER LLP**

By: ___/s/ Robert C. Finkel_____
                  ROBERT C. FINKEL
                  (admitted *pro hac vice*)

845 Third Avenue
New York, NY  10022
Telephone: (212) 759-4600
Facsimile:  (212) 486-2093

Marc J. Gross
**GREENBAUM ROWE SMITH & DAVIS LLP**
75 Livingston Street, Suite 301
Roseland, NJ  07068
Telephone: (973) 535-1600
Facsimile:  (973) 535-1698

Joseph J. Tabacco, Jr.
Christopher T. Heffelfinger
James C. Magid
**BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO**
425 California Street, Suite 2100
San Francisco, CA  94104
Telephone: (415) 433-3200
Facsimile:  (415) 433-6382

**Attorneys for Plaintiff Northstar Financial Advisors, Inc.**