| | |
|---|---|
| 1 | DARRYL P. RAINS (CA SBN 104802) |
| | K.C. ALLAN WALDRON (CA SBN 231866) |
| 2 | MORRISON & FOERSTER LLP |
| | 755 Page Mill Road |
| 3 | Palo Alto, California 94304-1018 |
| | Telephone: 650.813.5600 |
| 4 | Facsimile: 650.494.0792 |
| | Email: DRains@mofo.com; KCWaldron@mofo.com |
| 5 | |
| | DOROTHY L. FERNANDEZ (CA SBN 184266) |
| 6 | MORRISON & FOERSTER LLP |
| | 425 Market Street |
| 7 | San Francisco, California 94105-2482 |
| | Telephone: 415.268.7000 |
| 8 | Facsimile: 415.268.7522 |
| | Email: DFernandez@mofo.com |
| 9 | |
| | Attorneys for defendants Schwab Investments, Charles |
| 10 | Schwab & Co., Inc., Charles Schwab Investment Management, |
| | Inc., and Schwab Total Bond Market Fund |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| NORTHSTAR FINANCIAL ADVISORS, INC., on behalf of itself and all others similarly situated, | | Case No.   CV-08-4119 SI |
| Plaintiff, | | CLASS ACTION |
| v. | | REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS COMPLAINT |
| SCHWAB INVESTMENTS, CHARLES SCHWAB & CO., INC., CHARLES SCHWAB INVESTMENT MANAGEMENT, INC., and SCHWAB TOTAL BOND MARKET FUND, | | Date:   January 23, 2009<br>Time:   9:00 a.m.<br>Court:   10<br>Judge:  Hon. Susan Illston |
| Defendants. | | |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION .......................................................................................................................1

ARGUMENT ................................................................................................................................1

I. NORTHSTAR LACKS STANDING BECAUSE IT DID NOT PURCHASE FUND SHARES. ..........................................................................................1

II. NORTHSTAR'S SECTION 13(A) CLAIM MUST BE DISMISSED. ............................4

    A. Section 13(a) Does Not Allow an Implied Private Right of Action. .....................4

    B. Northstar Does Not Properly Allege a Violation of Section 13(a). .......................6

        1. The Fund Did Not Deviate from Its Investment Objective. .......................6

        2. The Fund Did Not Deviate from Its Concentration Policy. .......................8

    C. Northstar's Section 13(a) Claim Is Barred by the Statute of Limitations. ..........................................................................................................10

III. NORTHSTAR'S BREACH OF FIDUCIARY DUTY ALLEGATIONS DO NOT STATE A CLAIM. ........................................................................................11

    A. Northstar Does Not Adequately Allege That Each Defendant Owed a Fiduciary Duty to Fund Investors. .....................................................................11

    B. Northstar Does Not Allege Any Breach of Duties. .............................................13

IV. NORTHSTAR'S THIRD AND FOURTH COUNTS SHOULD BE DISMISSED. .....................................................................................................................13

    A. Northstar Does Not Plead a Contract. .................................................................13

    B. Northstar Alleges No Breach of Contract. ..........................................................14

    C. The Breach of Covenant of Good Faith and Fair Dealing Claim Should Be Dismissed. ........................................................................................................15

CONCLUSION ..........................................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Batchelder v. Kawamoto*,
   147 F.3d 915 (9th Cir. 1998) ............................................................................................ 11

*Bell Atlantic Corp. v. Twombly*,
   530 U.S. 544, 127 S. Ct. 1955 (2007) ................................................................................. 1

*Betz v. Trainer Wortham & Co., Inc.*,
   504 F.3d 1017 (9th Cir. 2007) .......................................................................................... 10

*Blatt v. Merrill Lynch*,
   916 F. Supp. 1343 (D. N.J. 1996) ....................................................................................... 5

*Conley v. Gibson*,
   355 U.S. 41 (1957) .............................................................................................................. 1

*Davis & Cox v. Summa Corp.*,
   751 F.2d 1507 (9th Cir. 1985) .......................................................................................... 12

*Employers-Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Anchor Capital Advisors*,
   498 F.3d 920 (9th Cir. 2007) .............................................................................................. 3

*Friese v. Superior Court*,
   134 Cal. App. 4th 693 (2005) ........................................................................................... 11

*Halebian v. Berv*,
   No. 06 Civ. 4099 (NRB), 2007 WL 2191819 (S.D.N.Y. July 31, 2007) ............................ 12

*Hamilton v. Allen*,
   396 F. Supp. 2d 545 (E.D. Pa. 2005) ................................................................................ 13

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
   159 F.3d 723 (2d Cir. 1998) ........................................................................................... 5, 8

*In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig.*,
   No. 95 Civ. 0330 (LMM), 1996 WL 551732 (S.D.N.Y. Sept. 27, 1996) ............................ 9

*In re Am. Funds Sec. Litig.*,
   556 F. Supp. 2d 1100 (C.D. Cal. 2008) ............................................................................ 10

*In re Blackrock Mut. Funds Fee Litig.*,
   No. 04 Civ. 164 (TFM), 2006 WL 4683167 (W.D. Pa. Mar. 29, 2006) ............................ 12

*In re Daisy Sys. Corp.*,
   97 F.3d 1171 (9th Cir. 1996) ............................................................................................ 13

*In re Ditropan XL Antitrust Litig.*,
    529 F. Supp. 2d 1098 (N.D. Cal. 2007) .................................................................................. 4

*In re Nuvelo, Inc. Sec. Litig.*,
    No. C 07-4056 VRW, 2008 WL 5114325 (N.D. Cal. Dec. 4, 2008) ....................................... 4

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*,
    209 F.R.D. 353 (S.D.N.Y. 2002) ........................................................................................... 3

*In re VeriSign, Inc., Derivative Litig.*,
    531 F. Supp. 2d 1173 (N.D. Cal. 2007) ................................................................................ 12

*Kim v. Regents of the Univ. of Cal.*,
    80 Cal. App. 4th 160 (2000) ................................................................................................ 15

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ............................................................................................................... 3

*Krouner v. Am. Heritage Fund, Inc.*,
    899 F. Supp. 142 (S.D.N.Y. 1995) ......................................................................................... 7

*Lapidus v. Hecht*,
    232 F.3d 679 (9th Cir. 2000) .............................................................................................. 4, 5

*Lapidus v. Hecht*,
    No. C 98-3130 MMC, 2002 WL 1034042 (N.D. Cal. May 17, 2002) ................................. 11

*Miller v. Dyadic Int'l, Inc.*,
    No. 07-80948-CIV-DIMITROULEAS,
    2008 U.S. Dist. LEXIS 32271 (S.D. Fl. Apr. 18, 2008) ......................................................... 3

*Mosesian v. Peat, Marwick, Mitchell & Co.*,
    727 F.2d 873 (9th Cir. 1984) ................................................................................................ 10

*Mutchka v. Harris*,
    373 F. Supp. 2d 1021 (C.D. Cal. 2005) ................................................................................ 12

*Olmsted v. Pruco Life Ins. Co.*,
    283 F.3d 429 (2d Cir. 2002) ............................................................................................... 5, 6

*Pension Trust Fund v. Anchor Capital Advisors*,
    498 F.3d 920 (9th Cir. 2007) .................................................................................................. 3

*Phillips v. Morgan Stanley Dean Witter High Income Advantage Trust III*,
    No. 01 CIV. 8139, 2002 WL 31119441 (S.D.N.Y. Sept. 25, 2002) ................................... 7, 9

*Potomac Capital Markets Corp. v. Prudential- Bache Corp. Dividend Fund, Inc.*,
    726 F. Supp. 87 (S.D.N.Y. 1989) ........................................................................................... 5

*Sakamoto v. Duty Free Shoppers, Ltd.*,
   764 F.2d 1285 (9th Cir. 1985) ..................................................................................................5

*Stokes v. Henson*,
   217 Cal. App. 3d 187 (1990) ..................................................................................................13

*Takeda v. Turbodyne Tech., Inc.*,
   67 F. Supp. 2d 1129 (C.D. Cal. 1999) .....................................................................................3

*Westlye v. Look Sports, Inc.*,
   17 Cal. App. 4th 1715 (1993) .................................................................................................14

*W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*,
   549 F.3d 100 (2d Cir. 2008) ..............................................................................................2, 3


**STATUTES AND RULES**

15 U.S.C.
   § 80a-8(b)(2) ............................................................................................................................7

Fed. R. Civ. P.
   8................................................................................................................................................1

Cal. Corp. Code
   § 2116 .....................................................................................................................................11

**OTHER AUTHORITIES**

Witkin, *Summary of California Law: Contracts* (10th ed. 2005) § 799 .....................................15

**INTRODUCTION**

The parties agree that Rule 8 provides the pleading standard by which Northstar's complaint must be judged. But we disagree on what Rule 8 requires. Northstar argues its complaint must only give "fair notice" of its claims, citing *Conley v. Gibson*, 355 U.S. 41, 47-48 (1957). (Opp. Br. at 5.) But bare notice (if it were ever acceptable) is not enough now after *Bell Atlantic Corp. v. Twombly*, 530 U.S. 544, 127 S. Ct. 1955 (2007). *Bell Atlantic* specifically rejected *Conley's* "fair notice" language, saying it is "best forgotten as an incomplete, negative gloss on an accepted pleading standard." 127 S. Ct. at 1969. Instead, *Bell Atlantic* says that Rule 8 "requires more than labels and conclusions." *Id*. at 1965. A plaintiff must now plead "enough fact to raise a reasonable expectation that discovery will reveal evidence" of wrongful conduct. *Id*. That is, a plaintiff must plead enough to get across "the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 1966.

Northstar's complaint does not get over this line: it offers no facts to make plausible its assertion that the fund deviated from its investment objective, and it does not support a reasonable expectation that discovery will reveal evidence of wrongful conduct. As we show below, Northstar pleads no plausible basis for a finding that it has standing to sue, that it has an implied private right of action under section 13(a), or that the fund deviated from its investment objective or concentration policy. Nor does Northstar plead facts supporting a reasonable expectation that discovery will reveal any breach of fiduciary duty or breach of contract. For these reasons, Northstar's complaint should be dismissed.

**ARGUMENT**

**I.   NORTHSTAR LACKS STANDING BECAUSE IT DID NOT PURCHASE FUND SHARES.**

We showed, in our opening brief, that Northstar lacks standing to bring this action because it never purchased or owned fund shares. (Open. Br. at 5-6.) As a result, Northstar suffered no personal "injury in fact" and has no personal "right to redress." (*Id.*)

In response, Northstar says it suffered an "injury-in-fact" because it "operates under a fee-based structure based on the total value of assets under management," and it allegedly "suffered a

1  reduction in fees as the total value of the assets it manages decreased." (Opp. Br. at 14.) Not

2  surprisingly, Northstar cites no case holding that a drop in asset-based fee revenue confers

3  standing to sue over the purchase of one of the underlying assets.

4        The leading case on investment advisor standing is *W.R. Huff Asset Management Co.,*

5  *LLC v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008). In *Huff*, an investment advisor

6  sought to bring securities claims on behalf of investors for whom it had purchased bonds issued

7  by Adelphia Communications. It claimed to have standing to sue on behalf of its clients as their

8  "investment adviser" and "attorney-in-fact." *Id*. at 104. But the Second Circuit rejected both

9  arguments — it specifically disallowed any notion of "investment manager standing," and it

10 concluded that "a power of attorney does not enable the grantee to bring suit in its own name."

11 *Id.* at 108, 110. Interestingly, the investment advisor argued in its briefs ("but not in its

12 complaint") that it had personally "suffered informational injuries and damages to its reputation

13 as a result of . . . the poor performance of the Adelphia bonds that [it] bought for its clients." *Id*.

14 at 104 n.2. But the only award sought in the complaint itself was damages based on the decline in

15 the bonds' value (plus costs of suit and attorneys' fees). *Id*. As a result, the Second Circuit

16 refused to consider whether the advisor had standing to pursue a separate claim to have "suffered

17 an injury individually in a way that is separate from its agency function." *Id*. at 104.

18       The exact same situation exists here. In its complaint, Northstar claims to have standing

19 to sue as an investment advisor who purchased fund shares for its investors. (Compl. ¶¶ 9-12.)

20 Those allegations clearly are not enough under *Huff*. Now, in its opposition brief, Northstar

21 argues for the first time that its standing derives, not from its status as an investment advisor, but

22 rather from its own "injury" — that is, a "reduction in fees" from its clients. (Opp. Br. at 14.)

23 That is not the injury alleged in Northstar's complaint. The complaint seeks losses based on the

24 "under performance between the Fund and the Index," which allegedly "caused [the fund] to

25 incur a negative total return of 1.09% for the period September 4, 2007 through August 27, 2008,

26 compared to a positive return of 5.92% for the Index over that period." (Compl. ¶¶ 5, 84.)

27 Nowhere in the complaint does Northstar seek any recovery for lost investment advisory fees. Of

28 course, even if Northstar could assert its own individual claim for lost fees, it would still not have

standing to assert claims, on behalf of its investors, based on the fund's alleged poor performance. *Kowalski v. Tesmer*, 543 U.S. 125, 128-29 (2004) (citations omitted) (attorneys lacked standing to assert *pro se* defendants' claims even if the attorneys had standing to assert their own claims).

Northstar relies on three cases, but none of them is a standing case. They are, instead, "lead plaintiff" cases under the Reform Act. As the Second Circuit noted in *Huff*, the Reform Act's lead plaintiff standards "are separate and apart from the elements of constitutional standing . . . and cannot be used to avoid constitutional requirements." 549 F.3d at 106.

In any event, none of the three cases says an investment advisor has standing to assert claims belonging to its clients. In *Employers-Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Anchor Capital Advisors*, 498 F.3d 920 (9th Cir. 2007), the Ninth Circuit held that absent class members lacked standing to appeal from an order dismissing a complaint. In a footnote, the court observed, without deciding, a split of authority as to whether an investment advisor can be a lead plaintiff without express delegated written authority from its clients. *Id.* at 922 n.1. *Takeda v. Turbodyne Technologies, Inc.*, 67 F. Supp. 2d 1129 (C.D. Cal. 1999), is distinguishable from this case because it involved a lead plaintiff motion where one of the proposed plaintiffs was an investment advisor which traded "on its own account" and "presumably some portion of its loss was incurred in a personal rather than a representative capacity." *Id.* at 1136 n.18 (quotations omitted). And *Miller v. Dyadic International, Inc.*, No. 07-80948-CIV-DIMITROULEAS, 2008 U.S. Dist. LEXIS 32271, at *26-*31 (S.D. Fl. Apr. 18, 2008), merely held that an investment advisor could serve as an adequate "institutional" lead plaintiff under the Reform Act. These cases may be contrasted with the many cases that expressly say an investment advisor lacks standing to sue on behalf of its clients. *See, e.g., In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 209 F.R.D. 353, 357-58 (S.D.N.Y. 2002) (investment advisor cannot be class representative because it lacked standing; "the .35% fee it earned on the total assets it invested . . . was almost purely in a representative capacity, rather than as an investor").

In a footnote, Northstar reveals that, in response to our motion, it went out and "obtained an assignment of claims . . . from one of its clients." (Opp. Br. at 15-16 n.9.) This brief disclosure raises more questions than it answers. The assignment, for example, does not appear

to have been made for any consideration, and it does not reveal whether the client, or Northstar, would be entitled to any recovery. (*See* Dec. 8, 2008 Assignment of Claim, attached to Finkel Decl. as Ex. F.) In any event, the assignment is not pleaded in Northstar's complaint, and Northstar "may not plead new facts via motion practice." *In re Nuvelo, Inc. Sec. Litig.*, No. C 07-4056 VRW, 2008 WL 5114325, at *14 (N.D. Cal. Dec. 4, 2008); *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1100-01 (N.D. Cal. 2007) (complaint dismissed where plaintiff claimed to have assignment but the "complaint fail[ed] to allege the existence of the assignment"). Northstar does not have standing to pursue this action.

## II.   NORTHSTAR'S SECTION 13(A) CLAIM MUST BE DISMISSED.

Northstar acknowledges that section 13(a) applies only to registered investment companies, and that three of the four defendants — Charles Schwab & Co., Inc., Charles Schwab Investment Management, and the Schwab Total Bond Market Fund — are not registered investment companies. (Opp. Br. at 6 n.4.) Those defendants should be dismissed from this claim based on Northstar's concession.

Northstar continues to insist, though, that it has an implied right of action under section 13(a), and that it has properly pleaded violations of that statute against Schwab Investments. We address both issues below.

### A.   Section 13(a) Does Not Allow an Implied Private Right of Action.

We demonstrated in our opening brief that, in the past six years, dozens of courts (including several judges in this district) have declined to imply private rights of action under the '40 Act, and that no court has recognized an implied right of action under the act during that period. (Open. Br. at 8.) We also showed how the four *Cort v. Ash* factors virtually mandated these outcomes. (*Id.*)

Northstar responds by arguing it is "well-settled law that a private right of action **does** exist under Section 13(a)," and it cites *Lapidus v. Hecht*, 232 F.3d 679 (9th Cir. 2000), as its principal support for this statement. (Opp. Br. at 16, emphasis in original.) In fact, *Lapidus* expressly declined to reach the question. In *Lapidus*, the district court dismissed the plaintiffs' claims "for lack of subject matter jurisdiction." 232 F.3d at 681. The question before the Ninth

Circuit was whether the district court's jurisdictional ruling was proper. In a footnote, the court identified, as a separate issue, the question of whether a private right of action exists for section 13(a). The court's entire footnote says only this:

> The United States Supreme Court has expressly declined to address whether there exists an implied private right of action under the ICA. *See Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 97 n. 4, 114 L.Ed.2d 152, 111 S.Ct. 1711 (1991); *Burks v. Lasker,* 441 U.S. 471, 476 n.5, 60 L.Ed.2d 404, 99 S.Ct. 1831 (1979). However, because the "question whether a cause of action exists is not a question of jurisdiction," it "may be assumed without being decided." *Burks,* 441 U.S. at 476 n. 5 .

*Id.* at 681 n.4. The decision not to decide an issue, of course, is not legal precedent. *See, e.g., Sakamoto v. Duty Free Shoppers, Ltd.*, 764 F.2d 1285, 1288 (9th Cir. 1985) (prior decision not precedent because "court simply assumed that the commerce clause applied, but the issue was never raised or discussed").

Northstar also drops a footnote citing three cases that, according to Northstar, "found Section 13(a) to provide a private right of action." (Opp. Br. at 16 n.11.) Two of the cases — *Potomac Capital Markets Corp. v. Prudential-Bache Corp. Dividend Fund, Inc.*, 726 F. Supp. 87, 92-93 (S.D.N.Y. 1989), and *Blatt v. Merrill Lynch*, 916 F. Supp. 1343, 1357 (D. N.J. 1996) — arose within the Second Circuit. Both predate the Second Circuit's decision in *Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429 (2d Cir. 2002), which specifically overruled both cases as being part of "an '*ancien regime*.'" *Olmsted*, 283 F.3d at 434 & n.4. Thus, they are no longer good authority. The third case — *Hunt v. Alliance North American Government Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998), was decided by the Second Circuit and also predates *Olmsted*. The only reason it was not overruled by *Olmsted* is because it, like *Lapidus*, did not squarely address the question of whether section 13(a) provides an implied private right of action. As such, *Hunt* is not authority for the proposition that a private right of action may be implied.

Finally, Northstar points out that *Olmsted* involved a different section of the '40 Act, and argues that *Olmsted* "did not address the well-settled law finding a private right of action under Section 13(a)." (Opp. Br. at 17.) As we have seen, there is no "well-settled" authority implying a private right of action under section 13(a). More importantly, Northstar does not explain why

REPLY MEM. IN SUPPORT OF MOTION TO DISMISS COMPLAINT
CASE NO. CV-08-4119 SI
pa-1309110

5

some supposed difference between section 13(a) and the sections addressed in *Olmsted* might compel a different outcome. The opposite is true: *Olmsted's* careful application of the *Cort v. Ash* factors would, upon application to section 13(a), produce the exact same outcome. *Olmsted* says a court must examine the text of the statute and the evidence of congressional intent to determine whether a private right of action that is not stated in the statute may nonetheless be implied by the courts. *Olmsted*, 283 F.3d at 432. Here, section 13(a)'s text prohibits conduct rather than creating rights and expressly provides for SEC enforcement without mentioning private enforcement. And there is no evidence of congressional intent to permit private enforcement; to the contrary, Congress created express private rights of action for other '40 Act sections without doing so for section 13(a). All these factors demonstrate that no private right of action should be implied for section 13(a), just as no private right of action was allowed by *Olmsted* for other '40 Act sections.

Northstar has asserted a claim under a statute that does not permit private enforcement. Its section 13(a) claim must be dismissed.

### B. Northstar Does Not Properly Allege a Violation of Section 13(a).

As best we can tell, Northstar bases its section 13(a) claim on allegations that (i) the fund failed to track the Lehman index, and (ii) the fund invested in "high risk, non-U.S. agency collateralized mortgage obligations ('CMOs')." (Opp. Br. at 1.)

Our opening brief demonstrated the fund never promised it would always track the Lehman index, and the fund openly disclosed its investments in non-agency CMOs. (Open. Br. at 9-12.) Still, Northstar maintains it is enough to allege the fund deviated from the index for several months and purchased non-agency CMOs. (Opp. Br. at 5-7.) We refute each contention below.

#### 1. The Fund Did Not Deviate from Its Investment Objective.

The fund's fundamental investment objective is specifically called out in the fund's prospectuses and SAIs. The prospectuses say the fund "seeks high current income by tracking the performance of the Lehman Brothers U.S. Aggregate Bond Index." (July 13, 2007 Prospectus at 14, attached to Waldron Decl. as Ex. A.) The fund's SAIs say the same thing in a bit more detail:

> [The fund's] investment objective is to attempt to provide a high level of current income consistent with preservation of capital by seeking to track the investment results of [the Lehman Brothers U.S. Aggregate Bond Index] through the use of an indexing strategy.

(Sept. 1, 2006 SAI at *2, attached to Waldron Decl. as Ex. B.)[1]

Northstar says Schwab Investments violated section 13(a) when the fund's performance fell below that of the Lehman index. (Opp. Br. at 5 (fund cannot, without a shareholder vote, deviate "from its fundamental investment polic[y to] 'track' the Index by use of an 'indexing strategy'").) But failing to achieve an investment objective is not the same thing as violating it. The actual language of the fund's investment objective makes this clear: the fund said only that it "seeks" and will "attempt" to track the index. Tracking the returns of the index for nearly ten years, and then falling short for several months, does not mean the fund deviated from its objective — it only means it did not achieve it. The fund's prospectuses, of course, clearly warned that "[t]here can be no guarantee that [the fund] will produce the desired results." (July 13, 2007 Prospectus at 17.) The fund was not required to obtain shareholder approval each time it began to underperform the Lehman index, nor would it have been feasible to do so as the proxy process takes months to complete.

Northstar also argues the fund deviated from its stated investment objective by purchasing "non-agency CMOs," which it says "were inconsistent with the Fund's stated investment objective to 'track' the Index 'through the use of an indexing strategy.'" (Opp. Br. at 6.) Nothing in the fund's stated fundamental investment objective, however, says anything about CMOs (whether issued by commercial banks or a government-affiliated entity like Fannie Mae or Freddie Mac). The investment objective says only that the fund will employ an indexing strategy. Northstar pleads no facts explaining how a decision to buy, or not buy, a non-agency CMO might constitute a deviation from the fund's indexing strategy. *See Krouner v. Am. Heritage Fund, Inc.*,

---

[1] These statements of the fund's fundamental investment objective are required by section 8 of the '40 Act. 15 U.S.C. § 80a-8(b)(2). The court may not treat any other statement as a fundamental investment objective if it is not expressly identified as such in the fund's prospectuses and SAIs. *Phillips v. Morgan Stanley Dean Witter High Income Advantage Trust III*, No. 01 CIV. 8139, 2002 WL 31119441, at *4 (S.D.N.Y. Sept. 25, 2002).

899 F. Supp. 142, 148-49 (S.D.N.Y. 1995) (fund invested in small-capitalization companies with "no profitable (or any) operating history, going concern qualifications in accountants' reports, [and] undeveloped product lines;" no violation of section 13(a) because fund had no particular "policy regarding investment in 'small cap' securities, or securities in the types of companies with which [the] plaintiff [was] concerned"); *Hunt*, 159 F.3d at 731 (investments in risky Argentine securities did not violate fund's objective to take on only "prudent investment risk").

Far from it: other disclosures contained in the fund's SAIs show the fund's indexing strategy <u>did</u> involve purchasing non-agency CMOs. The SAIs contain a 4-page-long discussion of mortgage-backed securities which explains, in detail, how mortgage-backed securities "may also be issued by private issuers, generally originators and investors in mortgage loans, including savings associations, mortgage banks, commercial banks, and special purpose entities," and "may be issued without any governmental guarantee." (*See, e.g.,* Sept. 1, 2006 SAI at *23-*26.) The discussion also includes several paragraphs of information specifically about CMOs. (*Id.*)

Finally, Northstar claims non-agency CMOs are inherently "high risk" and "significantly more risky than the agency-issued mortgage-backed securities that were part of the Index." (Opp. Br. at 6.) Northstar pleads no facts to support this charge, and it is obviously untrue, as many non-agency CMOs earn triple-A ratings while many tranches of Fannie Mae and Freddie Mac CMOs obtain lower credit ratings. Nor does Northstar plead any facts showing the fund's ownership of non-agency CMOs somehow made the fund's overall portfolio more risky than the Lehman index.

Northstar's two allegations do not make out a case that the fund deviated from its fundamental investment objective to seek to track the Lehman index using an indexing strategy.

### 2. **The Fund Did Not Deviate from Its Concentration Policy.**

Section 13(a) prohibits a registered investment company from deviating from its concentration policy without obtaining shareholder approval. We showed, in our opening brief, that the fund limits its concentration in any one industry to 25 percent of the fund's assets, and that the fund may, consistent with SEC regulations, reasonably determine what an "industry" is for these purposes. We also showed the fund fully disclosed its treatment of mortgage-backed

securities under this policy, including the 2006 disclosure that the fund had determined that non-agency mortgage-backed securities would no longer be treated as part of any industry.  (Open. Br. at 10-12.)

That change was fully permitted by Guide 19 and did not require a shareholder vote.  SEC Release No. IC-13436, at *74 (Aug. 12, 1983).  Northstar, by contrast, insists that any revision to an industry definition constitutes a change to a fund's overall concentration policy.  It argues that Guide 19 "confirms that a fund wishing to change its concentration policy must disclose its intention to do so and then obtain shareholder approval." (Opp. Br. at 8-9.)  We agree with that statement, but it does not respond to our point.  The fund never changed its concentration policy, which has always been not to "concentrate investments in a particular industry or group of industries."  (Sept. 1, 2006 SAI at *39.)  Instead, the fund changed an industry classification.  Guide 19 does not require a shareholder vote every time an industry classification is changed — it simply requires disclosure.  Courts agree that changes to investment policies and practices not designated as "fundamental" do not require a shareholder vote.  *Phillips*, 2002 WL 31119441, at *4; *In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig.*, No. 95 Civ. 0330 (LMM), 1996 WL 551732, at *6 (S.D.N.Y. Sept. 27, 1996) (section 13(a) claim dismissed where challenged policy not "explicitly labeled as fundamental").  (*See* Sept. 1, 2006 SAI at *2-*3, *38-*40 (industry classification of mortgage-backed securities not part of fundamental concentration policy).)

Northstar also argues that non-agency CMOs are "one industry" — by this, it must mean the fund's decision to exclude mortgage-backed securities from any industry concentration limit was not "reasonable" within the meaning of Guide 19.  (*See* Opp. Br. at 9-10.)  Northstar offers no authority for this claim; it argues, instead, that the collateral for all mortgage-backed securities is "residential homes" and that "real estate is a separate asset class."  (*Id*. at 9.)  Neither of these arguments supports the idea that mortgage-backed securities comprise an "industry" — that is, that they together comprise a "productive enterprise in a particular field, often named after its principal product: *the automobile industry; the steel industry.*" (http://dictionary.reference.com/browse/industry.)

1   Northstar also claims that mortgage-backed securities fall "within a sub-industry of
2   mortgage real estate investment trusts." (Opp. Br. at 10.) But Northstar's authority actually says
3   that real estate investment trusts ("REITs") are an "industry" and that "Mortgage REITs" are a
4   sub-industry within the REIT industry. (Nov. 28, 2008 MSCI Barra/Standard & Poor's Press
5   Release, attached to Finkel Decl. as Ex. D, at 4-5.) As far as we can tell, no case, no rule or
6   regulation, and no industry source have ever called non-agency mortgage-backed securities an
7   "industry." The fund certainly was reasonable in concluding they are not.

### C. Northstar's Section 13(a) Claim Is Barred by the Statute of Limitations.

9    Everything Northstar complains about was fully disclosed in the fund's SEC filings more
10  than one year before Northstar commenced this action. The fund disclosed its performance versus
11  the Lehman index. It disclosed its investments in non-agency CMOs. And it disclosed its
12  concentration percentage in mortgage-backed securities, along with its decision not to classify
13  them as falling within the fund's 25 percent concentration limit. Northstar's section 13(a) is
14  therefore barred by the applicable one year/three year limitations period.

15   In response, Northstar argues that, "as a matter of fact or of law," a statute of limitations
16  defense "cannot be established by defendants' SEC filings." (Opp. Br. at 12, emphasis omitted.)
17  It maintains that public disclosures in SEC filings did not put it "on inquiry notice until late 2007,
18  at the earliest." (*Id*.) All of the relevant disclosures, however, were made in 2005 and 2006 —
19  that cannot be the basis of Northstar's argument. Instead, Northstar bases its argument on the
20  claim that "the Fund did not suffer any decline in value relative to the Index until late 2007." (*Id*.,
21  emphasis omitted.)

22   Actual losses, however, are not required to put an investor on inquiry notice. It is
23  improper conduct, not a realized loss, which triggers inquiry notice. *Betz v. Trainer Wortham &
24  Co., Inc.*, 504 F.3d 1017, 1024-25 (9th Cir. 2007) (limitations period runs once plaintiff has
25  inquiry notice and with reasonable diligence should have discovered facts constituting fraud);
26  *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 877 (9th Cir. 1984) (inquiry notice
27  triggered "when uncontroverted evidence irrefutably demonstrates that plaintiff discovered or
28  should have discovered" misconduct); *In re Am. Funds Sec. Litig.*, 556 F. Supp. 2d 1100, 1105

REPLY MEM. IN SUPPORT OF MOTION TO DISMISS COMPLAINT
CASE NO. CV-08-4119 SI
pa-1309110

10

(C.D. Cal. 2008) (securities claims dismissed where plaintiffs were on inquiry notice because of public information); *Lapidus* v. *Hecht*, No. C 98-3130 MMC, 2002 WL 1034042, at *7 (N.D. Cal. May 17, 2002) (limitations period begins to run "from the date the [§ 13] violation should have been discovered in the exercise of ordinary diligence").

### III. NORTHSTAR'S BREACH OF FIDUCIARY DUTY ALLEGATIONS DO NOT STATE A CLAIM.

In our opening brief, we explained that Northstar's fiduciary duty claim should be dismissed because it does not properly allege any fiduciary duty running from any of the four corporate defendants to the fund's investors. (Open. Br. at 14-15.) Northstar responds by arguing that California, not Massachusetts, law should be applied, and that California law imposes fiduciary duties on each of the defendants. (Opp. Br. at 17-20.) Northstar is wrong on both points.

#### A. Northstar Does Not Adequately Allege That Each Defendant Owed a Fiduciary Duty to Fund Investors.

The law of the state of incorporation governs disputes between a trust and its investors. Under California law, the choice of law rule applicable to the relationship between a company and its investors is the "internal affairs doctrine." Cal. Corp. Code § 2116 (codifying internal affairs doctrine); *Friese v. Superior Court*, 134 Cal. App. 4th 693, 706-07 (2005) ("internal affairs doctrine" applies "in the absence of an applicable local statute"). "The internal affairs doctrine is a conflict of laws principle which recognizes that only one [s]tate should have the authority to regulate a corporation's internal affairs." *Friese*, 134 Cal. App. 4th at 706 (quotations and citation omitted).

Northstar argues against the internal affairs doctrine, saying that, instead, California's general "governmental interests" choice-of-law rules should be applied. (Opp. Br. at 18.) But those rules do not apply when a corporation's internal affairs are at issue. *Cf. Batchelder v. Kawamoto*, 147 F.3d 915, 920 (9th Cir. 1998) ("internal affairs" doctrine followed rather than governmental interest test).

An investor's claim for breach of fiduciary duty by a trust, or its advisors, arises from the trust's "internal affairs" and therefore falls within the ambit of the "internal affairs" choice of law rule. *See, e.g.*, *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1527 (9th Cir. 1985) (fiduciary duty claims are "internal affairs"); *In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1214-15 (N.D. Cal. 2007) (law of state of incorporation applied to fiduciary duty claims); *Cf. Friese*, 134 Cal. App. 4th at 709-10 ("breach of fiduciary duty" claim subject to internal affairs doctrine).

For this reason, courts routinely apply Massachusetts law to breach of fiduciary duty claims against Massachusetts business trusts. *See, e.g.*, *Halebian v. Berv*, No. 06 Civ. 4099 (NRB), 2007 WL 2191819, at *4 (S.D.N.Y. July 31, 2007) (applying Massachusetts law to breach of fiduciary duty claim); *Mutchka v. Harris*, 373 F. Supp. 2d 1021, 1027 & n.12 (C.D. Cal. 2005) (same); *see also Lapidus*, 232 F.3d at 679, 682 (applying Massachusetts law to determine whether '40 Act claim was direct or derivative).

Under Massachusetts law, Schwab Investments (and the Total Bond Market Fund, which is a series of the Schwab Investments trust) cannot owe a fiduciary duty to the fund's investors. (Open. Br. at 15.) The reason is simple — a corporation cannot owe a duty to itself, and it cannot be made to respond to itself (or its shareholders) in damages. (*Id.*) We do not argue that no person or entity owes a fiduciary duty to the fund's investors. But Northstar has not sued any of the proper defendants — it has instead sued the fund itself. Northstar also argues that, under California law, a trust owes a fiduciary duty to its investors, but, again, it cites no authority for this proposition. (Opp. Br. at 19.)

Next, Northstar argues that Charles Schwab & Co., Inc., owes a fiduciary duty to the fund's investors because "the relationship between a stockbroker and his customer is fiduciary in nature." (*Id.*) But Charles Schwab & Co., Inc., is not a "stockbroker" in this scenario — Northstar itself acts as its customers' fiduciary and investment advisor. (Compl. ¶ 9.) Charles Schwab & Co., Inc., instead plays the much more limited role of underwriter and fund distributor. *In re Blackrock Mut. Funds Fee Litig.*, No. 04 Civ. 164 (TFM), 2006 WL 4683167, at *8 (W.D.

Pa. Mar. 29, 2006) (fiduciary duty does not run from investment management company, investment adviser, or broker-dealer to fund shareholder).

Finally, Northstar claims that Charles Schwab Investment Management — the fund's investment advisor — owed a fiduciary duty to the fund's investors. But the law is clear that an investment advisor's duty runs to its direct client — in this case, the Total Bond Market Fund — not the fund's underlying investors. *Hamilton v. Allen*, 396 F. Supp. 2d 545, 551 n.12, 553 n.14 (E.D. Pa. 2005) (investment advisor has no "special relationship" with fund investors). (*See also* Opp. Br. at 20 (*citing In re Daisy Sys. Corp.*, 97 F.3d 1171, 1178 (9th Cir. 1996) (advisor's duty is to its own client); *Stokes v. Henson*, 217 Cal. App. 3d 187, 195 (1990) (same)).)

### B. Northstar Does Not Allege Any Breach of Duties.

Northstar also has not adequately pleaded that any duty was breached. Northstar's reference to unspecified "material misrepresentations and omissions" makes no sense. (Opp. Br. at 20 (*citing* Compl. ¶¶ 70-84).) Since the fund did not deviate from its investment objective or fundamental policies, *supra* at 6-10, there can be no breach.

## IV. NORTHSTAR'S THIRD AND FOURTH COUNTS SHOULD BE DISMISSED.

We showed in our opening brief that Northstar's breach of contract and good faith and fair dealing claims are missing key elements — a contract and a breach of contract. We also showed that Northstar fails to allege any facts that show the type of egregious conduct that creates a breach of the covenant of good faith and fair dealing. Northstar does not adequately address these defects.

### A. Northstar Does Not Plead a Contract.

Northstar's opposition only serves to confuse this claim. As an initial matter, Northstar makes no effort to clarify what document constitutes the contract. Northstar's complaint alleges that the proxy *and* all the prospectuses are the contract. (Compl. ¶ 93.) On one page of the opposition Northstar argues the prospectuses are the contract. (Opp. Br. at 21.) The next page Northstar argues it is the 1997 Proxy. (*Id.* at 22.) Of course, these documents are not contracts because they lack the essential terms necessary to create a binding agreement. (Open. Br. at 16-17.)

Northstar argues that the fund's prospectus "makes [it] clear that an offer is being made," and that "after the investor accepts the offer by placing an order . . . a contract is created." (Opp. Br. at 21.) Northstar neglects, however, to point to any prospectus language showing an investor can accept the terms of the prospectus and create a final and binding agreement. That's not surprising, because there is no such language. There is nothing stopping the fund from withdrawing its offer of shares at any time. Moreover, offers to purchase shares went through intermediaries, such as Northstar, who were free to add other conditions to the purchase.

Northstar does not even try to explain how the proxy might be a contract. (Opp. Br. at 22.) Northstar alleges that the proxy was sent to investors for a shareholder vote more than ten years before the start of the class period in this case. (*See, e.g.*, Compl. ¶¶ 1, 32.) Northstar does not allege the proxy was an offer to sell or that it called for any consideration by investors.

And, while Northstar purports to bring this claim against "all defendants," (Compl. at 19), the only defendant specifically mentioned by Northstar is Schwab Investments. (Opp. at 22.) Northstar does not point to any language in the prospectuses or proxy that purports to identify any contracting parties or explain the process by which the fund's investment manager and underwriter entered into contracts with investors. (*See* Open. Br. at 16 (*citing Westlye v. Look Sports, Inc.*, 17 Cal. App. 4th 1715, 1728 (1993)).)

Under Northstar's view, any filing issued by the fund somehow created a contract between investors and all of the defendants. The facts and law, however, do not support this conclusion. Northstar fails to point to any binding language in the prospectuses or any accompanying contract that incorporates by reference the terms of the prospectuses or the proxy.

### B. Northstar Alleges No Breach of Contract.

The "breach of contract" is based on the same facts underlying Northstar's Section 13(a) claim. (*See* Compl. ¶ 93; *see also* Opp. Br. 22.) For the same reasons that claim fails, this claim fails as well. *See supra* § II.B.

Moreover, the fund clearly disclosed that "there can be no guarantee that [the fund's advisers] will produce the desired results" or that the "fund will achieve its investment objective." (July 13, 2007 Prospectus at 17; Sept. 1, 2006 SAI at *3.) Because the purported contract carried

no guarantee, the fact that the fund temporarily failed to track the results of the Lehman index cannot be considered a breach.

### C. The Breach of Covenant of Good Faith and Fair Dealing Claim Should Be Dismissed.

Without a contract, no covenant of good faith and fair dealing exists. *Kim v. Regents of the Univ. of Cal.*, 80 Cal. App. 4th 160, 164 (2000). Northstar does not argue otherwise. (Opp. Br. at 22-23.) For this reason alone, this claim must fail.

This claim fails for the independent reason that the type of conduct Northstar is complaining about does not show a breach of good faith and fair dealing. Northstar's argument that defendants breached the covenant of good faith and fair dealing "by not following the industry concentration limits and other rules" in the "prospectuses and SEC filings," (*id.* at 22-23), is just a recap of its breach of contract claim. As we pointed out, simply breaching a contract is not the type of egregious and willful conduct required to support this claim. (Open. Br. at 18-19 (*citing* Witkin, *Summary of California Law: Contracts* (10th ed. 2005) § 799).)

### CONCLUSION

Northstar alleges no securities law violation or a violation of any state or common law. As a result, Northstar's complaint must be dismissed.

Dated: January 9, 2009

DARRYL P. RAINS
DOROTHY L. FERNANDEZ
K.C. ALLAN WALDRON
MORRISON & FOERSTER LLP

By: /s/ Darryl P. Rains
      Darryl P. Rains

Attorneys for Defendants