1 | Joseph J. Tabacco, Jr. (75484)
jtabacco@bermanesq.com
2 | Christopher Heffelfinger (118058)
cheffelfinger@bermanesq.com
3 | James C. Magid (233043)
jmagid@bermanesq.com
4 | **BERMAN DEVALERIO**
425 California Street, Suite 2100
5 | San Francisco, CA  94104
Telephone: 415.433.3200
6 | Facsimile:  415.433.6382

7 | **Local Counsel**

8 | [Additional Counsel on Signature Page]

9 |

10 | UNITED STATES DISTRICT COURT

11 | NORTHERN DISTRICT OF CALIFORNIA

12 |

| | |
|---|---|
| NORTHSTAR FINANCIAL ADVISORS, INC., on Behalf of Itself and all Others Similarly Situated, | Case No. C-08-4119 SI |
| | CLASS ACTION |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR VIOLATION OF THE INVESTMENT COMPANY ACT OF 1940** |
| v. | |
| SCHWAB INVESTMENTS and CHARLES SCHWAB INVESTMENT MANAGEMENT, INC., | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

Plaintiff, for its First Amended Class Action Complaint, alleges the following upon personal knowledge as to itself and its own acts, and as to all other matters upon information and belief, based upon the investigation made by its attorneys, which included a review of Securities and Exchange Commission ("SEC") filings, news reports and other publicly available materials.

## NATURE OF THE ACTION

1.      This action is brought by Northstar, individually, and on behalf of persons who owned shares of the Schwab Total Bond Market Fund (the "Fund") (Ticker: SWLBX) at any time from August 31, 2007 to the present, and were damaged thereby.

2.      The action is brought against Schwab Investments and Charles Schwab Management, Inc. for causing the Fund to deviate from its fundamental investment objective to track the Lehman Brothers U.S. Aggregate Bond Index (the "Index") (Ticker: LBUSTRUU). Section 8 of the Investment Company Act of 1940 (the "ICA") directs an investment company to recite in its Registration Statement "all investment policies of the registrant . . ., which are changeable only if authorized by shareholder vote," as well as all policies that "the registrant deems matters of fundamental policy."  15 U.S.C. § 80a-8(b) (2) & (3).  Section 13 prohibits a registered investment company from deviating from any such policies "unless authorized by the vote of a majority of its outstanding voting securities." 15 U.S.C. § 80a-13.

3.      The Fund deviated from its stated investment objective by investing a material percentage of its portfolio in high risk non-U.S. agency collateralized mortgage obligations ("CMOs").  The non-U.S. agency CMOs were not part of the Lehman Index and were substantially more risky than the U.S. agency securities and other instruments that comprised the Index.

4.      The Fund also deviated from its stated fundamental investment objective by investing more than 25% of its total assets in U.S. agency and non-agency mortgage-backed securities and CMOs.   The Fund's investment objectives prohibited any concentration of investments greater than 25% in any industry (other than if necessary to track the Index).

5.      Defendants' deviation from the Fund's investment objective exposed the Fund and its shareholders to tens of millions of dollars in losses stemming from a sustained decline in the

value of non-agency mortgage-backed securities.  The Fund's deviation from its stated investment objective caused investors to suffer a negative 12.64% differential in total return for the Fund compared to the Index for the period August 31, 2007 through February 27, 2009, consisting of a negative total return of 4.80% for the Fund compared to a positive total return of 7.85% for the Index over that same period (including interest payments).

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action under § 44 of the Investment Company Act of 1940 (15 U.S.C. § 80a-43), 28 U.S.C. §§ 1331, 1332(d)(2), and 1367. The plaintiff is diverse from at least one of the defendants and the amount in controversy exceeds $5 million.

7.      Venue is properly laid in this District under 15 U.S.C. § 80a-43, and 28 U.S.C. § 1391(b).  Many of the acts giving rise to the violations of law complained of herein, including the dissemination to shareholders of the Registration Statements, Proxy Statements, and Prospectuses, referenced herein occurred in this District.

## PARTIES

8.      Plaintiff Northstar Financial Advisors, Inc. ("Northstar") is a New Jersey corporation with offices at 46 Beachmont Terrace, North Caldwell, NJ 07006.

9.      Northstar is a registered investment advisory and financial planning firm serving both institutional and individual clients.  Northstar manages both discretionary and non-discretionary accounts on behalf of investors in its role as an investment advisor.

10.     With respect to its discretionary accounts, which form approximately 50% of its assets under management, Northstar retains discretion over investment decisions.

11.     Northstar had at all relevant times herein purchased and sold securities on behalf of its clients as an independent investment advisor through Charles Schwab's Institutional Advisor Platform.

12.     Northstar, in purchasing and/or selling shares in the Fund, relied on defendants' representations as to the Fund's investment objectives and policies.

13.     On or about August 31, 2007, Northstar had 239,290 shares of the Fund under its management.

14.     Northstar operates under a fee-based structure based on the total value of assets under management.  Northstar is customarily paid on a quarterly basis a .5% to 1.0% annualized management fee based on the valuation of assets under management, including the reported net asset value ("NAV") of the shares of the Fund under Northstar's management.  Northstar suffered actual financial injury from the diminution of its management fee as a result of the underperformance of the Fund against the Index subsequent to August 31, 2007.

15.     By way of Assignment of Claim dated December 8, 2008 (the "Assignment"), Henry Holz, a client of Northstar who owned 4,181.093 shares of the Fund as of August 31, 2007, assigned to Northstar "all of the Assignor's right, title and interest in any claim that the Assignor has or could have against Schwab Investments, Charles Schwab & Co., Inc., Charles Schwab Investment Management, Inc. and Schwab Total Bond Market Fund …."

16.     Defendant Schwab Investments (the "Trust") has its headquarters at 101 Montgomery Street, San Francisco, CA 94104.  Schwab Investments is an investment trust organized under Massachusetts law and is a registered investment company under the ICA.  The Trust consists of a series of mutual funds, including the Fund.  The Trust is managed by a Board of Trustees.  The Trust and its Board of Trustees are responsible for filing with the SEC and disseminating to investors documents regarding the Fund.  The Trust and its Board of Trustees are also responsible for supervising the Fund's investment advisor and monitoring the Fund's compliance with its stated investment objectives and policies.

17.     Defendant Charles Schwab Investment Management, Inc. ("Investment Advisor" or "Schwab Management") has its headquarters at 101 Montgomery Street, San Francisco, CA 94104.  Schwab Management is the investment advisor to the Fund.  As the Investment Advisor, Schwab Management receives a management fee from the Fund.  The Investment Advisor's management fee is 0.25% of the Fund's net assets, or approximately $3.5 million per year.  In addition the Fund incurs .28% of net assets in other expenses, for a total annual operating expense of .53%.  The

Investment Advisor is responsible for adhering to the Fund's stated investment objectives and policies.  The Investment Advisor is organized under Massachusetts law.

18.    The Schwab Total Bond Market Fund is a series of Schwab Investments and a member of the Charles Schwab Family of Funds.  The Fund is managed by the Trust and advised by the Investment Advisor.

19.    The Fund issues redeemable securities.  The value of its shares is computed daily by taking the assessed market value of all portfolio securities, adding the assessed value of other assets and liabilities, and dividing the result by the number of shares outstanding.  The Fund reports its portfolio holdings to investors on a semi-annual basis in reports issued as of August and February.  The Fund also reports its portfolio holdings as of May and November in Form N-Q filings with the SEC, which are not mailed to investors.  The Fund does not report the dates or prices at which it purchases or sells securities.

20.    The Trust and the Investment Advisor are under the common control of The Charles Schwab Corp., a publicly traded corporation.

## CLASS ACTION ALLEGATIONS

21.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), individually and on behalf of a class consisting of all person or entities who owned shares of the Fund at any time from August 31, 2007 to the present, and suffered damages as a result therefore.  Excluded from the Class are the defendants herein, any subsidiaries or affiliates of the defendants in which defendants or its affiliates have a controlling ownership interest, officers and directors of any of the defendants, heirs, successors and assigns of any of the defendants or their officers and directors, and any entity in which any defendant has a controlling ownership interest.

22.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of members of the Class is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, the Fund had over $1.5 billion in assets as of August 31, 2007, and 150 million shares outstanding.  Plaintiff thereby concludes that there

are thousands of members located throughout the United States in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Registrant or its transfer agent and may be notified of the pendency of this action by mail.

23. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal and state laws that is complained of herein.

24. Northstar has standing to pursue this claim for money damages as assignee of Holz's claim and in its own right because it suffered direct financial injury as a result of the Fund's deviation from its stated fundamental investment objectives and policies (and other claims alleged herein). Northstar's financial injury and entitlement to recovery are derivative of the Class' claims. Northstar cannot prove its own financial injury and entitlement to recovery without first proving the Class' financial injury and entitlement to recovery.

25. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class litigation.

26. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the Trust or Investment Advisor caused the Fund to deviate from an investment objective or policy that could only be changed by a shareholder vote;

(b)     Whether the Trust or Investment Advisor were obligated to cause the Fund to track the Lehman Brothers U.S. Aggregate Bond Index using an indexing strategy;

(c)     Whether the Fund's investments tracked the Lehman Brothers U.S. Aggregate Bond Index using an indexing strategy;

(d)     Whether the Trust or Investment Advisor concentrated investments in the Fund of in excess of 25% of its total assets in any one industry;

(e)     Whether non-agency mortgage-backed securities comprise one or more than one "industry."

[C-08-4119 SI] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE INVESTMENT COMPANY ACT OF 1940                                                                                          5

(f)     Whether agency and non-agency mortgage-backed securities comprise one or more than one "industry."

(g)     Whether the Trust's acts as alleged herein violated the ICA;

(h)     Whether the Investment Advisor caused the Fund to violate the ICA;

(i)     Whether members of the Class are third party beneficiaries of the investment advisory contract between the Trust and the Investment Advisor;

(j)     Whether the Trust or the Investment Advisor owed members of the Class fiduciary duties;

(k)     Whether the Trust or the Investment Advisor violated fiduciary duties to Class members; and

(l)     Whether the members of the Class have sustained damages, and, if so, what is the proper measure thereof.

27.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  As the damages suffered by any individual Class member may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in managing this action as a class action.

## SUBSTANTIVE ALLEGATIONS
### Background and History Prior to the 1997 Shareholder Vote

28.     The Schwab Total Bond Market Fund (SWLBX) was initiated on March 5, 1993 under a predecessor name – the Schwab Long-Term Government Bond Fund (the "Government Bond Fund") -- as an actively managed bond fund.

29.     According to the Prospectus for the Government Bond Fund dated December 30, 1994, as amended June 30, 1995, the "investment objective" of the Government Bond Fund was "to provide a high level of current income consistent with preservation of capital by investing primarily in securities issued or guaranteed by the United States Government, its agencies or instrumentalities and repurchase agreements covering those securities."

[C-08-4119 SI] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE INVESTMENT COMPANY ACT OF 1940                                                          6

30.     The June 30, 1995 Prospectus also stated that "[the] Fund's investment objective … is fundamental and cannot be changed without approval by holders of a majority of the Fund's outstanding voting shares."

31.     The Prospectus added that "U.S. Government Securities are generally viewed by the Investment Manager as being among the safest of debt securities with respect to the timely payment of principal and interest…."

32.     Schwab was unable to successfully market the Government Bond Fund.

33.     As of August 31, 1997, after more than four years of operations, the Government Bond Fund only had $24.8 million in investment assets.

### The Formation of the Schwab Total Bond Market Index Fund

34.     On July 25, 1997, Schwab Investments mailed to investors in the Government Bond Fund a Proxy Statement on SEC Form 14A with respect to a shareholder vote "[t]o amend [the] Fund's fundamental investment objective resulting in changing the Fund from [a] Government bond fund[] to [a] bond index fund[] that would include Government and other fixed income securities" (at 2).

35.     The Proxy Statement (at 14) informed investors that the Board of Trustees of the Fund was proposing to change the Fund's then existing investment objective from attempting "to provide a high level of current income consistent with preservation of capital by investing primarily in securities issued or guaranteed by the U.S. Government" to a "proposed investment objective … to attempt to provide a high level of current income consistent with preservation of capital by seeking to track the investment results of a particular bond index through the use of an indexing strategy."

36.     The Proxy Statement added (at 3) that "[i]f its proposed investment objective is approved, the Total Bond Fund would invest in a portfolio of fixed-income securities that seeks to track the Lehman Brothers Aggregate Bond Index."

37.     The Lehman Index was described in the Proxy Statement (at 18) as "a broad market-weighted index which encompasses the following classes of investment grade fixed-income

securities:   U.S. Treasury  and agency securities, corporate bonds, international (dollar-denominated) bonds, agency mortgage-backed securities, and asset-backed securities."

38.     The Lehman Index is a proprietary Lehman Brothers index, consisting of over 9,000 separate instruments whose exact composition is not generally available to investors.   The composition of the Index changes from time-to-time.

39.     The Proxy Statement stated with respect to mortgage-backed securities and asset-backed securities (at 21) that "[t]he primary risk of these securities is 'prepayment risk.' Namely that during periods of changing interest rates, the payment streams in the underlying pools will be paid faster … than anticipated."

40.     The Proxy Statement further described (at 22) the "investment process of indexing" by stating that the Fund "would be unable to hold all of the individual issues which comprise the [Index] because of the large number of securities in the [Index]," but that the "Fund would hold a portfolio of fixed-income securities that is managed to closely approximate [the] Index's 'characteristics' of coupon rate, duration, sector, quality and optionality (or convexity)":

> If the proposed investment objective is approved, the Funds would not be managed according to traditional methods of "active" investment management, which involve the buying and selling of securities based upon economic, financial, and market analyses and investment judgment.  Instead, the Investment Manager would utilize a "passive" or "indexing" investment approach, to attempt to track the investment performance of each Fund's Index through statistical sampling and other procedures. The Funds would be unable to hold all of the individual issues which comprise the Indexes because of the large number of securities in the Indexes.  Each Fund would hold a portfolio of fixed-income securities that is managed to closely approximate its Index's "characteristics" of coupon rate, duration, sector, quality and optionality (or convexity).

41.     The Proxy Statement assured investors (at 22) that "[b]efore purchasing or selling a security, the Investment Manager would analyze each security's characteristics and determine whether purchasing or selling the security would help the Fund's portfolio approximate the characteristics of the Index":

> Before purchasing or selling a security, the Investment Manager would analyze each security's characteristics and determine whether purchasing or selling the security would help the Fund's portfolio approximate the characteristics of the Index.  As a result, when the Fund's portfolio as a whole is considered, the Fund's performance and risk is expected to be similar to its Index's performance and risk.

For example, with respect to the "sector characteristic," if U.S. Treasury and agency securities represent approximately 60% of an Index's interest rate risk, then approximately 60% of the respective Fund's interest rate risk would come from such securities. Similarly, if corporate bonds represent 20% of the Fund's interest rate risk, then they would represent approximately 20% of the Fund's interest rate risk. This technique is expected to enable each Fund to track the coupon income and price movements of its respective Index, while minimizing transaction, custodial and accounting costs.

42.     The 1997 Proxy Statement represented (at 23) that the Investment Manager would seek a 90% correlation between the Fund and the Index:

Over the long term, the Investment Manager will seek a correlation between the performance of each Fund, as measured by its net asset value, including the value of its dividend and capital gain distributions, and that of its Index of 0.9 or better. A correlation of 1.0 would indicate perfect correlation, but since each Fund incurs operating expenses, unlike its respective Index, a perfect correlation is unlikely to be achieved. The Investment Manager will monitor the performance of each Fund versus that of its Index on a regular basis. If a tracking error develops, each Fund is rebalanced to help bring it in line with the Index. In the unlikely event that a correlation of 0.9 or better is not achieved, the Board of Trustees of a Fund will consider alternative arrangements.

43.     The 1997 Proxy Statement described (at 2) Schwab's rationale for proposing that the Fund be changed to an index fund and the Fund's appeal to passive investors who were seeking "broad bond portfolio diversification" and "a consistent investment style," as follows:

Schwab has long been an advocate of indexing as an investment strategy. The Board of Trustees believes the proposed bond index funds will offer customers many benefits through the use of an indexing strategy. These benefits include: broad bond portfolio diversification, a consistent investment style, and potentially lower trading costs as a result of lower portfolio turnover and fewer transactions, over the long term. And, all other things being equal, lower costs can translate into higher returns.

The objective of an index fund, unlike an actively managed fund, is to closely track the total return of a benchmark or index for a particular market, or market sector. Because both proposed Funds plan to invest in a larger number and broader range of bonds, the Funds should provide investors a more broadly diversified bond fund investment for their asset allocation plan. The proposed bond index funds could represent excellent choices for the core component of an investor's bond fund holdings and could fulfill the bond portion of an asset allocation plan, whether that plan calls for a longer-term or short-term bond fund.

44.     The 1997 Proxy Statement (at 2) stated that because investors would not be required to actively monitor and assess the investment selections of the Fund's Investment Advisor (which was charged with the responsibility of following the Index), the bond index fund "should gave a broader appeal to a larger number of investors."

[C-08-4119 SI] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE INVESTMENT COMPANY ACT OF 1940                                                                9

In addition, the Board of Trustees believes that the proposed bond index funds should have a broader appeal to a larger number of investors. This would permit the Funds to be marketed more effectively, creating economies of scale if assets grow. These economies could be achieved by spreading the Funds' fixed costs over a larger asset base, which would potentially lower the Funds' operating expenses.

45.     The Proxy Statement sought to assure investors (at 4) that the change to an indexing strategy would not then increase the risk profile of the Fund because 80% of the Fund's assets would still be invested on a current basis in U.S. government or agency bonds, and given the then current composition of the Index, 15% of the portfolio would be invested in investment grade corporate bonds, 4% in international (dollar-denominated bonds), and 1% in asset-backed securities:

As shown in the two preceding charts, as of June 30, 1997, both of the proposed index Funds would maintain significant positions in U.S. Treasury and agency, and agency mortgage-backed securities – 85.0% for the Short-Term Bond Market Index Fund and 80.0% for the Total Bond Market Index Fund.

The non-U.S. Treasury/agency securities represented in both indices are all investment grade and quite diversified. As a result, both index Funds are expected to maintain relatively low levels of credit risk. However, given that U.S. Treasury and agency securities have the lowest credit risk compared to other types of fixed income securities, the portfolio management team anticipates that the proposed Funds would have a slightly higher level of credit risk than the current Funds.

46.     The July 25, 1997 Proxy Statement also proposed a change in the Fund's "fundamental investment policies and investment restrictions" regarding concentration of investments.

47.     Previously, the Fund's fundamental investment policies and investment restrictions barred investments of "25% or more of the value of its total assets … in any industry" (excluding investments in U.S. government, agency, or instrumentality securities):

Each Fund may not:

Purchase securities (other than securities issued or guaranteed by the U.S. Government, its agencies or instrumentalities) if, as a result of such purchase, 25% or more of the value of its total assets would be invested in any industry. Securities issued by governments or political subdivisions or authorities of governments are not considered to be securities subject to this industry concentration restriction.

48.     The proposed change incorporated the definition of "concentration" under the Investment Company Act of 1940, and gave the Fund discretion to concentrate investments of greater than 25% of total assets in any industry if necessary to track the Lehman Index:

Each Fund may not concentrate investments in a particular industry or group of industries, or within one state (except with respect to the Total Bond Market Index Fund and the Short Term Bond Market Index Fund, to the extent that the index which each Fund seeks to track is also so concentrated) as concentration is defined under the Investment Company Act of 1940 or the rules or regulations thereunder, as such statute, rules or regulations may be amended from time to time.

49.     The rationale of the proposed change, according to the Proxy Statement, was to incorporate the SEC's interpretation of the term "concentration" from the Investment Company Act of 1940 (which at the time was and remains 25%) to give the Fund greater flexibility in the event of future changes in interpretation:

The current self-designated restriction specifically limits a Fund's investments to less than 25% of a Fund's total assets in a particular industry.  Under the Proposal, this current self-designated restriction will be eliminated and replaced by a more flexible proposed restriction.  The proposed restriction would continue to prevent each Fund from "concentrating" its investments in a single industry or in a state, except if the Index that the Fund tracks is "concentrated" in a particular industry or state.  Further, to provide flexibility, the concept of "concentration" in a Fund's proposed restriction is articulated so as to always track the current meaning of "concentration" under the 1940 Act.

At present, "concentration" is interpreted under the 1940 Act in a manner consistent with each Fund's current self-designated restriction (25% or more).  However, in order to achieve greater flexibility (if for instance the percentage limitation were to be changed by the SEC), the proposed restriction would eliminate the specific percentage reference and instead define the term "concentration" with respect to the meaning conferred under the 1940 Act.  Because the present interpretation of the percentage limit of "concentration" under the 1940 Act is the same as the current concentration restriction, it is not expected that there would be any immediate impact on a Fund's operations as a result of approving this aspect of the proposed concentration restriction.  Any future change in operations would occur only if the SEC staff changed its interpretation of what constitutes "concentration."

50.     There has been no subsequent change in the SEC's interpretation of what constitutes "concentration."

51.     On September 25, 1997, Schwab Investments reported that the shareholders of the Schwab Government Fund had approved the amendment to the Fund's "fundamental investment objective … to allow [the] Fund to pursue an indexing strategy":

As a result of the amendment referenced in Item No. 1 above, as of November 1, 1997, the name of the Schwab Short/Intermediate Government Bond Fund will be changed to the Schwab Short-Term Bond Market Index Fund, and the name of the Schwab Long-Term Government Bond Fund will be changed to the Schwab Total Bond Market Index Fund.  As a result of the shareholder vote, each Fund's fundamental investment objective is amended to allow each Fund to pursue an indexing strategy.  The Schwab Short-Term Bond Market Index Fund will seek to

track the Lehman Brothers Short (1-5) Government/Corporate Index and the Schwab Total Bond Market Index Fund will seek to track the Lehman Brothers Aggregate Bond Index.  Each index is market-weighted and designed to track the performance of broad segments of the bond market.

52.    Schwab Investments further reported that shareholders approved the change in the Fund's fundamental investment policies and restrictions with respect to the concentration of investments.

53.    The Registration Statement and Prospectus dated January 15, 1998 for the Total Bond Fund and the Schwab Short-Term Total Bond Market Index Fund (at page 10), issued after the 1997 shareholder vote, reiterated the Fund's investment objective to track a bond index:

INVESTMENT OBJECTIVES:

Each Fund's investment objective is to attempt to provide a high level of current income consistent with preservation of capital by seeking to track the investment results of a particular bond index through the use of an indexing strategy.
Each Fund's investment objective is fundamental, which means that it may be changed only by vote of a majority of a Fund's shareholders.

54.    The Prospectus further stated (at 10) that the Lehman Brothers Aggregate Bond Index was the index against which the Total Bond Fund would be tracked:

THE INDEXES are the Lehman Brothers Mutual Fund Short (1-5)

Government/Corporate Index (the Short-Term Index) for the Short Bond Fund and the Lehman Brothers Aggregate Bond Index (the Aggregate Bond Index) for the Total Bond Fund.

55.    That same recitation of the Fund's investment objective was contained in subsequent Prospectuses for the Fund, as well as in Statements of Additional Information incorporated by reference into the Prospectuses.

56.    A Statement of Additional Information (or "SAI") contains a more comprehensive discussion of material facts than is contained in a Prospectus.

57.    The Fund's conversion to an indexing strategy was a success, as net assets increased from $24 million as of August 31, 1997 to $1.5 billion as of August 31, 2007.

58.    Schwab Investments, in the August 31, 1998 Reports to shareholders emphasized the conservative nature of the Fund's indexed securities:

Schwab's Bond Index Funds seek to track the total returns of broadly diversified bond indices.  And because index funds generally result in lower portfolio turnover and fewer transactions—and therefore lower trading costs—you could potentially

realize higher returns.

In addition to some of the same benefits of equity index funds, including broad diversification, lower expenses, consistent investment style and straightforward choices, bond index funds can also provide the added benefit of high credit-quality investments. Schwab's Bond Index Funds are designed to maintain high credit-quality standards because the indices they seek to track primarily comprise U.S. Treasuries, government agency securities and government agency mortgage-backed securities; the remaining bonds in the indices are investment-grade corporate bonds rated AAA through BBB the four highest credit ratings. [Emphasis added.]

59.     The government agency mortgage-backed securities referenced in the Fund's SEC documents and included in the Lehman Index were issued by the Governmental National Mortgage Association ("Ginnie Mae"), the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). Ginnie Mae, Fannie Mae, and Freddie Mac are U.S. Government agencies (also known as Government Sponsored Enterprises ("GSEs")) established by Congress to facilitate residential mortgage loans.

60.     The GSEs purchased and securitized mortgage loans that met established criteria for creditworthiness.

61.     The government agency mortgage-backed securities referenced in the 1998 Annual Report as contained in the Index were fixed income pass-through securities, in which all principal and interest on the underlying mortgages is passed through to the mortgage-backed securities investor.

62.     The type of securities that could be acquired by those agencies are restricted by their government charters.

63.     Ginnie Mae benefits from an express U.S. Government guarantee of payment on its securities.

64.     Both Fannie Mae and Freddie Mac benefit from an implied U.S. Government guarantee of payment on its securities by virtue of their status as U.S. chartered institutions.

65.     The mortgage-backed securities issued by Ginnie Mae, Fannie Mae and Freddie Mac, and maintained in the Lehman Index, had the highest credit quality among mortgage-backed securities.

66.     The Statement of Additional Information dated May 6, 2002, reported that the Fund had changed its name to the Schwab Total Bond Market Fund:

Prior to May 6, 2002, . . . Schwab Total Bond Market Fund was named Schwab Total Bond Market Index Fund.

67.     In the ordinary course of defendants' business, this Statement of Additional Information was not mailed to investors.

68.     The May 6, 2002 Statement of Additional Information, incorporated by reference into the May 6, 2002 Prospectus, continued to state that the Fund's investment objective was unchanged and could only be changed by a majority shareholder vote, which had not occurred:

Each fund's investment objective is to attempt to provide a high level of current income consistent with preservation of capital by seeking to track the investment results of a particular bond index through the use of an indexing strategy.

\*          \*          \*

The indexes are the Lehman Brothers Mutual Fund Short (1-5 Year) U.S. Government/Credit Index for the Schwab Short-Term Bond Market Fund (the Short-Term Index), and the Lehman Brothers U.S. Aggregate Bond Index for the Schwab Total Bond Market Fund (the U.S. Aggregate Bond Index).

\*          \*          \*

The U.S. Aggregate Bond Index is a market-capitalization weighted index of investment-grade debt securities with maturities of greater than one year.

\*          \*          \*

Each fund's investment objective may be changed by vote of a majority of its outstanding voting shares.

69.     Schwab Investments issued a further Registration Statement and Prospectus with regard to the Fund dated November 15, 2003.

70.     Beginning with that Prospectus and in subsequent Prospectuses issued by Schwab Investments with respect to the Fund, including the Prospectus dated June 13, 2008, defendants prominently reported in large type-face at the front of the Prospectus that the Fund was "designed to offer high current income by tracking the performance of the Lehman Brothers U.S. Aggregate Bond Index" and was "intended for investors seeking to fill the fixed income component of their asset allocation plan":

THE SCHWAB TOTAL BOND MARKET FUND TM is designed to offer high current income by tracking the performance of the Lehman Brothers U.S. Aggregate Bond Index.  The fund invests primarily in a diversified portfolio of investment-grade debt instruments.  The fund is intended for investors seeking to fill the fixed income

component of their asset allocation plan.

71. The Statement of Additional Information attached to the November 15, 2003 Prospectus – and all subsequent Statements of Additional Information -- reaffirmed that the Fund would continue to track the Index until that investment objective was changed by shareholder vote:

> Each fund's investment objective is to attempt to provide a high level of current income consistent with preservation of capital by seeking to track the investment results of a particular bond index through the use of an indexing strategy.
>
> \*　　\*　　\*
>
> The indexes are the Lehman Brothers Mutual Fund Short (1-5 Year) U.S. Government/Credit Index for the Schwab Short-Term Bond Market Fund (the Short-Term Index), and the Lehman Brothers U.S. Aggregate Bond Index for the Schwab Total Bond Market Fund (the U.S. Aggregate Bond Index).
>
> The Short-Term Index is a market-capitalization weighted index of investment-grade debt securities with maturities between one and five years. The U.S. Aggregate Bond Index is a market-capitalization weighted index of investment-grade debt securities of greater than one year.
>
> \*　　\*　　\*
>
> Each fund's investment objective may be changed by vote of a majority of its outstanding voting shares.

72. From August 31, 1997 through August 31, 2007, the Fund substantially performed in a manner that was consistent with the Index, returning an annualized rate of 5.75% compared to 6.04% for the Index -- within the 10% deviation anticipated by the Investment Manager.

73. As stated in the Fund's annual and semi-annual reports, this degree of deviation between the Fund and the Index occurred "mainly because, unlike the Index, the Fund incurs operating expenses and trading costs and must keep a small part of its assets in cash for paying expenses and processing shareholder orders."

**The Fund Substantially Deviates From Its Stated Investment Objective**

74. The Fund first reported a material deviation from the Index in its Semi-Annual Report for the period ended February 29, 2008:

> The Schwab Total Bond Market Fund returned 3.41% underperforming Lehman Brothers U.S. Aggregate Bond Index, which was up 5.67%. Risk aversion and forced selling in the fixed income market, combined with persistent volatility, impacted the fund as investors remained cautious of all non-Government securities irrespective of underlying credit quality. Under these conditions of extreme volatility, U.S. Treasuries outperformed all other fixed income securities.

During the period, the financial markets experienced liquidity and confidence issues as the collapse of the subprime mortgage market and related credit turmoil cascaded into other sectors.  Correspondingly, a reprising of risk premiums and a flight to quality across all segments of the fixed income market contributed to downward pricing pressure, with prices for many non-U.S. Treasury securities falling regardless of their quality or fundamentals.  In order to maintain liquidity, many investors were forced to sell high quality assets at depressed prices.  This selling pressure occurred at the same time demand for non-U.S. Treasury securities was weakest, and as a result prices were driven down even further.

75.    Investors in the Fund, however, could not anticipate from this Report that the Fund would continue to deviate from the Index.  Among other things, the Prospectus dated September 15, 2007 had stated that "the Fund primarily invests in a diversified portfolio of debt investments that is designed to track the performance of the Lehman Brothers U.S. Aggregate Bond Index" and that "[y]our investment follows the bond market, as measured by the index.  The fund is designed to follow the performance of the index during upturns as well as downturns."  The November 15, 2007 Statement of Additional Information also reiterated that the Fund's "investment objective is to attempt to provide a high level of current income consistent with preservation of capital by seeking to track the investments results of [the Index] through the use of an indexing strategy."

76.    The Trust had informed investors in the 1997 Proxy Statement (at 23) that some volatility in the Fund against the Index may not be totally avoidable, and that "if a tracking error develops, each Fund is rebalanced to help bring it in line with the Index."

77.    The Fund had also consistently tracked the Index for the prior decade since inception.

78.    Accordingly, it was not apparent to investors at that time, who thought they were holding a conservative index fund, that the Trust and Investment Advisor had engaged in a risky strategy of concentrating the Fund's portfolio in non-agency CMOs that deviated materially from the government and government agency securities that comprised a majority of the Index.

79.    From 2002 until June 2008, Kimon Daifotis acted as the senior vice president and chief investment officer of the Investment Advisor, responsible for the overall management of the Fund.  On June 13, 2008, the Trust filed a Supplement to the Fund's Prospectus dated November 15, 2007, stating that Jeffrey Mortimer was then responsible for the overall management of the Fund.  No explanation was given by defendants, in the Prospectus or elsewhere, for replacing

Daifotis as Fund manager.  Investors were not informed that Daifotis had engaged in an investment strategy that was inconsistent with the Fund's stated investment objectives and policies.

80.     In fact, however, the Fund's underperformance against the Index did continue subsequent to February 29, 2008.  From August 31, 2007 through February 27, 2009, the Fund experienced a negative total return of 4.80% compared to a positive 7.85% total return for the Index – a total underperformance of 12.64% in absolute terms (including interest payments).

81.     The Fund's deviation in performance from the Index was caused by the Fund's investment of 27.3% of assets as of February 29, 2008 in non-agency collateralized mortgage obligations ("CMOs").

82.     The CMOs in the Fund's portfolio were not issued by government agencies.  Rather they were issued by financial institutions through subsidiaries and backed by residential loans that did not conform to the agencies' high loan underwriting requirements.

83.     Moreover, non-agency CMOs purchased by the Investment Manager for the Fund represented tranches of mortgage-backed securities, such as principal only or interest only payments, and were significantly more risky than the agency-issued mortgage-backed securities that were part of the index.  Included in the Fund's portfolio were CMOs sponsored by such subprime lenders as Citigroup, Merrill Lynch, Countrywide, Bear Stearns, IndyBank, Lehman, and Washington Mutual.

84.     This concentration of investments in mortgage backed securities was in violation of the Fund's stated investment objectives that the Fund's assets not be concentrated more than 25% in any one industry (except as required by the Index).

85.     Subsequent analyses of other bond index funds that represent that they track the Lehman Bros. Aggregate Bond Index indicates that as of February 29, 2008, the Lehman Government Index had a 0% weighting in non-agency mortgage-backed securities, and a 37% weighting in agency mortgage-backed securities.

86.     Moreover, according to the February 28, 2008 Semi-Annual Report, the Fund was invested 45.4% in agency and non-agency mortgage backed securities.

87.     By November 30, 2008, the Fund had lessened its exposure to non-agency CMOs to 3.4% of total assets.  The liquidation of the non-agency CMO portfolio coincided with a further deviation in performance of the Fund.

88.     Defendants have taken the position, as stated in the Statement of Additional Information dated November 15, 2007, as amended June 13, 2008 (at 6), to justify the Fund's over-concentration in non-agency mortgage-based securities and CMOs, that non-agency mortgage-backed securities "are not part of any industry for purposes of a fund's concentration policy":

> Based on the characteristics of mortgage-backed securities, the funds have determined that mortgage-backed securities issued by private lenders and not guaranteed by U.S. government agencies or instrumentalities are not part of any industry for purposes of a fund's concentration policy.  This means that a fund may invest more than 25% of its total assets in privately-issued mortgaged-backed securities, which may cause the fund to be more sensitive to adverse economic, business or political developments that affect privately-issued mortgage-backed securities.

89.     Defendants recognized, however, as stated in the November 15, 2007, as amended June 13, 2008 (at 6) (quoted immediately above), that the non-agency investments "may cause the fund to be more sensitive to adverse economic, business or political developments that affect privately-issued mortgage-backed securities" and accordingly should be classified as within one industry.

90.     The Fund's investment in CMOs were made at a time when there was increased concern with the quality of mortgage lending.

91.     For example, on June 28, 2007, the Department of Treasury, Federal Reserve System, Federal Deposit Insurance Corp., and National Credit Union Administration, issued a joint Statement on Subprime Mortgage Lending "to address subprime mortgage products and lending practices."

92.     The Fund's investment in CMOs at this time, in light of all circumstances, was speculative, irresponsible and a gross deviation from the Fund's fundamental investment policies and a breach of the defendants' fiduciary duties.

93.     The attached chart prepared on a Bloomberg terminal, comparing the Schwab

Fund's change in total return to the Lehman Index's change in total return over the period December 31, 2004 through February 27, 2009, demonstrates how closely correlated the Schwab Bond Fund was to the Index until approximately August 31, 2007 and how dramatically the Bond Fund has deviated from the Index thereafter:



94.     The magnitude of under performance between the Fund and the Index were not the result of unforeseen economic circumstances, but rather the gross deviation by the Investment Manager from the Fund's stated investment objective, by investing 45.4% of the Fund's total assets in mortgage-backed-securities and 27.3% of the Fund's total assets in non-agency CMOs.

## COUNT I:

**ON BEHALF OF THE CLASS FOR VIOLATION OF
SECTION 13(A) OF THE INVESTMENT COMPANY ACT
(ON BEHALF OF THE CLASS AGAINST THE TRUST)**

95.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.  This Count is asserted on behalf of members of the Class for violation of § 13(a) of the ICA, 15 U.S.C. § 80a-13(a).

96.     The Trust caused the Fund to deviate from the Fund's investment policy that was changeable only by a shareholder vote, and a deviation from a policy recited in the Funds' Registration Statement as a "fundamental investment policy" in that, as detailed above, the Fund failed to invest in bond securities that tracked the Lehman Brothers U.S. Aggregate Bond Index and invested more than 25% of its assets in investments concentrated in one industry.

97.     The above-noted investments made in violation of a stated fundamental investment policy caused significant losses to the Fund's shareholders, as alleged above.  As described above, plaintiff and other members of the Class have suffered substantial damages in connection with losses in the Funds' value that resulted from the Funds' deviation from their stated fundament investment policy.

## COUNT II:

**ON BEHALF OF THE CLASS FOR BREACH OF FIDUCIARY DUTY
(ON BEHALF OF THE CLASS AGAINST BOTH DEFENDANTS)**

98.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.  This Count is asserted against Schwab Investments (the Trust) and Charles Schwab Investment Management, Inc. (the Investment Advisor).  Both of the defendants owed fiduciary duties to Class members.

99.     This Count is asserted under California law.  The relationship of Class members to the defendants is not as a shareholder to the corporation, but rather as an investor in the Fund to the

Trust (charged with responsibility for managing the Fund) and to the Investment Advisor (charged with responsibility for investing the Fund's assets). Class members are not shareholders of the Trust, but rather are shareholders of the Fund. Because the defendants are headquartered in San Francisco, California and the principal activities of the defendants with respect to this Count took place in California, California has the principal interest in applying its law to this claim. Count II is viable under Massachusetts law, as well.

100. The Trust is a registered investment company and the sponsor of the Fund. The Trust was responsible for the oversight of the Fund's investments, the oversight of the activities of the Investment Advisor, and the accuracy of the Trust's SEC filings. The Trust was also responsible for the Fund's compliance with its stated investment objectives. The Trust had discretion to operate the Fund, subject to the Fund's stated fundamental investment policies, and Class members were reliant on the Trust for the operations of the Fund.

101. The Trust and its Board of Trustees' fiduciary obligations to the Class were summarized in the Schwab Investments Definitive Proxy Statement for the Fund, filed with the SEC on March 24, 2000, as follows (at 5):

102. The Board of Trustees is responsible for protecting the interests of the funds' shareholders. The Board meets regularly to review the funds' activities, contractual arrangements and performance.

103. Charles Schwab, personally, in his letter to shareholders appended to the August 31, 2007 Annual Report filed by the Trust with the SEC, on behalf of all Schwab-related entities, thanked the Fund's shareholders for "entrusting us with their assets."

104. The Trust further acknowledged in its August 31, 2007 Annual Report to Shareholders (at 71) that "as part of their fiduciary duties with respect to fund fees, fund boards are required to evaluate the material factors applicable to their decision to approve an investment advisory agreement."

105. The Investment Advisor owed Class members a fiduciary duty to manage the Fund's assets with the care and prudence of a professional in like circumstances and to adhere to

the Fund's investment objective and policies.  Given the disparity of access to information and expertise in investment matters, Class members relied on the Investment Advisors' diligence and good faith.

106.    By virtue of their relationship with plaintiff and the members of the Class, the Trust and the Investment Advisor were each in a fiduciary relationship with plaintiff and the members of the Class to act in good faith and with utmost loyalty to plaintiff and the members of the Class, to protect the interests of the Fund and its shareholders, and to refrain from doing anything that would cause injury to the Fund or deprive plaintiff and the members of the Class of profit or advantage to which they were otherwise entitled.

107.    The Trust repeatedly stated that the Fund was "intended for investors seeking to fill the fixed income component of their asset allocation plan."  The Investment Advisor was aware of that statement and recognized that Class members were relying on its management of the Fund.

108.    Defendants acknowledge on the "Charles Schwab" website that Schwab Investments, by creating the Fund and recommending that the Fund be used in an investment plan "to fill the fixed income component of [investors'] asset allocation plan" were acting in a fiduciary capacity:  "Professional investors consider creating an investment plan vital for performing their fiduciary duty to clients."  *See*  "Investing Principle 1:  A Blueprint for Success," by Mark W. Riepe, CFA, Senior Vice President, Schwab Center for Financial Research, March 10, 2008.

109.    Defendants breached their fiduciary duties to plaintiff and the members of the Class by the acts and omissions set forth above in violation of the Fund's stated investment objective and policies.

110.    By virtue of the wrongful conduct of defendants, plaintiff and the members of the Class sustained money damages in connection with their ownership of shares in the Fund.

<u>COUNT III</u>:

**FOR BREACH OF CONTRACT
(ON BEHALF OF THE CLASS AGAINST THE TRUST)**

111.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs

as if fully set forth herein.  This Count is asserted on behalf of members of the Class for breach of contract.

112.    The 1997 Proxy Statement (at 14) formed the terms of a contract between Schwab Investments and investors in the Fund that if investors voted in favor of changing the Fund's fundamental investment objective to seek "to track the investment results of the [Index] through use of an indexing strategy" that the Trust would cause the Fund to conform with that objective. Investors in the Fund accepted that offer by voting in favor of the change in investment objective. See Proxy Statement at 3 ("[T]he Total Bond Market Index Fund … would seek to track the Lehman Brothers Aggregate Bond Index.").

113.    The Proxy Statement sets forth in detail the meaning of the term "indexing strategy" that could only be charged by shareholder vote.  Thus, for example, page 22 of the Proxy Statement assured investors that "[b]efore purchasing or selling a security, the Investment Manager would analyze each security's characteristics and determine whether purchasing or selling the security would help the Fund's portfolio approximate the characteristics of the Index."

114.    The Proxy Statement also formed the terms of a contract whereby the Trust covenanted that subject to shareholder vote, the Fund "may not" "[p]urchase securities (other than securities issued or guaranteed by the U.S. Government, its agencies or instrumentalities) if, as a result of such purchase, 25% or more of the value of its assets would be invested in any industry."

115.    The Fund's shareholders accepted the terms of that contract by voting in favor of that fundamental investment policy.

116.    Subsequent to the 1997 proxy vote, the Trust continued to offer shares in the Fund pursuant to the terms of a contract that the Trust would cause the Fund to continue to adhere to its fundamental investment objectives and policies contained in the 1997 Proxy Statement and reiterated in Prospectuses and in Statements of Additional Information (as quoted above). Investors accepted the terms of that contract by purchasing shares in the Fund.

117.    The terms of that contract are contained in the 1997 Proxy Statement, which established the contractual relationship between the Trust and Class members, and were reiterated

in the Trust's subsequent SEC filings, including the January 15, 1998 Prospectus, and the May 6, 2002 Statement of Additional Information ("SAI").

118.    The Trust violated the terms of the contract with the Fund's shareholders as set forth in the 1997 Proxy Statement and subsequent prospectuses and SAIs, as more fully described above, by directing the purchases or allowing the Investment Advisor to direct the purchases of securities that deviated from the composition of the Lehman Brothers U.S. Aggregate Bond Index and caused the Fund to concentrate more than 25% of its net assets in mortgage backed securities, including CMOs, without a subsequent shareholder vote.

119.    By virtue of the wrongful conduct of defendants, plaintiff and the members of the Class sustained money damages in connection with their ownership of shares in the Fund.

## COUNT IV:

### FOR BREACH OF CONVENANT OF GOOD FAITH AND FAIR DEALING (ON BEHALF OF THE CLASS AGAINST BOTH DEFENDANTS)

120.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.  This Count is asserted on behalf of members of the Class for breach of the covenant of good faith and fair dealing.

121.    Defendants have a common law duty of good faith and fair dealing with respect to investors in the Fund.

122.    Defendants violated the covenant of good faith and fair dealing by inducing investors to purchase and hold shares in the Fund by stating that it was the Fund's fundamental investment objective, changeable only by a shareholder vote, to track the Lehman Index, and to invest no more than 25% of the Fund's total assets in any one industry.

123.    Defendants, in violation of the covenant of good faith and fair dealing, engaged in speculation with the Fund's assets by investing more than 25% of the Fund's total assets in CMO securities that were not contained in the Lehman Index.

124.    By virtue of the wrongful conduct of defendants, plaintiff and the members of the Class sustained money damages in connection with their ownership of shares in the Fund.

## COUNT V:

### THIRD PARTY BENEFICIARY OF THE INVESTMENT ADVISORY AGREEMENT
### (ON BEHALF OF THE CLASS AGAINST THE INVESTMENT ADVISOR)

125.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

126.    The Investor Advisor managed the investments of the Fund pursuant to an Investment Advisory Agreement between the Investor Advisor and the Trust.

127.    The Investment Advisory Agreement required the Investment Advisor, among other things, to manage the Fund consistent with the Fund's fundamental investment objectives and policies.

128.    The shareholders of the Fund were third party beneficiaries of that Agreement. Class members were known and intended beneficiaries of the Investment Advisory Agreement.

129.    Inasmuch as the Trust issues and redeemed shares of the Fund on a daily basis at its reported NAV, if the Investment Advisor managed the Fund in a manner that was inconsistent with the Fund's fundamental investment objectives and policies, the Fund's shareholders would be subject to direct financial injury.

130.    The Investor Advisor breached the terms of its Investment Advisory Agreement with the Trust by failing to manage the Fund's assets in a manner consistent with the Fund's fundamental investment objectives and policies by investing in securities, including non-agency CMOs, which deviated from the securities contained in the Index, and by concentrating greater than 25% of the Fund's assets in non-agency CMOs.

131.    Class members suffered actual and direct financial damages as a result of the Investment Advisor's failure to manage the Fund's assets in a manner consistent with the Fund's fundamental investment objectives and policies.

1

<u>COUNT VI:</u>

2

**VIOLATIONS OF THE CALIFORNIA BUS. & PROF. CODE**
**§§ 17200 ET SEQ. ON BEHALF OF NORTHSTAR**
**(ON BEHALF OF NORTHSTAR AGAINST BOTH DEFENDANTS)**

3

4        132.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs

5    as if fully set forth herein.

6        133.    This Count is asserted by Northstar against the Trust and the Investment Advisor.

7        134.    Defendants engaged in "unlawful" business acts and practices in violation of the

8    UCL by violating federal law, and state common law, including but not limited to Section 13(a) of

9    the Investment Company Act, breach of contract, and breach of fiduciary duties.   Northstar

10   reserves the right to identify additional violations of California and/or federal law by the Fund

11   caused by these defendants as further investigation and discovery warrants.

12       135.    Northstar was a Schwab independent investor advisor that was paid a management

13   fee based on the reported asset values of its clients' Schwab accounts on a quarterly basis.

14   Northstar's method of compensation was common among Schwab independent investment

15   advisors.  Defendants had actual knowledge that Schwab independent investment advisors were

16   compensated on this basis..

17       136.    Defendants knew that by causing the Fund to deviate from its fundamental

18   investment objectives and policies, defendants would cause investors in the Fund, as well as

19   Schwab independent investor advisors such as Northstar, who purchased shares of the Fund for

20   their clients, to suffer financial harm.

21       137.    All of the wrongful conduct alleged herein occurred and continues to occur in the

22   conduct of these defendants' businesses.  These defendants' wrongful conduct is part of a pattern

23   or generalized course of conduct that has been repeated in the State of California on a continuing

24   basis.  The defendants' conduct thus impacts the public interest.

25       138.    As a proximate result of the defendants' wrongful conduct, Northstar sustained

26   money damages in connection with losses in the Fund's value that resulted from the Fund's

27   deviation from its stated fundamental investment policies.

28       139.    Northstar's claim is derivative of the Class's claims in that Northstar will be

required to prevail on the Class's claims in order to prevail on its claim, individually.

140.    Northstar requests that this Court enter such orders and judgments as may be necessary to restore to any person in interest any money that may have been acquired by means of such unfair competition, as provided in California Business & Professions Code §§ 17203 and Civil Code § 3345, and for such relief as set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying plaintiff Northstar as a representative of the Class under Rule 23 of the Federal Rules of Civil Procedure;

B.    Appointing Wolf Popper LLP and Greenbaum Rowe Smith & Davis LLP as Class Counsel;

C.    Awarding compensatory damages in favor of plaintiff and the members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    Disgorging from defendants for the benefit of the Class any management or other fees forfeited by Defendants' deviation from the Fund's fundamental investment objectives;

E.    Awarding plaintiff and the Class their reasonable costs and expenses   incurred   in this action, including counsel fees and expert fees;

F.    Awarding recessionary damages; and

G.    Such equitable, injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

Plaintiff hereby demands a trial by Jury.

Dated:  March 2, 2009

By: /s Christopher T. Heffelfinger
CHRISTOPHER T. HEFFELFINGER (118058)

Joseph J. Tabacco, Jr. (75484)
James C. Magid (233043)
**BERMAN DEVALERIO**
425 California Street, Suite 2100
San Francisco, CA  94104
Telephone: 415.433.3200
Facsimile:  415.433.6382

**Local Counsel**

Robert C. Finkel (admitted *pro hac vice*)
**WOLF POPPER LLP**
845 Third Avenue
New York, NY  10022
Telephone:  212.759.4600
Facsimile:  212.486.2093

Marc J. Gross (admitted *pro hac vice*)
**GREENBAUM ROWE SMITH
  & DAVIS LLP**
75 Livingston Street, Suite 301
Roseland, NJ  07068
Telephone:  973.535.1600
Facsimile:  973.535.1698

**Attorneys for Plaintiff Northstar Financial
Advisors, Inc.**

[C-08-4119 SI] FIRST AMENDED COMPLAINT FOR VIOLATION OF THE INVESTMENT
COMPANY ACT OF 1940                                                                                        28