1   DARRYL P. RAINS (CA SBN 104802)
    K.C. ALLAN WALDRON (CA SBN 231866)
2   MORRISON & FOERSTER LLP
    755 Page Mill Road
3   Palo Alto, California  94304-1018
    Telephone: 650.813.5600
4   Facsimile: 650.494.0792
    Email: DRains@mofo.com; KCWaldron@mofo.com
5
    DOROTHY L. FERNANDEZ (CA SBN 184266)
6   MORRISON & FOERSTER LLP
    425 Market Street
7   San Francisco, California  94105-2482
    Telephone: 415.268.7000
8   Facsimile: 415.268.7522
    Email: DFernandez@mofo.com
9
    Attorneys for defendants Schwab Investments and
10  Charles Schwab Investment Management, Inc.

11

12                    UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                      SAN FRANCISCO DIVISION

15

16  NORTHSTAR FINANCIAL ADVISORS, INC.,        Case No.      CV-08-4119 SI
    on Behalf of Itself and All Others Similarly
17  Situated,                                  CLASS ACTION

18                  Plaintiff,                 REPLY MEMORANDUM IN
                                               SUPPORT OF MOTION TO DISMISS
19          v.                                 FIRST AMENDED COMPLAINT

20  SCHWAB INVESTMENTS and CHARLES             Date:   May 1, 2009
    SCHWAB INVESTMENT MANAGEMENT,              Time:   9:00 a.m.
21  INC.,                                      Court:  10
                                               Judge:  Hon. Susan Illston
22                  Defendants.

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

TABLE OF AUTHORITIES ................................................................................................ii

3

INTRODUCTION ........................................................................................................1

4

ARGUMENT ...............................................................................................................1

5

I.      NORTHSTAR'S CLAIMS MUST BE ASSERTED DERIVATIVELY IN
        COMPLIANCE WITH RULE 23.1. ....................................................................1

6

        A.      Northstar's Section 13(a) Claim Is Derivative. .....................................3

7

        B.      Northstar's Fiduciary Duty and Contract-Based Claims Are Derivative..............6

8

II.     COUNT II DOES NOT STATE A BREACH OF FIDUCIARY DUTY CLAIM. ..........7

9

        A.      Massachusetts Law Applies to Northstar's Breach of Fiduciary Duty
                Claims.........................................................................................7

10

        B.      Massachusetts Law Does Not Create a Fiduciary Duty Running from a
                Fund or Its Advisor Directly to Fund Shareholders...............................9

11

12

        C.      Defendants Owe No Fiduciary Duty to Investors Under California Law..............9

13

III.    COUNT III DOES NOT PLEAD A CLAIM FOR BREACH OF CONTRACT..............9

14

        A.      Northstar Does Not Sufficiently Allege the Formation of a Contract with
                Investors. .................................................................................10

15

        B.      Northstar Alleges No Breach of Any Contract Provision. ...................11

16

IV.     COUNT IV STATES NO CLAIM FOR BREACH OF THE COVENANT OF
        GOOD FAITH AND FAIR DEALING..........................................................12

17

18

V.      COUNT V FAILS TO STATE A THIRD-PARTY BENEFICIARY CLAIM. ...............12

19

        A.      Northstar Does Not Allege Any Breach of the Investment Advisory
                Agreement. ...............................................................................12

20

        B.      Investors Were Not the Express Intended Third-Party Beneficiaries of the
                Investment Advisory Agreement. .................................................14

21

22

CONCLUSION............................................................................................................15

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*,
  158 Cal. App. 4th 226 (2007) ..................................................................................................9

*Ascherman v. General Reins. Corp.*,
  183 Cal. App. 3d 307 (1986) .................................................................................................14

*Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*
  No. 03 Civ. 1537 (MBM),
  2003 U.S. Dist. LEXIS 23062 (S.D.N.Y. Dec. 22, 2003) ...........................................13, 15

*Cal. Emergency Physicians Med. Group v. PacifiCare of Cal.*,
  111 Cal. App. 4th 1127 (2003) ..............................................................................................14

*Charles Lowe Co. v. Xomox Corp.*,
  No. C 95-0498 SI, 1999 WL 1293362 (N.D. Cal. Dec. 27, 1999)........................................14

*City of Moorpark City of Moorpark v. Moorpark Unified School Dist.*,
  54 Cal. 3d 921 (1991)............................................................................................................10

*Edgar v. MITE Corp.*,
  457 U.S. 624 (1982) ................................................................................................................7

*Forsythe v. Sun Life Fin'l, Inc.*,
  417 F. Supp. 2d 100 (D. Mass. 2006)......................................................................................6

*Green v. Brown*,
  276 F. Supp. 753 (S.D.N.Y. 1967)..........................................................................................5

*Green v. Brown*,
  398 F.2d 1006 (2d Cir. 1968)...............................................................................................4, 5

*Guerrero v. Gates*,
  442 F.3d 697 (9th Cir. 2006) ...................................................................................................2

*Halebian v. Berv*,
  No. 06 Civ. 4099 (NRB), 2007 WL 2191819 (S.D.N.Y. July 31, 2007) ................................4

*Hicks v. Small*,
  842 F. Supp. 407 (D. Nev. 1993) .............................................................................................2

*Hydrick v. Hunter*,
  500 F.3d 978 (9th Cir. 2007) ...................................................................................................2

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
   No. 98 Civ. 4318(HB), 2000 WL 10211 (S.D.N.Y. Jan. 6, 2000).......................................4, 5

*In re Eaton Vance Mut. Funds Fee Litig.*,
   403 F. Supp. 2d 310 (S.D.N.Y. 2005) ...............................................................6

*In re Harmonic, Inc., Sec. Litig.*,
   No. C 00-2287 PJH, 2006 U.S. Dist. LEXIS 90450 (N.D. Cal. Dec. 11, 2006) ....................2

*In re J.P. Morgan Chase & Co. Shareholder Litig.*,
   906 A.2d 766 (Del. 2006) .................................................................................4

*In re Mut. Funds Inv. Litig.*,
   519 F. Supp. 2d 580 (D. Md. 2007) ..................................................................8

*In re Worldcom, Inc.*,
   323 B.R. 844 (S.D.N.Y. B.R. 2005)...................................................................4

*Ind. Elec. Workers Pension Trust Fund v. Dunn*,
   No. C-06-01711 RMW, 2007 WL 1223220 (N.D. Cal. Mar. 1, 2007)..................................4

*ING Principal Prot. Funds Derivative Litig.*,
   369 F. Supp. 2d 163 (D. Mass. 2005)................................................................8

*Jones v. Aetna Casualty & Surety Co.*,
   26 Cal. App. 4th 1717 (1994)...........................................................................14

*Lapidus v. Hecht*,
   232 F.3d 679 (9th Cir. 2000) .........................................................................3, 4

*Lewis v. Casey*,
   518 U.S. 343 (1996) .....................................................................................3

*Mutchka v. Harris*,
   373 F. Supp. 2d 1021 (C.D. Cal. 2005)...........................................................4, 5

*Potomac Capital Mkts. Corp. v. Prudential-Bache Corporate Dividend Fund, Inc.*,
   726 F. Supp. 87 (S.D.N.Y. 1989)......................................................................7

*Potter v. Hughes*,
   546 F.3d 1051 (9th Cir. 2008) ..........................................................................3

*Scalisi v. Grills*,
   501 F. Supp. 2d 356 (E.D.N.Y. 2007)................................................................7

*Sepulveda v. Pacific Maritime Ass'n*,
   878 F.2d 1137 (9th Cir. 1989) ........................................................................14

*Smith v. Microskills San Diego L.P.*,
   153 Cal. App. 4th 892 (2007) ..........................................................................5

iii

*Spinks v. Equity Residential Briarwood Apts.*,
   171 Cal. App. 4th 1004 (2009) ...................................................................14

*Stegall v. Ladner*,
   394 F. Supp. 2d 358 (D. Mass. 2005)......................................................6, 8

*Strigliabotti v. Franklin Resources, Inc.*,
   No. C 04-00883 SI, 2005 WL 645529 (N.D. Cal. Mar. 7, 2005) ......................5, 6

*United States v. Cote*,
   51 F.3d 178 (9th Cir. 1995) ...................................................................2

*United States v. Smith*,
   389 F.3d 944 (9th Cir. 2004) ..................................................................2

*Vogel v. Jobs*,
   No. C 06-5208 JF, 2007 WL 3461163 (N.D. Cal. Nov. 14, 2007).........................4

**STATUTES**

15 U.S.C.
   § 80a-35(b)......................................................................................8

Cal. Civ. Code
   § 1559 ...........................................................................................15

**OTHER AUTHORITIES**

18B Wright, Miller & Cooper, Fed. Prac. & Proc.
   § 4478 (2009)....................................................................................2

**INTRODUCTION**

Northstar's opposition brief is most remarkable for what it does not do. Northstar argues that claims based on a decline in the value of a mutual fund are direct, not derivative, but Northstar does not cite one case reaching this conclusion. Northstar argues that a 1997 proxy statement constitutes a "contract" between Schwab Investments and every investor in its funds, but Northstar does not cite one case in which a proxy statement was held to be a contract. Northstar argues that California law governs all the claims of a nationwide class of investors who invested in a Massachusetts investment trust, but Northstar does not cite one case in which California law was applied in such a way. Northstar argues that an investment advisor to a mutual fund takes on fiduciary duties to all its individual investors, but Northstar does not cite one case making this leap. Northstar argues that the advisory agreement between Schwab Investments and Charles Schwab Investment Management expressly makes investors the third-party beneficiaries of the contract, but Northstar does not cite any provision of the contract in which this intent is expressed.

Northstar's theories, in short, are not supported by any case or legal principle. Northstar's complaint does not set out allegations which state a claim upon which relief can be granted. Northstar's complaint must therefore, once again, be dismissed.

**ARGUMENT**

## I.   NORTHSTAR'S CLAIMS MUST BE ASSERTED DERIVATIVELY IN COMPLIANCE WITH RULE 23.1.

In our opening brief, we demonstrated that Northstar's overarching damages theory is based on a decline in the fund's NAV relative to its benchmark. We then showed this theory must be asserted derivatively in compliance with Rule 23.1. (Open. Br. at 2-7.)

Northstar begins its opposition, not by responding to the merits of our position, but by asserting our argument is barred by the "law of the case" doctrine. According to Northstar, we previously "conceded that beneficial purchasers have standing to pursue claims under Section 13(a) of the Investment Company Act." (Opp. Br. at 2.) Wrong. We argued that Northstar lacked standing because it was not an investor in the fund. (Feb. 19, 2009, Order at 3.) And the Court agreed with us. (*Id.* at 4.) Nowhere did we concede that investors may bring direct, rather than

1

1   derivative, claims under section 13(a) or any other statute, and Northstar cites no place where such
2   a concession was made.
3          Northstar next argues that, even if the issue was not addressed explicitly in the prior motion,
4   it was "necessarily decided by the Court in holding that Northstar had standing to assert the class's
5   claims." (Opp. Br. at 3.)  There are two problems with this argument.  First, the Court did not hold
6   that Northstar had standing; to the contrary, it decided that Northstar did not have standing and it
7   dismissed Northstar's complaint.  (Feb. 19, 2009, Order at 4.)  Second, the Court did not decide
8   whether Northstar's claims were direct or derivative, since it did not have to reach that question
9   once it concluded Northstar lacked standing.  The "law of the case" doctrine applies only to
10  questions that were "decided explicitly or by necessary implication in the previous disposition."
11  *Hydrick v. Hunter*, 500 F.3d 978, 986 (9th Cir. 2007), *petition for cert. filed*, 76 U.S.L.W. 3410
12  (U.S. Jan. 17, 2008) (No. 07-958) (citation and quotation omitted); *United States v. Cote*, 51 F.3d
13  178, 181 (9th Cir. 1995) (law of case doctrine "clearly does not extend to issues an appellate court
14  did not address") (citation and quotation omitted); 18B Wright, Miller & Cooper, Fed. Prac. &
15  Proc. § 4478 at 666 (2009).[1]
16         Finally, Northstar argues we are "estopped" or "precluded" from raising the issue.  (Opp.
17  Br. at 3.)  Northstar argues, in effect, that a defendant must raise every legal defect in its first
18  motion to dismiss.  That is not the law.  *In re Harmonic, Inc., Sec. Litig.*, No. C 00-2287 PJH, 2006
19  U.S. Dist. LEXIS 90450, at *39-40 (N.D. Cal. Dec. 11, 2006) ("[u]nder Rule 12(h), defenses for
20  failure to state a claim may be presented at any time up to and including trial, and under Rule 12(g),
21  a party does not waive a ground for moving to dismiss for failure to state a claim by not including
22  that ground in an earlier motion to dismiss"); *Hicks v. Small*, 842 F. Supp. 407, 408 (D. Nev. 1993)
23  ("12(b)(6) motions to dismiss for failure to state a claim upon which relief can be granted are
24  excepted from" general rule requiring all arguments to be made in single motion), *aff'd*, 69 F.3d
25
26  _____
27  [1] Even if the Court had somehow decided the derivative question, it would always be free to
    revise its decision prior to the entry of judgment.  *Guerrero v. Gates*, 442 F.3d 697, 702 n.4 (9th
    Cir. 2006); *United States v. Smith*, 389 F.3d 944, 949 (9th Cir. 2004).
28

1   967 (9th Cir. 1995).[2]  Northstar has no basis for saying the "law of the case" doctrine bars

2   consideration of Rule 23.1 and its applicability to Northstar's claims.

3       **A.       Northstar's Section 13(a) Claim Is Derivative.**

4           Northstar's section 13(a) claim asserts the fund's investors were harmed by "losses in the

5   Fund's value that resulted from the Fund's deviation from their stated fundament [sic] investment

6   policy."  (First Am. Compl. ¶ 97.)  We demonstrated in our opening brief that this sort of claim —

7   mismanagement resulting in a decline in the value of investors' shares — must be asserted as a

8   derivative claim.  (Open. Br. at 4-6.)  In response, Northstar argues first that this Court already held

9   "that Northstar and the Class had direct claims under Section 13(a)."  (Opp. Br. at 4.)  The Court

10  held no such thing.  The Court never reached the issue, and Northstar cites nothing in the Court's

11  order as support for its claim.

12          Northstar next says its claims are direct claims under *Lapidus v. Hecht*, 232 F.3d 679 (9th

13  Cir. 2000).  *Lapidus* held that a section 13(a) "voting rights" claim satisfies the requirements for

14  bringing "a direct action under Massachusetts law."  *Id.* at 683.  The Ninth Circuit said that, under

15  Massachusetts law, a mutual fund investor may bring a direct claim for either "an injury distinct

16  from that suffered by shareholders generally or a wrong involving . . . contractual rights as a

17  shareholder, such as the right to vote."  *Id.*  The *Lapidus* complaint met the second test, as "the

18  plaintiffs allege[d] violations of their contractual rights . . . to vote on proposed changes to" the

19  fund's investment policies.  *Id.*  The Ninth Circuit concluded that "[t]hese allegations are sufficient

20  to satisfy the injury requirement for a direct action under Massachusetts law" because the "alleged

21  injury is predicated upon a violation of a shareholder's voting rights."  *Id.*

22          The *Lapidus* court then addressed the plaintiffs' claim for money damages and held it could

23  only be brought derivatively.  The Ninth Circuit again referred to Massachusetts law, noting that a

24  claim for diminution in the value of mutual fund shares is not distinct from an injury suffered by

25  shareholders generally.  It found:  "the only injury to the shareholder is the indirect harm which

26  _____

27  [2] Even if that were the rule generally, it could not apply to questions of standing to bring a
    derivative claim, which goes to the court's jurisdiction and, therefore, cannot be waived.  *Lewis v.*
    *Casey*, 518 U.S. 343, 349 n.1 (1996); *Potter v. Hughes*, 546 F.3d 1051, 1055 (9th Cir. 2008).

28

1   consists of the diminution in the value of his or her shares." *Id.*  As a result, the Ninth Circuit

2   affirmed dismissal of the plaintiffs' damages claim, because the "district court correctly determined

3   that this claim alleged only indirect harm to the shareholders." *Id.* at 684.

4        *Lapidus* thus draws a careful distinction between "voting rights" injuries and "diminution in

5   value" injuries.  That distinction has been consistently observed in subsequent cases.  For instance,

6   in *In re J.P. Morgan Chase & Co. Shareholder Litig.*, 906 A.2d 766, 772-73 (Del. 2006), the

7   Delaware Supreme Court acknowledged that if a "disclosure violation impaired the stockholders'

8   right to cast an informed vote, that claim is direct." *Id.* at 772.  But a damages claim based on harm

9   to the company resulting from that vote must be asserted derivatively — even though the voting

10  rights violation allegedly contributed to the financial injury.  *Id.*  Similarly, in *Halebian v. Berv*, No.

11  06 Civ. 4099 (NRB), 2007 WL 2191819 (S.D.N.Y. July 31, 2007), a plaintiff claimed his voting

12  rights were interfered with by a false proxy solicitation.  *Id.* at *2-3.  The court held that his claims

13  had to be asserted derivatively even though "plaintiff characterizes this as being a case where

14  defendants interfered with shareholders' voting rights." *Id.* at *12.  According to the court, the

15  plaintiff had failed "to articulate a theory by which the alleged harm to shareholders which resulted

16  from the misleading nature of the Proxy Statement was separate and independent from the harm

17  allegedly resulting to the Fund itself." *Id.*[3]

18       Northstar claims, however, that "[e]very court that has addressed the private right of action

19  under Section 13(a) has considered the claim to be direct."  (Opp. Br. at 5.)  That is not true.

20  Among the cases cited by Northstar, *Green v. Brown* states (without discussion) that the section

21  13(a) claim in that case was a "derivative action." *Green v. Brown*, 398 F.2d 1006, 1007 (2d Cir.

22

---

23  [3] *See also In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318 (HB), 2000 WL

24  10211, at *1, *4 (S.D.N.Y. Jan. 6, 2000) (section 13(a) claim held to be derivative where plaintiff
     alleged an "emphasis on risky, unstable and unproven micro-cap securities" made "the Funds
     perform[] poorly"); *Vogel v. Jobs*, No. C 06-5208 JF, 2007 WL 3461163, at *3 (N.D. Cal.

25  Nov. 14, 2007) (disclosure claim was derivative because "[p]laintiff has not identified a unique
     injury independent of any harm done to the corporation"); *Ind. Elec. Workers Pension Trust

26  Fund v. Dunn*, No. C-06-01711 RMW, 2007 WL 1223220, at *11 (N.D. Cal. Mar. 1, 2007)
     ("actions charging mismanagement which depress the value of stock allege a wrong to the
     corporation") (citation and quotation omitted); *In re Worldcom, Inc.*, 323 B.R. 844, 856

27  (S.D.N.Y. B.R. 2005) (voting rights claims were derivative where the "Court does not see how
     the right to vote, in this case, is differentiated from a diminution in value of the shares").

28

1   1968); *Green v. Brown*, 276 F. Supp. 753, 754 (S.D.N.Y. 1967), *remanded on other grounds*, 398

2   F.2d 1006 (2nd Cir. 1968).  The remaining cases cited by Northstar do not discuss whether the

3   particular allegations in those cases involved voting rights, a declining NAV, or both.  Northstar

4   ignores that, in *In re Dreyfus Aggressive Growth Mutual Fund Litig.*, No. 98 Civ. 4318(HB), 2000

5   WL 10211, at *1, *4 (S.D.N.Y. Jan. 6, 2000), a section 13(a) claim was held to be derivative in

6   nature.

7          Finally, Northstar argues that a decline in the value of a mutual fund's assets does not

8   "injure" the fund because any harm is passed along to the shareholders.  (Opp. Br. at 5.)  That does

9   not distinguish mutual funds from any other company:  a harm to a company, or an investment

10  fund, necessarily is felt, ultimately, by the company's or the fund's shareholders.  Northstar claims,

11  though, that *Strigliabotti v. Franklin Resources, Inc.*, No. C 04-00883 SI, 2005 WL 645529, at *8

12  (N.D. Cal. Mar. 7, 2005), supports its argument.  *Strigliabotti*, of course, applied California, not

13  Massachusetts, law, and seems to say that excessive fees charged to a mutual fund "is harm to the

14  individual investors, who own the Funds' assets and bear its expenses directly on a pro rata basis."

15  *Id*. at *8.  But any harm borne by shareholders on a "pro rata basis" is, by definition, a derivative

16  claim, not a direct claim for shareholders.  *Mutchka v. Harris*, 373 F. Supp. 2d 1021, 1028 (C.D.

17  Cal. 2005) (claim is derivative if "injury is identical to every other investor's in that their pro rata

18  share of the fund allegedly would have been more valuable" but for defendants' alleged

19  misconduct).

20         For this reason, subsequent cases have concluded that *Strigliabotti* cannot be read to apply

21  outside the excessive fee context.  Those cases reject the notion that mutual funds are "special" or

22  "unique" and are not, as a result, subject to the general division between direct and derivative

23  claims.  In *Mutchka*, for example, the plaintiffs argued that "mutual funds are unlike conventional

24  corporations in that any increase or decrease in fund assets is immediately passed on or allocated to

25  the fund investors."  *Id*. at 1027.  The court, however, was "unpersuaded" by this argument:

26              [T]he fact that the funds' per share net asset value ("NAV") is
                calculated daily does not make the alleged injury any more direct
27              because the injury is not realized until an investor sells his or her
                shares of the fund.  In that respect, mutual funds are no different

28

than stock ownership, where the value of shares is calculated by the marketplace with each and every trade.

*Id.  Accord*, *see*, *e.g.*, *Forsythe v. Sun Life Fin'l, Inc.*, 417 F. Supp. 2d 100, 112 (D. Mass. 2006) (rejecting argument based on the "unique nature" of mutual funds; *Strigliabotti's* "reasoning is unpersuasive [because it] ignores the fact that the injuries claimed by the plaintiffs here would be suffered only by reason of a precedent wrong to the . . .  funds"); *Stegall v. Ladner*, 394 F. Supp. 2d 358, 365-66 (D. Mass. 2005) (argument that mutual funds are "mere shells" rejected; "[t]hat description of mutual funds does not distinguish them in any material way from traditional corporations" or the "fluctuating daily prices of shares held by stockholders of publicly traded corporations"); *In re Eaton Vance Mut. Funds Fee Litig.*, 403 F. Supp. 2d 310, 316 (S.D.N.Y. 2005) ("the *Strigliabotti* analysis is inconsistent with the analysis used by courts applying Massachusetts law").

Northstar's section 13(a) claim is based upon a supposed decline in the NAV of the Total Bond Market fund.  Because investors experience that decline only indirectly, by reason of their share ownership, Northstar's claim must be dismissed and instead asserted derivatively.

### B.   Northstar's Fiduciary Duty and Contract-Based Claims Are Derivative.

Like its section 13(a) claim, Northstar's contract-based claims (Counts III, IV, and V) all allege that investors were harmed by the decline of the fund NAV through "their ownership of shares in the fund."  (First Am. Compl. ¶¶ 119, 124; *see id.* ¶¶ 128, 131.)  These allegations are derivative in nature.  (Open. Br. at 6-7.)  Northstar does not respond on the merits to this apparent defect in its claims; instead, it argues that its contract-based claims are direct "[f]or the same reasons as the Class' Section 13(a)" claim.  (Opp. Br. at 9 n.3.)  We therefore incorporate our response to Northstar's section 13(a) arguments here.

Similarly, in defense of its fiduciary duty claim, Northstar argues the claim seeks recovery for "individual injuries suffered by themselves and other investors."  (*Id.* at 16.)  That is not what Northstar's complaint says.  The complaint alleges that investors were injured, not directly, but as a result of "their ownership of shares in the Fund."  (First Am. Compl. ¶ 110.)  This, too, is a derivative claim.

## II.     COUNT II DOES NOT STATE A BREACH OF FIDUCIARY DUTY CLAIM.

Northstar's main defense of its fiduciary duty claim depends on a choice-of-law issue:  do the claims of a nationwide class of investors against a Massachusetts business trust arise under Massachusetts or California law?  (Opp. Br. at 10.)  We show below that Massachusetts law governs Northstar's claim and does not permit a breach of fiduciary duty claim against a trust or its contractual investment advisor.

### A.     Massachusetts Law Applies to Northstar's Breach of Fiduciary Duty Claims.

In our opening, we showed that the "internal affairs" choice-of-law rule requires application of Massachusetts law because Schwab Investments is organized under that state's laws.  (Open. Br. at 8-10.)  In response, Northstar says two things.  First, it argues the "internal affairs doctrine" must be "narrowly applied" — by which it means not applied to this case.  (Opp. Br. at 10.)  And second, Northstar argues that fund investors "are not shareholders of" Schwab Investments.  (*Id.* at 12.)  It reasons that, because the internal affairs doctrine regulates claims between shareholders and their company, it cannot be applied if investors are not shareholders.

The argument that the "internal affairs" doctrine should be "narrowly applied" does not really help answer the question in this case.  We cited a dozen cases in our opening brief in which, pursuant to the internal affairs doctrine, the law of the state of incorporation was applied to shareholders' claims for breach of fiduciary duty.  (Open. Br. at 8-10.)  Northstar cites no contrary case.  The reason is obvious:  the internal affairs doctrine applies to claims involving "the relationships among or between the corporation and its current officers, directors, and shareholders."  *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982).  The whole point of the doctrine is to make sure that internal corporate affairs are governed by one set of laws rather than a patchwork of conflicting state laws.  And that's what happens in mutual fund cases.  *See, e.g., Scalisi v. Grills*, 501 F. Supp. 2d 356, 358, 361 (E.D.N.Y. 2007) (New York court applied Maryland law to breach of fiduciary duty claim involving Maryland-incorporated mutual fund); *Potomac Capital Mkts. Corp. v. Prudential-Bache Corporate Dividend Fund, Inc.*, 726 F. Supp. 87, 94 (S.D.N.Y. 1989) (same).

1    Yes, says Northstar, but the internal affairs doctrine should not be applied to its fiduciary

2  duty claim because supposedly it is not "asserted by a shareholder against its corporation." (Opp.

3  Br. at 11.)  According to Northstar, "the Fund's investors are not shareholders of the Trust." (*Id.*

4  at 12.)  In our opening memorandum, we quoted the founding Agreement and Declaration of Trust,

5  as well as the fund's registration statement, to show that fund investors own shares of Schwab

6  Investments (what Northstar calls the "Trust").  (Open. Br. at 11-12.)  *See ING Principal Prot.*

7  *Funds Derivative Litig.*, 369 F. Supp. 2d 163, 171 (D. Mass. 2005) (requiring investors in a series

8  mutual fund to make shareholder derivative demand on board of the business trust); *Stegall*, 394 F.

9  Supp. 2d at 367 (same).

10    Northstar, by contrast, cites no document supporting its argument that fund investors are not

11  trust shareholders.  And the one case it cites does not help its position.  *In re Mut. Funds Inv. Litig.*,

12  519 F. Supp. 2d 580 (D. Md. 2007).  That case held that investors "who hold shares in one mutual

13  fund [have] standing to sue on behalf of other persons who hold shares in other mutual funds within

14  the same family of funds."  *Id.* at 583, 587.  The court made an exception, however, for claims

15  asserted under section 36(b) of the '40 Act.  *Id.* at 587-88.  That section permits a "security holder

16  of [a] registered investment company" to sue an investment advisor for charging excessive

17  management fees.  15 U.S.C. § 80a-35(b).  The court held that an investor who had not purchased a

18  specific fund could not sue the advisor of that fund under the specific language of section 36(b),

19  even though the investor owned other mutual funds managed by the same advisor.  519 F. Supp. 2d

20  at 588-89.  Finally, the court held that an investor in a "series" fund could not bring a section 36(b)

21  claim against other "series" funds managed by the same advisor since, under SEC regulations,

22  "under such circumstances each series is to be treated as a separate investment company." *Id.* at

23  588.  Nothing in the case suggests that, for purposes of a breach of fiduciary duty claim, investors

24  are not shareholders of the trust whose shares they purchased, or that the internal affairs doctrine

25  does not apply to mutual fund investors.

26

27

28

**B.**   **Massachusetts Law Does Not Create a Fiduciary Duty Running from a Fund or Its Advisor Directly to Fund Shareholders.**

Northstar claims that investors were owed fiduciary duties by Schwab Investments and Charles Schwab Investment Management even though (they claim) they were not shareholders of either entity. Northstar bases this claim on the idea that the "relationship between a trustee and its beneficiary is fiduciary as a matter of law." (Opp. Br. at 15.) This argument, of course, makes our point: Northstar has not sued the trustees. It has sued the trust and an investment advisor with a contractual relationship to the trust. Northstar cites no case in which a trust, or a third-party investment advisor, was held to owe fiduciary duties to a fund's investors under Massachusetts law. Northstar ignores the cases we cited showing no such duties are owed. (Open. Br. at 10-13.)

**C.**   **Defendants Owe No Fiduciary Duty to Investors Under California Law.**

Northstar argues for a different result under California law. (Opp. Br. at 13.) But, again, Northstar mistakenly relies on cases about trustees, not cases about a trust or an investment advisor. Its key case is *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226 (2007). (Opp. Brief at 13.) *Apollo*, however, did not involve mutual fund investors or, for that matter, an investment advisor. Instead, *Apollo* involved claims against an underwriter who had sold bridge loans for an internet startup. 158 Cal. App. 4th at 232-33. The court held the underwriter did not owe fiduciary duties to the investors who purchased the loans because the underwriter worked for the company, not the investors: "the complaint does not allege the investors were Roth's customers or had any other preexisting relationship with Roth." *Id.* at 245. *Apollo* does not help Northstar's case.

**III.**   **COUNT III DOES NOT PLEAD A CLAIM FOR BREACH OF CONTRACT.**

Our opening brief demonstrated that Northstar's contract claim lacks allegations showing the formation of a contract, the involvement of Schwab Investments as a party to that contract, or the breach of any contractual terms. (Open. Br. at 14-19.) Northstar does not refute any of these points.

A.     **Northstar Does Not Sufficiently Allege the Formation of a Contract with Investors.**

Northstar claims the fund's initial 1997 proxy statement constituted a contract entered into with every subsequent investor in the fund.  (Opp. Br. at 7.)  But Northstar does not attempt to explain how this happened.  Does Northstar mean the contract was formed with those investors who received the 1997 proxy statement and submitted a proxy with a "yes" vote?  Apparently not, for Northstar alleges the contract is with class members who held shares "from August 31, 2007 to the present."  (First Am. Compl. ¶ 1.)  Northstar apparently means to say that investors who owned shares on or after August 31, 2007, somehow entered into a contract based on the 1997 proxy statement.  (*Id.* ¶ 116.)  But Northstar offers absolutely no legal or factual explanation for how that could be the case.  Northstar does not allege, for example, that the 1997 proxy was ever distributed, or made available, to investors in 2007, or that new investors somehow "bargained" for the benefits of that earlier proxy.

It gets more confusing.  Northstar alleges that 1997 investors "accepted" the terms of the 1997 proxy statement by submitting a proxy with a "yes" vote.  (*Id.* ¶ 115.)  Those who voted "no," but remained investors, apparently also made contracts merely by "retain[ing] shares" even after they voted "no."  (Opp. Br. at 8.)  Newer investors — that is, those who purchased after 1997 — allegedly entered into contracts when they "purchased" fund shares — without voting at all.  All these supposed contracts incorporated the 1997 proxy statement, even though there is no document, and no allegation, showing the proxy statement was incorporated by reference.

What really happened, of course, is much simpler.  The 1997 proxy statement was a solicitation of shareholder proxies.  Shareholders were asked to provide proxies, or votes, on various proposals, including a proposal to change the fund's name and investment approach.  The proxy statement contained no promises, or bargained-for exchanges, and no rights-creating language.  It was not, in short, a contractual "offer" to be accepted, or rejected, by individual investors.  It was simply a solicitation of votes.  Contract law says an "offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *City of Moorpark v. Moorpark Unified*

1    *School Dist.*, 54 Cal. 3d 921, 930 (1991) (citation and quotation omitted). The 1997 proxy

2    statement contains no language reflecting a "willingness to enter into a bargain."

3         Similarly, Northstar's brief does not explain how Schwab Investments gave consideration as

4    part of some bargain involving the 1997 proxy statement. Northstar says Schwab Investments

5    "issued and redeemed shares of the Fund in direct privity with investors," and that much is true.

6    (Opp. Br. at 8.) But simple purchase and sale transactions do not bring along with them all of a

7    fund's past SEC filings or proxy solicitations. Northstar criticizes the cases we cited showing a

8    proxy is not a contract, but it does not cite even one case supporting its claim.

9         **B.      Northstar Alleges No Breach of Any Contract Provision.**

10        In our opening brief, we showed that Northstar's complaint does not properly allege that

11   Schwab Investments breached a provision of any contract with investors. We noted, first, that

12   Northstar has not shown the 1997 proxy statement was incorporated by reference into purchase

13   contracts made years, or even a decade, later. We next pointed out that, by 2007, when the class

14   period begins, the precise language relied upon by Northstar had been replaced with new language

15   distributed to investors by means of the fund's prospectus and SAI. Northstar's opposition brief

16   does not even attempt to explain how investors who purchased after August 31, 2007, could claim

17   they entered into a contract incorporating statements from a 1997 proxy statement when those

18   statements were changed, in current SEC filings, to permit precisely what Northstar claims was

19   prohibited in 1997. (Open. Br. at 18-19.)

20        Northstar persists, however, in arguing the 1997 proxy statement imposes contractual duties

21   to "seek to track the [Lehman index] by means of an indexing strategy" and to "invest no more than

22   25% of the Fund's total assets in any 'industry.'" (Opp. Br. at 7.) There are no such contractual

23   terms in the 1997 proxy statement. True, the statement describes the proposals put to investors in

24   1997, and it describes what the fund *would* do if the proposals were adopted. (Waldron Decl. Ex. H

25   at 17-18.) Nowhere is the commitment made that, if the vote were successful, the fund would never

26

27

28

1  change its policies.[4]  Northstar has not pleaded the basic elements of a breach of contract claim.

2  Count III must be dismissed.

3  **IV.    COUNT IV STATES NO CLAIM FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING.**

4

5      Our opening brief showed that Northstar's covenant of good faith and fair dealing claim

6  must be premised on the existence of a valid contract, and that, if Northstar's contract claim is

7  dismissed, its covenant of good faith and fair dealing claim must be dismissed as well.  (Open. Br.

8  at 19.)  Northstar does not dispute the point.  Accordingly, Count IV (breach of the covenant of

9  good faith and fair dealing) should be dismissed along with Count III (breach of contract).

10  **V.    COUNT V FAILS TO STATE A THIRD-PARTY BENEFICIARY CLAIM.**

11      Northstar claims that California law permits investors to assert a breach of contract claim to

12  enforce Charles Schwab Investment Management's advisory agreement with Schwab Investments.

13  But Northstar's complaint doesn't allege any breach of that agreement, and investors cannot assert

14  any breach of contract claim because they are not the express third-party beneficiaries of that

15  agreement.

16      **A.    Northstar Does Not Allege Any Breach of the Investment Advisory Agreement.**

17

18      Northstar's complaint alleges that the Investment Advisory Agreement obligates Charles

19  Schwab Investment Management "to manage the Fund consistent with the Fund's fundamental

20  investment objectives and policies."  (First Am. Compl. ¶ 127.)  We demonstrated, in our opening

21  brief, that this breach of contract theory fails to allege a breach for two reasons:  (1) the agreement

22  does not contain the provision Northstar says was breached, and (2) the contract contains an express

23

24  ───────────────
[4] The 1997 proxy statement contains many examples of language showing it is not a binding

25  contract.  (*See*, *e.g.*, Waldron Decl. Ex. H at 17 (fund will follow certain investment protocols "[u]nder normal market conditions"); *id.* at 19 (fund "would likely continue to invest

26  significantly" in treasuries and agencies); *id.* at 22 (fund's performance and risk "is expected" to track the index's performance and risk); *id.* at 23 (fund "may follow a policy of substituting one

27  type of investment grade bond for another . . . [f]or instance [the fund] may hold more short-term corporate bonds (and fewer short-term U.S. Treasury Bonds) than represented in the [Lehman index] so as to increase income").)

28

1   hold harmless clause prohibiting any claim for breach not arising from willful or grossly negligent

2   misconduct.  (Open. Br. at 20-22.)

3        The Investment Advisory Agreement — which is publicly filed with the Securities and

4   Exchange Commission — contains no provision obligating Charles Schwab Investment

5   Management to manage the fund "consistent with the Fund's fundamental investment objectives."

6   Northstar now concedes the agreement "does not explicitly" contain any such provision.  (Opp. Br.

7   at 18.)  But it contends the agreement "would make little, if any, sense" unless that term is implied

8   in the contract.  (*Id.*)

9        Northstar's argument ignores the other terms of the agreement.  The Investment Advisory

10   Agreement imposes all sorts of obligations and restrictions on Charles Schwab Investment

11   Management — just not the restriction upon which Northstar bases its claim.  Northstar's argument

12   also ignores the agreement's express hold harmless clause.  That provision protects Charles Schwab

13   Investment Management against claims — including breach of contract claims — alleging "any

14   error of judgment or mistake" not amounting to "willful misfeasance, bad faith or gross negligence

15   [or] reckless disregard of its obligations and duties."  (Waldron Decl. Ex. F § 8.)  Northstar's breach

16   of contract claim does not meet that standard.  *See Banco Espirito Santo de Investimento, S.A. v.

17   Citibank, N.A.* ("*Citibank*"), No. 03 Civ. 1537 (MBM), 2003 U.S. Dist. LEXIS 23062, at *34-35

18   (S.D.N.Y. Dec. 22, 2003) (third-party beneficiary claim would fail where plaintiff failed to allege

19   more than negligence to overcome protection of "limited liability clause"), *aff'd,* 110 Fed. Appx.

20   191 (2d Cir. 2004).

21        Northstar does not attempt to explain how its breach of contract claim could possibly

22   survive this provision — which is, after all, part of the agreement Northstar says was breached.  For

23   its part, Northstar's complaint does not allege any willful misfeasance, bad faith, gross negligence,

24   or reckless disregard.  Northstar's complaint thus does not properly plead any breach of the

25   advisory agreement between Schwab Investments and Charles Schwab Investment Management.

26

27

28

1

**B.**      **Investors Were Not the Express Intended Third-Party Beneficiaries of the**
            <u>**Investment Advisory Agreement.**</u>

2

3          Even if there had been a breach of contract, the fund's investors could not sue because they

4     are not parties to the advisory agreement and are not the agreement's express intended beneficiaries.

5     (*See* Open. Br. at 20-22.)  Northstar admits the investors are not expressly mentioned in the

6     advisory agreement.  (Opp. Br. at 19.)  But they claim the investors "comprise a 'class of persons'

7     that the Advisory Agreement intended to benefit."  (*Id*.)  Northstar does not, however, cite any

8     provision of the agreement for this proposition.

9          The intent to benefit absent third parties must be apparent in the terms of the agreement

10     itself.  *Spinks v. Equity Residential Briarwood Apts.*, 171 Cal. App. 4th 1004, 1021, 1023 (2009)

11     ("the determination turns on the manifestation of intent to confer a benefit on the third party . . .

12     [i]ntent is to be inferred, if possible, solely from the language of the written contract"); *Cal.*

13     *Emergency Physicians Med. Group v. PacifiCare of Cal.*, 111 Cal. App. 4th 1127, 1138 (2003)

14     ("plaintiff must plead a contract which was made expressly for his benefit and one in which it

15     clearly appears that he was a beneficiary") (citation and quotation omitted); *Jones v. Aetna Casualty*

16     *& Surety Co.*, 26 Cal. App. 4th 1717, 1725 (1994) ("[w]hether a third party is an intended

17     beneficiary or merely an incidental beneficiary to the contract involves construction of the parties'

18     intent, gleaned from reading the contract as a whole in light of the circumstances under which it

19     was entered"); *Ascherman v. General Reins. Corp.*, 183 Cal. App. 3d 307, 311 (1986) (the parties'

20     "intent must appear from the terms of the contract").

21          Without any reference to the actual agreement, Northstar cannot meet its burden of showing

22     investors were the agreement's intended beneficiaries.  *Charles Lowe Co. v. Xomox Corp.*, No. C

23     95-0498 SI, 1999 WL 1293362, at *7 (N.D. Cal. Dec. 27, 1999) ("California case law establishes

24     that intent that is not disclosed in the terms of the contract is insufficient, by itself, to render a party

25     a third party beneficiary to a contract"); *Sepulveda v. Pacific Maritime Ass'n*, 878 F.2d 1137, 1139

26     (9th Cir. 1989) (beneficiary must either be named in the agreement or "be a member of a class

27     referred to and identified in it") (citation and quotations omitted).

28

1    Northstar correctly points out that third-party beneficiaries need not be identified, by name,

2   in an agreement.  (Opp. Br. at 19.)  But the agreement must nevertheless express the parties' intent

3   to confer the contract's benefits on identifiable third parties.  Cal. Civ. Code § 1559 (third-party

4   may enforce contract "made expressly for [his] benefit").  Here, the advisory agreement was made

5   for "the benefit of the parties hereto and their respective successors."  (Waldron Decl. Ex. F § 11.)

6   That language cannot be read as intending to confer any benefit on third-party investors.  *See*

7   *Smith v. Microskills San Diego L.P.*, 153 Cal. App. 4th 892, 898-99 (2007) (agreement stating it

8   "shall inure to the benefit of your successors and assigns" "failed to manifest any intent to confer

9   such benefit upon" a third-party) (citation and quotation omitted).

10   Northstar nevertheless argues the advisory agreement "must" be intended to benefit

11   investors because "[t]here could be no other intended beneficiary of the Agreement than the fund-

12   owners themselves."  (Opp. Br. at 21.)  But mutual fund cases have repeatedly held that investors

13   are not third-party beneficiaries of a contract for advisory services to the fund.  In *Citibank*, for

14   example, the court concluded that investors were not third-party beneficiaries of the administrative

15   agreement between the fund and its manager.  2003 U.S. Dist. LEXIS 23062, at *23-36.

16   Northstar's new third-party beneficiary contract claim fails properly to allege the breach of

17   any contractual term, and it is asserted on behalf of investors who do not qualify as third-party

18   beneficiaries.  Count V must therefore be dismissed.

19                                      **CONCLUSION**

20   Northstar's complaint once again fails to state a claim.  Because Northstar has had two chances

21   to correct the errors identified by the Court, it would be futile and pointless to allow further leave to

22   amend.  Defendants respectfully request that the Court dismiss Northstar's complaint with prejudice.

23   Dated: April 17, 2009                    DARRYL P. RAINS
                                             DOROTHY L. FERNANDEZ
24                                           K.C. ALLAN WALDRON
                                             MORRISON & FOERSTER LLP
25
                                             By: _____/s/ Darryl P. Rains_____
26                                                    Darryl P. Rains

27                                           Attorneys for defendants Schwab Investments
                                                  and Charles Schwab
28                                             Investment Management, Inc.