Joseph J. Tabacco, Jr. (75484)
jtabacco@bermandevalerio.com
Christopher Heffelfinger (118058)
cheffelfinger@bermandevalerio.com
Anthony D. Phillips (259688)
aphillips@bermandevalerio.com
**BERMAN DEVALERIO**
One California Street, Suite 900
San Francisco, CA  94111
Telephone: 415.433.3200
Facsimile:  415.433.6382

*Attorneys for Plaintiff Northstar Financial Advisors, Inc.*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORTHSTAR FINANCIAL ADVISORS, INC., on Behalf of Itself and all Others Similarly Situated, | Case No. 08-cv-04119 LHK |
| | CLASS ACTION |
| Plaintiff, | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| SCHWAB INVESTMENTS; and MARIANN BYERWALTER, DONALD F. DORWARD, WILLIAM A. HASLER, ROBERT G. HOLMES, GERALD B. SMITH, DONALD R. STEPHENS, MICHAEL W. WILSEY, CHARLES R. SCHWAB, RANDALL W. MERK, JOSEPH H. WENDER and JOHN F. COGAN  as TRUSTEES OF SCHWAB INVESTMENTS; and CHARLES SCHWAB INVESTMENT MANAGEMENT, INC. | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

Plaintiff, for its Second Amended Class Action Complaint, alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based upon the investigation made by its attorneys, which included a review of

Securities and Exchange Commission ("SEC") filings, news reports and other publicly available materials.

### NATURE OF THE ACTION

1.     This action is brought by Northstar Financial Advisors, Inc., individually, and on behalf of persons who owned shares of the Schwab Total Bond Market Fund (the "Fund" or "Index Fund") (Ticker: SWLBX) at any time from August 31, 2007 through February 27, 2009, and were damaged thereby.

2.     This action is brought against Schwab Investments, the members of the Board of Trustees of Schwab Investments, and Charles Schwab Management, Inc. for violating shareholders' rights and causing the Fund to deviate from its fundamental investment objective to "seek to track the investment results" of the Lehman Brothers U.S. Aggregate Bond Index (the "Index") (Ticker: LBUSTRUU) "through the use of an indexing strategy."

3.     The Fund deviated from its stated investment objective by investing a material percentage of its portfolio in high risk non-U.S. agency collateralized mortgage obligations ("CMOs").   The non-U.S. agency CMOs were not part of the Lehman Index and were substantially more risky than the U.S. agency securities and other instruments that comprised the Index.

4.     The Fund also deviated from its stated fundamental investment objective by investing more than 25% of its total assets in U.S. agency and non-agency mortgage-backed securities and CMOs.   The Fund's investment objectives prohibited any concentration of investments of "25% or more of the value of the total assets in any industry" (other than if necessary to track the Index).

5.     Defendants' deviation from the Fund's investment objective exposed the Fund and its shareholders to tens of millions of dollars in losses stemming from a sustained decline in the value of non-agency mortgage-backed securities.   The Fund's deviation from its stated investment objective caused investors to suffer a negative 12.64% differential in total return for the Fund compared to the Index for the period August 31, 2007 through February 27, 2009,

consisting of a negative total return of 4.80% for the Fund compared to a positive total return of 7.85% for the Index over that same period (including interest payments).

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1332(d)(2) and 1367.  The plaintiff is diverse from at least one of the defendants and the amount in controversy exceeds $5 million.

7.     Venue is properly laid in this District under 28 U.S.C. § 1391(b).  Many of the acts giving rise to the violations of law complained of herein, including the dissemination to shareholders of the Registration Statements, Proxy Statements, and Prospectuses referenced herein occurred in this District.

## PARTIES

8.     Plaintiff Northstar Financial Advisors, Inc. ("Northstar") is a New Jersey corporation with offices at 46 Beachmont Terrace, North Caldwell, NJ 07006.

9.     Northstar is a registered investment advisory and financial planning firm serving both institutional and individual clients.  Northstar manages both discretionary and non-discretionary accounts on behalf of investors in its role as an investment advisor.

10.     With respect to its discretionary accounts, which form approximately 50% of its assets under management, Northstar retains discretion over investment decisions.

11.     Northstar had at all relevant times herein purchased and sold securities on behalf of its clients as an independent investment advisor through Charles Schwab's Institutional Advisor Platform.

12.     Northstar, in purchasing and/or selling shares in the Fund, relied on defendants' contractual and fiduciary obligations with respect to the Fund's investment objectives and policies.

13.     On or about August 31, 2007, Northstar had 239,290 shares of the Fund under its management.

14.     Northstar operates under a fee-based structure based on the total value of assets under management.  Northstar is customarily paid on a quarterly basis a .5% to 1.0%

annualized management fee based on the valuation of assets under management, including the reported net asset value ("NAV") of the shares of the Fund under Northstar's management. Northstar suffered actual financial injury from the diminution of its management fee as a result of the underperformance of the Fund against the Index subsequent to August 31, 2007.

15.     By way of Assignment of Claim, dated December 8, 2008 (the "Assignment"), Henry Holz, a client of Northstar who owned 4,181.093 shares of the Fund as of August 31, 2007, assigned to Northstar "all of the Assignor's right, title and interest in any claim that the Assignor has or could have against Schwab Investments, Charles Schwab & Co., Inc., Charles Schwab Investment Management, Inc. and Schwab Total Bond Market Fund ...."  The Assignment of Claim was amended on September 28, 2010 to include claims asserted against the Trustees of Schwab Investments.

16.     Defendant Schwab Investments, at all relevant times since at least 1997, has had its headquarters at 101 Montgomery Street, San Francisco, CA 94104.  Schwab Investments is an investment trust (the "Trust" or "Schwab Trust"), organized under Massachusetts law and is a registered investment company under the Investment Company Act of 1940 (the "ICA" or "Investment Company Act").  The Trust consists of a series of mutual funds, including the Fund.

17.     The Schwab Trust is an affiliate of and subject to the control of The Charles Schwab Corporation (the "Schwab Corp."), and defendant Charles Schwab, individually ("defendant Schwab").

18.     The Schwab Trust is a legal fiction in that it owns no assets and has no employees.  Rather, the Schwab Trust contracts out all its management and operation functions to other "Schwab" companies affiliated with the Schwab Corp.

19.     The Schwab Trust is managed by a Board of Trustees.  The Trust and its Board of Trustees are responsible for filing with the SEC and disseminating to investors documents regarding the Fund.  The Schwab Trust and its Board of Trustees are also responsible for supervising the Fund's investment advisor and monitoring the Fund's compliance with its stated investment objectives and policies.  According to the Statements of Additional

1  Information made available to investors in the Index Fund, the Trustees of the Trust "are

2  responsible for protecting shareholder interests."

3       20.    Defendants Mariann Byerwalter, Donald F. Dorward, William A. Hasler,

4  Robert G. Holmes, Gerald B. Smith, Donald R. Stephens, Michael W. Wilsey, Charles R.

5  Schwab, and Randall W. Merk, were, according to the Fund's Prospectus dated November 15,

6  2007, the Trustees of the Fund as of August 31, 2007.  The following chart identifies each

7  Trustee as of August 31, 2007, the Trustee's length of service, the number of discrete portfolios

8  in the Schwab fund complex that the Trustee oversaw (with the Fund being one such portfolio),

9  and the Trustee's annual compensation derived as a Trustee of Schwab taxable and tax-free

10  mutual funds:

11

12

| Name of Trustee | Years of Service | Portfolios Overseen | Annual Compensation |
|---|---|---|---|
| Byerwalter, Mariann | Since 2000 | 70 | $230,642 |
| Dorward, Donald F. | Since 1989 | 59 | $202,775 |
| Hasler, William A. | Since 2000 | 70 | $230,642 |
| Holmes, Robert G. | Since 1989 | 59 | $202,775 |
| Smith, Gerald B. | Since 2000 | 59 | $202,775 |
| Stephens, Donald R. | Since 1989 | 59 | $202,775 |
| Wilsey, Michael W. | Since 1989 | 59 | $202,775 |
| Schwab, Charles R. | Since 1989 | 59 | N/A |
| Merck, Randall W. | Since 2005 | 70 | N/A |

23       21.    According to the Amended Prospectus dated June 13, 2008, defendants

24  Joseph H. Wender and John F. Cogan joined the Board of Trustees in 2008, replacing

25  defendants Holmes and Dorward as Trustees.  The Trustee defendants are referred to herein in

26  the aggregate as the Trustees.

27       22.    The Fund's shareholders and shareholders of other Schwab mutual funds are not

28  required to vote annually or periodically on appointment of Trustees.  Rather, those Trustees

may be selected by, or selected with the acquiescence of, defendant Schwab and the Schwab Corp. as controlling persons of the Trust.

23.     Each Trustee serves with respect to all or substantially all the Schwab mutual funds, and the Investment Advisor is the investment manager for all the Schwab mutual funds.

24.     Although the Schwab Trust and the Schwab Trustees were responsible for reviewing the performance and fees of the Investment Advisor (as defined below) on an annual basis, in fact, no Schwab Trust or trustee has ever selected a non-Schwab entity as a Schwab fund's investment manager.  Rather, the Trust and Trustees merely serve to rubber-stamp the determinations made by the Schwab Corp. and defendant Schwab.

25.     Because Trustee-defendants Schwab and Merk are interested trustees employed by the Schwab Corp., their compensation is not paid by the Schwab Trust, but rather by the parent corporation or other affiliates of the Schwab Corp.  Defendant Charles Schwab was paid cash compensation for 2007 of $6.6 million for his services as Chairman and CEO of the Schwab Corp.

26.     Defendant Schwab founded the Schwab Corp. in 1971, and has served as its Chairman since 1978.  Defendant Schwab has also served as Schwab Corp.'s CEO at various times, including from 2004 through October 2008.

27.     According to the Schwab Corp.'s Proxy Statement dated May 13, 2010, defendant Schwab owns approximately 200 million shares, or approximately 17.0% of the outstanding common stock of the Schwab Corp.  That Proxy Statement recites that defendant Schwab's "vision continues to drive the company's growth."

28.     Defendant Schwab is also identified in the Proxy Statement as Chairman and trustee of The Charles Schwab Family of Funds and Schwab Investments, among other Schwab related entities.

29.      Defendant Schwab, by virtue of his stock ownership in the Schwab Corp. and his positions as Chairman and trustee of the Schwab Corp. and affiliated entities, is considered a controlling person of the Schwab Corp. and its affiliated entities.

30.     Defendant Charles Schwab Investment Management, Inc. (the "Schwab Advisor"), at all relevant times since at least 1997), has had its headquarters at 101 Montgomery Street, San Francisco, CA 94104.  The Schwab Advisor is the investment advisor to the Fund.  The Schwab Advisor receives a management fee from the Fund.  The Schwab Advisor's management fee is 0.25% of the Fund's net assets, or approximately $3.5 million per year.  In addition, the Index Fund incurs 0.28% of net assets in other expenses, for a total annual operating expense of 0.53%.  The Schwab Advisor is responsible for preserving shareholders' voting rights and adhering to the Fund's stated investment objectives and policies.  The Investment Advisor is organized under Delaware law.  The Investment Advisor is wholly owned by the Schwab Corp., and is under the control of the Schwab Corp. and defendant Schwab.

31.     The Index Fund is a series of the Schwab Trust and a member of the Charles Schwab Family of Funds.  The Index Fund is managed by the Schwab Trust and advised by the Schwab Advisor.

32.     The Index Fund issues redeemable securities.   Sales of the shares of the Index Fund can only be made by the Schwab Trust to investors pursuant to a Registration Statement and Prospectus filed with the SEC.  Investors in the Schwab Fund cannot sell or trade shares among themselves.

33.     Each investor in the Fund has an individual, indivisible interest in the assets of the Fund based on the ratio of its shares to the total number of shares outstanding.  Investors in the Fund can buy or sell shares on a daily basis.  The value of the Fund's shares is computed daily by taking the assessed market value of all portfolio securities, adding the assessed value of other assets and liabilities, and dividing the result by the number of shares outstanding.  The Index Fund reports its portfolio holdings to investors on a semi-annual basis in reports issued as of August and February.  The Index Fund also reports its portfolio holdings as of May and November in Form N-Q filings with the SEC, which are not mailed to investors.  The Fund does not report the dates or prices at which it purchases or sells securities.

34.     The Schwab Trust at times refers to itself and its affiliated companies as "Schwab" and to the Index Fund and other Schwab mutual funds under the tradename "the SchwabFunds," or as members of the Schwab "Family of Funds" or the "Schwab mutual fund complex."

## CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), individually and on behalf of a class consisting of all person or entities who owned shares of the Fund at any time from August 31, 2007 through February 27, 2009, and suffered damages as a result thereof (the "Class"). Excluded from the Class are the defendants herein, any subsidiaries or affiliates of the defendants in which defendants or its affiliates have a controlling ownership interest, officers and directors of any of the defendants, heirs, successors and assigns of any of the defendants or their officers and directors, and any entity in which any defendant has a controlling ownership interest.

36.     August 31, 2007 is the last date of the fiscal year prior to the Fund's performance first deviating from the Lehman Index. February 27, 2009 is the approximate date by which the Fund reverted back to its required fundamental investment policy to seek to track the Lehman Index through the use of an indexing strategy.

37.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of members of the Class is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, the Fund had over $1.5 billion in assets as of August 31, 2007, and approximately 150 million shares outstanding. Plaintiff thereby concludes that there are thousands of members located throughout the United States in the proposed Class. Record owners and other members of the Class may be identified from records maintained by defendants or other affiliated Schwab entities and may be notified of the pendency of this action by mail.

38.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of state law that is complained of herein.

39.     Northstar has standing to pursue this claim for money damages as assignee of Holz's claim and in its own right because it suffered direct financial injury as a result of the Fund's deviation from its stated fundamental investment objectives and policies (and other claims alleged herein).  Northstar's financial injury and entitlement to recovery are derivative of the Class' claims.  Northstar cannot prove its own financial injury and entitlement to recovery without first proving the Class' financial injury and entitlement to recovery.

40.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class litigation.

41.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether the Schwab Trust  or the Schwab Advisor caused the Index Fund to deviate from an investment objective or policy that could only be changed by a shareholder vote;

(b)     Whether the Schwab Trust or the Schwab Investment Advisor were obligated to cause the Fund to track the Lehman Brothers U.S. Aggregate Bond Index using an indexing strategy;

(c)     Whether the Index Fund's investments tracked the Lehman Brothers U.S. Aggregate Bond Index using an indexing strategy;

(d)     Whether the Schwab Trust or Investment Advisor concentrated investments in the Fund in excess of 25% of its total assets in any one industry;

(e)     Whether non-agency mortgage-backed securities comprise one or more than one "industry;"

(f)     Whether agency and non-agency mortgage-backed securities comprise one or more than one "industry;"

(g)     Whether members of the Class are third party beneficiaries of the investment advisory contract between the Schwab Trust  and the Schwab Advisor;

1

    (h)      Whether the Schwab Trust or the Schwab Advisor owed members of the Class

2

               fiduciary duties;

3

    (i)      Whether the Schwab Trust  or the Schwab Advisor violated fiduciary duties to

4

               Class members; and

5

    (j)      Whether the members of the Class have sustained damages, and, if so, what is

6

               the proper measure thereof.

7

    42.    A class action is superior to all other available methods for the fair and efficient

8

adjudication of this controversy since joinder of all members is impracticable.  As the damages

9

suffered by any individual Class member may be relatively small, the expense and burden of

10

individual litigation make it impossible for members of the Class to redress individually the

11

wrongs done to them.  There will be no difficulty in managing this action as a class action.

12

13

**SUBSTANTIVE ALLEGATIONS**
**Background and History Prior to the 1997 Shareholder Vote**

14

    43.    The Schwab Total Bond Market Fund was initiated by the Schwab Trust on

15

March 5, 1993 under a predecessor name – the Schwab Long-Term Government Bond Fund

16

(the "Government Bond Fund") – as an actively managed bond fund.

17

    44.    According to the Prospectus for the Government Bond Fund, dated

18

December 30, 1994, as amended June 30, 1995, the "investment objective" of the Government

19

Bond Fund was "to provide a high level of current income consistent with preservation of

20

capital by investing primarily in securities issued or guaranteed by the United States

21

Government, its agencies or instrumentalities and repurchase agreements covering those

22

securities."

23

    45.    The June 30, 1995 Prospectus also stated that "[the] Fund's investment objective

24

… is fundamental and cannot be changed without approval by holders of a majority of the

25

Fund's outstanding voting shares."

26

    46.    The Prospectus added that "U.S. Government Securities are generally viewed by

27

the Investment Manager as being among the safest of debt securities with respect to the timely

28

payment of principal and interest[.]"

47.     Schwab was unable to successfully market the Government Bond Fund.

48.     As of August 31, 1997, after more than four years of operations, the Government Bond Fund only had $24.8 million in investment assets.

**The Formation of the Schwab Total Bond Market Index Fund**

49.     On July 25, 1997, the Schwab Trust  mailed to investors in the Government Bond Fund a Proxy Statement on SEC Form 14A with respect to a shareholder vote "[t]o amend [the] Fund's fundamental investment objective resulting in changing the Fund from [a] Government  bond fund[ ] to [a] bond index fund[ ] that would include Government and other fixed income securities."  The Proxy Statement stated that "[t]he changes proposed will give your Fund the opportunity to take advantage of the many benefits offered by an indexing strategy, including a more diversified bond portfolio."

50.     The Proxy Statement informed investors that the Board of Trustees of the Fund was proposing to change the Fund's then-existing investment objective from attempting "to provide a high level of current income consistent with preservation of capital by investing primarily in securities issued or guaranteed by the U.S. Government" to a "proposed investment objective … to attempt to provide a high level of current income consistent with preservation of capital by seeking to track the investment results of a particular bond index through the use of an indexing strategy."

51.     The Proxy Statement added that "[i]f its proposed investment objective is approved, the Total Bond Fund would invest in a portfolio of fixed-income securities that seeks to track the Lehman Brothers Aggregate Bond Index."

52.     The Proxy Statement listed, as Proposal 2, "Amending Each Funds' Fundamental Investment Objective," gave a detailed description of the meaning and significance of the proposed amendments and formed the terms of a contract to provide shareholders with voting rights in that those "fundamental investment objectives" were only changeable by shareholder vote.

53.     The Lehman Index was described in the Proxy Statement as "a broad market-weighted index which encompasses the following classes of investment grade fixed-income

securities:   U.S. Treasury and agency securities, corporate bonds, international (dollar-denominated) bonds, agency mortgage-backed securities, and asset-backed securities."

54.    The Lehman Index is a proprietary Lehman Brothers index, consisting of over 9,000 separate instruments whose exact composition is not generally available to investors. The composition of the Index changes from time-to-time.

55.    Because the individual bonds in the Lehman Index may be illiquid and cannot be (at least at times) purchased at efficient prices, the Proxy Statement explained that the Index Fund would not necessarily purchase the bonds that were part of the Index but rather would purchase bonds that "closely approximated the Index's characteristics."

56.    The Proxy Statement described the "investment process of indexing" and proposed "indexing strategy" by stating that the Fund "would be unable to hold all of the individual issues which comprise the [Index] because of the large number of securities in the [Index]," and would not necessarily hold securities that were part of the Index, but that the "Fund would hold a portfolio of fixed-income securities that is managed to closely approximate [the] Index's 'characteristics' of coupon rate, duration, sector, quality and optionality (or convexity)":

> If the proposed investment objective is approved, the Funds would not be managed according to traditional methods of "active" investment management, which involve the buying and selling of securities based upon economic, financial, and market analyses and investment judgment.  Instead, *the Investment Manager would utilize a "passive" or "indexing" investment approach, to attempt to track the investment performance of each Fund's Index through statistical sampling and other procedures.*  The Funds would be unable to hold all of the individual issues which comprise the Indexes because of the large number of securities in the Indexes.  *Each Fund would hold a portfolio of fixed-income securities that is managed to closely approximate its Index's "characteristics" of coupon rate, duration, sector, quality and optionality (or convexity).*  [Emphasis added.]

57.    The Proxy Statement assured investors that "[b]efore purchasing or selling a security, the Investment Manager would analyze each security's characteristics and determine whether purchasing or selling the security would help the Fund's portfolio approximate the characteristics of the Index":

> Before purchasing or selling a security, the Investment Manager would analyze each security's characteristics and determine whether purchasing or selling the security would help the Fund's portfolio approximate the characteristics of the

Index.  As a result, when the Fund's portfolio as a whole is considered, the Fund's performance and risk is expected to be similar to its Index's performance and risk.

For example, with respect to the "sector characteristic," if U.S. Treasury and agency securities represent approximately 60% of an Index's interest rate risk, then approximately 60% of the respective Fund's interest rate risk would come from such securities.  Similarly, if corporate bonds represent 20% of the Fund's interest rate risk, then they would represent approximately 20% of the Fund's interest rate risk.  This technique is expected to enable each Fund to track the coupon income and price movements of its respective Index, while minimizing transaction, custodial and accounting costs.

58.     The 1997 Proxy Statement represented that the Schwab Investment Manager would seek a 90% correlation between the Fund and the Index:

Over the long term, the Investment Manager will seek a correlation between the performance of each Fund, as measured by its net asset value, including the value of its dividend and capital gain distributions, and that of its Index of 0.9 or better.  A correlation of 1.0 would indicate perfect correlation, but since each Fund incurs operating expenses, unlike its respective Index, a perfect correlation is unlikely to be achieved.  The Investment Manager will monitor the performance of each Fund versus that of its Index on a regular basis.  If a tracking error develops, each Fund is rebalanced to help bring it in line with the Index.  In the unlikely event that a correlation of 0.9 or better is not achieved, the Board of Trustees of a Fund will consider alternative arrangements.

59.     The 1997 Proxy Statement described Schwab's rationale for proposing that the Fund be changed to an index fund and the Fund's appeal to passive investors who were seeking "broad bond portfolio diversification" and "a consistent investment style," as follows:

Schwab has long been an advocate of indexing as an investment strategy.  The Board of Trustees believes the proposed bond index funds will offer customers many benefits through the use of an indexing strategy.  These benefits include: broad bond portfolio diversification, a consistent investment style, and potentially lower trading costs as a result of lower portfolio turnover and fewer transactions, over the long term.  And, all other things being equal, lower costs can translate into higher returns.

The objective of an index fund, unlike an actively managed fund, is to closely track the total return of a benchmark or index for a particular market, or market sector.  Because both proposed Funds plan to invest in a larger number and broader range of bonds, the Funds should provide investors a more broadly diversified bond fund investment for their asset allocation plan.  The proposed bond index funds could represent excellent choices for the core component of an investor's bond fund holdings and could fulfill the bond portion of an asset allocation plan, whether that plan calls for a longer-term or short-term bond fund.

60.     The 1997 Proxy Statement stated that because investors would not be required to actively monitor and assess the investment selections of the Fund's Investment Advisor (which

was charged with the responsibility of following the Index), the bond index fund "should have

a broader appeal to a larger number of investors."

> In addition, the Board of Trustees believes that the proposed bond index funds should have a broader appeal to a larger number of investors. This would permit the Funds to be marketed more effectively, creating economies of scale if assets grow. These economies could be achieved by spreading the Funds' fixed costs over a larger asset base, which would potentially lower the Funds' operating expenses.

61.     The Proxy Statement sought to assure investors that the change to an indexing

strategy would not increase the risk profile of the Fund (which at the time was holding

approximately 100% of its assets in securities issued or guaranteed by the U.S. Government)

because 80% of the Fund's assets would still be invested on a current basis in U.S. government

or agency bonds, and given the then current composition of the Index, 15% of the portfolio

would be invested in investment grade corporate bonds, 4% in international (dollar-

denominated bonds), and 1% in asset-backed securities:

> As shown in the two preceding charts, as of June 30, 1997, both of the proposed index Funds would maintain significant positions in U.S. Treasury and agency, and agency mortgage-backed securities – 85.0% for the Short-Term Bond Market Index Fund and 80.0% for the Total Bond Market Index Fund.

> The non-U.S. Treasury/agency securities represented in both indices are all investment grade and quite diversified. As a result, both index Funds are expected to maintain relatively low levels of credit risk. However, given that U.S. Treasury and agency securities have the lowest credit risk compared to other types of fixed income securities, the portfolio management team anticipates that the proposed Funds would have a slightly higher level of credit risk than the current Funds.

62.     The Proxy Statement added that bond securities issued by the U.S. government

and its agencies were of the highest credit quality:

> The risks associated with U.S. Treasury and agency securities, generally considered the least risky form of fixed-income security in terms of credit risks, are detailed in the Funds' current prospectus.

> . . . .

> Although a higher return is expected from corporate bonds, these securities will generally not be of the same credit quality and risk as U.S. Treasury and agency securities because they are not issued or guaranteed as to principal and interest by the federal government or its agencies or instrumentalities.

63.     The July 25, 1997 Proxy Statement also proposed a change (Proposal No. 3) in the Fund's "fundamental investment policies and investment restrictions" regarding concentration of investments.

64.     Previously, the Fund's fundamental investment policies and investment restrictions barred investments of "25% or more of the value of its total assets … in any industry" (excluding investments in U.S. government, agency, or instrumentality securities):

> Each Fund may not:
>
> Purchase securities (other than securities issued or guaranteed by the U.S. Government, its agencies or instrumentalities) if, as a result of such purchase, 25% or more of the value of its total assets would be invested in any industry. Securities issued by governments or political subdivisions or authorities of governments are not considered to be securities subject to this industry concentration restriction.

65.     The proposed change incorporated the definition of "concentration" under the Investment Company Act of 1940, and gave the Fund discretion to concentrate investments of greater than 25% of total assets in any industry only if necessary to track the Lehman Index:

> Each Fund may not concentrate investments in a particular industry or group of industries, or within one state (except with respect to the Total Bond Market Index Fund and the Short Term Bond Market Index Fund, to the extent that the index which each Fund seeks to track is also so concentrated) as concentration is defined under the Investment Company Act of 1940 or the rules or regulations thereunder, as such statute, rules or regulations may be amended from time to time.

66.     The rationale for the proposed change, according to the Proxy Statement, was to incorporate the SEC's interpretation of the term "concentration" from the Investment Company Act of 1940 (which at the time was and remains 25%) to give the Fund greater flexibility in the event of future SEC changes in interpretation:

> The current self-designated restriction specifically limits a Fund's investments to less than 25% of a Fund's total assets in a particular industry.  Under the Proposal, this current self-designated restriction will be eliminated and replaced by a more flexible proposed restriction.  The proposed restriction would continue to prevent each Fund from "concentrating" its investments in a single industry or in a state, except if the Index that the Fund tracks is "concentrated" in a particular industry or state.  Further, to provide flexibility, the concept of "concentration" in a Fund's proposed restriction is articulated so as to always track the current meaning of "concentration" under the 1940 Act.
>
> At present, "concentration" is interpreted under the 1940 Act in a manner consistent with each Fund's current self-designated restriction (25% or more).

However, in order to achieve greater flexibility (if for instance the percentage limitation were to be changed by the SEC), the proposed restriction would eliminate the specific percentage reference and instead define the term "concentration" with respect to the meaning conferred under the 1940 Act. Because the present interpretation of the percentage limit of "concentration" under the 1940 Act is the same as the current concentration restriction, it is not expected that there would be any immediate impact on a Fund's operations as a result of approving this aspect of the proposed concentration restriction. Any future change in operations would occur only if the SEC staff changed its interpretation of what constitutes "concentration."

67.   There has been no subsequent change in the SEC's interpretation of what constitutes "concentration."

68.   On September 25, 1997, the Schwab Trust filed a Prospectus Supplement with the SEC reporting that the shareholders of the Schwab Government Fund and shareholders of the Schwab Short/Intermediate Government Bond Fund had approved Proposal Nos. 2 and 3, including  the "[a]mendment of each Fund's Fundamental investment objective resulting in changing each Fund from a Government bond fund to a bond index fund that would include Government and other fixed income securities."

69.   The Prospectus Supplement emphasized further that "[a]s a result of the shareholder vote, each Fund's fundamental investment objective is amended to allow each Fund to pursue an indexing strategy":

As a result of the amendment referenced in Item No. 1 above, as of November 1, 1997, the name of the Schwab Short/Intermediate Government Bond Fund will be changed to the Schwab Short-Term Bond Market Index Fund, and the name of the Schwab Long-Term Government Bond Fund will be changed to the Schwab Total Bond Market Index Fund.  As a result of the shareholder vote, each Fund's fundamental investment objective is amended to allow each Fund to pursue an indexing strategy.  The Schwab Short-Term Bond Market Index Fund will seek to track the Lehman Brothers Short (1-5) Government/Corporate Index and the Schwab Total Bond Market Index Fund will seek to track the Lehman Brothers Aggregate Bond Index.  Each index is market-weighted and designed to track the performance of broad segments of the bond market.

70.   The Proxy Statement imposed detailed contractual obligations on the Schwab Trust and the Schwab Advisor on how the Fund would be managed.  The Proxy Statement also created voting rights on behalf of the Fund's existing and future shareholders in that the investment objectives and fundamental policies could not thereafter be changed without a majority shareholder vote.

71.     Defendants' contractual obligations to "seek to track" the Index "through the use of an indexing strategy," and investors' voting rights, were fundamental to the Index Fund's shares and appurtenant to each subsequent share issued by the Schwab Trust.

72.     The Registration Statements and Prospectuses dated November 1, 1997 and as amended January 15, 1998 for the Total Bond Fund and the Schwab Short-Term Total Bond Market Index Fund, issued shortly after the 1997 shareholder vote, reiterated the Index Fund's fundamental  indexing strategy "to track" a bond index "through the use of an indexing strategy" and that the terms of that undertaking could only be modified by shareholder vote:

INVESTMENT OBJECTIVES:

Each Fund's investment objective is to attempt to provide a high level of current income consistent with preservation of capital by seeking to track the investment results of a particular bond index through the use of an indexing strategy.

Each Fund's investment objective is fundamental, which means that it may be changed only by vote of a majority of a Fund's shareholders.

73.     That same recitation of the Fund's investment objective was contained in subsequent Prospectuses for the Fund (dated March 17, 1998, November 4, 1998), as well as in Statements of Additional Information incorporated by reference into those and subsequent Prospectuses.

74.     A Statement of Additional Information (or "SAI") contains a more comprehensive discussion of material facts than is contained in a Prospectus.

75.     In Prospectuses issued by the Schwab Trust with respect to the Fund, including Prospectuses dated November 13, 2003; November 15, 2004; November 15, 2005; November 15, 2006; November 15, 2007; and November 15, 2007, as amended June 13, 2008, defendants prominently reported in large type-face at the front of the Prospectus that the Fund was "designed to offer high current income by tracking the performance of the Lehman Brothers U.S. Aggregate Bond Index" and was "intended for investors seeking to fill the fixed income component of their asset allocation plan":

THE SCHWAB TOTAL BOND MARKET FUND TM is designed to offer high current income by tracking the performance of the Lehman Brothers U.S. Aggregate Bond Index.  The fund invests primarily in a diversified portfolio of

investment-grade debt instruments. The fund is intended for investors seeking to fill the fixed income component of their asset allocation plan.

76. These Prospectuses added with respect to the Index Fund's fundamental investment policies that:

The STATEMENT OF ADDITIONAL INFORMATION (SAI) includes a more detailed discussion of investment policies and the risks associated with various investments. The SAI is incorporated by reference into the prospectus.

77. The Statement of Additional Information attached to the November 15, 2003 Prospectus – and all Statements of Additional Information, issued by the Trust with respect to the Fund, including the SAIs dated November 15, 2005 and November 15, 2006 – reaffirmed investors' contractual voting rights and that the Index Fund would continue to track the Index until that investment objective was changed by shareholder vote:

Each fund's investment objective is to attempt to provide a high level of current income consistent with preservation of capital by seeking to track the investment results of a particular bond index through the use of an indexing strategy.

\* \* \*

The indexes are the Lehman Brothers Mutual Fund Short (1-5 Year) U.S. Government/Credit Index for the Schwab Short-Term Bond Market Fund (the Short-Term Index), and the Lehman Brothers U.S. Aggregate Bond Index for the Schwab Total Bond Market Fund (the U.S. Aggregate Bond Index).

\* \* \*

Each fund's investment objective may be changed by vote of a majority of its outstanding voting shares.

78. Schwab actively marketed the Index Fund to investors, on its website (www.schwab.com) and elsewhere as an index fund. For example, Schwab, in its "On Investing" magazine for "Spring 2006," described as "The Financial Journal of the Charles Schwab Corporation," identified the "Schwab Total Bond Market Fund" as a "Bond Index Fund" and compared its performance to the Dreyfus Bond Market Index Fund.

79. Similarly, Schwab's "Mutual Fund Report Card," available on Schwab's website, as of July 31, 2008, referred to the Fund, and continues to refer to the Fund, as an "Index Fund."

80. The Index Fund's conversion to an indexing strategy was a great success for Schwab, as net assets increased from $24 million as of August 31, 1997 to approximately $1.5 billion as of August 31, 2007.

81.     The Schwab Trust, in the August 31, 1998 Annual Report to shareholders (and repeated in subsequent annual and semi-annual reports to shareholders, including the semiannual report dated February 29, 2000) reiterated the conservative nature of the Index Fund's indexed securities:

> Schwab's Bond Index Funds seek to track the total returns of broadly diversified bond indices.  And because index funds generally result in lower portfolio turnover and fewer transactions—and therefore lower trading costs—you could potentially realize higher returns.
>
> In addition to some of the same benefits of equity index funds, including broad diversification, lower expenses, consistent investment style and straightforward choices, bond index funds can also provide the added benefit of high credit-quality investments.  Schwab's Bond Index Funds are designed to maintain high credit-quality standards because the indices they seek to track primarily comprise U.S. Treasuries, government agency securities and government agency mortgage-backed securities; the remaining bonds in the indices are investment-grade corporate bonds rated AAA through BBB, the four highest credit ratings.

82.     The government agency mortgage-backed securities referenced in the Fund's SEC documents (including the June 1997 Proxy) and included in the Lehman Index were issued by the Governmental National Mortgage Association ("Ginnie Mae"), the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac").   Ginnie Mae, Fannie Mae, and Freddie Mac are U.S. Government agencies (also known as Government Sponsored Enterprises ("GSEs")) established by Congress to facilitate residential mortgage loans.

83.     The GSEs purchased and securitized mortgage loans that met established criteria for creditworthiness.

84.     The government agency mortgage-backed securities referenced in the 1997 Proxy as contained in the Index were fixed income pass-through securities, in which all principal and interest on the underlying mortgages is passed through to the mortgage-backed securities investor.

85.     The type of securities that could be acquired by those agencies are restricted by their government charters.

86.     Ginnie Mae benefits from an express U.S. Government guarantee of payment on its securities.

87.     Both Fannie Mae and Freddie Mac benefit from an implied U.S. Government guarantee of payment on their securities by virtue of their status as U.S. chartered institutions.

88.     The mortgage-backed securities issued by Ginnie Mae, Fannie Mae and Freddie Mac, and maintained in the Lehman Index, had the highest credit quality among mortgage-backed securities.

89.     The Statement of Additional Information dated May 6, 2002, reported that the Fund had changed its name to the Schwab Total Bond Market Fund:

> Prior to May 6, 2002, . . . Schwab Total Bond Market Fund was named Schwab Total Bond Market Index Fund.

90.     This Statement of Additional Information was not mailed to investors.  No explanation was given by given by Schwab Trust or Investment Advisor for the change in name.  Upon information and belief, the Schwab Trust was required by the SEC to delete the word "Index" from the Fund name because the Fund's fundamental investment objective did not require the Fund to own the actual securities that were part of the Index but rather only to own those securities that "closely approximated the Index's characteristics."

91.     The change in Fund name was not approved by Fund shareholders and had no consequence to investors' contractual voting rights with respect to the Fund's fundamental investment objectives.

92.     The May 6, 2002 Statement of Additional Information, incorporated by reference into the May 6, 2002 Prospectus, and each subsequent (and previous) SAI, incorporated by reference into each subsequent (and previous) Prospectus, continued to state that shareholders' voting rights and the Fund's investment objective were unchanged and could only be changed by a majority shareholder vote, which had not occurred:

> Each fund's investment objective is to attempt to provide a high level of current income consistent with preservation of capital by seeking to track the investment results of a particular bond index through the use of an indexing strategy.
>
> *        *        *
>
> Each fund's investment objective may be changed by vote of a majority of its outstanding voting shares.

93.   From August 31, 1997 through August 31, 2007, the Fund substantially performed in a manner that was consistent with the Index, returning an annualized rate of 5.75% compared to 6.04% for the Index -- within the 10% deviation anticipated by the Investment Manager.

94.   As stated in the Fund's annual and semi-annual reports, this degree of deviation between the Fund and the Index occurred "mainly because, unlike the Index, the Fund incurs operating expenses and trading costs and must keep a small part of its assets in cash for paying expenses and processing shareholder orders."

## The Fund Substantially Deviates From Its Stated Investment Objective

95.   The Fund first reported a material performance deviation from the Index in its Semi-Annual Report for the period ended February 27, 2008, filed with the SEC on May 6, 2008:

> The Schwab Total Bond Market Fund returned 3.41% underperforming Lehman Brothers U.S. Aggregate Bond Index, which was up 5.67%.   Risk aversion and forced selling in the fixed income market, combined with persistent volatility, impacted the fund as investors remained cautious of all non-Government securities irrespective of underlying credit quality.   Under these conditions of extreme volatility, U.S. Treasuries outperformed all other fixed income securities.

> During the period, the financial markets experienced liquidity and confidence issues as the collapse of the subprime mortgage market and related credit turmoil cascaded into other sectors.   Correspondingly, a reprising of risk premiums and a flight to quality across all segments of the fixed income market contributed to downward pricing pressure, with prices for many non-U.S. Treasury securities falling regardless of their quality or fundamentals.   In order to maintain liquidity, many investors were forced to sell high quality assets at depressed prices.   This selling pressure occurred at the same time demand for non-U.S. Treasury securities was weakest, and as a result prices were driven down even further.

96.   Investors in the Fund, however, could not anticipate from this Report that the Fund would continue to deviate from the Index.   Among other things, the Prospectus dated September 15, 2007 had stated that "the Fund primarily invests in a diversified portfolio of debt investments that is designed to track the performance of the Lehman Brothers U.S. Aggregate Bond Index" and that "[y]our investment follows the bond market, as measured by the index. The fund is designed to follow the performance of the index during upturns as well as

downturns." The November 15, 2007 Statement of Additional Information also reiterated that the Fund's "investment objective is to attempt to provide a high level of current income consistent with preservation of capital by seeking to track the investments results of [the Index] through the use of an indexing strategy."

97. In fact, the explanation given for the underperformance of the Index Fund compared to the Index, was the forced selling of securities into a weak bond market, rather than the violation of shareholders' voting rights and the deviation of the securities in the Fund from the Index.

98. The Schwab Trust had informed investors in the 1997 Proxy Statement that some volatility in the Fund against the Index may not be totally avoidable, and that "if a tracking error develops, each Fund is rebalanced to help bring it in line with the Index."

99. The Fund had also consistently tracked the Index for the prior decade since inception.

100. From 2002 until June 2008, Kimon Daifotis acted as the senior vice president and chief investment officer of the Investment Advisor, responsible for the overall management of the Fund. On June 13, 2008, Schwab Investments filed a Supplement to the Fund's Prospectus dated November 15, 2007, stating that Jeffrey Mortimer was then responsible for the overall management of the Fund. No explanation was given by defendants, in the Prospectus or elsewhere, for replacing Daifotis as Fund Manager. Investors were not informed that Daifotis had engaged in an investment strategy that was inconsistent with shareholders' voting rights and the Fund's stated investment objectives and policies.

101. The Fund's underperformance against the Index continued subsequent to February 27, 2008 as the Schwab Advisor sought to liquidate the non-agency CMOs into a weak bond market for high risk securities. From August 31, 2007 through February 27, 2009, the Fund experienced a negative total return of 4.80% compared to a positive 7.85% total return for the Index – a total underperformance of 12.64% in absolute terms (including interest payments).

102.    The Fund's shares had closed on August 31, 2007 at $9.72 a share. Accordingly, the 12.63% differential in performance between the Index and the Fund is equivalent to damages per share of approximately $1.23.

103.    The Fund's deviation in performance from the Index was caused by the Fund's investment of 27.3% of assets as of February 27, 2008 in non-agency collateralized mortgage obligations ("CMOs").

104.    The CMOs in the Fund's portfolio were not issued by government agencies. Rather they were issued by financial institutions through subsidiaries and backed by residential loans that did not conform to the agencies' high loan underwriting requirements.

105.    Moreover, non-agency CMOs purchased by the Investment Manager for the Fund represented tranches of mortgage-backed securities, such as principal only or interest only payments, and were significantly more risky than the agency-issued mortgage-backed securities that were part of the Index.  Included in the Fund's portfolio were CMOs sponsored by such subprime lenders as Citigroup, Merrill Lynch, Countrywide, Bear Stearns, IndyBank, Lehman, and Washington Mutual.

106.    This concentration of investments in mortgage backed securities was also in violation of the Fund's stated investment objectives that the Fund's assets not be concentrated more than 25% in any one industry (except as required by the Index).

107.    The composition of the Lehman Index is proprietary and not publicly available. However, subsequent analyses of other bond index funds that represent that they track the Lehman Bros. Aggregate Bond Index indicates that as of February 27, 2008, the Lehman Government Index had a 0% weighting in non-agency mortgage-backed securities, and a 37% weighting in agency mortgage-backed securities.

108.    Moreover, according to the February 28, 2008 Semi-Annual Report, the Fund was invested 45.4% in agency and non-agency mortgage backed securities.

109.    The Fund's investment in non-agency CMOs violated shareholders' voting rights and the Fund's fundamental investment objective to "seek to track" the Index "through

1    the use of an indexing strategy."  The non-agency CMOs did not "closely approximate" the

2    "characteristics" of the securities in the Lehman Index.

3          110.    By November 30, 2008, the Index Fund had lessened its exposure to non-agency

4    CMOs to 3.4% of total assets.  The liquidation of the non-agency CMO portfolio into an

5    illiquid bond market for risky securities coincided with the further deviation in performance of

6    the Fund.

7          111.    Defendants have taken the position, as stated in the Statement of Additional

8    Information dated November 15, 2007, as amended June 13, 2008 , to justify the Fund's  over-

9    concentration in non-agency mortgage-based securities and CMOs, that non-agency mortgage-

10   backed securities "are not part of any industry for purposes of a fund's concentration policy":

> Based on the characteristics of mortgage-backed securities, the funds have
> determined that mortgage-backed securities issued by private lenders and not
> guaranteed by U.S. government agencies or instrumentalities are not part of any
> industry for purposes of a fund's concentration policy.  This means that a fund
> may invest more than 25% of its total assets in privately-issued mortgaged-backed
> securities, which may cause the fund to be more sensitive to adverse economic,
> business or political developments that affect privately-issued mortgage-backed
> securities.

16         112.    Defendants' determination that non-agency CMOs were not part of an

17   "industry" was unreasonable, in violation of shareholders' voting rights, and inconsistent with

18   the Fund's stated investment policy that was only changeable by shareholder vote.  Defendants

19   recognized, as stated in the November 15, 2007 Statement of Additional Information, as

20   amended June 13, 2008  (quoted immediately above), that the non-agency investments "may

21   cause the fund to be more sensitive to adverse economic, business or political developments

22   that affect privately-issued mortgage-backed securities" and accordingly should be classified as

23   within one industry.

24         113.    Agency and non-agency CMOs are routinely considered to be part of an

25   "industry" because they derive their value from real estate holdings.

26         114.    Consistent with the 1997 Proxy Statement, defendants were not allowed to

27   defeat shareholder's voting rights by creating unreasonable classifications of an "industry."

28

115.    The Fund's investment in CMOs were made at a time when there was increased concern with the quality of mortgage lending.

116.    For example, on June 28, 2007, the Department of the Treasury, Federal Reserve System, Federal Deposit Insurance Corporation, and National Credit Union Administration, issued a joint Statement on Subprime Mortgage Lending "to address subprime mortgage products and lending practices."

117.    The Fund's investment in non-agency CMOs at this time, in light of all circumstances, was speculative, irresponsible and a gross deviation from the Fund's fundamental investment policies and a breach of the defendants' fiduciary duties.

118.    The attached chart, prepared on a Bloomberg terminal, comparing the Schwab Fund's change in total return to the Lehman Index's change in total return over the period December 31, 2004 through February 27, 2009, demonstrates how closely correlated the Schwab Bond Fund was to the Index until approximately August 31, 2007 and how dramatically the Bond Fund deviated thereafter from the Index through February 27, 2009.



119.    The magnitude of under performance between the Fund and the Index was not the result of unforeseen economic circumstances, but rather the gross deviation by the Schwab Advisor from the Fund's stated investment objective, by investing 45.4% of the Fund's total assets in mortgage-backed-securities and 27.3% of the Fund's total assets in non-agency CMOs.

**FIRST CAUSE OF ACTION**

**ON BEHALF OF THE CLASS FOR BREACH OF FIDUCIARY DUTY
(ON BEHALF OF THE CLASS AGAINST ALL DEFENDANTS)**

120.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.  This Count is asserted against the Schwab Trust (Schwab Investments), the Schwab Advisor (Charles Schwab Investment Management, Inc.), and the Schwab Trustees.  All defendants owed fiduciary duties to Class members.

121.    This Count is asserted under California law.  The relationship of Class members to the defendants is not as a shareholder to a corporation, but rather is akin to the relationship between an investor and its financial advisor.  The Trust is a legal fiction in that it has no employees, assets, or management capabilities.  Rather, it was created by and is subject to the control of the Schwab Corp. and defendant Schwab.  The Schwab Trust does not act as an independent entity but rather as part of the Schwab affiliated companies.  Investors' primary investment relationship is with the Schwab Advisor, which has the actual responsibility for managing the Fund's assets.  Because the defendants and the controlling entities are headquartered in San Francisco, California and the principal activities of the defendants with respect to this Count took place in California, California has the principal interest in applying its law to this claim.  Moreover, the Trust's Investment Advisory Agreement with the Schwab Advisor provides that California law shall apply.  This Count is viable under Massachusetts law, as well.

122.    Schwab Investments is a registered investment company and the sponsor of the Fund.  Schwab Investments, through its Trustees and affiliates, was responsible for the oversight of the Fund's investments, the oversight of the activities of the Investment Advisor,

and the accuracy of Schwab Investments' SEC filings.  The Schwab Trustees are responsible for discharging the obligations of the Trust.  Schwab Investments and the Schwab Trustees were also responsible for preserving shareholders' voting rights and the Fund's compliance with its stated investment objectives.  Schwab Investments and the Schwab Trustees had discretion to operate the Fund, subject to shareholders' voting rights and the Fund's stated fundamental investment policies, and Class members were reliant on Schwab Investments and the Schwab Trustees for the operations of the Fund.

123.   The Trustees are liable to investors for gross negligence and reckless disregard of their obligations to protect shareholder interests and voting rights and to ensure that the Fund's assets were invested consistent with the Fund's stated fundamental investment objectives.

124.   Schwab Investments and its Board of Trustees' fiduciary obligations to the Class were summarized in the Schwab Investments' Definitive Proxy Statement for the Fund, filed with the SEC on March 24, 2000, as follows:

> The Board of Trustees is responsible for protecting the interests of the funds' shareholders.  The Board meets regularly to review the funds' activities, contractual arrangements and performance.

125.   Indeed, Charles Schwab, personally, in his letter to shareholders appended to the August 31, 2007 Annual Report filed by Schwab Investments with the SEC, on behalf of all Schwab-related entities, thanked the Fund's shareholders for "entrusting us with their assets."

126.   Schwab Investments further acknowledged in its August 31, 2007 Annual Report to Shareholders that "as part of their fiduciary duties with respect to fund fees, fund boards are required to evaluate the material factors applicable to their decision to approve an investment advisory agreement."

127.   The Schwab Advisor had control of the property of the investors and a disparity of sophistication and access to data about the composition of the Index and the Fund's securities holdings.

128.     The Fund's prospectus explains that the Investment Advisor provided advisory services in that it utilized discretion and control to "oversee[ ] the asset management and administration of the funds."

129.     All defendants repeatedly assumed fiduciary obligations in SEC filings disseminated to shareholders and repeatedly thanked investors for placing their "trust" in Schwab.  *See, e.g.,* Semiannual Report dated February 28, 2007 to Shareholders (Charles Schwab:  "Thank you for placing your trust in SchwabFunds.");   Annual Report to Shareholders dated August 31, 1998 and Semiannual Report to Shareholders dated February 28, 1999 (Charles Schwab:  "We continue to do everything we can to warrant the trust you have placed in us."); Annual Report dated August 31, 1999 ("We continue to do our best to warrant the trust you have placed in us."); Semiannual Report dated February 28, 2002 (Charles Schwab:  "Thank you for the trust that you have placed in SchwabFunds"); Annual Report, dated August 31, 2002 (Charles Schwab: "We appreciate your trust and will continue to work hard to earn it."); Semiannual Report dated February 28, 2003 (Charles Schwab:  "Your continued trust and support mean a great deal to us, and it's our goal to respond to them by doing everything we can to help you meet your financial goals"; and Randall W. Merk (President and CEO of the Schwab Advisor):  "Times of market volatility and uncertainty about world events seem to demand a heightened level of diligence on the part of investment professionals.  At SchwabFunds we are keenly aware to this, and we're working hard to uphold the best interests of our shareholders"); Semiannual Report dated February 27, 2004 (Randall W. Merk:  "[T] rust of our shareholders is very important to us, and we invest with your outcomes in mind.  Thank you for investing with us, and once more I want to remind you that we operate our business with the highest ethical standards and an unwavering commitment to you."); Annual Report dated August 31, 2004 (Charles Schwab: "[W]e recognize that your investment reflects the trust you have placed in those of us responsible for managing your wealth, and it is a responsibility that we assume with the utmost integrity."; and Evelyn Dilsaver (President and CEO of the Schwab Advisor):  "["Y]our trust is very important to us and I will do all I can to earn and maintain that trust.").

130.   Undeniably, the Schwab Trust, the Schwab Trustees, and the Schwab Advisor owed Class members a fiduciary duty to manage the Fund's assets with the care and prudence of a professional in like circumstances and to adhere to the Fund's investment objectives and policies.  Given the disparity of access to information and expertise in investment matters, Class members relied on the Schwab Trust's, the Schwab Trustees', and the Schwab Advisors' diligence and good faith.

131.   Schwab Investments repeatedly stated that the Fund was "intended for investors seeking to fill the fixed income component of their asset allocation plan."  The Investment Advisor was aware of that statement and recognized that Class members were relying on its management of the Fund.

132.   The Schwab Trust, the Schwab Trustees, and the Schwab Advisor had actual knowledge that the funds safeguarded to Schwab for investment were of great significance to investors and would be used for such once-in-a-lifetime events as to purchase a first home, pay for college, or retirement.

133.   Defendants acknowledge on the "Charles Schwab" website that Schwab Investments, by creating the Fund and recommending that the Fund be used in an investment plan "to fill the fixed income component of [investors'] asset allocation plan" were acting in a fiduciary capacity:  "Professional investors consider creating an investment plan vital for performing their fiduciary duty to clients."  *See*  "Investing Principle 1:  A Blueprint for Success," by Mark W. Riepe, CFA, Senior Vice President, Schwab Center for Financial Research, March 10, 2008.

134.   Defendants breached their fiduciary duties to plaintiff and the members of the Class by the acts and omissions set forth above in violation of the shareholders' voting rights and the Fund's stated investment objectives, including the failure to require a majority shareholder vote prior to deviating from the Fund's stated fundamental investment objectives.

135.   The Trustees, by failing to review the Fund's portfolio to ensure that it complied with the Fund's stated fundamental investment objectives that were only changeable by shareholder vote, acted with gross negligence and with reckless disregard of their obligations.

136.    By virtue of the wrongful conduct of defendants, plaintiff and the members of the Class sustained money damages in connection with their ownership of shares in the Fund.

### SECOND CAUSE OF ACTION

**FOR BREACH OF CONTRACT**
**(ON BEHALF OF THE CLASS AGAINST SCHWAB INVESTMENTS)**

137.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.  This Count is asserted on behalf of members of the Class for breach of contract.

138.    Proposal Number 2 of the 1997 Proxy Statement formed the terms of a contract between the Schwab Trust and investors in the Fund that if investors voted in favor of changing the Fund's fundamental investment objective to seek "to track the investment results of the [Index] through use of an indexing strategy" that Schwab Investments would cause the Fund to conform to that objective.  Investors in the Fund accepted that offer by voting in favor of the change in investment objective.  See Proxy Statement at 3 ("[T]he Total Bond Market Index Fund … would seek to track the Lehman Brothers Aggregate Bond Index.").

139.    The 1997 Proxy Statement also created voting rights for the Index Fund's investors.

140.    In its 1997 Proxy Statement, Schwab Investments set forth in detail the meaning of the term "indexing strategy" that could only be changed by shareholder vote.  Thus, for example, on page 22 of the Proxy Statement Schwab Investments promised investors that "[b]efore purchasing or selling a security, the Investment Manager would analyze each security's characteristics and determine whether purchasing or selling the security would help the Fund's portfolio approximate the characteristics of the Index."

141.    Proposal Number 3 of the 1997 Proxy Statement also formed the terms of a contract whereby Schwab Investments covenanted that, subject to shareholder vote, the Fund "may not" "[p]urchase securities (other than securities issued or guaranteed by the U.S. Government, its agencies or instrumentalities) if, as a result of such purchase, 25% or more of the value of its assets would be invested in any industry."

142.    The Fund's shareholders accepted the terms of that contract by voting in favor of those fundamental investment policies.

143.    Subsequent to the 1997 proxy vote, Schwab Investments continued to offer shares in the Fund pursuant to the terms of a contract that Schwab Investments would preserve shareholders' voting rights and cause the Fund to continue to adhere to its fundamental investment objectives and policies contained in the 1997 Proxy Statement and reiterated in Prospectuses and in Statements of Additional Information (as quoted above).   Investors accepted the terms of that contract by purchasing shares in the Fund.

144.    The terms of that contract are contained in the 1997 Proxy Statement, which established the contractual relationship between Schwab Investments and Class members, and were reiterated in Schwab Investments' subsequent SEC filings, including the January 15, 1998 Prospectus, and in each subsequent Prospectus and Statement of Additional Information incorporated by reference into and made a part of the Prospectus.

145.    The aforesaid provision constituted contractual terms, where existing investors retained shares and new investors purchased shares in consideration of the contractual obligations not to change fundamental investment objectives without a shareholder vote.

146.    Plaintiff and the Class also relied on federal law for the terms of that contract. Section 8 of the Investment Company Act directs an investment company to recite in its Registration Statement "all investment policies of the registrant . . ., which are changeable only if authorized by shareholder vote," as well as all policies that "the registrant deems matters of fundamental policy."   15 U.S.C. § 80a-8(b) (2) & (3).   Section 13 prohibits a registered investment company from deviating from any such policies "unless authorized by the vote of a majority of its outstanding voting securities."   15 U.S.C. § 80a 13.

147.    Schwab Investments violated the terms of the contract with the Fund's shareholders as set forth in the 1997 Proxy Statement and subsequent prospectuses and SAIs, as more fully described above, by directing the purchases or allowing the Schwab Advisor to direct the purchases of securities that deviated from the composition of the Lehman Brothers

U.S. Aggregate Bond Index and caused the Fund to concentrate more than 25% of its net assets in mortgage backed securities, including CMOs, without a shareholder vote.

148.    By virtue of the wrongful conduct of defendants, plaintiff and the members of the Class sustained injury to their voting rights and money damages in connection with their ownership of shares in the Fund.

### THIRD CAUSE OF ACTION

**FOR BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**
**(ON BEHALF OF THE CLASS AGAINST THE TRUST AND THE INVESTMENT ADVISOR  DEFENDANTS)**

149.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.  This Count is asserted on behalf of members of the Class for breach of the covenant of good faith and fair dealing.

150.    Defendants have a common law duty of good faith and fair dealing with respect to investors in the Fund.

151.    Defendants, in violation of the covenant of good faith and fair dealing, engaged in speculation with the Fund's assets by investing more than 25% of the Fund's total assets in CMO securities that were not contained in the Lehman Index, and engaged in such speculation without a shareholder vote.

152.    By virtue of the wrongful conduct of defendants, plaintiff and the members of the Class sustained money damages in connection with their ownership of shares in the Fund.

# FOURTH CAUSE OF ACTION

**THIRD PARTY BENEFICIARY OF THE INVESTMENT ADVISORY AGREEMENT (ON BEHALF OF THE CLASS AGAINST THE INVESTMENT ADVISOR)**

153.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

154.    The Investment Advisor managed the investments of the Fund pursuant to an Investment Advisory Agreement between the Investment Advisor and Schwab Investments.

155.    The Investment Advisory Agreement required the Investment Advisor, among other things, to manage the Fund consistent with the Fund's fundamental investment objectives and policies.

156.    The Investment Advisory Agreement between the Schwab Investment Manager and the Schwab Trust unambiguously charged the Investment Advisor with performing "all aspects of the operations of the Schwab Funds," which included, but were not limited to: determining "what securities and other investments will be purchased, retained or sold" by the Fund; furnishing statistical and research data; preparing the Trust's Annual and Semi-Annual Reports to shareholders and amendments to its Registration Statements; preparing and filing Notices with the SEC; keeping and maintaining the financial accounts and records of the Fund; "generally assist[ing] in all aspects of the operations of the" Fund; and complying "with all applicable Rules and Regulations of the SEC." The Advisory Agreement also requires the Investment Advisor to comply with the provisions of the Investment Company Act of 1940 in buying or selling any portfolio securities.

157.    Thus, the Advisory Agreement conferred broad obligations upon the Investment Advisor with respect to the overall management of the Fund – the most fundamental of which would include management of the Fund in accordance with the Fund's fundamental investment objectives and policies.  It would make little, if any, sense, if the Investment Advisor was free to deviate from the Fund's fundamental investment objectives during its management of the Fund.

158.  The Trust appended a copy of the Investment Advisory Agreement to an amendment to the Trust's Registration Statement dated December 29, 1997 precisely to inform class members of its terms.

159.  The Investment Advisory Agreement provided that it "shall be governed by the laws of the State of California."

160.  Defendant Merk routinely wrote letters to the Fund's shareholders contained in the Fund's annual and semiannual reports and addressed the Fund's shareholders as "Dear Shareholders."

161.  In a letter to shareholders in the Schwab Trust's August 31, 2005 Annual Report to Shareholders, defendant Charles Schwab emphasized the direct obligations and commitment of the Schwab Investment Managers to the shareholders of the Schwab mutual funds:

> Schwab Funds is managed by Charles Schwab Investment Management, Inc., one of the largest mutual fund managers in the U.S. Our portfolio managers share a passion for market analysis and use some of the most sophisticated financial models in the country. I am proud of their depth of experience, which reflects an average tenure of more than 15 years in the investment industry. *Furthermore, I am impressed with the commitment that our managers bring to the stewardship of the funds, for you, their shareholders*. [Emphasis added.]

162.  The shareholders of the Fund were known and intended third party beneficiaries of the Investment Advisory Agreement.

163.  Inasmuch as Schwab Investments issued and redeemed shares of the Fund on a daily basis at its reported NAV, if the Investment Advisor managed the Fund in a manner that was inconsistent with the Fund's fundamental investment objectives, the Fund's shareholders would be subject to direct financial injury.

164.  The Investment Advisor breached the terms of its Investment Advisory Agreement with Schwab Investments by violating shareholders' voting rights and failing to manage the Fund's assets in a manner consistent with the Fund's fundamental investment objectives by investing in securities, including non-agency CMOs, which deviated from the securities contained in the Index, and by concentrating greater than 25% of the Fund's assets in non-agency CMOs.

165.    Class members suffered actual and direct financial damages and injury to their voting rights, as a result of the Investment Advisor's failure to manage the Fund's assets in a manner consistent with the Fund's fundamental investment objectives and policies.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying plaintiff Northstar as a representative of the Class under Rule 23 of the Federal Rules of Civil Procedure;

B.    Appointing Wolf Popper LLP and Greenbaum Rowe Smith & Davis LLP as Class Counsel;

C.    Awarding compensatory damages in favor of plaintiff and the members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    Disgorging from defendants for the benefit of the Class any management or other fees forfeited by Defendants' deviation from the Fund's fundamental investment objectives;

E.    Directing the defendants to preserve shareholders' voting rights and comply with the Fund's fundamental investment objectives;

F    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

G.    Awarding recessionary damages; and

H.    Such equitable, injunctive or other relief as deemed appropriate by the Court.

///

////

///

1

## JURY DEMAND

2   Plaintiff hereby demands a trial by Jury.

3  Dated:  September 28, 2010     By: /s Christopher T. Heffelfinger
                  Christopher T. Heffelfinger (118058)

4

5                  Joseph J. Tabacco, Jr. (75484)
                  Anthony D. Phillips (259688)

6                  **BERMAN DEVALERIO**
                  One California Street, Suite 900

7                  San Francisco, CA  94111
                  Telephone: 415.433.3200

8                  Facsimile:  415.433.6382

9                  **Local Counsel**

10                By:  /s Robert C. Finkel
                Robert C. Finkel (admitted *pro hac vice*)

11                **WOLF POPPER LLP**
                845 Third Avenue

12                New York, NY  10022
                Telephone:  212.759.4600

13                Facsimile:  212.486.2093

14                By:  /s Marc J. Gross
                Marc J. Gross (admitted *pro hac vice*)

15                **GREENBAUM ROWE SMITH**
                 **& DAVIS LLP**

16                75 Livingston Street, Suite 301
                Roseland, NJ  07068

17                Telephone:  973.535.1600
                Facsimile:  973.535.1698

18                *Attorneys for Plaintiff Northstar Financial*
                *Advisors, Inc.*

19

20

21

22

23

24

25

26

27

28