1  DARRYL P. RAINS (CA SBN 104802)
   Drains@mofo.com
2  EUGENE ILLOVSKY (CA SBN 117892)
   EIllovsky@mofo.com
3  MORRISON & FOERSTER LLP
   755 Page Mill Road
4  Palo Alto, California  94304-1018
   Telephone: 650.813.5600
5  Facsimile: 650.494.0792

6  RICHARD A. SCHIRTZER (CA SBN 150165)
   richardschirtzer@quinnemanuel.com
7  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   865 South Figueroa Street, 10th Floor
8  Los Angeles, CA  90017-2543
   Telephone: (213) 443-3000
9  Facsimile: (213) 443-3100

10  JOHN M. POTTER (CA SBN 165843)
    johnpotter@quinnemanuel.com
11  PATRICK DOOLITTLE (CA SBN 203659)
    patrickdoolittle@quinnemanuel.com
12  QUINN EMANUEL URQUHART & SULLIVAN, LLP
    50 California Street, 22nd Floor
13  San Francisco, CA  94111-4788
    Telephone: (415) 875-6600
14  Facsimile: (415) 875-6700

15  Attorneys for defendants Schwab Investments, Charles Schwab
    Investment Management, Inc., Marianne Byerwalter, Donald F.
16  Dorward, William A. Hasler, Robert G. Holmes, Gerald B. Smith,
    Donald R. Stephens, Michael W. Wilsey, Charles R. Schwab,
17  Randall W. Merk, Joseph H. Wender, and John F. Cogan

18
                    UNITED STATES DISTRICT COURT
19
                 NORTHERN DISTRICT OF CALIFORNIA
20
                          SAN JOSE DIVISION
21

22
    NORTHSTAR FINANCIAL ADVISORS,        Case No.      08-cv-04119 LHK
23  INC., on Behalf of Itself and All Others
    Similarly Situated,                  CLASS ACTION
24
                         Plaintiff,       MOTION TO DISMISS SECOND
25                                        AMENDED CLASS ACTION
             v.                           COMPLAINT
26
    SCHWAB INVESTMENTS, et al.            Date:   January 13, 2011
27                                        Time: 1:30 p.m.
                         Defendants.      Court: Hon. Lucy Koh
28

**NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT:**

TO NORTHSTAR FINANCIAL ADVISORS, INC. AND ITS COUNSEL OF RECORD: PLEASE TAKE NOTICE THAT, on January 13, 2011, at 1:30 p.m. or as soon thereafter as the matter may be heard, in Courtroom 4 of the United States District Court for the Northern District of California, 280 South First Street, San Jose California, 95113, defendants Schwab Investments, Charles Schwab Investment Management, Inc., Marianne Byerwalter, Donald F. Dorward, William A. Hasler, Robert G. Holmes, Gerald B. Smith, Donald R. Stephens, Michael W. Wilsey, Charles R. Schwab, Randall W. Merk, Joseph H. Wender and John F. Cogan, will, and hereby do, move for dismissal of the complaint in this action pursuant to Rules 8 and 12 of the Federal Rules of Civil Procedure and Civil Local Rule 7-2.

The motion is based on this notice of motion, the memorandum set forth below, the accompanying declaration of Kevin A. Calia, the accompanying request for judicial notice, the reply memorandum, the pleadings and papers on file in this action, and such other written or oral argument as may be presented before the motion is taken under submission by the Court.

1

**STATEMENT OF ISSUES**
(Civil Local Rule 7-4)

2

3      1.      Must Northstar's claims, all of which allege damages based on a decline in value

4  of shares in the fund, be asserted derivatively rather than as direct claims?

5      2.      Can Northstar assert state law claims on behalf of a class alleging

6  misrepresentations or omissions in connection with the purchase or sale of securities, when the

7  Securities Litigation Uniform Standards Act bars all such state law claims?

8      3.      Can Northstar assert claims on behalf of fund shareholders when it never

9  purchased or owned any fund shares and cannot benefit from any favorable verdict on the claims

10  it has alleged?

11      4.      May Northstar avoid the requirement that standing exist at the commencement of a

12  suit by obtaining an assignment of claim as the case progresses?

13      5.      Can Northstar assert a claim for breach of fiduciary duty against the fund, its

14  trustees, and its investment advisor, even though under Massachusetts law none of these

15  defendants owes a fiduciary duty running directly to individual investors?

16      6.      Can Northstar assert a claim for breach of contract against Schwab Investments

17  based on the fund's proxy statement and SEC filings when no contract with the fund's investors

18  incorporates these documents by reference?  Can Northstar assert such a claim when the fund's

19  SEC filings during the class period expressly permit the challenged conduct?

20      7.      Can Northstar state a claim for breach of the covenant of good faith and fair

21  dealing when it has not properly pleaded the existence of a contract?

22      8.      Can fund investors be third-party beneficiaries of the investment advisory

23  agreement between Schwab Investments and Charles Schwab Investment Management when that

24  agreement does not refer to them or state they are intended beneficiaries of the agreement?  Can

25  Northstar plead such a claim without identifying any provision of the contract that allegedly was

26  breached?

27

28

1

**TABLE OF CONTENTS**

Page

2

NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED
COMPLAINT:.....................................................................................................i

STATEMENT OF ISSUES ....................................................................................ii

TABLE OF AUTHORITIES..................................................................................iv

INTRODUCTION .................................................................................................. 1

BACKGROUND .................................................................................................... 2

PROCEDURAL HISTORY ................................................................................... 3

ARGUMENT ......................................................................................................... 3

I.      NORTHSTAR'S CLAIMS MUST BE ASSERTED DERIVATIVELY ........................... 4

II.     NORTHSTAR'S CLAIMS ARE PREEMPTED BY SLUSA ............................. 6

III.    NORTHSTAR LACKS STANDING TO BRING THIS ACTION.................................... 8

        A.      Northstar Has No Direct Standing Because It Never Purchased Shares of
                the Fund. ................................................................................................ 8

        B.      The Assignment of Claim Does Not Cure Northstar's Lack of Standing ............. 10

IV.     NORTHSTAR'S FIRST CLAIM FAILS TO PLEAD ANY BREACH OF
        FIDUCIARY DUTY. ............................................................................... 10

        A.      Massachusetts Law Applies to Northstar's Breach of Fiduciary Duty Claim ...... 10

        B.      Massachusetts Law Does Not Create a Fiduciary Duty Running from a
                Fund,  Its Trustees, Or Its Advisor Directly to Fund Shareholders...................... 12

                1.      Schwab Investments ................................................................. 13

                2.      Charles Schwab Investment Management .................................. 14

                3.      Trustees of Schwab Investments ............................................... 14

        C.      Northstar Has Not Alleged A Breach of Duty by Any Defendant ...................... 15

        D.      The Statute of Limitations Bars Assertion of This Claim Against the
                Individual Defendants. ............................................................................ 16

V.      NORTHSTAR'S SECOND CLAIM — FOR BREACH OF CONTRACT —
        FAILS BECAUSE A PROSPECTUS IS NOT A CONTRACT................................ 16

        A.      Northstar Does Not Allege the Formation of Contracts with Investors ................ 17

        B.      Schwab Investments Had No Involvement in Investors' Purchase
                Negotiations........................................................................................... 21

        C.      Northstar Alleges No Breach of Any Contract Provision ..................................... 21

VI.     NORTHSTAR'S THIRD CLAIM DOES NOT PROPERLY ALLEGE A
        BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING. .............. 22

VII.    NORTHSTAR WAS NOT A THIRD PARTY BENEFICIARY OF THE
        ADVISORY AGREEMENT BETWEEN THE FUND AND CSIM................................ 23

CONCLUSION ...................................................................................................... 25

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **<u>TABLE OF AUTHORITIES</u>**

2

**Page(s)**

3

**CASES**

4

*Ashcroft v. Iqbal,*
    129 S.Ct. 1937 (2009) ............................................................................................................. 4

5

*Batchelder v. Kawamoto,*

6
    147 F.3d 915 (9th Cir. 1998) .............................................................................................. 11

7

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................................................. 3

8

9

*Berry-McKee v. Walker,*
    No. C 99-4203 SI, 1999 U.S. Dist. LEXIS 19612 (N.D. Cal. Dec. 10, 1999) ........................ 25

10

*Cal. Emergency Physicians Med. Group v. Pacificare of Cal.,*

11
    111 Cal. App. 4th 1127 (2003) .......................................................................................... 24

12

*Caleb & Co. v. E.I. DuPont De Nemours & Co.,*
    624 F. Supp. 747 (S.D.N.Y. 1985) ..................................................................................... 19

13

14

*Cariaga v. Local No. 1184 Laborers Int'l Union of N. Am.,*
    154 F.3d 1072 (9th Cir. 1998) ........................................................................................... 18

15

*Cigal v. Leader Dev. Corp.,*

16
    557 N.E. 2d 1119 (Mass. 1990) .......................................................................................... 14

17

*City of Moorpark v. Moorpark Unified School Dist.,*
    54 Cal. 3d 921 (1991) ......................................................................................................... 18

18

19

*Cohen v. State St. Bank & Trust Co.,*
    72 Mass. App. 627 (2008) .................................................................................................. 16

20

*Cohen v. Stratosphere Corp.,*

21
    115 F.3d 695 (9th Cir. 1997) ....................................................................................... 18, 19

22

*Conder v. Home Sav. of Am.,*
    680 F. Supp. 2d 1168 (C.D. Cal. 2010) ............................................................................. 17

23

24

*Demoulas v. Demoulas Super Markets,*
    424 Mass. 501 (1997) ......................................................................................................... 15

25

*Dimmick v. Lungren,*

26
    No. C 98-4137 SI, 1999 WL 111793 (N.D. Cal. Feb. 19, 1999) ........................................ 25

27

*Doe v. Harbor Schs., Inc.,*
    446 Mass. 245 (2006) ......................................................................................................... 16

28

*Edgar v. MITE Corp.*,
   457 U.S. 624 (1982) ..................................................................................... 11

*Everett v. Bozic*,
   No. 05 Civ. 00296 (DAB), 2006 WL 2291083 (S.D.N.Y. Aug. 3, 2006)........................... 4, 6

*Fid. Bank Nat'l Ass'n v. Aldrich*,
   No. Civ. A. 3-95-CV-2566H, 1998 WL 120296 (N.D. Tex. Mar. 5, 1998) ....................... 19

*Forsythe v. Sun Life Fin., Inc.*,
   417 F. Supp. 2d 100 (D. Mass. 2006).................................................................. 4

*Green v. Nuveen Advisory Corp.*,
   186 F.R.D. 486 (N.D. Ill. 1999) ..................................................................... 14

*Grosset v. Wenaas*,
   42 Cal. 4th 1100 (2008)................................................................................ 11

*Gruenberg v. Aetna Ins. Co.*,
   9 Cal. 3d 566 (1973)..................................................................................... 23

*Halebian v. Berv*,
   457 Mass. 620 (2010) ................................................................................... 13

*Hamilton v. Allen*,
   396 F. Supp. 2d 545 (E.D. Pa. 2005)............................................................ 13, 14

*Hewitt v. Mobile Research Tech., Inc.*,
   285 F. App'x 694 (11th Cir. 2008)................................................................... 20

*Howe v. Bank for Int'l Settlements*,
   194 F. Supp. 2d 6 (D. Mass. 2002).................................................................. 13

*In re BlackRock Mut. Funds Fee Litig.*,
   No. 04 Civ. 164, 2006 WL 4683167 (W.D. Pa. Mar. 29, 2006) ............................... 14

*In re Charles Schwab Corp. Sec. Litig.*,
   No. C 08-01510 WHA, 2009 WL 262456 (N.D. Cal. Feb. 4, 2009) ........................... 11

*In re Charles Schwab Corp. Sec. Litig.*,
   No. C 08-01510 WHA, 2009 WL 1371409 (N.D. Cal. May 15, 2009) ................... 15, 20, 21

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
   No. 98 Civ. 4318 (HB), 2000 WL 10211 (S.D.N.Y. Jan. 6, 2000) ............................... 6

*In re J.P. Morgan Chase & Co. S'holder Litig.*,
   906 A.2d 766 (Del. 2006).............................................................................. 6

*In re SLM Corp. Sec. Litig.*,
   258 F.R.D. 112 (S.D.N.Y. 2009)..................................................................... 10

*In re Textainer P'ship Sec. Litig.*,
　　No. C 05-0969 MMC, 2005 WL 1791559 (N.D. Cal. July 27, 2005) ................................... 11

*In re Transkaryotic Therapies, Inc.*,
　　954 A.2d 346 (Del. Ch. 2008) ........................................................................................ 6

*In re Tyco Int'l Ltd.*,
　　236 F.R.D. 62 (D.N.H. 2006) .......................................................................................... 8

*In re U.S. West, Inc. Sec. Litig.*,
　　201 F. Supp. 2d 302 (D. Del. 2002) ............................................................................... 20

*In re Vantive Corp. Sec. Litig.*,
　　283 F.3d 1079 (9th Cir. 2002) ....................................................................................... 25

*In re VeriSign, Inc. Derivative Litig.*,
　　531 F. Supp. 2d 1173 (N.D. Cal. 2007) .......................................................................... 11

*In re Worldcom, Inc.*,
　　323 B.R. 844 (S.D.N.Y. Bankr. 2005) ............................................................................. 6

*Indemnified Capital Invs., SA. v. R.J. O'Brien & Assocs.*,
　　12 F.3d 1406 (7th Cir. 1993) .......................................................................................... 8

*Indiana Electrical Workers Pension Trust Fund v. Dunn*,
　　No. C-06-01711 RMW, 2007 WL 1223220 (N.D. Cal. Mar. 1, 2007) ................................... 6

*Jackson v. Stuhlfire*,
　　547 N.E.2d 1146 (Mass. App. Ct. 1990) .......................................................................... 5

*Jernberg v. Mann*,
　　358 F.3d 131 (1st Cir. 2004) ................................................................................... 14, 15

*Jones v. Aetna Cas. & Surety Co.*,
　　26 Cal. App. 4th 1717 (1994) ....................................................................................... 24

*Kim v. Regents of the Univ. of Cal.*,
　　80 Cal. App. 4th 160 (2000) ......................................................................................... 23

*Lapidus v. Hecht*,
　　232 F.3d 679 (9th Cir. 2000) .................................................................................... 5, 14

*Levesque v. Ojala*,
　　No. 20034485, 2005 WL 3721859 (Mass. Super. Ct. Dec. 8, 2005) ..................................... 13

*Lujan v. Defenders of Wildlife*,
　　504 U.S. 555 (1992) ................................................................................................... 8, 9

*MainStreet Org. of Realtors v. Calumet City*,
　　505 F.3d 742 (7th Cir. 2007) .......................................................................................... 9

*McKesson HBOC, Inc. v. New York State Common Retirement Fund, Inc.*,
    339 F.3d 1087 (9th Cir. 2003) ........................................................................................ 19

*Merola v. Exergen Corp.*,
    668 N.E.2d 351 (Mass. 1996) ......................................................................................... 13

*Micromuse, Inc. v. Micromuse, Plc.*,
    304 F. Supp. 2d 202 (D. Mass. 2004) ............................................................................. 16

*Mutchka v. Harris*,
    373 F. Supp. 2d 1021 (C.D. Cal. 2005) ........................................................................ 4, 6

*Northstar Fin. Advisors, Inc. v. Schwab Invs.*,
    615 F. 3d 1106 (9th Cir. 2010) ......................................................................................... 3

*O'Brien v. Pearson*,
    449 Mass. 377 (2007) ...................................................................................................... 15

*Ochs v. PacifiCare of Cal.*,
    115 Cal. App. 4th 782 (2004) .......................................................................................... 24

*Park v. Am. Circuit Breaker Corp.*,
    No. 1:06-CV-00549, 2008 WL 4596234 (M.D. N.C. Oct. 14, 2008) ................................ 11

*Perry v. Vill. of Arlington Heights*,
    186 F.3d 826 (7th Cir. 1999) ........................................................................................... 10

*Powers v. Ryan*,
    No. Civ. A 00-10295-00, 2001 WL 92230 (D. Mass. Jan. 9, 2001) ................................. 13

*Radol v. Thomas*,
    772 F.2d 244 (6th Cir. 1985) ........................................................................................... 13

*Smelt v. County of Orange*,
    447 F.3d 673 (9th Cir. 2006) ............................................................................................. 8

*Smith v. Microskills San Diego L.P.*,
    153 Cal. App. 4th 892 (2007) .......................................................................................... 24

*State Farm Mut. Auto. Ins. Co. v. Super. Ct.*,
    114 Cal. App. 4th 434 (2003) .......................................................................................... 11

*State St. Trust Co. v. Hall*,
    311 Mass. 299 (1942) ...................................................................................................... 15

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) ......................................................................................... 25

*U.S. Mortgage, Inc. v. Saxton*,
    494 F.3d 833 (9th Cir. 2007) ............................................................................................. 6

*ULQ, LLC v. Meder*,
  666 S.E.2d 713 (Ga. Ct. App. 2008) .................................................................................. 13

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*,
  454 U.S. 464 (1982) ........................................................................................................ 9

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche*,
  549 F.3d 100 (2d Cir. 2008) ........................................................................................... 9

*White v. Lee*,
  227 F.3d 1214 (9th Cir. 2000) ...................................................................................... 10

## STATUTES

15 U.S.C. § 77r(b)(2)..................................................................................................................... 7

15 U.S.C. § 78bb(f)(1) .................................................................................................................. 6

Fed. R. Civ. P. 8 ........................................................................................................................... 3

Fed. R. Civ. P. 12(b)(6) .............................................................................................................. 25

Fed. R. Civ. P. 23.1 ............................................................................................................. 4, 5, 6

Cal. Civ. Code § 1559 ......................................................................................................... 23, 24

Mass. Gen. Laws ch. 260, § 2A................................................................................................. 16

## OTHER AUTHORITIES

Sarah E. Cogan and Philip L. Kirstein, "Board Composition and the Role of Fund
Directors" (2008)....................................................................................................................... 15

1

**INTRODUCTION**

2

This is Northstar's third time around the block and it still hasn't fixed the problems with

3

its complaint.  Although defendants have repeatedly demonstrated the defects in Northstar's case,

4

it still alleges that the Schwab Total Bond Market mutual fund deviated from its stated investment

5

objectives and caused investors to suffer a negative differential in return compared to the Lehman

6

Brothers U.S. Aggregate Bond Index.  (Sec. Amend. Compl. ¶ 5.)  Northstar says this

7

"differential in performance between the Index and the Fund is equivalent to damages per share

8

of approximately $1.23."  (*Id.* ¶ 102.)  Northstar seeks to recover these damages on behalf of a

9

proposed class of holders of fund shares between August 31, 2007, and February 27, 2009.

10

There are fundamental problems with Northstar's theory.  First, claims for lost investment

11

profits, due to a purported "deviation" from stated investment objectives, are derivative in nature

12

and cannot be asserted directly on behalf of class members.  Second, state law claims alleging

13

misrepresentations or omissions cannot be asserted in a class action, because the Securities

14

Litigation Uniform Standards Act bars all such state law claims.  And third, Northstar lacks

15

standing to assert claims on behalf of class members, because it never purchased or owned any

16

fund shares and could not benefit from any favorable verdict on the claims it has alleged.

17

Northstar's new complaint also fails to correct defects identified in its earlier pleadings.

18

Its first cause of action (for breach of fiduciary duty) does not adequately allege the existence of

19

any fiduciary duty running from the defendants directly to the fund's investors (the defendants'

20

duties were owed to the fund).  Northstar's second cause of action (for breach of contract) does

21

not allege any enforceable contract, relying instead on the false notion that routine SEC filings,

22

like prospectuses and proxy statements, should be treated as contracts.  Its claim for breach of the

23

covenant of good faith and fair dealing (third cause of action) fails for the same reason.  And

24

Northstar's fourth cause of action (for breach of contract as a third party beneficiary) alleges

25

neither a breach of contract nor any basis for finding that the fund's shareholders were the

26

intended beneficiaries of the advisory agreement between the fund and its investment advisor.

27

This case has been on file for more than two years, and Northstar still has not been able to

28

plead a viable claim.  There is no reason to think it ever will.  Northstar's action should be

1    dismissed with prejudice.

2                                    **BACKGROUND**

3          The Schwab Total Bond Market Fund is a fixed income mutual fund that seeks to track

4    the Lehman Brothers U.S. Aggregate Bond Index.  (Declaration of Kevin A. Calia In Support of

5    Motion to Dismiss Second Amended Complaint ["Calia Decl."] Exh. A, July 13, 2007

6    Prospectus, at 1.)  The Lehman index reflects the performance of the entire U.S. fixed income

7    market, and includes approximately 9,000 bonds of all types, including government, corporate,

8    mortgage-backed, and asset-backed securities with maturities longer than one year.  (Sec. Amend.

9    Compl. ¶¶ 53, 54; Calia Decl. Exh. A at 14.)

10         The fund's stated investment objective is:  "to attempt to provide a high level of current

11   income consistent with preservation of capital by seeking to track the investment results of [the

12   Lehman Brothers U.S. Aggregate Bond Index] through the use of an indexing strategy."  (Calia

13   Decl. Exh. B, Sept. 1, 2006 SAI, at *2.)  This objective is restated, in various ways, throughout

14   the fund's prospectuses and SAIs.

15         The fund's prospectuses explain that, "to pursue [this] goal, the fund primarily invests in a

16   diversified portfolio of debt instruments."  (Calia Decl. Exh. A at 14.)  "The fund may invest in

17   debt instruments of domestic and foreign issuers, including convertible, preferred, mortgage-

18   backed or asset-backed securities and collateralized mortgage obligations."  (*Id.*)  While the fund

19   seeks to track the Lehman index, it is not an "index" fund.  Instead of passively buying all the

20   bonds in the index, the fund "uses the index as a guide in structuring the fund's portfolio and

21   selecting its investments," and attempts "to track the performance of the" index by using

22   "statistical sampling and other procedures."  (Sec. Amend. Compl. ¶ 56; Calia Exh. A at 14, 17.)

23   Indeed, "the fund is not required to invest any percentage of its assets in the securities represented

24   in the index."  (Calia Decl. Exh. A at 14.)

25         Because the fund does not simply buy the bonds comprising the index, its performance

26   will deviate from the index.  Indeed, the fund's proxy statements explain the fund will only "seek

27   a correlation between the performance" of the fund and "that of its Index of 0.9 or better."  (Sec.

28   Amend. Compl. ¶ 58.)  And the prospectuses warn that "[t]he fund's investment in securities that

1    are not included in the index may increase the gap between the performance of the fund and that

2    of the index." (*See, e.g.*, Exh. A at 17.)  The proxy statements also warn: "a perfect correlation

3    [between the index and the fund] is unlikely to be achieved."  (Sec. Amend. Compl. ¶ 58.)

4         For the first ten years of its existence, the fund "substantially performed in a manner . . .

5    consistent with the Index."  (Sec. Amend. Compl. ¶ 93.)  But then the credit crisis hit.  After

6    August 31, 2007, Northstar alleges, the fund's performance deviated substantially from the

7    Lehman index.  (*Id.* ¶ 118.)  Northstar alleges the fund underperformed the index because it

8    invested in non-agency collateralized mortgage obligations and mortgage-backed securities.  (*Id.*

9    ¶¶ 103-106.)

10                  **PROCEDURAL HISTORY**

11         Northstar filed its complaint in this case on August 28, 2008.  On February 19, 2009,

12    Judge Illston granted in part and denied in part the defendants' motion to dismiss the complaint.

13    [Dkt. 74.]  Northstar filed its first amended complaint on March 2, 2009, and defendants again

14    moved to dismiss.

15         Defendants sought leave to take an interlocutory appeal of Judge Illston's ruling finding

16    an implied private right of action under section 13(a) of the Investment Company Act of 1940.

17    On April 27, 2009, Judge Illston agreed to certify her section 13(a) ruling for interlocutory

18    appeal, denied the remainder of defendants' motion to dismiss without prejudice, and stayed all

19    proceedings in the action.  [Dkt. 108.]  Earlier this year, the Ninth Circuit reversed Judge Illston's

20    ruling, holding there is no implied private right of action under section 13(a).  *Northstar Fin.*

21    *Advisors, Inc. v. Schwab Invs.*, 615 F. 3d 1106, 1122 (9th Cir. 2010).

22         After remand, Northstar filed its second amended complaint on September 28, 2010.

23    [Dkt. 127.]  The new complaint drops a claim and adds several individual defendants, but

24    otherwise leaves Northstar's other claims largely intact.

25                     **ARGUMENT**

26         Rule 8 obligated Northstar to set forth facts showing it has a plausible chance of

27    prevailing on its claims.  Fed. R. Civ. P. 8(a).  It was required to allege enough specific facts to

28    push the complaint over "the line between possibility and plausibility."  *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 577 (2007).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citations omitted).  Instead, plaintiffs must ensure that the legal conclusions of the complaint are "supported by factual allegations."  *Id.* at 1950.

Northstar's new complaint does not meet these tests.  It has alleged plenty of legal conclusions, but many of those conclusions are, in fact, unsupported by law.  And it has not backed up its conclusory allegations with facts sufficient to show any plausible chance of recovery.

## I.   NORTHSTAR'S CLAIMS MUST BE ASSERTED DERIVATIVELY.

We showed, in our motion to dismiss the *Smit* action,[1] that claims seeking money damages based upon an alleged failure to comply with investment objectives are derivative in nature and must comply with Rule 23.1.  *See Mutchka v. Harris*, 373 F. Supp. 2d 1021, 1027 (C.D. Cal. 2005) (under Massachusetts law "[i]f the injury merely is a reduction in the price of stock, then the suit must be derivative"); *Everett v. Bozic*, No. 05 Civ. 00296 (DAB), 2006 WL 2291083, at *3 (S.D.N.Y. Aug. 3, 2006) ("a reduction in share price is an indirect injury, the remedy for which may be found in a derivative action"); *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 112 (D. Mass. 2006) (claim is derivative "if the wrong underlying [the] claim results in harm to a plaintiff shareholder only because the corporate entity has been injured"). A claim "alleging mismanagement or wrongdoing on the part of corporate officers or directors" is not a direct claim causing a separate and distinct injury to any shareholder or subset of shareholders; rather it "normally states a claim of wrong to the corporation" and "therefore, is

---

[1] The *Smit* motion to dismiss is hereby incorporated by reference.

1    properly derivative." *Jackson v. Stuhlfire*, 547 N.E.2d 1146, 1148 (Mass. App. Ct. 1990) (citation

2    and internal quotations omitted).[2]

3        Northstar's complaint alleges that "[d]efendants' deviation from the Fund's fundamental

4    investment objective exposed the Fund and its shareholders to tens of millions of dollars in losses

5    stemming from a sustained decline in the value of non-agency mortgage-backed securities." (Sec.

6    Amend. Compl. ¶ 5.) Northstar says this alleged deviation from the fund's strategy "caused

7    investors to suffer a negative 12.64% differential in total return for the Fund compared to the"

8    Lehman Brothers U.S. Aggregate Bond Index. (*Id.*) Northstar says this "differential in

9    performance between the Index and the Fund is equivalent to damages per share of approximately

10   $1.23." (*Id.* ¶ 102.) And it seeks to recover "money damages" based on this "differential in

11   performance between the Index and the Fund." (*Id.* ¶¶ 102, 136, 148, 152, 165.)

12       The claims in this case, like the claims in *Smit*, do not allege any direct injury to investors

13   in the fund. They instead allege that the fund's managers and trustees breached their duties to the

14   fund and that those alleged breaches caused the fund to underperform its index. Investors in the

15   fund suffered "money damages" only indirectly as a result of their ownership of fund shares.

16   Because Northstar seeks money damages arising from the way the fund was managed, its claims

17   are derivative and must be pleaded in compliance with Rule 23.1.

18       Northstar tries to avoid this obvious conclusion by saying its claims do not really seek

19   money damages for mismanagement, but rather seek to vindicate shareholders' voting rights.

20   (*See* Sec. Amend. Compl. ¶ 122, 123.) But Northstar doesn't seek a shareholder vote or to

21   rescind some corporate action taken without a vote. Northstar's entire focus has been, and

22   continues to be, money damages.

23       Northstar cannot dress up its damages claims with "voting rights" language and hope to

24   avoid application of the distinction between derivative and direct claims. Courts regularly

25   distinguish  between voting rights claims and derivative "diminution in value" claims. *Lapidus v.*

26

27   [2] The law of the state of incorporation of Schwab Investments — Massachusetts —
     controls the issue of whether a claim is derivative or direct. *Lapidus v. Hecht,* 232 F.3d 679, 682
     (9th Cir. 2000).

28

1  *Hecht*, 232 F.3d 679, 683 (9th Cir. 2000); s*ee also Indiana Electrical Workers Pension Trust*

2  *Fund v. Dunn*, No. C-06-01711 RMW, 2007 WL 1223220, at *10 (N.D. Cal. Mar. 1, 2007)

3  ("[a]lthough plaintiffs argue that they have been injured because they were not given their right to

4  vote, the nature of their claims is essentially mismanagement of corporate assets and derivative in

5  nature"); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318 (HB), 2000 WL

6  10211, at *4 (S.D.N.Y. Jan. 6, 2000) (claim that mutual fund deviated from investment from

7  investment objective without shareholder vote is derivative); *Mutchka*, 373 F. Supp. 2d at 1028;

8  *Everett*, 2006 WL 1191083, at *3; *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766,

9  773 (Del. 2006) (although denial of voting rights was a direct claim, no damages could be

10  recovered by shareholders, as all economic harm was suffered by corporation); *In re*

11  *Transkaryotic Therapies, Inc.*, 954 A.2d 346, 362 (Del. Ch. 2008) (direct claim for denial of right

12  to cast an informed vote dismissed because no monetary damages could be awarded); *In re*

13  *Worldcom, Inc.*, 323 B.R. 844, 856 (S.D.N.Y. Bankr. 2005) (shareholders' voting rights claims

14  were derivative because the court "does not see how the right to vote, in this case, is differentiated

15  from a diminution in value of the shares").

16      Northstar's claims are all derivative in nature.  They should have been pleaded as

17  derivative claims, and they should have been made in compliance with Rule 23.1.  Because

18  Northstar did not comply with Rule 23.1, its complaint should be dismissed in its entirety without

19  leave to amend.

20  **II.    NORTHSTAR'S CLAIMS ARE PREEMPTED BY SLUSA.**

21      Northstar's complaint is also preempted by the Securities Litigation Uniform Standards

22  Act (SLUSA).  As explained in our companion brief in the *Smit* action, SLUSA bars securities

23  class actions based on state law when five conditions exist:  (1) the case is a "covered class

24  action;" (2) the complaint asserts a claim under state law; (3) the case involves a "covered

25  security;" and (4) the complaint contains allegations concerning a misrepresentation or omission

26  of material fact; and (5) the alleged misstatement or omission was made "in connection with" the

27  purchase or sale of a security.  15 U.S.C. § 78bb(f)(1); *U.S. Mortgage, Inc. v. Saxton*, 494 F.3d

28

833, 843-44 (9th Cir. 2007).  All five requirements are met here.  Northstar's complaint is therefore precluded by federal law and must be dismissed.

The first element — that the case be a "covered class action" — is met because Northstar claims to sue "on behalf of persons who owned shares of the [Fund] from August 31, 2007 through February 27, 2009."  (Sec. Amend. Compl. ¶ 1.)  Northstar alleges that common issues of law and fact predominate among class members.  (*Id.* ¶ 41.)  And Northstar seeks damages on a representative basis.  (*Id.* ¶¶ 41(j), 165(C).)

The second element is met because Northstar's complaint asserts only state law claims — for breach of fiduciary duty, breach of contract, breach of the covenant of good faith and fair dealing, and breach of contract (asserted by Northstar as a third party beneficiary).

The third element — the "covered securities" requirement — is met because the fund's shares were "issued by an investment company" — Schwab Investments — which "is registered, or that has filed a registration statement, under the Investment Company Act of 1940."  15 U.S.C. § 77r(b)(2); (Sec. Amend. Compl. ¶ 16).

The fourth element — the "misrepresentations and omissions" requirement — is met because Northstar's complaint is replete with allegations of misrepresentations and omissions. Northstar alleges the fund issued a proxy statement representing it would attempt to provide high current income and preservation of capital using an indexing strategy, and that it "assured" investors it would carefully analyze the characteristics of each security it bought or sold.  (*See* Sec. Amend. Compl. ¶¶ 50, 57.)  The proxy statement, says Northstar, "represented" that the fund would "seek a 90% correlation" between the fund and its index, and that this strategy would not increase the fund's risk profile.  (*Id.* ¶¶ 58, 61.)  Northstar also alleges that the fund was marketed to investors as a conservative investment.  (*Id.* ¶¶ 78, 81.)  These representations later allegedly were proved false because the fund deviated from its stated objectives.  (*Id.* ¶¶ 95-96.)  Indeed, according to Northstar, the fund later offered investors a false explanation when its share price began to decline.  (*Id.* ¶ 97.)

And the final element — the "in connection with" requirement — is satisfied because Northstar alleges that investors' purchasers coincided with Schwab's alleged misrepresentations

1   and omissions.  Northstar alleges that "existing investors retained shares and new investors

2   purchased shares" in reliance upon the fund's allegedly misleading proxy statements,

3   prospectuses, and other SEC filings.  (Sec. Amend. Compl. ¶ 145.)

4       Accordingly, Northstar's claims are all preempted by SLUSA and should be dismissed.

5   **III.    NORTHSTAR LACKS STANDING TO BRING THIS ACTION.**

6       Northstar lacks standing to bring this case because it was not an investor in the fund and

7   has not suffered any compensable injury.  Northstar also lacks standing to assert claims on behalf

8   of its investor clients, and the assignment it claims to have received from one of its customers

9   does not cure its standing defect.

10      **A.    Northstar Has No Direct Standing Because It Never Purchased Shares of the**
                **Fund.**

11

12      To satisfy the "irreducible constitutional minimum of standing" under Article III, a

13  plaintiff must establish three elements:  (1) "injury in fact — an invasion of a legally protected

14  interest;" (2) a causal connection between that injury and the conduct complained of; and (3) a

15  likelihood that "the injury will be 'redressed by a favorable decision.'"  *Lujan v. Defenders of*

16  *Wildlife*, 504 U.S. 555, 560-61 (1992), quoting *Simon v. Eastern Ky. Welfare Rights*

17  *Organization*, 426 U.S. 26, 41-42 (1976).  "The burden of showing that there is standing rests on

18  the shoulders of the party asserting it."  *Smelt v. County of Orange*, 447 F.3d 673, 682 (9th Cir.

19  2006), quoting *Lujan*, 504 U.S. at 560-61.

20      Northstar cannot satisfy the first prong of the standing test because it did not purchase

21  fund shares for its own account and it did not lose any money in the fund.  It alleges, instead, that

22  it purchased and sold fund shares "on behalf of its clients as an independent investment advisor."

23  (Sec. Amend. Compl. ¶ 11.)  Judge Illston concluded that these allegations failed to plead injury

24  in fact.  (Feb. 19, 2009 Order at 4.)  *See also Indemnified Capital Invs., SA. v. R.J. O'Brien &*

25  *Assocs.*, 12 F.3d 1406, 1409 (7th Cir. 1993) (losses "incurred by . . . customer accounts accrued

26  only to [the adviser's] customers and [were] too attenuated to create standing for [the adviser]");

27  *In re Tyco Int'l Ltd.*, 236 F.R.D. 62, 72-73 (D.N.H. 2006) (investment advisor did not satisfy

28  "injury in fact" requirement and therefore "lack[ed] standing to sue on its clients' behalf").

1    Northstar has tried to correct this standing deficiency by alleging that the fund's

2    performance resulted in Northstar's collecting lower fees from clients.  (Sec. Amend. Compl.

3    ¶ 14.)  Northstar claims that, when the value of fund shares held by Northstar clients failed to

4    keep pace with the U.S. Aggregate Bond Index, it also suffered because it faced a "diminution of

5    its management fee."  (*Id.*)  But Northstar's expectation of receiving larger management fees does

6    not rise to the level of "an invasion of a legally protected interest."  *Lujan*, 504 U.S. at 560-61.

7    Northstar also fails to satisfy the third prong of the standing test — that its "injury will be

8    'redressed by a favorable decision.'"  Even if Northstar wins a favorable decision, any award

9    would go to its clients and other shareholders, and Northstar cannot recover its management fees.

10   Because Northstar's claimed injury will not be resolved even by a favorable verdict, Northstar has

11   no Article III standing.  *See W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche*, 549 F.3d 100, 104

12   n.2 (2d Cir. 2008) (investment advisor lacked standing to assert client claims where "the only

13   award that would not ultimately flow to [the advisor's] clients" was the litigation costs and

14   expenses requested in the prayer for relief").

15   In addition to Article III standing, Northstar's lack of prudential standing precludes the

16   Court from exercising jurisdiction here.  *See MainStreet Org. of Realtors v. Calumet City*,

17   505 F.3d 742, 745 (7th Cir. 2007).  Prudential standing requires that "the plaintiff generally must

18   assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or

19   interests of third parties."  *Valley Forge Christian Coll. v. Ams. United for Separation of Church*

20   *& State*, 454 U.S. 464, 474 (1982) (citation omitted).  As noted, Northstar concedes that its entire

21   complaint rests completely on the legal rights or interests of the fund's shareholders, and that its

22   own "financial injury and entitlement to recovery are derivative of the Class' claims."  (Sec.

23   Amend. Compl. ¶ 39.)  And Northstar concedes it "cannot prove its own financial injury and

24   entitlement to recovery without first proving the Class' financial injury and entitlement to

25   recovery."  (*Id.*)  This is the quintessential case barred by the doctrine of prudential standing,

26   because "the injury on which the plaintiff founds his suit is derivative from the injury suffered by

27   the defendant's immediate victim."  *MainStreet Org.*, 505 F.3d at 745.

28

1

**B.      The Assignment of Claim Does Not Cure Northstar's Lack of Standing.**

2

After Judge Illston ruled that Northstar lacked standing to sue, Northstar amended its

3

complaint to allege it had obtained an "Assignment of Claim" from one of its clients.

4

(Sec. Amend. Compl. ¶ 15.)  The assignment, however, came too late.  "Because standing goes to

5

the jurisdiction of a federal court to hear a particular case, it must exist at the commencement of

6

the suit."  *Perry v. Vill. of Arlington Heights*, 186 F.3d 826, 830 (7th Cir. 1999), citing *U.S.*

7

*Parole Comm'n v. Geraghty,* 445 U.S. 388, 397 (1980); *White v. Lee*, 227 F.3d 1214, 1243 (9th

8

Cir. 2000) ("[s]tanding is examined at 'the commencement of the litigation'"); *see also In re SLM*

9

*Corp. Sec. Litig.*, 258 F.R.D. 112 (S.D.N.Y. 2009) (investment advisor rejected as lead plaintiff

10

where it received an assignment of claim after commencement of litigation).  A plaintiff cannot

11

"satisfy the requirements of standing as the case progresses."  *Perry*, 186 F.3d at 830.

12

That is exactly what Northstar has attempted to do.  Although Northstar filed this lawsuit

13

on August 28, 2008, it allegedly obtained an assignment of claim only on December 8, 2008, in

14

an attempt to defeat defendants' then-pending motion to dismiss.  (Sec. Amend. Compl. ¶ 15.)

15

That assignment allegedly was later amended to include claims against the trustee defendants on

16

September 28, 2010 — more than two years after this case was filed.  (*Id.*)  Because Northstar did

17

not satisfy the requirements for standing when it filed its complaint, the case must be dismissed.

18

**IV.      NORTHSTAR'S FIRST CLAIM FAILS TO PLEAD ANY BREACH OF FIDUCIARY DUTY.**

19

20

Each of Northstar's complaints has pleaded a claim for breach of fiduciary duty.  In her

21

most recent order, Judge Illston dismissed Northstar's fiduciary duty claim and ordered Northstar

22

"to carefully examine whether each of the defendants named in this claim can in fact be named in

23

such a claim, and under which state's law such a claim is properly brought."  (Feb. 19, 2009,

24

Order at 14-15.)  Northstar's new complaint does not correct the defects identified by Judge

25

Illston.

26

**A.      Massachusetts Law Applies to Northstar's Breach of Fiduciary Duty Claim.**

27

Schwab Investments is a business trust formed under Massachusetts law.  (Sec. Amend.

28

Compl. ¶ 16.)  California's internal affairs doctrine thus mandates that Massachusetts law be

MOTION TO DISMISS SECOND AMENDED COMPLAINT
CASE NO. CV-08-4119 LHK (PVT)
sf-2914002

10

1    applied to Northstar's fiduciary duty claim against Schwab Investments and its trustees.[3]  *State*

2    *Farm Mut. Auto. Ins. Co. v. Super. Ct.*, 114 Cal. App. 4th 434, 442-49 (2003).  "The internal

3    affairs doctrine is a conflict of laws principle which recognizes that only one State should have

4    the authority to regulate a corporation's internal affairs — matters peculiar to the relationships

5    among or between the corporation and its current officers, directors, and shareholders — because

6    otherwise a corporation could be faced with conflicting demands."  *Edgar v. MITE Corp*., 457

7    U.S. 624, 645 (1982).

8         California's internal affairs doctrine applies "to matters that involve 'the relations inter se

9    of the corporation, its shareholders, directors, officers, or agents.'"  *Grosset v. Wenaas*, 42 Cal.

10   4th 1100, 1106-07 n.2 (2008), citing Restatement (Second) of Conflict of Laws § 302 cmt. a

11   (1971)).  This includes a claim by shareholders of breach of fiduciary duty where the claim

12   involves alleged mismanagement or a violation of internal corporate policies.  *In re Textainer*

13   *P'ship Sec. Litig.*, No. C 05-0969 MMC, 2005 WL 1791559, at *5 (N.D. Cal. July 27, 2005)

14   ("courts have consistently applied the internal affairs doctrine to claims for breach of fiduciary

15   duty"); *In re VeriSign, Inc. Derivative Litig.*, 531 F. Supp. 2d 1173, 1215 (N.D. Cal. 2007)

16   (internal affairs doctrine applied to fiduciary duty claims related to backdated options); *State*

17   *Farm Mut. Auto. Ins. Co.*, 114 Cal. App. 4th at 443 (courts "have consistently applied the law of

18   the state of incorporation to the entire gamut of internal corporate affairs") (citation omitted).

19        Indeed, Judge Alsup recently relied on the internal affairs doctrine in applying

20   Massachusetts law to a fiduciary duty claim involving many of the same defendants and another

21   Schwab mutual fund.  *In re Charles Schwab Corp. Sec. Litig*., No. C 08-01510 WHA, 2009 WL

22   ――――――――――――――

         [3] Charles Schwab Investment Management is incorporated in Delaware, but, because

23   investors had no direct financial interest in that entity, Massachusetts law also governs
     Northstar's claims against Charles Schwab Investment Management.  *Batchelder v. Kawamoto*,

24   147 F.3d 915, 920 (9th Cir. 1998) (plaintiff's "prerogative to step into the shoes of the parent
     corporation as derivative plaintiff, or of the subsidiary as double derivative plaintiff, must be

25   determined by the law of the place of incorporation of the company in which he holds an
     interest"); *Park v. Am. Circuit Breaker Corp.*, No. 1:06-CV-00549, 2008 WL 4596234, at *4-5

26   (M.D. N.C. Oct. 14, 2008) (shareholder's fiduciary duty claim governed by law of state of
     incorporation of parent company, not other entities in which shareholder had no direct ownership

27   interest).

28

1    262456, at *15 (N.D. Cal. Feb. 4, 2009), citing *Batchelder v. Kawamoto*, 147 F.3d 915, 920

2    (9th Cir. 1998)).

3        Northstar, however, pleads that California law applies to its fiduciary duty claim. (Sec.

4    Amend. Compl. ¶ 121.) Northstar seems to believe that the fund's shareholders maintained their

5    "primary investment relationship" with the fund's investment advisor, Charles Schwab

6    Investment Management, rather than the fund itself. (*Id.*) It also claims that the advisory

7    agreement between Charles Schwab Investment Management and Schwab Investments "provides

8    that California law shall apply" to that agreement. (*Id.*) Mushing these two unrelated ideas

9    together, Northstar then concludes that California law should also govern shareholders'

10    relationships with all the defendants. (*Id.*)

11        Both of the premises for Northstar's argument are false. Shareholders' primary

12    investment relationship was not with the fund's advisor. Indeed, Northstar does not allege any

13    relationship between the advisor and the fund's shareholders. Investors dealt directly with their

14    brokers and/or financial advisors in purchasing shares of the fund, and they purchased and sold

15    their shares in transactions with Schwab Investments. They never dealt with Charles Schwab

16    Investment Management, which had a contractual relationship with the fund, not its shareholders.

17        Similarly, the California choice of law provision seized upon by Northstar is found in a

18    contract between the fund and Charles Schwab Investment Management. (*See id.* ¶¶ 30, 121.)

19    That agreement does not govern the relationship between fund shareholders and any of the

20    defendants. Indeed, Northstar alleges no agreement between the Charles Schwab Investment

21    Management and individual shareholders. Northstar cannot have California law applied to its

22    claims based on a choice of law provision in an agreement between other parties.

23        **B.**    <u>**Massachusetts Law Does Not Create a Fiduciary Duty Running from a Fund,**</u>

24             <u>**Its Trustees, Or Its Advisor Directly to Fund Shareholders.**</u>

25        Northstar argues that all of the defendants — the fund, its advisors, and its trustees —

26    owed fiduciary duties directly to the fund's shareholders. But, under Massachusetts law, none of

27    these defendants owes a fiduciary duty directly to the fund's investors.

28

1

### 1.      Schwab Investments.

Schwab Investments — the mutual fund — does not owe a fiduciary duty to its

shareholders.[4]  *Howe v. Bank for Int'l Settlements*, 194 F. Supp. 2d 6, 28-29 (D. Mass. 2002)

(court is unaware of any Massachusetts authority "to the effect that a corporation itself owes a

fiduciary duty to its shareholders"); *Powers v. Ryan*, No. Civ. A 00-10295-00, 2001 WL 92230,

at *3 (D. Mass. Jan. 9, 2001) (no case under Massachusetts law "recognizes a fiduciary duty

owed by a corporation to a shareholder"); *see Merola v. Exergen Corp.*, 668 N.E.2d 351, 353 n.2

(Mass. 1996) (claim by minority shareholder dismissed; "the claim for breach of fiduciary duty

lies only against the majority shareholder, not against the corporation"); *Levesque v. Ojala,*

No. 20034485, 2005 WL 3721859, at *22 n.32 (Mass. Super. Ct. Dec. 8, 2005) (shareholder

could not assert fiduciary duty claim against corporation; citing "'no Massachusetts law (and [this

court is] unaware of any) to the effect that a corporation itself owes a fiduciary duty to its

shareholder'"), quoting *Howe*, 194 F. Supp. 2d at 28-29).  This rule holds true in the mutual fund

context:  "there is insufficient basis to find that the law of . . . Massachusetts imposes [a fiduciary]

duty running to the individual investors of a mutual fund."  *Hamilton v. Allen*, 396 F. Supp. 2d

545, 553 n.14 (E.D. Pa. 2005) ("no personal fiduciary duty is owed to individual investors").

The reason for this rule is obvious: "it would make no sense to hold [the company]

responsible for its manager's breaches of a fiduciary duty to [the company] and its members, as it

would shift the cost of that breach to the company (and indirectly to its members), thereby

shifting the cost to the very parties harmed by the breach."  *ULQ, LLC v. Meder*, 666 S.E.2d 713,

718 (Ga. Ct. App. 2008); *see also Radol v. Thomas*, 772 F.2d 244, 258 (6th Cir. 1985) ("Liability

for breach of the directors' fiduciary obligation could not possibly run against the corporation

itself, for this would create the absurdity of satisfying the shareholders' claims against the

directors from the corporation, which is owned by the shareholders").

---

[4] Massachusetts courts apply Massachusetts corporations law to proceedings brought by shareholders of Massachusetts business trusts.  *See, e.g.*, *Halebian v. Berv*, 457 Mass. 620 (2010) (applying statutory business judgment rule in mutual fund shareholder lawsuit against trust and its trustees).  The fund's investors are shareholders of Schwab Investments, and, accordingly, are subject to Massachusetts law.

The fund's shareholders therefore cannot prosecute a claim for breach of fiduciary duty against the fund.[5]

### 2.  Charles Schwab Investment Management.

Massachusetts law likewise does not impose fiduciary duties on an investment advisor who, under contract, performs advisory services for a mutual fund.  Charles Schwab Investment Management — the investment advisor to Schwab Investments — has a contractual relationship, not with investors, but with Schwab Investments.  It has no direct relationship with, and owes no duties to, the shareholders of Schwab Investments.  *See*, *e.g.*, *In re BlackRock Mut. Funds Fee Litig.*, No. 04 Civ. 164, 2006 WL 4683167, at *8 (W.D. Pa. Mar. 29, 2006) ("fiduciary duties regarding management of corporate funds runs to the corporation, not the shareholders"); *Hamilton*, 396 F. Supp. 2d at 552 ("there is insufficient basis to find that the law of either Ohio or Massachusetts imposes such a [fiduciary] duty running to the individual investors of a mutual fund"); *Green v. Nuveen Advisory Corp.*, 186 F.R.D. 486, 490 (N.D. Ill. 1999) (investment advisor owed no duty directly to shareholders).

### 3.  Trustees of Schwab Investments.

Similarly, under Massachusetts law, "a director or officer of a corporation does not occupy a fiduciary relationship to individual stockholders."  *Jernberg v. Mann*, 358 F.3d 131, 135 (1st Cir. 2004), citing 14A Howard J. Alperin and Lawrence D. Shubow, Massachusetts Practice Series, Summary of Basic Law § 8.85 (3d ed. 1996)); *see also Cigal v. Leader Dev. Corp.*, 557 N.E. 2d 1119, 1123 (Mass. 1990) (fiduciary duty ran to corporation/association rather than shareholder/member).  Because the fund trustees function like directors of a corporation, they are subject to the same fiduciary duties as corporate directors.  Sarah E. Cogan and Philip L. Kirstein, "Board Composition and the Role of Fund Directors" ABCs of Mutual Funds 2008, PLI at 14, 16

---

[5] Northstar's argument is similar to one made, and rejected, in *Lapidus v. Hecht*.  232 F.3d at 683.  *Lapidus* involved a "Massachusetts business trust and open-ended series investment company which offer[ed] shares" in a family of mutual funds.  As here, "[e]ach fund [wa]s a series of the trust."  *Id.* at 680.  The Ninth Circuit analogized the investment trust, with its different series of funds, to a corporation with different classes of stock.  It then concluded that, regardless of the fund owned by shareholders, any claim by them "relating to the capital stock as an entirety, *or a particular class of stock*," must be asserted as a derivative claim.  *Id.* at 683.

1  (2008); *see also State St. Trust Co. v. Hall*, 311 Mass. 299, 302-03 (1942); *Jernberg*, 358 F. 3d at

2  135 ("While it is sometimes said that directors and officers owe a fiduciary duty to the

3  corporation and its shareholders, any responsibility to the latter is anchored in the duty to the

4  former."); *Demoulas v. Demoulas Super Markets*, 424 Mass. 501, 529-30 (1997).

5       Thus, none of the defendants owed a fiduciary duty directly to the fund's investors as a

6  matter of law.  They owed their duties directly to the fund.  Neither Northstar nor the fund's

7  shareholders can proceed against the defendants for breach of fiduciary duty.

8       **C.**     **Northstar Has Not Alleged A Breach of Duty by Any Defendant.**

9       Northstar does not allege that it had any fiduciary relationship with any defendant.  To the

10  contrary, Northstar only says that it "relied" on "fiduciary obligations" owed to others.  (Sec.

11  Amend. Compl. ¶ 12.)

12       Northstar's fiduciary breach claim, then, rests on the theory that the defendants owed a

13  fiduciary obligation to the fund's investors not to deviate from the fund's investment objectives.

14  (Sec. Amend. Compl. ¶¶ 122, 123.)  While Northstar's complaint does not explicitly identify the

15  source of this alleged duty, Northstar appears to rely on the requirements of the Investment

16  Company Act of 1940.  (*See* Sec. Amend. Compl. ¶ 146.)  But, under Massachusetts law, a failure

17  to meet a statutory obligation does not necessarily result in a fiduciary breach.  *O'Brien v.*

18  *Pearson*, 449 Mass. 377, 385 n.7 (2007) (violation of statutory duty to obtain shareholder

19  approval prior to sale of corporation's primary asset did not constitute breach of fiduciary duty).

20       Indeed, Judge Alsup rejected precisely this claim in *In re Charles Schwab Corp.*

21  *Securities Litigation*, No. C 08-01510 WHA, slip op. (N.D. Cal. May 15, 2009).  In that case,

22  plaintiffs asserted that defendants breached their fiduciary duty by permitting a concentration in

23  mortgage-backed securities in violation of a mutual fund's investment objectives.  The court

24  concluded, however, that the plaintiffs had "entirely fail[ed] to explain how the alleged violation

25  of the [Investment Company Act] would activate any non-ICA fiduciary duties."  *Id.* at 9.

26       Northstar cannot establish that the defendants breached their purported fiduciary duties to

27  shareholders simply because they allegedly violated a provision of the Investment Company Act.

28

1   But that is all Northstar alleges.  Northstar's claim for breach of fiduciary duty should be

2   dismissed for this reason as well.

3       D.      **The Statute of Limitations Bars Assertion of This Claim Against the**
            **Individual Defendants.**

4

5       Northstar's September 28, 2010 complaint adds to the litigation, for the first time, eleven

6   individual defendants.  The three-year statute of limitations bars assertion of this claim against

7   these new defendants.

8       A claim for breach of fiduciary duty is subject to a three year statute of limitations.

9   Mass. Gen. Laws ch. 260, § 2A.  The limitations period begins to run when the plaintiff has actual

10  knowledge "that she has been injured by the fiduciary's conduct."  *Doe v. Harbor Schs., Inc.*,

11  446 Mass. 245, 254 (2006).  "Actual knowledge of injury suffered at a fiduciary's hands, not

12  knowledge of the consequences of that injury (i.e., a legal claim against the fiduciary), sets the

13  three-year statute of limitations in play."  *Id.* at 256-57.

14      Northstar alleges that, by September 1, 2007, it was apparent that the fund no longer

15  tracked the Lehman index.  Indeed, the complaint includes a chart, "prepared on a Bloomberg

16  terminal," demonstrating "how dramatically the Bond Fund deviated" from the Lehman index

17  after August 31, 2007.  (Sec. Amend. Compl. ¶ 118.)  These facts, known by September 1, 2007,

18  mean Northstar had actual knowledge of potential claims against the individual defendants.  This

19  claim is therefore barred as against the new individual defendants.  *See Cohen v. State St. Bank &*

20  *Trust Co.*, 72 Mass. App. 627, 630-32 (2008) (claim barred against investment advisor where

21  plaintiff knew of the investment objective applied by his investment managers and of his losses);

22  *Micromuse, Inc. v. Micromuse, Plc.*, 304 F. Supp. 2d 202, 215 (D. Mass. 2004) (statute of

23  limitations enforced because plaintiff "had actual knowledge" that it "had not received that to

24  which it was entitled").

25  **V.  NORTHSTAR'S SECOND CLAIM — FOR BREACH OF CONTRACT — FAILS
        BECAUSE A PROSPECTUS IS NOT A CONTRACT.**

26

27      Judge Illston previously dismissed Northstar's breach of contract claim and instructed

28  Northstar "to add more specific allegations regarding the language plaintiff relies on to allege the

MOTION TO DISMISS SECOND AMENDED COMPLAINT       16
CASE NO. CV-08-4119 LHK (PVT)
sf-2914002

1    formation of a contract, as well as each defendants' involvement."  (Feb. 19, 2009 Order at 15.)

2            Northstar has added no "specific allegations" about "the formation of a contract."  (*Id.*)

3    It has not alleged discussions, negotiations, or communications between any investor and Schwab

4    Investments (the contracting party).  It did not add any allegations about contractual terms,

5    consideration, or mutual assent.  And while Northstar now pleads that the contract includes a

6    proxy statement issued in 1997, it has not alleged how this SEC filing was incorporated by

7    reference into the agreements Northstar says shareholders made.

8            Nor did Northstar plead new facts concerning the "involvement" of Schwab Investments

9    in the formation of contracts with investors, or its role in the supposed breach of those contracts.

10   Northstar, in short, did not do what Judge Illston asked.  Its breach of contract claim should be

11   dismissed, this time without leave to amend.

12           **A.       Northstar Does Not Allege the Formation of Contracts with Investors.**

13           Northstar does not allege that it had a contractual relationship with Schwab Investments.

14   Rather, it alleges that it "relied on" contractual obligations supposedly owed to others.  (Sec.

15   Amend. Compl. ¶ 12.)  But Northstar cannot sue for breach of a contract to which it was not a

16   party.  *See*, *e.g.*, *Conder v. Home Sav. of Am.,* 680 F. Supp. 2d 1168, 1174 (C.D. Cal. 2010)

17   (dismissing a breach of contract claim where plaintiff was not in contractual privity with

18   defendant).  This alone requires dismissal of the claim.

19           Northstar's complaint also fails to allege the most fundamental elements of a contract.

20   Northstar's contract theory goes something like this.  Each class member bought shares of the

21   fund according to "the terms of a contract that Schwab Investments would preserve shareholders'

22   voting rights and cause the Fund to continue to adhere to its fundamental investment objectives

23   and policies contained in the 1997 Proxy Statement and reiterated in Prospectuses and in

24   Statements of Additional Information."  (Sec. Amend. Compl. ¶ 143.)  Investors allegedly

25   "accepted the terms of that contract by purchasing shares in the Fund."  (*Id*.)

26           What really happened, of course, is much simpler.  The 1997 proxy statement was a

27   solicitation of shareholder proxies.  Shareholders were asked to provide proxies, or votes, on

28   various proposals, including a proposal to change the fund's name and investment approach.  The

1   proxy statement contained no promises, or bargained-for exchanges, and no rights-creating

2   language.  It was not, in short, a contractual "offer" to be accepted, or rejected, by individual

3   investors.  It was simply a solicitation of votes.  Contract law says "[a]n offer is the manifestation

4   of willingness to enter into a bargain, so made as to justify another person in understanding that

5   his assent to that bargain is invited and will conclude it."  *City of Moorpark v. Moorpark Unified*

6   *School Dist.*, 54 Cal. 3d 921, 930 (1991) (citation and quotation omitted).  The 1997 proxy

7   statement contains no language reflecting a "willingness to enter into a bargain."

8          In any event, Northstar never points to any contract, or any other document, making the

9   fund's 1997 proxy statement, and subsequent SEC filings, part of any contract with investors.

10   How did all these SEC filings become part of each investor's purchase contract?  Northstar does

11   not say.  They were not incorporated by reference.  *See Cariaga v. Local No. 1184 Laborers Int'l*

12   *Union of N. Am.*, 154 F.3d 1072, 1074 (9th Cir. 1998) (language in one document is not

13   incorporated by reference into another document unless the reference is "'clear and

14   unequivocal'") (citation omitted).  And they were not part of any "bargaining" between Schwab

15   Investments and class members — after all, investors had no direct dealings with Schwab

16   Investments, as they purchased their shares through financial advisors or other intermediaries.

17          The Ninth Circuit has, at least twice, concluded that a prospectus is not a contract.

18   *Cohen v. Stratosphere Corp.*, 115 F.3d 695 (9th Cir. 1997), involved the initial public offering of

19   Stratosphere Corporation.  Investors submitted applications to purchase shares in the offering and

20   tendered payment for those shares, but, because the offering was oversubscribed, they "did not

21   receive all of the Units for which they subscribed."  *Id*. at 699.  Plaintiffs argued that the

22   prospectus "was an offer that was accepted when the investors submitted subscription agreements

23   and tendered payment."  *Id*. at 701.  But the Ninth Circuit held the prospectus, plus payment, "did

24   not create enforceable contracts" with investors.  *Id*. at 700–01.  "At most, the Prospectus was a

25   solicitation of offers, to be submitted in the form of subscription agreements."  *Id*. at 701.  As a

26   result, "the mutual assent and intent to be bound that are required for the formation of a contract"

27   were "absent."  *Id*.

28

1    In *McKesson HBOC, Inc. v. New York State Common Retirement Fund, Inc.*,

2    339 F.3d 1087, 1092–93 (9th Cir. 2003), the Ninth Circuit held that a prospectus seeking

3    shareholder approval for a merger was not a contract.  That case involved McKesson's ill-fated

4    acquisition of HBOC and its subsequent efforts to recover "unjust enrichment" from HBOC's

5    former shareholders.  HBOC's shareholders argued that McKesson could not pursue equitable

6    remedies because a contract — the prospectus — governed the parties' relationship.  But, once

7    again, the Ninth Circuit recognized that a prospectus "is a disclosure document (Form S-4)

8    required under the federal securities laws."  *Id*. at 1092.  To be sure, the prospectus was used as a

9    "solicitation of the shareholders' vote," but that did not convert the prospectus "into a contractual

10   offer."  *Id*.  The Ninth Circuit reasoned:

11
> Although the Securities Act refers to a prospectus as a
> communication "which offers any security for sale," "the term
12   > 'offer' has a different and far broader meaning in securities law
> than in contract law."
13

14   *Id.* (citations omitted).

15   Judge Illston noted that these cases "do not broadly hold that these documents can never

16   constitute contracts."  (Feb. 19, 2009 Order at 15.)[6]  What *Cohen* and *McKesson* hold, instead, is

17   that traditional contract law must be applied to determine whether an SEC filing contains the

18   mutual promises, price terms, evidence of mutual assent, and evidence of mutual consideration

19   necessary to the formation of a legally enforceable contract.  Most courts have found that SEC

20   filings — which, after all, are styled as disclosure documents, not agreements — fail these tests.

21   *See, e.g.*, *Fid. Bank Nat'l Ass'n v. Aldrich*, No. Civ. A. 3-95-CV-2566H, 1998 WL 120296, at *2

22   (N.D. Tex. Mar. 5, 1998) (claim that "Merger Agreement, Proxy Statement, and the National

23   Banking Act" created contract rights dismissed because plaintiffs "have not shown the existence

24   of a contract"); *In re U.S. West, Inc. Sec. Litig.*, 201 F. Supp. 2d 302, 309 (D. Del. 2002) (proxy

25

26   ───────────────
   [6] Tender offer proxy statements, for example, have, on some occasions, been held to form
   the basis of a contract with a tendering shareholder.  *See, e.g.*, *Caleb & Co. v. E.I. DuPont De*
27   *Nemours & Co.*, 624 F. Supp. 747, 749-50 (S.D.N.Y. 1985) (assumes that tender offer proxy
   statement is a contractual offer).

28

1   statement was not a promise supporting a claim of promissory estoppel); *Hewitt v. Mobile*

2   *Research Tech., Inc.*, 285 F. App'x 694, 696 (11th Cir. 2008) (unpubl.) ("The 8-K form filed with

3   the Commission is neither a contract nor an assignment").

4          Moreover, the fund's 1997 proxy statement, and other SEC filings, do not bear any of the

5   hallmarks of a contract.  (Calia Decl. Exh. C; July 25, 1997, Schwab Investments Proxy

6   Statement.)  They do not identify anyone as contracting parties.  They do not state the typical

7   terms of a sales contract, like the unit price, total price, or payment terms.  They do not reflect any

8   consideration.  And the fund's SEC filings do not contain specific commitments to performance.

9   To the contrary:  the prospectuses state that the funds reserve certain rights, including the right

10  "[t]o withdraw or suspend any part of the offering made by this prospectus."  (Calia Decl. Exh. A

11  at 40.)

12         These characteristics, typical of SEC filings, led Judge Alsup to dismiss with prejudice an

13  almost identical claim for breach of contract.  *See In re Charles Schwab Corp. Sec. Litig*,

14  No. C 08-01510 WHA, 2009 WL 1371409 (N.D. Cal. May 15, 2009).  As here, the plaintiffs in

15  that case alleged that a Schwab fund's SEC disclosure documents "constituted contracts between

16  shareholders and the fund."  Id. at *2.  As here, the plaintiffs claimed that the contracts included

17  "each and every term of the registration statements and SAIs."  *Id.* at *3.  And, like Northstar,

18  plaintiffs complained that the fund had breached those contracts by increasing its concentration in

19  mortgage-backed securities without a shareholder vote.  *Id.*

20         Judge Alsup held that no contract had been alleged.  He noted that the fund's SEC filings

21  are "*mandatory* regulatory disclosure documents."  *Id.* (emphasis in original).  He observed that

22  "the SEC *requires* Schwab to issue those documents," and that "the Investment Company Act

23  *required* the fund to disclose its concentration policy and *required* that the policy could be

24  changed only via a shareholder vote."  *Id.* at *3 & 4, citing 15 U.S.C. 80a-8, 80a-13(a)(3)

25  (emphasis in original).  Although plaintiffs, like Northstar, had alleged "in conclusory fashion the

26  existence of an overarching contract consisting of a swath of evidently distinct documents,"

27  plaintiffs failed to offer a "coherent theory as to why such documents should be deemed

28  incorporated into a contract with each investor."  *Id*. at *4.  "Given the lack of any plausible

1   allegation as to why the disclosure documents constituted (or were incorporated into) a contract,"

2   Judge Alsup denied plaintiffs leave to amend.  *Id.* at \*5.

3       Northstar's revised contract claim does not include allegations sufficient to show the

4   fund's 1997 proxy statement, and subsequent prospectuses and SAIs, met the requirements

5   necessary for formation of a binding contract.

6         **B.**      <u>**Schwab Investments Had No Involvement in Investors' Purchase**</u>
            <u>**Negotiations.**</u>

7

8       Judge Illston's order instructed Northstar to "add more specific allegations regarding" "the

9   formation of a contract" and "each defendants' involvement."  (Feb. 19, 2009 Order at 15.)

10  Northstar, however, did not add any allegations about the "involvement" of Schwab Investments,

11  the only defendant alleged to have been party to any contract with investors.  (*See* Sec. Amend.

12  Compl. ¶¶ 137-148.)  To the contrary, Northstar's new allegations portray Schwab Investments as

13  incapable of such involvement.  (*See id.* ¶ 121 (Schwab Investments is a "legal fiction" with "no

14  employees, assets, or management capabilities" that "does not act as an independent entity").)

15      Northstar does not say one word about Schwab Investments' role in dealing with

16  investors — for the obvious reason that investors purchased fund shares through investment

17  advisors like Northstar.  Nor does Northstar allege what role Schwab Investments played in the

18  alleged deviations from the fund's investment objectives.  (*See id.* ¶ 146.)  Because Northstar did

19  not comply with Judge Illston's instructions, its breach of contract claim against Schwab

20  Investments should be dismissed without leave to amend.

21        **C.**      <u>**Northstar Alleges No Breach of Any Contract Provision.**</u>

22      Northstar's contract claim focuses on statements contained in a 1997 proxy statement.

23  Northstar never explains how this document became part of purchase agreements Northstar says

24  investors entered into when they bought (or retained) their shares.  (*See* Sec. Amend. Compl.

25  ¶ 145.)

26      But, in some ways, that is the least of Northstar's problems with this theory.  The

27  particular portions of the 1997 proxy statement (and subsequent fund prospectuses and SAIs)

28  quoted by Northstar were changed in September 2006 — that is, exactly one year *before* the

1   beginning of Northstar's proposed class period.  Northstar alleges that the fund's earlier SEC

2   filings prohibited it from investing more than 25 percent of its assets in mortgage-backed

3   securities, and that Schwab Investments allegedly breached this "contract" term when it "caused

4   the Fund to concentrate more than 25% of its net assets in mortgage backed securities, including

5   CMOs, without a shareholder vote." (*Id.* ¶¶ 141, 147.)  But, on September 1, 2006, the fund's

6   SAI was amended to state, explicitly, that the fund would no longer consider "privately-issued

7   mortgage-backed securities" as an industry for purposes of the fund's concentration policy:

8               The funds have determined that mortgage-backed securities issued
             by private lenders do not have risk characteristics that are correlated
9               to any industry and, therefore, the funds have determined that
             mortgage-backed securities issued by private lenders are not part of
10              any industry for purposes of the funds' concentration policies.  This
             means that a fund may invest more than 25% of its total assets in
11              privately-issued mortgage-backed securities, which may cause the
             fund to be more sensitive to adverse economic, business or political
12              developments that affect privately-issued mortgage-backed
             securities.

13

14   (Calia Decl. Exh. B at *8.)  In other words, the fund's SAI was changed to explicitly permit what

15   Northstar claims was earlier prohibited by contract.

16          Investors who purchased on or after August 31, 2007, cannot claim that their so-called

17   contracts with Schwab Investments incorporated by reference the fund's outdated proxy statement

18   and prospectuses, but did not incorporate the fund's then current prospectuses and SAIs which

19   included the language regarding mortgage-backed securities not being treated as an industry.

20   Northstar's breach of contract claim fails for this reason as well.

21   **VI.   NORTHSTAR'S THIRD CLAIM DOES NOT PROPERLY ALLEGE A BREACH
     OF THE COVENANT OF GOOD FAITH AND FAIR DEALING.**

22

23          A claim for breach of the covenant of good faith and fair dealing must be based on the

24   existence of an underlying contract.  *Kim v. Regents of the Univ. of Cal.*, 80 Cal. App. 4th 160,

25   164 (2000) ("the existence of a contractual relationship is a prerequisite for any action for breach

26   of the covenant").

27          Judge Illston previously dismissed Northstar's breach of contract claim.  Accordingly, the

28   Court should also have dismissed Northstar's claim for breach of the covenant of good faith and

fair dealing.  If the Court again concludes that Northstar has failed to plead the existence of an enforceable contract, then it should also dismiss this claim for breach of the covenant of good faith and fair dealing.

Even if Northstar can allege the elements of a breach of contract claim, the breach of covenant claim against Charles Schwab Investment Management must dismissed.  Non-parties to a contract are not subject to an implied covenant of good faith and fair dealing.  *Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 576 (1973).  Because Northstar does not allege that Charles Schwab Investment Management was a party to any contract, the claim against Charles Schwab Investment Management cannot proceed.  (*See* Sec. Amend. Compl. ¶¶ 137-148.)

**VII.   NORTHSTAR WAS NOT A THIRD PARTY BENEFICIARY OF THE ADVISORY AGREEMENT BETWEEN THE FUND AND CSIM.**

Northstar has asserted a state law claim for breach of the management contract between Schwab Investments and Charles Schwab Investment Management, Inc.  This claim is asserted on behalf of fund investors as purported third-party beneficiaries.

There is an advisory agreement between Schwab Investments and Charles Schwab Investment Management.  (Calia Decl. Exh. D; Investment Advisory and Administrative Agreement.)  Indeed, the agreement is publicly available and has been filed with the SEC as an exhibit to Schwab Investments' registration statement.  Northstar, however, has not chosen to attach the agreement or cite any of its terms.  Instead, it alleges, without citation, that this agreement "conferred broad obligations" on Charles Schwab Investment Management, including "management of the Fund in accordance with the Fund's fundamental investment objectives and policies."  (Sec. Amend. Compl. ¶ 157.)  The agreement, in fact, contains no such term.

Northstar also alleges that all the fund's investors were the intended third-party beneficiaries of the agreement.  (*Id.* ¶ 162.)  Non-parties can sue to enforce a contract only if they are the express intended beneficiaries of that contract.  Civil Code section 1559 states: "A contract, made expressly for the benefit of a third person, may be enforced by him at any time

1   before the parties thereto rescind it."[7]  Courts interpreting this provision have consistently held

2   that the word "expressly" means the contract must state the intent to benefit a third-party "in an

3   express manner; in direct or unmistakable terms; explicitly; definitely; directly."  *Smith v.*

4   *Microskills San Diego L.P.*, 153 Cal. App. 4th 892, 898 (2007) (citation omitted); *see Cal.*

5   *Emergency Physicians Med. Group v. Pacificare of Cal.*, 111 Cal. App. 4th 1127, 1138 (2003)

6   (health care provider not express third-party beneficiary of contracts between patients and their

7   insurer); *Ochs v. PacifiCare of Cal.*, 115 Cal. App. 4th 782, 795-96 (2004) (same).

8           The investment advisory agreement between Schwab Investments and Charles Schwab

9   Investment Management does not identify any intended third-party beneficiaries.  And while

10  Northstar alleges the fund's shareholders "were known and intended beneficiaries" of the

11  agreement, Northstar's complaint does not identify any clause stating the agreement was "made

12  expressly for the benefit" of investors.  (*See* Sec. Amend. Compl. ¶ 162.)  Northstar's third-party

13  beneficiary allegations are, therefore, insufficient.   Cal. Civ. Code § 1559.

14          Northstar adds that the fund's shareholders "suffered actual and direct financial damages

15  and injury to their voting rights, as a result of" Charles Schwab Investment Management's alleged

16  breaches of the investment advisory agreement.  (Sec. Amend. Compl. ¶ 165.)  But an alleged

17  injury is not enough to confer third-party beneficiary status.  It "is well settled that Civil Code

18  section 1559 excludes enforcement of a contract by persons who are only incidentally or remotely

19  benefited by it."  *Jones v. Aetna Cas. & Surety Co.*, 26 Cal. App. 4th 1717, 1724 (1994);

20  *Ochs*, 115 Cal. App. 4th at 795 ("incidental beneficiaries of a contractual agreement" cannot sue

21  for breach of contract).

22          Northstar's third-party beneficiary contract claim fails properly to allege the breach of any

23  contractual term, and is asserted on behalf of investors who do not qualify as intended third-party

24  beneficiaries.  It must therefore be dismissed with prejudice.

25

26

27          [7] California law applies pursuant to a choice of law clause in the agreement.  (Calia Decl.
     Exh. D § 11.)

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CONCLUSION**

After granting a motion to dismiss, a court "must . . . decide whether to grant leave to amend." *Berry-McKee v. Walker*, No. C 99-4203 SI, 1999 U.S. Dist. LEXIS 19612, at \*5 (N.D. Cal. Dec. 10, 1999). "Although there is a general rule that parties are allowed to amend their pleadings, it does not extend to cases in which any amendment would be an exercise in futility." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998) (leave to amend denied following dismissal pursuant to Rule 12(b)(6)); *see also In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1097 (9th Cir. 2002), *abrogation on other grounds recognized by South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (dismissal affirmed where it "would [have] be[en] pointless to give the plaintiffs yet another chance to amend"); *Dimmick v. Lungren*, No. C 98-4137 SI, 1999 WL 111793, at \*2 & \*4 (N.D. Cal. Feb. 19, 1999) (complaint dismissed with prejudice where any amendment would be "futile").

Northstar has had already had three chances to plead its complaint — the second time with the benefit of direct judicial guidance, and the third time with the benefit of defendants' motion to dismiss. Its failure to correct the errors identified previously by defendants and this Court strongly suggest it would be "futile" and "pointless" to allow further leave to amend. We therefore respectfully request that Northstar's complaint be dismissed with prejudice.

Dated: November 10, 2010

RICHARD A. SCHIRTZER
QUINN EMANUEL URQUHART &
SULLIVAN, LLP

DARRYL P. RAINS
EUGENE G. ILLOVSKY
MORRISON & FOERSTER LLP

By:  _____/s/ Darryl P. Rains_____
Darryl P. Rains

Attorneys for defendants