Joseph J. Tabacco, Jr. (75484)
jtabacco@bermandevalerio.com
Christopher Heffelfinger (118058)
cheffelfinger@bermandevalerio.com
**BERMAN DEVALERIO**
One California Street, Suite 900
San Francisco, CA  94111
Telephone: 415.433.3200
Facsimile:  415.433.6382

*Attorneys for Plaintiff Northstar Financial Advisors, Inc.*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| NORTHSTAR FINANCIAL ADVISORS, INC., on Behalf of Itself and all Others Similarly Situated, | Case No. 08-cv-04119 LHK |
| Plaintiff, | CLASS ACTION |
| v. | **FOURTH AMENDED CLASS ACTION COMPLAINT** |
| SCHWAB INVESTMENTS; MARIANN BYERWALTER, DONALD F. DORWARD, WILLIAM A. HASLER, ROBERT G. HOLMES, GERALD B. SMITH, DONALD R. STEPHENS, MICHAEL W. WILSEY, CHARLES R. SCHWAB, RANDALL W. MERK, JOSEPH H. WENDER and JOHN F. COGAN,  as TRUSTEES OF SCHWAB INVESTMENTS; and CHARLES SCHWAB INVESTMENT MANAGEMENT, INC., | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

1    Plaintiff, for its Fourth Amended Class Action Complaint, alleges the following upon

2    personal knowledge as to itself and its own acts, and upon information and belief as to all other

3    matters, based upon the investigation made by its attorneys, which included a review of

4    Securities and Exchange Commission ("SEC") filings, news reports and other publicly available

5    materials.

6                                   **NATURE OF THE ACTION**

7        1.      This action is brought by plaintiff Northstar Financial Advisors, Inc. ("Northstar"

8    or "Plaintiff"), individually, and on behalf of persons who owned shares of the Schwab Total

9    Bond Market Fund (the "Fund" or "Index Fund") (Ticker: SWLBX) either (i) as of August 31,

10   2007 (the "Pre-Breach Class") and/or (ii) who acquired those shares at any time from

11   September 1, 2007 through February 27, 2009 (the "Breach Class"), and who were damaged as

12   a result of the Fund's deviation from its stated fundamental investment policies.

13       2.      Defendants are (i) Schwab Investments (the "Trust" or "Schwab Trust"), (ii) the

14   members of the Board of Trustees of Schwab Investments (the "Trustees" or "Schwab

15   Trustees"), and (iii) Charles Schwab Management, Inc. (the "Advisor" or "Schwab Advisor").

16   Defendants are each affiliates of Charles Schwab & Co., Inc. (a publicly traded corporation).

17       3.      The Trust is the sponsor of a series of 94 Schwab-related mutual funds (as of

18   September 21, 2009), including the Index Fund.  See Schwab Investments Proxy Statement

19   dated October 30, 2009 at 21.  The Schwab Advisor is the investment advisor to each of those

20   94 mutual funds, including the Index Fund. The Schwab Advisor is responsible for managing

21   the Fund's assets (and the assets of the other 93 mutual funds) pursuant to an Investment

22   Advisory and Administration Agreement ("IAA") dated June 15, 1994.

23       4.      On or shortly before August 31, 2007, defendants, acting in breach of their

24   fiduciary duties and in violation of shareholders' contractual rights, caused the Fund to deviate

25   from the Fund's fundamental investment objective to "seek to track the investment results" of

26   the Lehman Brothers U.S. Aggregate Bond Index (the "Index") (Ticker: LBUSTRUU) "through

27   the use of an indexing strategy."   The Fund's fundamental investment objectives were only

28

changeable by majority shareholder vote.    The exact date of differential between the Pre-Breach and Breach Periods is a matter for merits and expert discovery.

5.    The Fund's performance deviated from the Index because defendants caused the Fund to maintain investments in high risk non-U.S. agency collateralized mortgage obligations ("CMOs").    The non-U.S. agency CMOs were not part of the Lehman Index and were substantially more risky than the U.S. agency securities and other instruments that comprised the Index.

6.    The Fund's investment objectives (only changeable by majority shareholder vote) also prohibited any concentration of investments of "25% or more of the value of the total assets in any industry" (other than if necessary to track the Index).   Defendants caused the Fund to deviate from that stated fundamental investment objective by maintaining more than 25% of its total assets in non-agency mortgage-backed securities and CMOs.

7.    Defendants' deviation from the Fund's investment objective caused the Fund's shareholders to lose tens of millions of dollars when those non-agency mortgage-backed securities sustained a substantial decline in value.   Investors suffered, as a direct result of defendants' deviation from the Index, a negative 12.64% differential in total return for the Fund compared to the Index for the period September 1, 2007 through February 27, 2009, consisting of a negative total return of 4.80% for the Fund compared to a positive total return of 7.85% for the Index over that same period (including interest payments).

8.    Judge Illston, in her February 19, 2009 opinion granting in part and denying in part defendants' motion to dismiss Northstar's initial complaint, held that plaintiff adequately alleged that defendant Schwab Advisor caused the Fund to deviate from a fundamental investment policy to seek to track the Lehman Brothers bond index without a shareholder vote. *Northstar Financial Advisors, Inc. v. Schwab Investments*, 609 F. Supp. 2d 936, 946 (N.D. Cal. 2009) ("Northstar's allegations are sufficient to state a claim that the Fund's significant investments in non-agency CMOs violated the Fund's investment objective.").

9.     By on or about February 27, 2009, subsequent to the filing of this action, defendants reverted back to the Fund's fundamental investment policy of seeking to track the Lehman Index through an indexing strategy.

10.     Since February 27, 2009, the Fund's assets and performance have substantially tracked the composition and performance of the Index.  The period up to August 31, 1997 is referred to herein as the "Pre-Breach Period" and the period from August 31, 1997 to February 27, 2009 is referred to herein as the "Breach Period."

11.     This action is legally and factually no different than if defendants invested class members' assets in an emerging stock market (or other assets that did not track the Lehman Index).  Defendants failed to adhere to the Fund's clear investment guidelines and should be held accountable for the direct damages caused to class members.

12.     Pursuant to this Court's direction in the March 2, 2011 Order, Northstar amended its Second Amended Complaint to remove any allegations even arguably relating to misrepresentations to class members, and to emphasize that plaintiff's only claims against defendants are for breach of fiduciary duty, for aiding and abetting the breach of fiduciary duty, breach of contract, breach of the covenant of good faith and fair dealing, and for third party beneficiary of contract.  The liability of defendants alleged herein is not predicated on misrepresentations or omissions, or purchases or sales of securities by plaintiff and the members of the Class based thereon or in connection therewith, but rather on the acts of defendants in failing to discharge their responsibilities to effectuate the Fund's fundamental investment objectives and purposes, and to preserve and protect Trust property held by the Trustees for the benefit of plaintiff and the other Class members, the beneficial owners of such property.

13.     Plaintiff has divided its Causes of Action by defendant (the Trustees, the Trust and the Advisor) and by period (the Pre-Breach Period and Breach Period), to clarify exactly what claims are being brought against which defendant based on what facts and which choice of law.  Thus, plaintiff's:

(a)     First Claim for Relief is against the Trustees and the Trust for breach of fiduciary duty on behalf of persons who acquired Fund shares during the Pre-Breach

1   Period and who held those shares as of August 31, 2007 and were damaged
2   thereafter.

3   (b)   Second Claim for Relief is against the Schwab Advisor for breach of fiduciary
4   duty on behalf of persons who acquired Fund shares during the Pre-Breach
5   Period and who held those shares as of August 31, 2007 and were damaged
6   thereafter.

7   (c)   Third Claim for Relief is against the Trustees for aiding and abetting the Schwab
8   Advisor's breach of fiduciary duty on behalf of persons who acquired Fund
9   shares during the Pre-Breach Period and who held those shares as of August 31,
10   2007 and were damaged thereafter.

11   (d)   Fourth Claim for Relief is against the Schwab Advisor for aiding and abetting
12   the Trustee's and the Trust's breach of fiduciary duty on behalf of persons who
13   acquired Fund shares during the Pre-Breach Period and who held those shares as
14   of August 31, 2007 and were damaged thereafter.

15   (e)   Fifth Claim for Relief is against the Schwab Advisor, on a third-party beneficiary
16   theory, for breach of the Investment Advisory and Administration Agreement on
17   behalf of persons who acquired Fund shares during the Pre-Breach Period and
18   who held those shares as of August 31, 2007 and were damaged thereafter.

19   (f)   Sixth Claim for Relief is against the Trust for breach of contract on behalf of
20   persons who acquired Fund shares during the Pre-Breach Period and who held
21   those shares as of August 31, 2007 and were damaged thereafter.

22   (g)   Seventh Claim for Relief is against the Trustees and the Schwab Advisor for
23   breach of the covenant of good faith and fair dealing on behalf of persons who
24   acquired Fund shares during the Pre-Breach Period and who held those shares as
25   of August 31, 2007 and were damaged thereafter.

26   (h)   Eighth Claim for Relief is against the Trustees and the Trust for breach of
27   fiduciary duty on behalf of persons who acquired Fund shares during the Breach
28   Period and who were damaged thereafter.

(i)     Ninth Claim for Relief is against the Schwab Advisor for breach of fiduciary duty on behalf of persons who acquired Fund shares during the Breach Period and were damaged thereafter.

(j)     Tenth Claim for Relief is against the Trustees for aiding and abetting the Schwab Advisor's breach of fiduciary duty on behalf of persons who acquired Fund shares during the Breach Period and were damaged thereafter.

(k)     Eleventh Claim for Relief is against the Schwab Advisor for aiding and abetting the Trustee's and the Trust's breach of fiduciary duty on behalf of persons who acquired Fund shares during the Breach Period and were damaged thereafter.

(l)     Twelfth Claim for Relief is against the Schwab Advisor, on a third-party beneficiary theory, for breach of the Investment Advisory and Administration Agreement on behalf of persons who acquired Fund shares during the Breach Period and were damaged thereafter.

(m)     Thirteenth Claim for Relief is against the Trust for breach of contract on behalf of persons who acquired Fund shares during the Breach Period and were damaged thereafter.

(n)     Fourteenth Claim for Relief is against the Trustees and the Schwab Advisor for breach of the covenant of good faith and fair dealing on behalf of persons who acquired Fund shares during the Breach Period and who were damaged thereafter.

14.     None of plaintiff's claims are pre-empted by the Securities Litigation Uniform Standard Act ("SLUSA") because plaintiff's claims are not based on allegations of "a misrepresentation or omission" or "any manipulative or deceptive device."   *See* 15 U.S.C. § 77p(b).

15.     Even were this Court to find that SLUSA applies to plaintiff's breach of fiduciary duty and aiding and abetting the breach of fiduciary duty claims, those claims are not pre-empted by SLUSA because plaintiff's claims are asserted against the "issuer" of the securities (the Trust) and affiliates of the issuer (the Trustees and the Advisor) under the state law of the

state of formation of the Trust (the Commonwealth of Massachusetts) and relate, among other things, to voting rights of shareholders in the Fund.  *See* 15 U.S.C. § 77p(d)(1).  Any further consideration of the "Delaware carve-out" at this time is premature inasmuch as plaintiff's claims, in any event, are not pre-empted by SLUSA.

16.    Plaintiff's claims are direct on behalf of investors rather than derivative on behalf of the Fund. Plaintiff's claims are predicated on fiduciary and other duties defendants owed as a matter of law directly to plaintiff and the other Class members, as the beneficiaries of the Trust, which duties stand separate and apart from any duties defendants owed to the Trust or Fund. The source of the claim of the rights of plaintiffs and the Class members asserted herein flow from the breaches of duties defendants owed directly to plaintiffs and the Class members. Plaintiff's claims do not flow from breaches of duties defendants owed to the Trust or Fund.

17.    Moreover, neither the Trust nor the Fund owns any assets. Rather the Trustees are the legal titleholders to the property they hold in trust for the benefit of plaintiff and the other Class members, who are certificate holders and the beneficial owners of such property. As provided in the Schwab Investments' Agreement and Declaration of Trust, "the Trustees they will hold all cash, securities and other assets, which they may from time to time acquire in any manner as Trustees hereunder IN TRUST to manage and dispose of the same . . . for the pro rata benefit of the holders from time to time of Shares in this Trust."  Accordingly, defendants' breaches of duty and other misconduct caused harm to the property of plaintiffs and other Class members directly; such harm did not flow through the Trust or Fund.  Investors in the Fund suffered unique injury based on their individual dates of purchase and sale of shares, and the degree to which defendants failed to seek to track the Index during that individual period of share ownership.  The calculation of an individual class member's damages can be made based on a mathematical formula based on the Fund's day-by-day deviation in performance against the performance of the Index, and does not preclude class certification.

18.    To have the recovery from this action be paid to the Trust or the Fund (rather than directly to investors in the Fund) would directly benefit the Schwab Advisor and reward it

for its misconduct, since the Advisor's management fee is based on a percentage of the Fund's assets.

19.     This Court, sitting in diversity, is required to apply California law to plaintiff's claims (including California choice of law).  Although a California court will generally apply the internal affairs doctrine and give deference to the state law of the state of formation of the Trust (Massachusetts), it will also consider California law and determine whether the foreign state's laws adequately protect important California public policies with respect to conduct taking place within California.

20.     Inasmuch as Massachusetts law supports plaintiff's claims, plaintiff has no reason to believe that a California state court would apply California substantive law to any claims that would otherwise be subject to Massachusetts law to protect an important California state public policy.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1332(d)(2) and 1367.  The plaintiff is diverse from at least one of the defendants and the amount in controversy exceeds $5 million.

22.     Venue is properly laid in this District under 28 U.S.C. § 1391(b).  Many of the acts giving rise to the violations of law complained of herein occurred in this District.

## PARTIES

23.     Plaintiff Northstar Financial Advisors, Inc. is a New Jersey corporation with offices at 46 Beachmont Terrace, North Caldwell, NJ 07006.

24.     Northstar is a registered investment advisory and financial planning firm serving both institutional and individual clients. Northstar manages both discretionary and non-discretionary accounts on behalf of investors in its role as an investment advisor.

25.     With respect to its discretionary accounts, which form approximately 50% of its assets under management, Northstar retains discretion over investment decisions.

26.     Northstar had at all relevant times herein purchased and sold securities on behalf of its clients as an independent investment advisor through Charles Schwab's Institutional Advisor Platform.

27.     As of August 31, 2007, Northstar had approximately 240,000 shares of the Fund under its management.  Northstar sold substantially all those shares under its management on April 1, 2008.

28.     Northstar operates under a fee-based structure based on the total value of assets under management.  Northstar is customarily paid on a quarterly basis a .5% to 1.0% annualized management fee based on the valuation of assets under management, including the reported net asset value ("NAV") of the shares of the Fund under Northstar's management.

29.     By way of Assignment of Claim, dated December 8, 2008 (the "Assignment"), Henry Holz ("Holz"), a client of Northstar, purchased shares in the Fund, beginning on February 7, 2007 with 3,932.927 shares and with additional monthly dividend reinvestments, totaling 4,181.043 shares in the Fund upon sale on April 1, 2008.  Holz assigned to Northstar "all of the Assignor's right, title and interest in any claim that the Assignor has or could have against Schwab Investments, Charles Schwab & Co., Inc., Charles Schwab Investment Management, Inc. and Schwab Total Bond Market Fund …."  The Assignment of Claim was amended on September 28, 2010 to include claims asserted against the Trustees of Schwab Investments.

30.     Defendant Schwab Investments (the "Trust" or "Schwab Trust"), at all relevant times since at least 1997, has had its headquarters at 101 Montgomery Street, San Francisco, CA 94104.  Schwab Investments is an investment trust, organized under Massachusetts law and is a registered investment company under the Investment Company Act of 1940 (the "ICA" or "Investment Company Act") and the sponsor of the Fund.  The Trust consists of a series of 94 Schwab-related mutual funds, including the Index Fund.

31.     The Schwab Trust is an affiliate of and subject to the control of The Charles Schwab Corporation (the "Schwab Corp.") (a publicly-owned corporation).

32.     The Index Fund is a series of the Schwab Trust and a member of the Charles Schwab Family of Funds.  The Index Fund is managed by the Schwab Trust and advised by the Schwab Advisor.

33.     The Trust is an unincorporated business organization created by an instrument of trust by which property is held and managed by trustees for the benefit of persons who are or become the holders of the beneficial interests in the trust estate.

34.     The Trust issues redeemable securities in the Index Fund.  Sales of the shares of the Index Fund can only be made by the Schwab Trust to investors pursuant to a Registration Statement and Prospectus filed with the SEC.  Investors in the Schwab Fund cannot sell or trade shares among themselves.

35.     As a matter of law, investors in the Trust enter into a voluntary, consensual, and contractual relationship with the Trust.

36.     The Index Fund reports its portfolio holdings to investors on a semi-annual basis in reports issued as of month-end August and February.  The Index Fund also reports its portfolio holdings as of month-end May and November in Form N-Q filings with the SEC, which are not mailed to investors.  The Fund does not report the dates or prices at which it purchases or sells securities.

37.     The Schwab Trust at times refers to itself and its affiliated companies as "Schwab" and to the Index Fund and other Schwab mutual funds under the trade name "the Schwab Funds," or as members of the Schwab "Family of Funds" or the "Schwab mutual fund complex."

38.     Individual Defendant Charles Schwab founded the Schwab Corp. in 1971, and has served as its Chairman since 1978.  Defendant Schwab has also served as Schwab Corp.'s CEO at various times, including from 2004 through October 2008.

39.     According to the Schwab Corp.'s Proxy Statement dated May 13, 2010, defendant Schwab owned approximately 200 million shares, or approximately 17.0% of the outstanding common stock of the Schwab Corp.  That Proxy Statement recites that defendant Schwab's "vision continues to drive the company's growth."

40.     Defendant Schwab was also identified in the Proxy Statement as Chairman and trustee of The Charles Schwab Family of Funds and Schwab Investments (the Trust), among other Schwab related entities.

41.     Defendant Schwab, by virtue of his stock ownership in the Schwab Corp. and his positions as Chairman and trustee of the Schwab Corp. and the Trust, among other affiliated entities, was at all relevant times a controlling person of the Schwab Corp. and its affiliated entities (including the Trust and the Schwab Advisor).

42.     The Schwab Trust is managed by a Board of Trustees, who are the vested owners of the property of the Trust, which they manage and hold for the benefit of the Fund's shareholders.  The Schwab Trust and its Board of Trustees are responsible for supervising the Fund's investment advisor and monitoring the Fund's compliance with its stated investment objectives and policies.  As further alleged below, the Trustees of the Schwab Trust owe fiduciary duties directly to investors in the Fund as a matter of law.  According to Statements of Additional Information filed with the SEC, the Trustees of the Trust "are responsible for protecting shareholder interests."  *See, e.g.,* Statement of Additional Information, dated November 15, 2005, as amended December 9, 2005, at 51.

43.     Defendants Mariann Byerwalter, Donald F. Dorward, William A. Hasler, Robert G. Holmes, Gerald B. Smith, Donald R. Stephens, Michael W. Wilsey, Charles R. Schwab and Randall W. Merk, were, according to the Fund's Prospectus dated November 15, 2007, the Trustees of the Fund as of August 31, 2007.  Each Trustee serves with respect to all or substantially all the Schwab mutual funds.

44.     The following chart identifies each Trustee as of August 31, 2007, the Trustee's length of service, the number of discrete portfolios in the Schwab fund complex that the Trustee oversaw at that time (with the Fund being one such portfolio), and the Trustee's annual compensation derived as a Trustee of the Schwab-related mutual funds:

| **Name of Trustee** | **Years of <u>Service</u>** | **Portfolios Overseen** | **Annual Compensation** |
|---|---|---|---|
| Byerwalter, Mariann | Since 2000 | 70 | $230,642 |
| Dorward, Donald F. | Since 1989 | 59 | $202,775 |

| **Name of Trustee** | **Years of Service** | **Portfolios Overseen** | **Annual Compensation** |
|---|---|---|---|
| Hasler, William A. | Since 2000 | 70 | $230,642 |
| Holmes, Robert G. | Since 1989 | 59 | $202,775 |
| Smith, Gerald B. | Since 2000 | 59 | $202,775 |
| Stephens, Donald R. | Since 1989 | 59 | $202,775 |
| Wilsey, Michael W. | Since 1989 | 59 | $202,775 |
| Schwab, Charles R. | Since 1989 | 59 | N/A |
| Merk, Randall W. | Since 2005 | 70 | N/A |

45. According to the Amended Prospectus dated June 13, 2008, defendants Joseph H. Wender and John F. Cogan joined the Board of Trustees in 2008, replacing defendants Holmes and Dorward as Trustees. The Trustee defendants are referred to herein in the aggregate as the "Trustees" or "Schwab Trustees."

46. Given the large number of Schwab-related funds that each Trustee is responsible for overseeing, the Trustees likely spend only a few hours (if not minutes) discharging their fiduciary duties to each fund each year.

47. The Trustees were first added as defendants in plaintiff's Second Amended Complaint dated September 28, 2010. Plaintiff's claims for breach of fiduciary duty against the Trustees are subject to a three year statute of limitations under Massachusetts law that begins to run when plaintiff has "actual knowledge" that he has been injured by the fiduciary's conduct. The deviation in the reported NAV for the Fund compared to the Index prior to September 28, 2007 was not greater than 1%, and certainly insufficient to establish plaintiff's actual knowledge of the claim against the Trustees prior to September 28, 2007.

48. The Fund's shareholders and shareholders of other Schwab mutual funds are not required to vote annually or periodically on appointment of Trustees. Rather, those Trustees are selected by, or selected with the acquiescence of, defendant Schwab and the Schwab Corp. as controlling persons of the Trust.

49. Because Trustee-defendants Schwab and Merk are interested trustees employed by the Schwab Corp., their compensation is not paid by the Schwab Trust, but rather by the parent corporation or other affiliates of the Schwab Corp.

50. The Schwab Trust contracts out its management and operation functions to other "Schwab" companies affiliated with the Schwab Corp.

51.     Defendant Charles Schwab Investment Management, Inc. (the "Advisor" or "Schwab Advisor"), at all relevant times since at least 1997, has had its headquarters at 101 Montgomery Street, San Francisco, CA 94104.  The Schwab Advisor is the investment advisor to the Fund.  The Schwab Advisor receives a management fee from the Fund.  The Schwab Advisor's management fee is 0.25% of the Fund's net assets, or approximately $3.5 million per year.  In addition, the Index Fund incurs 0.28% of net assets in other expenses, for a total annual operating expense of 0.53%.  The Schwab Advisor is responsible for preserving shareholders' voting rights and adhering to the Fund's stated investment objectives and policies for the benefit of the Fund's shareholders.  The Advisor is wholly owned by the Schwab Corp., and is under the control of the Schwab Corp. and defendant Schwab.  Because of their common ownership and control, the Advisor is an affiliate of the Trust and the Schwab Corp.

52.     The Investment Advisor is the investment manager for all the Schwab mutual funds.

53.     All defendants repeatedly assumed fiduciary obligations in SEC filings disseminated to shareholders and repeatedly thanked investors for placing their "trust" in Schwab.  *See, e.g.,* Annual Report to Shareholders dated August 31, 1998 and Semiannual Report to Shareholders dated February 28, 1999 (Charles Schwab:  "We continue to do everything we can to warrant the trust you have placed in us."); Annual Report dated August 31, 1999 ("We continue to do our best to warrant the trust you have placed in us."); Semiannual Report dated February 28, 2002 (Charles Schwab:  "Thank you for the trust that you have placed in Schwab Funds") as President and CEO of the Schwab Advisor; Annual Report, dated August 31, 2002 (Charles Schwab:  "We appreciate your trust and will continue to work hard to earn it."); Semiannual Report dated February 28, 2003 (Charles Schwab:  "Your continued trust and support mean a great deal to us, and it's our goal to respond to them by doing everything we can to help you meet your financial goals"; and Randall W. Merk (President and CEO of the Schwab Advisor):  "Times of market volatility and uncertainty about world events seem to demand a heightened level of diligence on the part of investment professionals.  At Schwab Funds we are keenly aware to this, and we're working hard to uphold the best interests of our

shareholders"); Semiannual Report dated February 27, 2004 (Randall W. Merk:  "[T]rust of our shareholders is very important to us, and we invest with your outcomes in mind.  Thank you for investing with us, and once more I want to remind you that we operate our business with the highest ethical standards and an unwavering commitment to you."); Annual Report dated August 31, 2004 (Charles Schwab:  "[W]e recognize that your investment reflects the trust you have placed in those of us responsible for managing your wealth, and it is a responsibility that we assume with the utmost integrity.;" Evelyn Dilsaver (President and CEO of the Schwab Advisor):  "["Y]our trust is very important to us and I will do all I can to earn and maintain that trust."); Semiannual Report dated February 28, 2007 to Shareholders (Charles Schwab:  "Thank you for placing your trust in Schwab Funds."); defendant Merk in a semi-annual letter for the period ending February 28, 2009 addressed to "Dear Shareholder", stated "Thank you for investing with us."

54.    The Board of Trustees' fiduciary obligations to the Class were summarized in the Schwab Investments' Definitive Proxy Statement for the Fund, filed with the SEC on March 24, 2000, as follows:

> The Board of Trustees is responsible for protecting the interests of the funds' shareholders.  The Board meets regularly to review the funds' activities, contractual arrangements and performance.

55.    Indeed, Charles Schwab, personally, in his letter to shareholders appended to the August 31, 2007 Annual Report filed by Schwab Investments with the SEC, on behalf of all Schwab-related entities, thanked the Fund's shareholders for "entrusting us with their assets."

56.    Schwab Investments further acknowledged in its August 31, 2007 Annual Report to Shareholders that "as part of their fiduciary duties with respect to fund fees, fund boards are required to evaluate the material factors applicable to their decision to approve an investment advisory agreement."

57.    The Trustees and the Schwab Advisor had direct fiduciary duties to investors, as well, in that the Schwab Advisor had control of the property of the investors and a disparity of sophistication and access to data about the composition of the Index and the Fund's securities holdings.

58.   The Fund's prospectuses explained that the Investment Advisor provided advisory services in that it utilized discretion and control to "oversee[ ] the asset management and administration of the funds."

59.   Defendants, and their affiliates, in their public statements, including the public statements quoted herein, fail to distinguish between the various Schwab-related entities, acknowledging that investors are dealing with one Schwab entity comprising the various Schwab affiliates.  *See also* 1997 Proxy Statement at 1 ("At Schwab, we realize that we earn your trust day-by-day."); at 2 ("Schwab has long been an advocate of indexing as an investment strategy.").

60.   Undeniably, the Schwab Trustees, the Schwab Trust and the Schwab Advisor owed Class members a fiduciary duty to manage the Fund's assets with the care and prudence of a professional in like circumstances and to adhere to the Fund's investment objectives and policies.  Given the disparity of access to information and expertise in investment matters, the Schwab Trustees, the Schwab Trust and the Schwab Advisor were obligated to exercise diligence and good faith in their management of investors' assets.

61.   The Schwab Trust, the Schwab Trustees, and the Schwab Advisor had actual knowledge that the assets safeguarded to Schwab for investment were of great significance to investors and would be used for such once-in-a-lifetime events as to purchase a first home, pay for college, or retirement.

62.   Defendants acknowledge on the "Charles Schwab" website that Schwab Investments, by creating the Fund "to fill the fixed income component of [investors'] asset allocation plan" were acting in a fiduciary capacity:  "Professional investors consider creating an investment plan vital for performing their fiduciary duty to clients."  *See*  "Investing Principle 1:  A Blueprint for Success," by Mark W. Riepe, CFA, Senior Vice President, Schwab Center for Financial Research, March 10, 2008.

63.   Although the Schwab Trust and the Schwab Trustees were responsible for reviewing the performance and fees of the Investment Advisor on an annual basis, they have never selected a non-Schwab entity as a Schwab fund's investment manager.  Rather, the Trust

1   and Trustees merely rubber-stamp the determinations made by the Schwab Corp. and defendant

2   Schwab.

3        64.    On January 11, 2011, the SEC charged Charles Schwab Investment Management

4   (the Advisor) with, *inter alia*, deviating from the YieldPlus Fund's concentration policy without

5   obtaining the required shareholder approval.  The YieldPlus Fund, was a Schwab short-term

6   bond fund that was also managed by the Schwab Advisor, which caused the YieldPlus Fund to

7   concentrate its portfolio in non-U.S. agency CMO's. The Advisor and other Schwab affiliates

8   agreed to pay more than $118 million to settle the SEC's charges.  *See* Litigation Release No.

9   21806; *SEC v. Charles Schwab Investment Management, Charles  Schwab & Co., Inc., and*

10  *Schwab Investments,* Civil Action No. CV-11-0136 EMC (N.D. Cal. Jan. 11, 2011).   The

11  Release  further  stated  that  the  $118  million  settlement  would  be  distributed  to  "harmed

12  investors."

13       65.    The SEC also commenced an action on January 11, 2011 against defendant

14  Randall Merk, a Schwab Trustee and President of the Schwab Advisor, and Damon Daifotis,

15  lead portfolio manager (on behalf of the Schwab Advisor ) for the YieldPlus Fund, as well as

16  Chief Investment Officer for Fixed Income for the Schwab Advisor.  The SEC Complaint

17  alleges, *inter alia*, that Daifotis aided and abetted the Advisor's violation of the YieldPlus

18  Fund's concentration policy without a shareholder vote.  Litigation Release No. 21805; *SEC v.*

19  *Kimon P. Daifitos And Randall Merk,* Civil Action No. CV-11-0137 MEJ (N.D. Cal. Jan. 11,

20  2011).   The  SEC  stated  in  that  Complaint  (para. 16),  with  respect  to  two  of  the  Schwab

21  Advisor's most senior officers, that "[u]nless enjoined, defendants are likely to engage in future

22  violations of the securities laws."

23       66.    Notwithstanding  the  Advisor's  failure  to  contest  allegations  that  it  failed  to

24  comply with fundamental anti-concentration investment policies, and the pending action against

25  two senior officers of the Advisor, the Trustees failed to take action against the Schwab Advisor

26  – either by terminating the Investment Advisory Agreement or seeking additional compensation

27  for fund shareholders.

28

67.     efendants do not dispute the existence of some fiduciary duty to investors.  As the Court noted in the March 2, 2011 Order, defendants acknowledge that a breach of fiduciary duty claim could be asserted against the "proper defendants."  *See* Order at 20; Defendants' Reply Mem. In Support of Motion to Dismiss Complaint (ECF No. 47) at 12.

### CLASS ACTION ALLEGATIONS

68.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3):

(a) on the First through Seventh Causes of Action, individually and on behalf of a class consisting of all persons or entities who purchased shares of the Fund on or prior to August 31, 2007, and who continued to hold their shares as of August 31, 2007 (the Pre-Breach Class), and were damaged thereafter; and

(b) on the Eighth through Fourteenth Causes of Action, individually and on behalf of a class consisting of all persons or entities who purchased shares of the Fund during the period September 1, 2007 through February 27, 2009 (the "Breach Class") and were damaged thereafter.

Excluded from the Class are the defendants herein, any subsidiaries or affiliates of the defendants in which defendants or their affiliates have a controlling ownership interest, officers and directors of any of the defendants, heirs, successors and assigns of any of the defendants or their officers and directors, and any entity in which any defendant has a controlling ownership interest.

69.     August 31, 2007 is the last day of the fiscal year during which the Fund first began deviating from its required fundamental investment policy to seek to track the Lehman Index through the use of an indexing strategy.  February 27, 2009 is the approximate date by which the Fund reverted back to its required fundamental investment policy to seek to track the Lehman Index through the use of an indexing strategy.

70.     None of plaintiff's causes of action allege claims (a) based on a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security, or

(b) that the defendants used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

71.     The Eighth through Fourteenth Causes of Action include investors who purchased their shares after August 31, 2007 and prior to February 27, 2009 – during which period the Fund deviated from the Index. This "Breach Class's" claims also are not precluded by SLUSA, as the Breach Class's claims are based on breach of fiduciary duty, aiding and abetting the breach of fiduciary duty, breach of contract, breach of the covenant of good faith and fair dealing, and their rights as third party beneficiaries of contract and do not allege any claims based on a misrepresentation or omission of a material fact or manipulative or deceptive device.

72.     Plaintiff's causes of action also fall under the "Delaware carve-out" under SLUSA (15 U.S.C. 77p(d)(1)) and are thus not precluded by SLUSA, even if this Court were to find that SLUSA is otherwise applicable to this Complaint.

73.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of members of the Class is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, the Fund had over $1.5 billion in assets, and approximately 150 million shares outstanding, as of August 31, 2007.  Plaintiff thereby concludes that there are thousands of members located throughout the United States in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by defendants or other affiliated Schwab entities and may be notified of the pendency of this action by mail.

74.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of state law that is complained of herein.

75.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class litigation.

76.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the Trustees, the Schwab Trust or the Schwab Advisor caused the Index Fund to deviate from an investment objective or policy that could only be changed by a shareholder vote;

(b)    Whether the Trustees, the Schwab Trust or the Schwab Advisor were obligated to cause the Fund to track the Lehman Brothers U.S. Aggregate Bond Index using an indexing strategy;

(c)    Whether the Index Fund's investments tracked the Lehman Brothers U.S. Aggregate Bond Index using an indexing strategy;

(d)    Whether the Trustees, the Schwab Trust or Schwab Advisor concentrated investments in the Fund in excess of 25% of its total assets in any one industry;

(e)    Whether non-agency mortgage-backed securities comprise one or more than one "industry;"

(f)    Whether agency and non-agency mortgage-backed securities comprise one or more than one "industry;"

(g)    Whether members of the Class are third party beneficiaries of the investment advisory contract between the Schwab Trust and the Schwab Advisor;

(h)    Whether the Trustees, the Schwab Trust or the Schwab Advisor owed members of the Class fiduciary duties;

(i)    Whether the Trustees, the Schwab Trust or the Schwab Advisor violated fiduciary duties owed to Class members;

(j)    Whether the Schwab Advisor aided and abetted the Trustees' and the Schwab Trust's breaches of fiduciary duties owed to Class members;

(k)    Whether the Trustees aided and abetted the Schwab Advisor's breaches of fiduciary duties owed to Class members;

(l)     Whether the Trust breached contractual duties with class members or breached the covenant of good faith and fair dealing;

(m)     Whether any of plaintiff's claims is precluded by SLUSA; and

(n)     Whether the members of the Class have sustained damages, and, if so, what is the proper measure thereof.

77.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  As the damages suffered by any individual Class member may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in managing this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background and History Prior to the 1997 Shareholder Vote

78.     The Schwab Total Bond Market Fund was initiated by the Schwab Trust on March 5, 1993 under a predecessor name – the "Schwab Long-Term Government Bond Fund" (the "Government Bond Fund") – as an actively managed bond fund.

79.     The "investment objective" of the Government Bond Fund was "to provide a high level of current income consistent with preservation of capital by investing primarily in securities issued or guaranteed by the United States Government, its agencies or instrumentalities and repurchase agreements covering those securities."

80.     According to documents filed with the SEC, the Government Bond Fund's "investment objective … [was] fundamental and [could not] be changed without approval by holders of a majority of the Fund's outstanding voting shares."

81.     Schwab was unable to successfully market the Government Bond Fund.

82.     As of August 31, 1997, after more than four years of operations, the Government Bond Fund had only $24.8 million in investment assets.

### The Formation of the Schwab Total Bond Market Index Fund

83.     The Schwab Trust, pursuant to Proxy Statement dated July 25, 1997, sought a shareholder vote to amend the Government Bond Fund's fundamental investment objective.

The September 25, 1997 Proxy Statement (the "1997 Proxy Statement") was appended by defendants as Exhibit C to the moving Declaration of Kevin A. Calia in support of their motion to dismiss the Second Amended Complaint (ECF No. 152-3).

84.     The Board of Trustees of the Trust, in Proposal No. 2 contained in the Proxy Statement, proposed to change the Fund's then-existing fundamental investment objective to a fundamental investment objective "to attempt to provide a high level of current income consistent with preservation of capital by seeking to track the investment results of a particular bond index through the use of an indexing strategy." The Proxy Statement identified that bond index as the "Lehman Brothers Aggregate Bond Index."

85.     Pursuant to that Proposal 2, the Fund's "fundamental investment objective" was only changeable by shareholder vote.

86.     The Lehman Index is "a broad market-weighted index which encompasses the following classes of investment grade fixed-income securities:  U.S. Treasury and agency securities, corporate bonds, international (dollar-denominated) bonds, agency mortgage-backed securities, and asset-backed securities, all with maturities greater than one year." *See* 1997 Proxy Statement at 18.

87.     The Lehman Index is a proprietary Lehman Brothers index, consisting of over 9,000 separate instruments whose exact composition is not generally available to investors.  The composition of the Index changes from time-to-time.

88.     The "investment process of indexing" and proposed "indexing strategy" was described in the Proxy Statement, as follows:

> If the proposed investment objective is approved, the Funds would not be managed according to traditional methods of "active" investment management, which involve the buying and selling of securities based upon economic, financial, and market analyses and investment judgment.  Instead, *the Investment Manager would utilize a "passive" or "indexing" investment approach, to attempt to track the investment performance of each Fund's Index through statistical sampling and other procedures.*  The Funds would be unable to hold all of the individual issues which comprise the Indexes because of the large number of securities in the Indexes.  *Each Fund would hold a portfolio of fixed-income securities that is managed to closely approximate its Index's "characteristics" of coupon rate, duration, sector, quality and optionality (or convexity).*  [1997 Proxy Statement at 22; emphasis added.]

89.     The Fund's "indexing strategy" required that "[b]efore purchasing or selling a security, the [Schwab Advisor] would analyze each security's characteristics and determine whether purchasing or selling the security would help the Fund's portfolio approximate the characteristics of the Index:"

> Before purchasing or selling a security, the Investment Manager would analyze each security's characteristics and determine whether purchasing or selling the security would help the Fund's portfolio approximate the characteristics of the Index.  As a result, when the Fund's portfolio as a whole is considered, the Fund's performance and risk is expected to be similar to its Index's performance and risk.

90.     The July 25, 1997 Proxy Statement also proposed a change (Proposal No. 3) in the Fund's "fundamental investment policies and investment restrictions" regarding concentration of investments.

91.     Previously, the Fund's fundamental investment policies and investment restrictions barred investments of "25% or more of the value of its total assets … in any industry" (excluding investments in U.S. government, agency, or instrumentality securities):

> Each Fund may not:
>
> Purchase securities (other than securities issued or guaranteed by the U.S. Government, its agencies or instrumentalities) if, as a result of such purchase, 25% or more of the value of its total assets would be invested in any industry.  Securities issued by governments or political subdivisions or authorities of governments are not considered to be securities subject to this industry concentration restriction.  [1997 Proxy Statement at 32.]

92.     The proposed change incorporated the definition of "concentration" under the Investment Company Act of 1940, and gave the Fund discretion to concentrate investments of greater than 25% of total assets in any industry only if necessary to track the Lehman Index:

> Each Fund may not concentrate investments in a particular industry or group of industries, or within one state (except with respect to the Total Bond Market Index Fund and the Short Term Bond Market Index Fund, to the extent that the index which each Fund seeks to track is also so concentrated) as concentration is defined under the Investment Company Act of 1940 or the rules or regulations thereunder, as such statute, rules or regulations may be amended from time to time.  [1997 Proxy Statement at 32.]

93.     The rationale for the proposed change was to incorporate the SEC's interpretation of the term "concentration" from the Investment Company Act of 1940 (which at the time was 25%) to give the Fund greater flexibility in the event of future SEC changes in interpretation:

The current self-designated restriction specifically limits a Fund's investments to less than 25% of a Fund's total assets in a particular industry. Under the Proposal, this current self-designated restriction will be eliminated and replaced by a more flexible proposed restriction. The proposed restriction would continue to prevent each Fund from "concentrating" its investments in a single industry or in a state, except if the Index that the Fund tracks is "concentrated" in a particular industry or state. Further, to provide flexibility, the concept of "concentration" in a Fund's proposed restriction is articulated so as to always track the current meaning of "concentration" under the 1940 Act.

At present, "concentration" is interpreted under the 1940 Act in a manner consistent with each Fund's current self-designated restriction (25% or more). However, in order to achieve greater flexibility (if for instance the percentage limitation were to be changed by the SEC), the proposed restriction would eliminate the specific percentage reference and instead define the term "concentration" with respect to the meaning conferred under the 1940 Act. Because the present interpretation of the percentage limit of "concentration" under the 1940 Act is the same as the current concentration restriction, it is not expected that there would be any immediate impact on a Fund's operations as a result of approving this aspect of the proposed concentration restriction. Any future change in operations would occur only if the SEC staff changed its interpretation of what constitutes "concentration." [1997 Proxy Statement at 32-33.]

94.    There has been no subsequent change in the SEC's interpretation of what constitutes "concentration."

95.    As reported by the Trust in a Prospectus Supplement, shareholders of the Schwab Government Fund approved Proposal Nos. 2 and 3, including the "[a]mendment of [the] Fund's fundamental investment objective resulting in changing [the] Fund from a Government bond fund to a bond index fund that would include Government and other fixed income securities."

96.    The Prospectus Supplement emphasized that "[a]s a result of the shareholder vote, each Fund's fundamental investment objective is amended to allow each Fund to pursue an indexing strategy:"

As a result of the amendment referenced in Item No. 1 above, as of November 1, 1997, the name of the … Schwab Long-Term Government Bond Fund will be changed to the Schwab Total Bond Market Index Fund. As a result of the shareholder vote, [the] Fund's fundamental investment objective is amended to allow [the] Fund to pursue an indexing strategy. … Schwab Total Bond Market Index Fund will seek to track the Lehman Brothers Aggregate Bond Index. The index is market-weighted and designed to track the performance of broad segments of the bond market.

97.    The 1997 Proxy Statement imposed detailed obligations on the Schwab Trust, the Trustees, and the Schwab Advisor on how the Fund would be managed. The Proxy Statement also created voting rights on behalf of the Fund's existing and future shareholders in that the

investment objectives and fundamental policies could not thereafter be changed without a majority shareholder vote.

98.     Once those fundamental objectives were adopted, they significantly restricted the discretion which the Agreement and Declaration of Trust conferred on the Schwab Trust to manage the Fund.  Moreover, the Fund's registration statement and prospectuses reflected the adoption of those restrictions.  The acquisition of the securities by shareholders constituted an acceptance of the offer.

99.     Defendants' obligations to "seek to track" the Index "through the use of an indexing strategy," and investors' voting rights, were fundamental to the Index Fund's shares, only changeable by shareholder vote, and appurtenant to each subsequent share issued by the Schwab Trust.

100.     Sections 8(b) and 13(a)(2) and (3) of the Investment Company Act of 1940 also imposed contractual and fiduciary obligations on the Trust, the Trustees and the Advisor to adhere to the Fund's stated investment policies.

101.     The government agency mortgage-backed securities referenced in the Fund's SEC documents (including the June 1997 Proxy) and included in the Lehman Index were issued by the Governmental National Mortgage Association ("Ginnie Mae"), the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac").  Ginnie Mae, Fannie Mae, and Freddie Mac are U.S. Government agencies (also known as Government Sponsored Enterprises ("GSEs")) established by Congress to facilitate residential mortgage loans.

102.     The GSEs purchased and securitized mortgage loans that met established criteria for creditworthiness.

103.     The government agency mortgage-backed securities referenced in the 1997 Proxy as contained in the Index were fixed income pass-through securities, in which all principal and interest on the underlying mortgages is passed through to the mortgage-backed securities investor.

104.    The type of securities that could be acquired by those agencies are restricted by their government charters.

105.    Ginnie Mae benefits from an express U.S. Government guarantee of payment on its securities.

106.    Both Fannie Mae and Freddie Mac benefit from an implied U.S. Government guarantee of payment on their securities by virtue of their status as U.S. chartered institutions.

107.    The mortgage-backed securities issued by Ginnie Mae, Fannie Mae and Freddie Mac, and maintained in the Lehman Index, had the highest credit quality among mortgage-backed securities.

108.    From August 31, 1997 through August 31, 2007, the Fund substantially performed in a manner that was consistent with the Index, returning an annualized rate of 5.75% compared to 6.04% for the Index.

109.    The Index Fund's net assets increased from $24 million as of August 31, 1997 to approximately $1.5 billion as of August 31, 2007 – a period over which the Trust, the Trustees and the Schwab Advisor managed the Fund to track the Index using an indexing strategy.

110.    By August 31, 2007, the Trustees and Advisor began to cause the Fund to deviate from the Index.  As of August 31, 2007, 37.0% of the total assets of the Fund were invested in non-agency collateralized mortgage obligations ("CMOs").

111.    From August 31, 2007 through February 27, 2009, the Fund underperformed the Index by 12.64%, consisting of a negative total return of 4.80% for the Fund compared to a positive total return of 7.85% for the Index over that same period (including interest payments).

112.    The CMOs in the Fund's portfolio were not issued by government agencies. Rather they were issued by financial institutions through subsidiaries and backed by residential loans that did not conform to the agencies' high loan underwriting requirements.

113.    Moreover, non-agency CMOs purchased by the Schwab Advisor for the Fund represented tranches of mortgage-backed securities, such as principal only or interest only payments, and were significantly more risky than the agency-issued mortgage-backed securities that were part of the Index.  Included in the Fund's portfolio were CMOs sponsored by such

subprime lenders as Citigroup, Merrill Lynch, Countrywide, Bear Stearns, IndyBank, Lehman, and Washington Mutual.

114.    This concentration of investments in mortgage backed securities was also in violation of the Fund's stated investment objectives that the Fund's assets not be concentrated more than 25% in any one industry (except as required by the Index).

115.    Thus, the Fund's investment in non-agency CMOs as of August 31, 2007 violated shareholders' voting rights, as set forth in the 1997 Proxy Statement, and the Fund's fundamental investment objective to "seek to track" the Index "through the use of an indexing strategy."  The non-agency CMOs maintained by the Index Fund as of August 31, 2007 did not "closely approximate" the "characteristics" of the securities in the Lehman Index.

116.    Indeed, analyses of other bond index funds that represented that they track the Lehman Bros. Aggregate Bond Index indicate that the Lehman Index had a 0% weighting in non-agency mortgage-backed securities, while defendants' weighting amounted to 37.0% in August of 2007.

117.    By November 30, 2008, the Index Fund had lessened its exposure to non-agency CMOs to 3.4% of total assets.  The liquidation of the non-agency CMO portfolio into an illiquid bond market for risky securities coincided with the further deviation in performance of the Fund.

118.    The Fund's investments in CMOs were made at a time when there was increased concern with the quality of mortgage lending.

119.    For example, on June 28, 2007, the Department of the Treasury, Federal Reserve System, Federal Deposit Insurance Corporation, and National Credit Union Administration, issued a joint Statement on Subprime Mortgage Lending "to address subprime mortgage products and lending practices."

120.    The Fund's investment in non-agency CMOs as of August 31, 2007, in light of all circumstances, was speculative, irresponsible and a gross deviation from the Fund's fundamental investment policies and a breach of the defendants' fiduciary duties.

121.    The following chart, prepared on a Bloomberg terminal, comparing the Fund's change in total return to the Lehman Index's change in total return over the period December 31, 2004 through February 27, 2009, demonstrates how closely correlated the Fund was to the Index until August 2007 and how dramatically the Fund began to deviate from the Index beginning in the second half of 2007 through February 27, 2009.



122.    The magnitude of under performance of the Fund in relation to the Index was not the result of unforeseen economic circumstances, but rather the gross deviation by the Schwab Advisor from the Fund's stated investment objective, by investing 37.0% of the Fund's total assets in non-agency CMOs as of August 31, 2007.

123.    After about February 27, 2009, the Fund reverted back to its required fundamental investment policy to seek to track the Lehman Index through the use of an indexing strategy. Since February 27, 2009, the Fund's performance has substantially tracked the performance of the Index.

## FIRST CLAIM FOR RELIEF

### (ON BEHALF OF THE PRE-BREACH CLASS FOR BREACH OF FIDUCIARY DUTY AGAINST THE SCHWAB TRUSTEES AND THE TRUST)

124.   Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

125.   Plaintiff asserts this First Claim for Relief against the Schwab Trustees and the Trust for breach of fiduciary duty.  This Claim for Relief is brought on behalf of investors who continued to own shares of the Fund as of August 31, 2007 and were damaged thereafter.

126.   Plaintiff predicates this claim based on the law of the Commonwealth of Massachusetts, under which Schwab Investments is organized.

127.   At all relevant times, the Schwab Trustees were trustees of Schwab Investments, a Massachusetts Business Trust of which plaintiff and the other Class members were the beneficiaries at all relevant times.  In their capacity as trustees of Schwab Investments, the Schwab Trustees were responsible for the oversight of the Fund's investments, the oversight of the activities of the Schwab Advisor and discharging the obligations of the Trust, including ensuring that the Trust's property, which they held and managed for the benefit of holders of the Fund's shares, the beneficial owners of such property, was invested prudently and in accordance with the Fund's fundamental investment objectives and policies, and that such investment objectives and policies were not changed without requisite shareholder vote.  As set forth in, *inter alia*, Schwab Investments' Definitive Proxy Statement for the Fund, filed with the SEC on March 24, 2000, "[t]he Board of Trustees is responsible for protecting the interests of the funds' shareholders."  By virtue of the foregoing, the Schwab Trustees owed fiduciary duties directly to plaintiff and the other Class members.

128.   Defendant Charles Schwab, in his capacity both as a trustee and as a major shareholder, had the ability at all relevant times through his stock ownership in Schwab Corp. and control over its affiliates, including the Schwab Advisor, to control the actions and affairs of Schwab Investments, and he actually exercised such control.  By virtue of such control, defendant Charles Schwab owed fiduciary duties to plaintiff and the other members of the Class separate and apart from the fiduciary duties he owed arising from his role as a Schwab Trustee.

129.   Plaintiff and the members of the Class placed confidence and repose in the fidelity, integrity, advice and judgment of all of the Schwab Trustees and Trust.  The Schwab Trustees and Trust actively sought that such confidence and repose be placed in them, and accepted and assumed such confidence.  The Schwab Trustees and Trust undertook to protect the interests and rights of the Fund's shareholders and to safeguard the property of Schwab Investments and the assets of the Fund, over which they had control.  The Schwab Trustees and Trust understood that the Fund's shareholders were reliant on them for the operation of the Fund and for the discharge of the Fund's fundamental investment objectives and policies.  The Schwab Trustees and Trust had knowledge superior to the Fund's shareholders regarding the composition of the Fund's holdings and the compliance with the Fund's fundamental investment objectives and policies.   By virtue of the foregoing, a confidential fiduciary relationship existed between the Schwab Trustees and Trust, on the one hand, and plaintiff and the other members of the Class, on the other.  The Trust also owed fiduciary duties to plaintiff and the other members of the Class by virtue of its affiliation with and being controlled by or under the common control of or with the Trustees, defendant Charles Schwab and the Schwab Corp.

130.   The fiduciary duties imposed on the Schwab Trustees and Trust included, *inter alia*:

(a)   the duty to ensure that the property of the Trust held by the Trustees for the benefit of plaintiff and the other Class members, the beneficial owners of such property, was invested in accordance with the Fund's fundamental investment objectives and policies;

(b)   the duty to use reasonable care to preserve and maintain the property of the Trust held by the Trustees for the benefit of plaintiff and the other Class members, the beneficial owners of such property;

(c)   the duty to manage and invest the property of the Trust held by the Trustees for the benefit of plaintiff and the other class members, the beneficial owners of such

property, with the highest integrity and in the best interests of plaintiff and the other Class members;

(d)    the duty to deal fairly, honestly and in good faith with plaintiff and the other Class members, the beneficial owners of the property held in trust;

(e)    the duties of loyalty; and

(f)    the duty to avoid placing themselves in situations involving a conflict of interest with plaintiff and the other Class members.

131.   By engaging in the conduct herein alleged above, beginning on or about August 31, 2007, the Schwab Trustees and Trust breached their fiduciary duties: they failed to ensure that the property of the Trust held by the Trustees for the benefit of plaintiff and the other Class members, the beneficial owners of such property, was invested in accordance with the Fund's fundamental investment objectives and policies; they made or permitted or authorized investments of trust property that were speculative, irresponsible and risky; they failed to preserve and protect Trust property; and they changed the Fund's fundamental investment objectives and policies without obtaining required shareholder authorization.

132.   The liability of defendants for the fiduciary duty breaches hereinabove alleged is not predicated on misrepresentations or omissions, or purchases or sales of securities by plaintiff and the members of the Class based thereon or in connection therewith, but rather on the acts of defendants in failing to discharge their responsibilities to effectuate the Fund's fundamental investment objectives and purposes, and to preserve and protect Trust property held by the Trustees for the benefit of plaintiff and the other Class members, the beneficial owners of such property.

133.   The conduct of each of the defendants named in this claim was with willful misfeasance, bad faith, gross negligence, or reckless disregard of their duties, entitling plaintiff and the members of the Class to exemplary and punitive damages.

134.   As a direct and proximate result of the foregoing conduct, plaintiff and the members of the Class have sustained damage and pray for the relief hereinafter specified.

**SECOND CLAIM FOR RELIEF**

**(ON BEHALF OF THE PRE-BREACH CLASS FOR BREACH
OF FIDUCIARY DUTY AGAINST THE SCHWAB ADVISOR)**

135.   Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

136.   Plaintiff asserts this Second Claim for Relief against the Schwab Advisor for breach of fiduciary duty.  This Claim for Relief is brought on behalf of investors who continued to own shares of the Fund as of August 31, 2007 and were damaged thereafter.  Plaintiff is predicating this claim based on the law of the Commonwealth of Massachusetts, under which Schwab Investments is organized.

137.   At all relevant times, the Schwab Advisor acted as investment advisor and administrator of Schwab Investments, and, in such capacity, oversaw and had control of the property of Schwab Investments, including the Fund's assets.  As set forth in the Investment Advisory and Administration Agreement between Schwab Investments and the Schwab Advisor:

> Subject to the direction and control of the Board of Trustees of the Trust, the Investment Adviser will supervise or perform for the Schwab Funds all aspects of the operations of the Schwab Funds except for those performed by the custodian for the Schwab Funds under the Custody Agreement, provide general economic and financial analysis and advice to the Schwab Funds, and provide a continuous investment program for the Schwab Funds, including investment research and management as to all securities and investments and cash equivalents in the Schwab Funds.

138.   Under the Investment Advisory and Administration Agreement, the Schwab Advisor was given, accepted and had delegated responsibility for the investment and preservation of the property of Schwab Investments, including to invest the Trust's property for the benefit of holders of the Fund's shares, the beneficial owners of such property, prudently and in accordance with the Fund's stated fundamental investment objectives and policies.  Such agreement specifically charged the Schwab Advisor with "determin[ing] from time to time what securities and other investments will be purchased, retained, or sold by the Schwab Funds."  This agreement mandated that the Fund's assets be invested in accordance with the Fund's stated fundamental investment objectives and policies by prohibiting the Schwab Advisor from

1    entering any sub-advisory agreement unless any such sub-advisor agreed to "adhere to such

2    guidelines as may be established by the Investment Adviser from time to time to insure

3    compliance with applicable investment objectives, policies and restrictions of the Trust and the

4    Schwab Funds."

5        139.   In view of its functions and responsibilities outlined above, the Schwab Advisor

6    owed fiduciary duties directly to plaintiff and the other Class members.  In fact, the Investment

7    Advisory and Administration Agreement obligated the Advisor "to use the same skill and care

8    in providing … services as it would use in providing services to fiduciary accounts if it had

9    investment responsibilities for such accounts."

10       140.   Plaintiff and the members of the Class placed confidence and repose in the

11   fidelity, integrity, advice and judgment of the Schwab Advisor.  The Schwab Advisor actively

12   sought that such confidence and repose be placed in it, and accepted and assumed such

13   confidence and repose.  The Schwab Advisor undertook to protect the interests and rights of the

14   Fund's shareholders and to safeguard the property of Schwab Investments and the assets of the

15   Fund, over which it had control.  The Schwab Advisor understood that the Fund's shareholders

16   were reliant on it for the operation of the Fund and for the discharge of the Fund's fundamental

17   investment objectives and policies.  The Schwab Advisor had knowledge superior to the Fund's

18   shareholders regarding the composition of the Fund's holdings and the compliance with the

19   Fund's fundamental investment objectives and policies.   By virtue of the foregoing, a

20   confidential fiduciary relationship existed between the Schwab Advisor, on the one hand, and

21   plaintiff and the other members of the Class, on the other.

22       141.   The fiduciary duties imposed on the Schwab Advisor included, *inter alia*:

23       (a)     the duty to ensure that the property of the Trust held by the Trustees for the

24                benefit of plaintiff and the other Class members, the beneficial owners of such

25                property, was invested in accordance with the Fund's fundamental investment

26                objectives and policies;

27

28

(b)     the duty to use reasonable care to preserve and maintain the property of the Trust held by the Trustees for the benefit of plaintiff and the other Class members, the beneficial owners of such property;

(c)     the duty to manage and invest the property of the Trust held by the Trustees for the benefit of plaintiff and the other Class members, the beneficial owners of such property, with the highest integrity and in the best interests of plaintiff and the other Class members;

(d)     the duty to deal fairly, honestly and in good faith with plaintiff and the other class members, the beneficial owners of the property held in trust;

(e)     the duties of loyalty; and

(f)     the duty to avoid placing itself in situations involving a conflict of interest with the plaintiff and the other Class members.

142.   By engaging in the conduct herein alleged above, beginning on or about August 31, 2007, the Schwab Advisor breached its fiduciary duties:  it failed to ensure that the property of the Trust held by the Trustees for the benefit of plaintiff and the other Class members, the beneficial owners of such property, was invested in accordance with the Fund's fundamental investment objectives and policies; it made or permitted or authorized investments of trust property that were speculative, irresponsible and risky; it failed to preserve and protect Trust property; and it changed the Fund's fundamental investment objectives and policies without obtaining required shareholder authorization.

143.   The liability of the Schwab Advisor for the fiduciary duty breaches hereinabove alleged is not predicated on misrepresentations or omissions, or purchases or sales of securities by plaintiff and the members of the Class based thereon or in connection therewith, but rather on the acts of the Schwab Advisor in failing to discharge its responsibilities to effectuate the Fund's fundamental investment objectives and purposes, and to preserve and protect Trust property held by the Trustees for the benefit of plaintiff and the other Class members, the beneficial owners of such property.

144.   The conduct of the defendant named in this claim was with willful misfeasance, bad faith, or gross negligence, or reckless disregard of their duties, entitling plaintiff and the members of the Class to exemplary and punitive damages.

145.   As a direct and proximate result of the foregoing conduct, plaintiff and the members of the Class have sustained damage and pray for the relief hereinafter specified.

### THIRD CLAIM FOR RELIEF

**(ON BEHALF OF THE PRE-BREACH CLASS FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST THE SCHWAB TRUSTEES)**

146.   Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

147.   Plaintiff asserts this Third Claim for Relief against the Schwab Trustees for aiding and abetting breaches of fiduciary duty. This Claim for Relief is brought on behalf of investors who continued to own shares in the Fund as of August 31, 2007 and were damaged thereafter.   Plaintiff predicates this claim based on the law of the Commonwealth of Massachusetts, under which Schwab Investments is organized.

148.   As hereinabove alleged in the Second Claim for Relief, the Schwab Advisor breached its fiduciary duties to plaintiff and the members of the Class.  Defendant Schwab Trustees knew of such breaches and actively participated in, rendered substantial assistance to, or encouraged such breaches of fiduciary duty by the Schwab Advisor, by enabling the Schwab Advisor to invest in assets that did not track the Index, to the degree that the Schwab Trustees could not reasonably be held to have acted in good faith.

149.   The liability of the Schwab Trustees for aiding and abetting the fiduciary duty breaches hereinabove alleged is not predicated on misrepresentations or omissions, or purchases or sales of securities by plaintiff and the members of the Class based thereon or in connection therewith, but rather on the acts of defendants in failing to discharge their responsibilities to effectuate the Fund's fundamental investment objectives and purposes, and to preserve and protect Trust property.

150.    The conduct of each of the defendants named in this claim was with willful misfeasance, bad faith, gross negligence, or reckless disregard of their duties, entitling plaintiff and the members of the Class to exemplary and punitive damages.

151.    As a direct and proximate result of the foregoing conduct, plaintiff and the members of the Class have sustained damage and pray for the relief hereinafter specified.

## FOURTH CLAIM FOR RELIEF

### (ON BEHALF OF THE PRE-BREACH CLASS FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST THE SCHWAB ADVISOR)

152.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

153.    Plaintiff asserts this Fourth Claim for Relief against the Schwab Advisor for aiding and abetting breaches of fiduciary duty.  This Claim for Relief is brought on behalf of investors who continued to own shares in the Fund as of August 31, 2007 and were damaged thereafter.   Plaintiff predicates this claim based on the law of the Commonwealth of Massachusetts, under which Schwab Investments is organized.

154.    As hereinabove alleged in the First Claim for Relief, the Schwab Trustees breached their fiduciary duties to plaintiff and the members of the Class.  Defendant Schwab Advisor knew of such breaches and actively participated in, rendered substantial assistance to, or encouraged such breaches of fiduciary duty by the Schwab Trustees, by maintaining investments in  securities that did not track the Index, to the degree that the Schwab Advisor could not reasonably be held to have acted in good faith.

155.    The liability of the Schwab Advisor for aiding and abetting the fiduciary duty breaches hereinabove alleged is not predicated on misrepresentations or omissions, or purchases or sales of securities by plaintiff and the members of the Class based thereon or in connection therewith, but rather on the acts of defendants in failing to discharge their responsibilities to effectuate the Fund's fundamental investment objectives and purposes, and to preserve and protect Trust property.

156.   The conduct of the Schwab Advisor in participating in, substantially assisting and encouraging the Schwab Trustee's fiduciary duty breaches was with willful misfeasance, bad faith, gross negligence, or reckless disregard of their duties, entitling plaintiff and the members of the Class to exemplary and punitive damages.

157.   As a direct and proximate result of the foregoing conduct, plaintiff and the members of the Class have sustained damage and pray for the relief hereinafter specified.

### FIFTH CLAIM FOR RELIEF

**(ON BEHALF OF THE PRE-BREACH CLASS AS A THIRD PARTY BENEFICIARY OF THE INVESTMENT ADVISORY AGREEMENT AGAINST THE SCHWAB ADVISOR)**

158.   Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

159.   Plaintiff asserts this Fifth Claim for Relief as a third party beneficiary of the Investment Advisory Agreement against the Schwab Advisor.  This Claim for Relief is brought on behalf of investors who continued to own shares in the Fund as of August 31, 2007 and were damaged thereafter.

160.   The Schwab Advisor managed the investments of the Fund pursuant to an Investment Advisory Agreement dated June 15, 1994 between the Investment Advisor and Schwab Investments.   The Investment Advisory Agreement was appended by Schwab Investments as an exhibit to a Registration Statement filed with the SEC on December 29, 1997. The Investment Advisory Agreement is incorporated by reference herein as if appended to this Complaint.

161.   The Investment Advisory Agreement required the Schwab Advisor to manage the Fund consistent with the Fund's fundamental investment objectives and policies to "seek to track" the Index "through the use of an indexing strategy" and not  "concentrate" more than 25% of the Fund's total assets in "investments in a particular industry or group."

162.   Pursuant to Section 3 of the Investment Advisory Agreement, the Schwab Advisor was required to:

(a)   "supervise or perform … all aspects of the operations of the Schwab Funds;"

(b)   "provide general economic and financial analysis and advice to the [Fund];"

(c)   provide a "continuous investment program for the Schwab Funds, including investment research and management as to all securities and investments and cash equivalents in the [Fund];"

(d)   "More particularly, … determine from time to time what securities and other investments will be purchased, retained or sold" by the Fund;

(e)   "assist in all aspects of the operations of the [Fund];"

(f)   comply "with all applicable Rules and Regulations of the SEC;" and

(g)   comply with the provisions of the Investment Company Act of 1940 in buying or selling portfolio securities.

163.   The 1997 Proxy Statement referenced the Schwab Advisor's obligations under the Investment Advisory Agreement to adhere to the Fund's fundamental investment policies:

(a)   "the Investment Manager would utilize a "passive" or "indexing" investment approach, to attempt to track the investment performance of each Fund's Index through statistical sampling and other procedures."

(b)   "Before purchasing or selling a security, the Investment Manager would analyze each security's characteristics and determine whether purchasing or selling the security would help the Fund's portfolio approximate the characteristics of the Index."

(c)   "Over the long term, the Investment Manager will seek a correlation between the performance of each Fund, as measured by its net asset value, including the value of its dividend and capital gain distributions, and that of its Index of 0.9 or better."

(d)   "The Investment Manager will monitor the performance of each Fund versus that of its Index on a regular basis."

164.   The IAA explicitly provides that it will become effective only after "it has been approved by a vote of a majority of the outstanding voting securities of such Schwab Fund, in accordance with the requirements under the 1940 [Investment Company] Act."  This suffices to

1    establish that the shareholders have more than a "remote" relationship to the contract between

2    the Schwab Trust and the Schwab Advisor.  Rather, it indicates the direct relationship that the

3    shareholders have with the IAA and the fact that they are the actual beneficiaries of the IAA.

4        165.    According to the 1997 Proxy Statement, the Schwab Advisor purportedly

5    undertook to establish an indexing strategy in the best interest of shareholders, and had the

6    requisite ability to manage the Fund to track the Index.

7        166.    It would make no sense if the Schwab Advisor were free to deviate from the

8    Fund's fundamental investment objectives during its management of the Fund.

9        167.    The Investment Advisory Agreement (Section 3) also authorized the Schwab

10    Advisor to select and contract with other investment advisors ("Sub-Advisors") to manage one

11    or more of the Schwab funds.  The Schwab Advisor was required in that regard to obligate the

12    Sub-Advisors to adhere to any "guidelines … to insure compliance with applicable investment

13    objectives, policies and restrictions of the Trust and the Schwab Funds."  Since the Investment

14    Advisory Agreement required Sub-Advisors, who were engaged at the discretion of the Schwab

15    Advisor, to comply with the Fund's investment objectives, it is clear that the Schwab Advisor

16    was under the same obligation.

17        168.    Inasmuch as Schwab Investments issued and redeemed shares of the Fund on a

18    daily basis at its reported NAV, the Fund's shareholders were subjected to direct financial

19    injury as a result of the Schwab Advisor's management of the Fund in a manner that was

20    inconsistent with the Fund's fundamental investment objective.

21        169.    The Schwab Advisor breached the terms of the Investment Advisory Agreement

22    (a) by failing to invest the Fund's assets consistent with the Fund's fundamental investment

23    policy to "seek to track" the Index "through the use of an indexing strategy" and (b) by

24    "concentrating" more than 25% of the Fund's total assets in "investments in a particular

25    industry or group."

26        170.    Investors in the Fund were intended third party beneficiaries of the Investment

27    Advisory Agreement.

28

171.     Defendant Merk (Schwab Advisor's CEO), and other officers of Schwab Advisor, repeatedly wrote letters to the Fund's shareholders contained in the Fund's annual and semiannual reports and addressed the Fund's shareholders as "Dear Shareholders."  Defendants and their affiliates held themselves out as one Schwab entity with contractual obligations to investors.

172.     For example, in a letter to shareholders in the Schwab Trust's August 31, 2005 Annual Report to Shareholders, defendant Charles Schwab acknowledged the direct obligations and commitment of the Schwab Investor to the shareholders of the Schwab mutual funds:

> Schwab Funds is managed by Charles Schwab Investment Management, Inc., one of the largest mutual fund managers in the U.S.  Our portfolio managers share a passion for market analysis and use some of the most sophisticated financial models in the country. I am proud of their depth of experience, which reflects an average tenure of more than 15 years in the investment industry.  *Furthermore, I am impressed with the commitment that our managers bring to the stewardship of the funds, for you, their shareholders*. [Emphasis added.]

173.     Shareholders have an investment relationship with the Schwab Advisor, which had the actual responsibility for managing the Fund's assets, trust property held by the Trustees for the benefit of shareholders, the beneficial owners of such property.

174.     Class members suffered actual and direct financial damages and injury to their voting rights, as a result of the Investment Advisor's breach of Section 3 of the Investment Advisory Agreement by failing to manage the Fund's assets in a manner consistent with the Fund's fundamental investment objectives and policies.

175.     The liability of the Investment Advisor for its breach of the Investment Advisory Agreement hereinabove alleged is not predicated on misrepresentations or omissions, or purchases or sales of securities by plaintiff and the members of the Class based thereon or in connection therewith, but rather on the acts of the Schwab Advisor in failing to discharge its contractual obligations to manage the Fund in a manner that would effectuate the Fund's fundamental investment objectives and purposes, and to preserve and protect Trust property.

176.     As a direct and proximate result of the foregoing conduct, plaintiff and the members of the Class have sustained damage and pray for the relief hereinafter specified.

**SIXTH CLAIM FOR RELIEF**

**(ON BEHALF OF THE PRE-BREACH CLASS FOR BREACH OF CONTRACT AGAINST THE TRUST)**

177.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.  This Court is asserted on behalf of members of the Pre-Breach Class for breach of contract.

178.    The 1997 Proxy Statement created voting rights for the Fund's investors.

179.    Proposal Number 2 of the 1997 Proxy Statement formed the terms of a contract between the Schwab Trust and investors in the Fund that if investors voted in favor of changing the Fund's fundamental investment objective to seek "to track the investment results of the [Index] through use of an indexing strategy", then Schwab Investments would cause the Fund to conform to that objective.

180.    Investors in the Fund accepted that offer by voting in favor of the change in investment objective.  <u>See</u> Proxy Statement at 3 ("[T]he Total Bond Market Index Fund … would seek to track the Lehman Brothers Aggregate Bond Index.").

181.    In its 1997 Proxy Statement, Schwab Investments set forth in detail the meaning of the term "indexing strategy" that could only be changed by shareholder vote.  Thus, for example, on page 22 of the Proxy Statement, Schwab Investments stated that promise "[b]efore purchasing or selling a security, the Investment Manager would analyze each security's characteristics and determine whether purchasing or selling the security would help the Fund's portfolio approximate the characteristics of the Index."

182.    Proposal Number 3 of the 1997 Proxy Statement also formed the terms of a contract whereby Schwab Investments covenanted that, subject to shareholder vote, the Fund "may not" "[p]urchase securities (other than securities issued or guaranteed by the U.S. Government, its agencies or instrumentalities) if, as a result of such purchase, 25% or more of the value of its assets would be invested in any industry."

183.    The Fund's shareholders accepted the terms of that contract by voting in favor of those fundamental investment policies.

1      184.    Subsequent to the 1997 proxy vote, Schwab Investments continued to offer

2   shares in the Fund pursuant to the terms of a contract that Schwab Investments would preserve

3   shareholders' voting rights and cause the Fund to continue to adhere to its fundamental

4   investment objectives and policies contained in the 1997 Proxy Statement; these same terms

5   were also included in Prospectuses and in Statements of Additional Information (as quoted

6   above).  Investors accepted the terms of that contract by purchasing shares in the Fund.

7      185.    The terms of that contract are contained in the 1997 Proxy Statement, which

8   established the contractual relationship between Schwab Investments and Class members, and

9   were reiterated in Schwab Investments' subsequent SEC filings, including the January 15, 1998

10   Prospectus, and in each subsequent Prospectus and Statement of Additional Information

11   incorporated by reference into and made a part of the Prospectus.

12      186.    The aforesaid provisions of the 1997 Proxy Statement constituted contractual

13   terms, where existing investors retained shares and new investors purchased shares in

14   consideration of the contractual obligations not to change fundamental investment objectives

15   without a shareholder vote.

16      187.    Federal law also provides support for the terms of the contract.  Section 8 of the

17   Investment Company Act directs an investment company to recite in its Registration Statement

18   "all investment policies of the registrant…, which are changeable only if authorized by

19   shareholder vote," as well as all policies that "the registrant deems matters of fundamental

20   policy."  15 U.S.C. § 80a-8(b) (2) & (3).  Section 13 prohibits a registered investment company

21   from deviating from any such policies "unless authorized by the vote of a majority of its

22   outstanding voting securities."  15 U.S.C. §80a 13.

23      188.    Beginning on or about August 31, 2007, Schwab Investments violated the terms

24   of the contract with the Fund's shareholders as set forth in the 1997 Proxy Statement and

25   subsequent prospectuses and SAIs, as more fully described above, by directing the purchases or

26   allowing the Schwab Advisor to direct the purchases of securities that deviated from the

27   composition of the Lehman Brothers U.S. Aggregate Bond Index and caused the Fund to

28

1   concentrate more than 25% of its net assets in mortgage backed securities, including CMOs,

2   without a shareholder vote.

3       189.   By virtue of the wrongful conduct of defendants, plaintiff and the members of

4   the Pre-Breach Class sustained injury to their voting rights and money damages in connection

5   with their ownership of shares in the Fund.

6   <u>**SEVENTH CLAIM FOR RELIEF**</u>

7   **(ON BEHALF OF THE PRE-BREACH CLASS AGAINST THE TRUST AND**
    **THE INVESTMENT ADVISOR DEFENDANTS FOR BREACH OF**
8   **COVENANT OF GOOD FAITH AND FAIR DEALING)**

9       190.   Plaintiff repeats and realleges the allegations contained in the foregoing

10  paragraphs as if fully set forth herein.  This Count is asserted on behalf of members of the Pre-

11  Breach Class for breach of the covenant of good faith and fair dealing.

12      191.   Each of the Trust and the Investment Advisor have contractual obligations to

13  members of the Pre-Breach Class as alleged in the Fifth and Sixth Claims for Relief.   The

14  covenant of good faith and fair dealing is an implied term in those contracts.

15      192.   Defendants, in violation of the covenant of good faith and fair dealing, engaged

16  in speculation with the Fund's assets by investing more than 25% of the Fund's total assets in

17  CMO securities that were not contained in the Lehman Index, and engaged in such speculation

18  without a shareholder vote.

19      193.   By virtue of the wrongful conduct of defendants, plaintiff and the members of

20  the Class sustained money damages in connection with their ownership of shares in the Fund.

21  <u>**EIGHTH CLAIM FOR RELIEF**</u>

22  **(ON BEHALF OF THE BREACH CLASS FOR BREACH OF**
    **FIDUCIARY DUTY AGAINST THE SCHWAB TRUSTEES AND THE TRUST)**
23

24      194.   Plaintiff repeats and realleges the allegations contained in the foregoing

25  paragraphs as if fully set forth herein.

26      195.   Plaintiff asserts this Eighth Claim for Relief against the Schwab Trustees and the

27  Trust for breach of fiduciary duty.  This Claim for Relief is brought on behalf of investors who

28  acquired Fund shares during the Breach Period and were damaged thereafter.

196.    Plaintiff predicates this claim based on the law of the Commonwealth of Massachusetts, under which Schwab Investments is organized.

197.    At all relevant times, the Schwab Trustees were trustees of Schwab Investments, a Massachusetts Business Trust of which plaintiff and the other Class members were the beneficiaries at all relevant times.   In their capacity as trustees of Schwab Investments, the Schwab Trustees were responsible for the oversight of the Fund's investments, the oversight of the activities of the Schwab Advisor and discharging the obligations of the Trust, including ensuring that the Trust's property, which they held and managed for the benefit of holders of the Fund's shares, the beneficial owners of such property, was invested prudently and in accordance with the Fund's stated fundamental investment objectives and policies, and that such investment objectives and policies were not changed without requisite shareholder vote.   As set forth in, *inter alia*, Schwab Investments' Definitive Proxy Statement for the Fund, filed with the SEC on March 24, 2000, "[t]he Board of Trustees is responsible for protecting the interests of the funds' shareholders."   By virtue of the foregoing, the Schwab Trustees owed fiduciary duties directly to plaintiff and the other Class members.

198.    Defendant Charles Schwab, in his capacity both as a trustee and as a major shareholder, had the ability at all relevant times through his stock ownership in Schwab Corp. and control over its affiliates, including the Schwab Advisor, to control the actions and affairs of Schwab Investments, and he actually exercised such control.   By virtue of such control, defendant Charles Schwab owed fiduciary duties to plaintiff and the other members of the Class separate and apart from the fiduciary duties he owed arising from his role as a Schwab Trustee.

199.    Plaintiff and the members of the Class placed confidence and repose in the fidelity, integrity, advice and judgment of all of the Schwab Trustees and Trust.   The Schwab Trustees and Trust actively sought that such confidence and repose be placed in them, and accepted and assumed such confidence and repose.   The Schwab Trustees and Trust undertook to protect the interests and rights of the Fund's shareholders and to safeguard the property of Schwab Investments and the assets of the Fund, over which they had control.   The Schwab Trustees and Trust understood that the Fund's shareholders were reliant on them for the

operation of the Fund and for the discharge of the Fund's fundamental investment objectives and policies.   The Schwab Trustees and Trust had knowledge superior to the Fund's shareholders regarding the composition of the Fund's holdings and the compliance with the Fund's fundamental investment objectives and policies.   By virtue of the foregoing, a confidential fiduciary relationship existed between the Schwab Trustees and Trust, on the one hand, and plaintiff and the other members of the Class, on the other.   The Trust also owed fiduciary duties to plaintiff and the other members of the Class by virtue of its affiliation with and being controlled by or under the common control of or with the Trustees, defendant Charles Schwab and the Schwab Corp.

200.   The fiduciary duties imposed on the Schwab Trustees and Trust included, *inter alia*:

(a)   the duty to ensure that the property of the Trust held by the Trustees for the benefit of plaintiff and the other Class members, the beneficial owners of such property, was invested in accordance with the Fund's fundamental investment objectives and policies;

(b)   the duty to use reasonable care to preserve and maintain the property of the Trust held by the Trustees for the benefit of plaintiff and the other Class members, the beneficial owners of such property;

(c)   the duty to manage and invest the property of the Trust held by the Trustees for the benefit of plaintiff and the other class members, the beneficial owners of such property, with the highest integrity and in the best interests of plaintiff and the other Class members;

(d)   the duty to deal fairly, honestly and in good faith with plaintiff and the other Class members, the beneficial owners of the property held in trust;

(e)   the duties of loyalty; and

(f)   the duty to avoid placing themselves in situations involving a conflict of interest with plaintiff and the other Class members.

201.   By engaging in the conduct herein alleged above, beginning on or about August 21, 2007, the Schwab Trustees and Trust breached their fiduciary duties:  they failed to ensure that the property of the Trust held by the Trustees for the benefit of plaintiff and the other Class members, the beneficial owners of such property, was invested in accordance with the Fund's fundamental investment objectives and policies; they made or permitted or authorized investments of trust property that were speculative, irresponsible and risky; they failed to preserve and protect Trust property; and they changed the Fund's fundamental investment objectives and policies without obtaining required shareholder authorization.

202.   The liability of defendants for the fiduciary duty breaches hereinabove alleged is not predicated on misrepresentations or omissions, or purchases or sales of securities by plaintiff and the members of the Class based thereon or in connection therewith, but rather on the acts of defendants in failing to discharge their responsibilities to effectuate the Fund's fundamental investment objectives and purposes, and to preserve and protect Trust property held by the Trustees for the benefit of plaintiff and the other Class members, the beneficial owners of such property.

203.   The conduct of each of the defendants named in this claim was with willful misfeasance, bad faith, gross negligence, or reckless disregard of their duties, entitling plaintiff and the members of the Class to exemplary and punitive damages.

204.   As a direct and proximate result of the foregoing conduct, plaintiff and the members of the Class have sustained damage and pray for the relief hereinafter specified.

### NINTH CLAIM FOR RELIEF

**(ON BEHALF OF THE BREACH CLASS FOR BREACH
OF FIDUCIARY DUTY AGAINST THE SCHWAB ADVISOR)**

205.   Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

206.  Plaintiff asserts this Ninth Claim for Relief against the Schwab Advisor for breach of fiduciary duty.  This Claim for Relief is brought on behalf of investors who acquired Fund shares during the Breach Period and were damaged thereafter.  Plaintiff is predicating this

1   claim based on the law of the Commonwealth of Massachusetts, under which Schwab

2   Investments is organized.

3       207.   At all relevant times, the Schwab Advisor acted as investment advisor and

4   administrator of Schwab Investments, and, in such capacity, oversaw and had control of the

5   property of Schwab Investments, including the Fund's assets.   As set forth in the Investment

6   Advisory and Administration Agreement between Schwab Investments and the Schwab

7   Advisor:

8       Subject to the direction and control of the Board of Trustees of the Trust, the Investment
        Adviser will supervise or perform for the Schwab Funds all aspects of the operations of
9       the Schwab Funds except for those performed by the custodian for the Schwab Funds
        under the Custody Agreement, provide general economic and financial analysis and
10      advice to the Schwab Funds, and provide a continuous investment program for the
        Schwab Funds, including investment research and management as to all securities and
11      investments and cash equivalents in the Schwab Funds.

12      208.   Under the Investment Advisory and Administration Agreement, the Schwab

13  Advisor was given, accepted and had delegated responsibility for the investment and

14  preservation of the property of Schwab Investments, including to invest the Trust's property for

15  the benefit of holders of the Fund's shares, the beneficial owners of such property, prudently

16  and in accordance with the Fund's stated fundamental investment objectives and policies.   Such

17  agreement specifically charged the Schwab Advisor with "determin[ing] from time to time what

18  securities and other investments will be purchased, retained, or sold by the Schwab Funds."

19  Such agreement mandated that the Fund's assets be invested in accordance with the Fund's

20  stated fundamental investment objectives and policies by prohibiting the Schwab Advisor from

21  entering any sub-advisory agreement unless any such sub-advisor agreed to "adhere to such

22  guidelines as may be established by the Investment Adviser from time to time to insure

23  compliance with applicable investment objectives, policies and restrictions of the Trust and the

24  Schwab Funds."

25      209.   In view of its functions and responsibilities outlined above, the Schwab Advisor

26  owed fiduciary duties directly to plaintiff and the other Class members.

27      210.   Plaintiff and the members of the Class placed confidence and repose in the

28  fidelity, integrity, advice and judgment of the Schwab Advisor.   The Schwab Advisor actively

1  sought that such confidence and repose be placed in it, and accepted and assumed such

2  confidence and repose.  The Schwab Advisor undertook to protect the interests and rights of the

3  Fund's shareholders and to safeguard the property of Schwab Investments and the assets of the

4  Fund, over which it had control.  The Schwab Advisor understood that the Fund's shareholders

5  were reliant on it for the operation of the Fund and for the discharge of the Fund's fundamental

6  investment objectives and policies.  The Schwab Advisor had knowledge superior to the Fund's

7  shareholders regarding the composition of the Fund's holdings and the compliance with the

8  Fund's fundamental investment objectives and policies.   By virtue of the foregoing, a

9  confidential fiduciary relationship existed between the Schwab Advisor, on the one hand, and

10  plaintiff and the other members of the Class, on the other.

11       211.    The fiduciary duties imposed on the Schwab Advisor included, *inter alia*:

12       (a)     the duty to ensure that the property of the Trust held by the Trustees for the

13               benefit of plaintiff and the other Class members, the beneficial owners of such

14               property, was invested in accordance with the Fund's fundamental investment

15               objectives and policies;

16       (b)     the duty to use reasonable care to preserve and maintain the property of the Trust

17               held by the Trustees for the benefit of plaintiff and the other Class members, the

18               beneficial owners of such property;

19       (c)     the duty to manage and invest the property of the Trust held by the Trustees for

20               the benefit of plaintiff and the other Class members, the beneficial owners of

21               such property, with the highest integrity and in the best interests of plaintiff and

22               the other Class members;

23       (d)     the duty to deal fairly, honestly and in good faith with plaintiff and the other

24               class members, the beneficial owners of the property held in trust;

25       (e)     the duties of loyalty; and

26       (f)     the duty to avoid placing itself in situations involving a conflict of interest with

27               the plaintiff and the other Class members.

28

212.   By engaging in the conduct herein alleged above, the Schwab Advisor breached its fiduciary duties:  it failed to ensure that the property of the Trust held by the Trustees for the benefit of plaintiff and the other Class members, the beneficial owners of such property, was invested in accordance with the Fund's fundamental investment objectives and policies; it made or permitted or authorized investments of trust property that were speculative, irresponsible and risky; it failed to preserve and protect Trust property; and it changed the Fund's fundamental investment objectives and policies without obtaining required shareholder authorization.

213.   The liability of the Schwab Advisor for the fiduciary duty breaches hereinabove alleged is not predicated on misrepresentations or omissions, or purchases or sales of securities by plaintiff and the members of the Class based thereon or in connection therewith, but rather on the acts of the Schwab Advisor in failing to discharge its responsibilities to effectuate the Fund's fundamental investment objectives and purposes, and to preserve and protect Trust property held by the Trustees for the benefit of plaintiff and the other Class members, the beneficial owners of such property.

214.   The conduct of the defendant named in this claim was with willful misfeasance, bad faith, gross negligence, or reckless disregard of their duties, entitling plaintiff and the members of the Class to exemplary and punitive damages.

215.   As a direct and proximate result of the foregoing conduct, plaintiff and the members of the Class have sustained damage and pray for the relief hereinafter specified.

**TENTH CLAIM FOR RELIEF**

**(ON BEHALF OF THE BREACH CLASS FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST THE SCHWAB TRUSTEES)**

216.   Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

217.   Plaintiff asserts this Tenth Claim for Relief against the Schwab Trustees for aiding and abetting breaches of fiduciary duty. This Claim for Relief is brought on behalf of investors who acquired Fund shares during the Breach Period and were damaged thereafter.

Plaintiff predicates this claim based on the law of the Commonwealth of Massachusetts, under which Schwab Investments is organized.

218.    As hereinabove alleged in the Ninth Claim for Relief, the Schwab Advisor breached its fiduciary duties to plaintiff and the members of the Class.  Defendant Schwab Trustees knew of such breaches and actively participated in, rendered substantial assistance to, or encouraged such breaches of fiduciary duty by the Schwab Advisor, by enabling the Schwab Advisor to invest in assets that did not track the Index, to the degree that the Schwab Trustees could not reasonably be held to have acted in good faith.

219.    The liability of the Schwab Trustees for aiding and abetting the fiduciary duty breaches hereinabove alleged is not predicated on misrepresentations or omissions, or purchases or sales of securities by plaintiff and the members of the Class based thereon or in connection therewith, but rather on the acts of defendants in failing to discharge their responsibilities to effectuate the Fund's fundamental investment objectives and purposes, and to preserve and protect Trust property.

220.    The conduct of each of the defendants named in this claim was with willful misfeasance, bad faith, gross negligence, or reckless disregard of their duties, entitling plaintiff and the members of the Class to exemplary and punitive damages.

221.    As a direct and proximate result of the foregoing conduct, plaintiff and the members of the Class have sustained damage and pray for the relief hereinafter specified.

## ELEVENTH CLAIM FOR RELIEF

### (ON BEHALF OF THE BREACH CLASS FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST THE SCHWAB ADVISOR)

222.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

223.    Plaintiff asserts this Eleventh Claim for Relief against the Schwab Advisor for aiding and abetting breaches of fiduciary duty.  This Claim for Relief is brought on behalf of investors who acquired Fund shares during the Breach Period and were damaged thereafter.

Plaintiff predicates this claim based on the law of the Commonwealth of Massachusetts, under which Schwab Investments is organized.

224.    As hereinabove alleged in the Eighth Claim for Relief, the Schwab Trustees breached their fiduciary duties to plaintiff and the members of the Class.  Defendant Schwab Advisor knew of such breaches and actively participated in, rendered substantial assistance to, or encouraged such breaches of fiduciary duty by the Schwab Trustees, by maintaining investments in securities that did not track the Index, to the degree that the Schwab Advisor could not reasonably be held to have acted in good faith.

225.    The liability of the Schwab Advisor for aiding and abetting the fiduciary duty breaches hereinabove alleged is not predicated on misrepresentations or omissions, or purchases or sales of securities by plaintiff and the members of the Class based thereon or in connection therewith, but rather on the acts of defendants in failing to discharge their responsibilities to effectuate the Fund's fundamental investment objectives and purposes, and to preserve and protect Trust property.

226.    The conduct of the Schwab Advisor in participating in, substantially assisting and encouraging the Schwab Trustee's fiduciary duty breaches was with willful misfeasance, bad faith, gross negligence, or reckless disregard of their duties, entitling plaintiff and the members of the Class to exemplary and punitive damages.

227.    As a direct and proximate result of the foregoing conduct, plaintiff and the members of the Class have sustained damage and pray for the relief hereinafter specified.

## TWELFTH CLAIM FOR RELIEF

### (ON BEHALF OF THE BREACH CLASS AS A THIRD PARTY BENEFICIARY OF THE INVESTMENT ADVISORY AGREEMENT AGAINST THE SCHWAB ADVISOR)

228.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

229.    Plaintiff asserts this Twelfth Claim for Relief as a third party beneficiary of the Investment Advisory Agreement against the Schwab Advisor.  This Claim for Relief is brought

on behalf of investors who acquired Fund shares during the Breach Period and were damaged thereafter.

230.   The Schwab Advisor managed the investments of the Fund pursuant to an Investment Advisory Agreement dated June 15, 1994 between the Investment Advisor and Schwab Investments.   The Investment Advisory Agreement was appended by Schwab Investments as an exhibit to a Registration Statement filed with the SEC on December 29, 1997. The Investment Advisory Agreement is incorporated by reference herein as if appended to this Complaint.

231.   The IAA explicitly provides that it will become effective only after "it has been approved by a vote of a majority of the outstanding voting securities of such Schwab Fund, in accordance with the requirements under the 1940 [Investment Company] Act."  This suffices to establish that the shareholders have more than a "remote" relationship to the contract between the Schwab Trust and the Schwab Advisor.  Rather, it indicates the direct relationship that the shareholders have with the IAA and the fact that they are the actual beneficiaries of the IAA.

232.   The Investment Advisory Agreement required the Schwab Advisor to manage the Fund consistent with the Fund's fundamental investment objectives and policies to "seek to track" the Index "through the use of an indexing strategy" and not  "concentrate" more than 25% of the Fund's total assets in "investments in a particular industry or group."

233.   Pursuant to Section 3 of the Investment Advisory Agreement, the Schwab Advisor was required to:

(a)   "supervise or perform … all aspects of the operations of the Schwab Funds;"

(b)   "provide general economic and financial analysis and advice to the [Fund];"

(c)   provide a "continuous investment program for the Schwab Funds, including investment research and management as to all securities and investments and cash equivalents in the [Fund];"

(d)   "More particularly, … determine from time to time what securities and other investments will be purchased, retained or sold" by the Fund;

(e)   "assist in all aspects of the operations of the [Fund];"

(f)     comply "with all applicable Rules and Regulations of the SEC.;" and

(g)     comply with the provisions of the Investment Company Act of 1940 in buying or selling portfolio securities.

234.    The 1997 Proxy Statement incorporated the Investment Advisory Agreement and the Schwab Advisor's obligations to adhere to the Fund's fundamental investment policies:

(a)     "the Investment Manager would utilize a "passive" or "indexing" investment approach, to attempt to track the investment performance of each Fund's Index through statistical sampling and other procedures."

(b)     "Before purchasing or selling a security, the Investment Manager would analyze each security's characteristics and determine whether purchasing or selling the security would help the Fund's portfolio approximate the characteristics of the Index."

(c)     "Over the long term, the Investment Manager will seek a correlation between the performance of each Fund, as measured by its net asset value, including the value of its dividend and capital gain distributions, and that of its Index of 0.9 or better."

(d)     "The Investment Manager will monitor the performance of each Fund versus that of its Index on a regular basis."

235.    The IAA explicitly provides that it will become effective only after "it has been approved by a vote of a majority of the outstanding voting securities of such Schwab Fund, in accordance with the requirements under the 1940 [Investment Company] Act."  This suffices to establish that the shareholders have more than a "remote" relationship to the contract between the Schwab Trust and the Schwab Advisor.  Rather, it indicates the direct relationship that the shareholders have with the IAA and the fact that they are the actual beneficiaries of the IAA.

236.    According to the 1997 Proxy Statement, the Schwab Advisor purportedly undertook to establish an indexing strategy in the best interest of shareholders, and had the requisite ability to manage the Fund to track the Index.

237.    It would make no sense if the Schwab Advisor were free to deviate from the Fund's fundamental investment objectives during its management of the Fund.

238.    The Investment Advisory Agreement (Section 3) also authorized the Schwab Advisor to select and contract with other investment advisors ("Sub-Advisors") to manage one or more of the Schwab funds.  The Schwab Advisor was required in that regard to obligate the Sub-Advisors to adhere to any "guidelines … to insure compliance with applicable investment objectives, policies and restrictions of the Trust and the Schwab Funds."  Since the Investment Advisory Agreement required Sub-Advisors, who were engaged at the discretion of the Schwab Advisor, to comply with the Fund's investment objectives, it is clear that the Schwab Advisor was under the same obligation.

239.    Inasmuch as Schwab Investments issued and redeemed shares of the Fund on a daily basis at its reported NAV, the Fund's shareholders were subjected to direct financial injury as a result of the Schwab Advisor's management of the Fund in a manner that was inconsistent with the Fund's fundamental investment objective.

240.    The Schwab Advisor breached the terms of the Investment Advisory Agreement (a) by failing to invest the Fund's assets consistent with the Fund's fundamental investment policy to "seek to track" the Index "through the use of an indexing strategy" and (b) by "concentrating" more than 25% of the Fund's total assets in "investments in a particular industry or group."

241.    Investors in the Fund were intended third party beneficiaries of the Investment Advisory Agreement.

242.    Defendant Merk (Schwab Advisor's CEO), and other officers of Schwab Advisor, repeatedly wrote letters to the Fund's shareholders contained in the Fund's annual and semiannual reports and addressed the Fund's shareholders as "Dear Shareholders."  Defendants and their affiliates held themselves out as one Schwab entity with contractual obligations to investors.

243.    For example, in a letter to shareholders in the Schwab Trust's August 31, 2005 Annual Report to Shareholders, defendant Charles Schwab acknowledged the direct obligations and commitment of the Schwab Investor to the shareholders of the Schwab mutual funds:

> Schwab Funds is managed by Charles Schwab Investment Management, Inc., one of the largest mutual fund managers in the U.S.  *Our* portfolio managers share a passion for market analysis and use some of the most sophisticated financial models in the country. I am proud of their depth of experience, which reflects an average tenure of more than 15 years in the investment industry.  *Furthermore, I am impressed with the commitment that our managers bring to the stewardship of the funds, for you, their shareholders*. [Emphasis added.]

244.    Shareholders have an investment relationship with the Schwab Advisor, which had the actual responsibility for managing the Fund's assets, trust property held by the Trustees for the benefit of shareholders, the beneficial owners of such property.

245.    Class members suffered actual and direct financial damages and injury to their voting rights, as a result of the Investment Advisor's breach of Section 3 of the Investment Advisory Agreement by failing to manage the Fund's assets in a manner consistent with the Fund's fundamental investment objectives and policies.

246.    The liability of the Investment Advisor for its breach of the Investment Advisory Agreement hereinabove alleged is not predicated on misrepresentations or omissions, or purchases or sales of securities by plaintiff and the members of the Class based thereon or in connection therewith, but rather on the acts of the Schwab Advisor in failing to discharge its contractual obligations to manage the Fund in a manner that would effectuate the Fund's fundamental investment objectives and purposes, and to preserve and protect Trust property.

## THIRTEENTH CLAIM FOR RELIEF

### (ON BEHALF OF THE PRE-BREACH CLASS
### AGAINST THE TRUST FOR BREACH OF CONTRACT)

247.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.  This Court is asserted on behalf of members of the Pre-Breach Class for breach of contract.

248.    The 1997 Proxy Statement created voting rights for the Fund's investors.

249.    Proposal Number 2 of the 1997 Proxy Statement formed the terms of a contract between the Schwab Trust and investors in the Fund that if investors voted in favor of changing the Fund's fundamental investment objective to seek "to track the investment results of the [Index] through use of an indexing strategy", then Schwab Investments would cause the Fund to conform to that objective.

250.    Investors in the Fund accepted that offer by voting in favor of the change in investment objective.  See Proxy Statement at 3 ("[T]he Total Bond Market Index Fund … would seek to track the Lehman Brothers Aggregate Bond Index.").

251.    In its 1997 Proxy Statement, Schwab Investments set forth in detail the meaning of the term "indexing strategy" that could only be changed by shareholder vote.  Thus, for example, on page 22 of the Proxy Statement, Schwab Investments stated that "[b]efore purchasing or selling a security, the Investment Manager would analyze each security's characteristics and determine whether purchasing or selling the security would help the Fund's portfolio approximate the characteristics of the Index."

252.    Proposal Number 3 of the 1997 Proxy Statement also formed the terms of a contract whereby Schwab Investments covenanted that, subject to shareholder vote, the Fund "may not" "[p]urchase securities (other than securities issued or guaranteed by the U.S. Government, its agencies or instrumentalities) if, as a result of such purchase, 25% or more of the value of its assets would be invested in any industry."

253.    The Fund's shareholders accepted the terms of that contract by voting in favor of those fundamental investment policies.

254.    Subsequent to the 1997 proxy vote, Schwab Investments continued to offer shares in the Fund pursuant to the terms of a contract that Schwab Investments would preserve shareholders' voting rights and cause the Fund to continue to adhere to its fundamental investment objectives and policies contained in the 1997 Proxy Statement; these same terms were also included in Prospectuses and in Statements of Additional Information (as quoted above).  Investors accepted the terms of that contract by purchasing shares in the Fund.

255.   The terms of that contract are contained in the 1997 Proxy Statement, which established the contractual relationship between Schwab Investments and Class members, and were reiterated in Schwab Investments' subsequent SEC filings, including the January 15, 1998 Prospectus, and in each subsequent Prospectus and Statement of Additional Information incorporated by reference into and made a part of the Prospectus.

256.   The aforesaid provisions of the 1997 Proxy Statement constituted contractual terms, where existing investors retained shares and new investors purchased shares in consideration of the contractual obligations not to change fundamental investment objectives without a shareholder vote.

257.   Federal law also provides support for the terms of that contract.  Section 8 of the Investment Company Act directs an investment company to recite in its Registration Statement "all investment policies of the registrant…, which are changeable only if authorized by shareholder vote," as well as all policies that "the registrant deems matters of fundamental policy."  15 U.S.C. § 80a-8(b) (2) & (3).  Section 13 prohibits a registered investment company from deviating from any such policies "unless authorized by the vote of a majority of its outstanding voting securities."  15 U.S.C. §80a 13.

258.   Beginning on or about August 31, 2007, Schwab Investments violated the terms of the contract with the Fund's shareholders as set forth in the 1997 Proxy Statement and subsequent prospectuses and SAIs, as more fully described above, by directing the purchases or allowing the Schwab Advisor to direct the purchases of securities that deviated from the composition of the Lehman Brothers U.S. Aggregate Bond Index and caused the Fund to concentrate more than 25% of its net assets in mortgage backed securities, including CMOs, without a shareholder vote.

259.   By virtue of the wrongful conduct of defendants, plaintiff and the members of the Class sustained injury to their voting rights and money damages in connection with their ownership of shares in the Fund.

**FOUTEENTH CLAIM FOR RELIEF**

**(ON BEHALF OF THE BREACH CLASS AGAINST THE TRUST
AND THE INVESTMENT ADVISOR DEFENDANTS FOR BREACH OF
THE COVENANT OF GOOD FAITH AND FAIR DEALING)**

260.   Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.  This Count is asserted on behalf of members of the Breach Class for breach of the covenant of good faith and fair dealing.

261.   Each of the Trust and the Investment Advisor have contractual obligations to members of the Breach Class as alleged in the Twelfth and Thirteenth Claims for Relief.  The covenant of good faith and fair dealing is an implied term in those contracts.

262.   Defendants, in violation of the covenant of good faith and fair dealing, engaged in speculation with the Fund's assets by investing more than 25% of the Fund's total assets in CMO securities that were not contained in the Lehman Index, and engaged in such speculation without a shareholder vote.

263.   By virtue of the wrongful conduct of defendants, plaintiff and the members of the Class sustained money damages in connection with their ownership of shares in the Fund.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.   Determining that this action is a proper class action and certifying plaintiff Northstar as a representative of the Class under Rule 23 of the Federal Rules of Civil Procedure;

B.   Appointing Wolf Popper LLP and Greenbaum Rowe Smith & Davis LLP as Class Counsel, and Berman DeValerio as Local Counsel;

C.   Awarding compensatory damages in favor of plaintiff and the members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.   Disgorging from Defendants for the benefit of the Class any management or other fees forfeited by Defendants' deviation from the Fund's fundamental investment objectives;

E.   Directing the Defendants to preserve shareholders' voting rights and comply with the Fund's fundamental investment objectives;

F       Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

G.      Awarding recessionary, exemplary and punitive damages; and

H.      Such equitable, injunctive or other relief as deemed appropriate by the Court.

### JURY DEMAND

Plaintiff hereby demands a trial by Jury.

Dated: June 25, 2015 _____

**BERMAN DEVALERIO**

By: /s/ Christopher T. Heffelfinger _____
Christopher T. Heffelfinger (118058)

Joseph J. Tabacco, Jr. (75484)
One California Street, Suite 900
San Francisco, CA  94111
Telephone: 415.433.3200
Facsimile:  415.433.6382

*Local Counsel*

Robert C. Finkel (admitted *pro hac vice*)
**WOLF POPPER LLP**
845 Third Avenue
New York, NY  10022
Telephone:  212.759.4600
Facsimile:  212.486.2093

Marc J. Gross (admitted *pro hac vice*)
**GREENBAUM ROWE SMITH
  & DAVIS LLP**
75 Livingston Street, Suite 301
Roseland, NJ  07068
Telephone:  973.535.1600
Facsimile:  973.535.1698

*Attorneys for Plaintiff Northstar Financial
Advisors, Inc.*